597

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2      - - - - - - - - - - - - - - - X

3      UNITED STATES OF AMERICA,          05cr060

4                  v.                     U.S. Courthouse
                                          Brooklyn, New York
5      VINCENT BASCIANO,
                                          March 8, 2011
6
                        Defendant.    9:30 a.m.
7
       - - - - - - - - - - - - - - - X
8

9                    TRANSCRIPT OF VOIR DIRE
                     BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10                   UNITED STATES DISTRICT JUDGE

11
       APPEARANCES:
12
       For the Government:       LORETTA E. LYNCH, ESQ.
13                               United States Attorney
                                 By:  TARYN MERKL
14                                    NICOLE ARGENTIERI
                                      STEPHEN FRANK
15                                    JACK DENNEHY
                                 Assistant U.S. Attorneys
16                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
17
       For the Defendant:       GEORGE GOLTZER, ESQ.
18                              RICHARD JASPER, ESQ.
                                YING STAFFORD, ESQ.
19

20
       Court Reporter:          Burton H. Sulzer
21                              225 Cadman Plaza East
                                Brooklyn, New York 11201
22                              (718) 613-2481
                                Fax # (718) 613-2505
23

24

25     Proceedings recorded by mechanical stenography, transcript
       produced by CAT.

598

1          (Open court.)

2          THE COURT:  Good morning.

3          (The defendant is present.)

4          (Case called.)

5          MS. MERKL:  Taryn Merkl and Jack Dennehey for the

6     United States.

7          MR. JASPER:  Richard Jasper, George Goltzer, and

8     Beth Bochnak for the defendant.

9          THE COURT:  The defendant is present.

10          I have a few housekeeping matters.  I think my clerk

11     has distributed a decision as to the three jurors whose status

12     was reserved earlier.

13          You all got it?

14          MS. MERKL:  Yes, your Honor.

15          MR. JASPER:  Yes.

16          THE COURT:  It's posted on ECF.

17          With regard to Juror No. 50, you will recall that is

18     the person who is the paralegal or administrative assistant

19     for the Bankruptcy Trustee in Central Islip.  I have some

20     further information from one of the bankruptcy judges out

21     there.

22          He indicated that he believes there are about 10 to

23     12 Chapter 7 bankruptcy trustees and that each one of them has

24     an assistant who helps with preparing the matters.  Some of

25     the assistants go with the trustee to the actual hearings and

599

1   prep the hearings and so Juror No. 50 is one of about a dozen

2   people who do this work in Central Islip.

3           So it would appear to the court that the juror's

4   anonymity would be comprised by virtue of the narrow, the

5   small number of individuals doing the work that she does at

6   that location.  But I'd like to hear from the attorneys.

7           MS. MERKL:  Your Honor, as the government -- I

8   believe it was the government's motion, and we would maintain

9   that it's not appropriate to seat a juror who is that narrowly

10  identifiable.

11          THE COURT:  Does the defense have a position on

12  this?

13          MR. JASPER:  Reluctantly we agree, your Honor.

14          THE COURT:  Thank you very much.

15          Juror No. 50 is struck for cause for potential

16  breach of anonymity.  Thank you.

17          68 is here.

18          Let me just mention one other thing.  I'm going to

19  have to finish by 5:30 tonight and we'll get as much done as

20  we can by 5:30 and if anyone is left over they will simply

21  have to come back.  I want to let you know about that.

22          MS. MERKL:  Just for recordkeeping.  The government

23  is also under the impression that there is still one more

24  juror outstanding, 64, but she was from yesterday.  So she's

25  going to be in a future position?

Pospective Juror 68                                    600

1          THE COURT:  Sure.

2          MS. MERKL:  I want to make sure my recordkeeping is

3     accurate.

4          THE COURT:  We will double check.  Thank you.

5          68.

6          (Prospective juror present.)

7          THE COURT:  Please be seated.  Good morning.

8          You are Juror No. 68?

9          THE PROSPECTIVE JUROR: Yes.

10         THE COURT:  I remind you that you are still under

11    oath.  Let me ask you this question.  Since you filled out the

12    questionnaire, have you read, listened to, watched, observed

13    or learned anything about this case?

14         THE PROSPECTIVE JUROR: No.

15         THE COURT:  You indicated that you have been doing

16    your current job for five years; is that right?

17         THE PROSPECTIVE JUROR: Yes.

18         THE COURT:  And you are a real estate agent?

19         THE PROSPECTIVE JUROR: Yes.

20         THE COURT:  Without telling me who you work for, do

21    you work for a large company or do you work for yourself or a

22    small company?

23         THE PROSPECTIVE JUROR: I work for a small company.

24         THE COURT:  Are you also trained as an accountant?

25         THE PROSPECTIVE JUROR: I got my bachelor's a year

Pospective Juror 68                                    601

1  and a half.

2         THE COURT:  I see.  And so have you ever worked as

3  an accountant?

4         THE PROSPECTIVE JUROR: No.  I only did taxes for

5  like four years, for a small firm, too.

6         THE COURT:  You're not doing that anymore?

7         THE PROSPECTIVE JUROR: No.

8         THE COURT:  You mentioned in answer to this

9  question:  Are you familiar with the religion or practice

10  known as Santaria?  You answered yes, and you said -- then you

11  were asked:  If yes, what is your understanding of it?  You

12  said, People talk a lot about it.

13         THE PROSPECTIVE JUROR: Yes.  I mean where I come

14  from, I heard so much about it, but that's all.

15         THE COURT:  Have you ever gone to an event, a

16  Santaria event?

17         THE PROSPECTIVE JUROR: No.  I just heard about it.

18  People say you have to be careful.  That's all.

19         THE COURT:  I see.  Now, let me go over some of your

20  answers about the death penalty with you, please.

21         You sort of grimaced.  Is there a reason for that?

22         THE PROSPECTIVE JUROR: No.  I just -- no.  There is

23  no reason.  I should have said my point of view, that's all.

24         THE COURT:  You were asked to describe your views on

25  the death penalty.  You say, I believe that if the law of New

1   York is in favor of it must be for a reason.  Life

2   imprisonment allows a person to continue living and I believe

3   humans fear the most death.  If you killed without a reason, I

4   believe two and murder, murder no discrimination, you should

5   also be punished with death.  I believe the topic is very

6   complex and I just accept it as what it is a punishment.

7            Is that basically your perspective on it.

8            THE PROSPECTIVE JUROR: Yeah.

9            THE COURT:  Now, let me just go over with you how

10  the process works in this kind of a case because it's

11  different from other types of cases because in this case the

12  death penalty is one of two potential penalties for the crime

13  of intentional and deliberate murder.

14           In this case, the government has charged the

15  defendant with having committed an intentional and deliberate

16  murder and also conspiracy to murder and also a weapons charge

17  in connection with the other two charges.

18           The first step, the first part of the case after we

19  select a jury, is that the government is going to put on its

20  case in the guilt portion of the case.  In other words, we're

21  going to have a trial on whether or not the government can

22  prove beyond a reasonable doubt to the jury unanimously that

23  the defendant committed the crimes it charges.

24           The defendant is presumed innocent until proven

25  guilty.  The defendant has no obligation to put on a case, has

Pospective Juror 68                              603

1  no obligation to testify.  The burden is always on the

2  government to prove that the defendant committed those crimes

3  beyond a reasonable doubt.

4          Do you understand that?

5          THE PROSPECTIVE JUROR: Yes, I understand that

6  completely.

7          THE COURT:  Okay.  Now, if, and only if, the jury,

8  after hearing all the evidence and hearing the law as I give

9  it to the jury, and deliberating on guilt or nonguilt, if the

10  jury returns a verdict of guilty for the intentional and

11  deliberate murder of an individual, then, and only then, will

12  the jury be asked to conduct, to participate in a second

13  trial.

14          The second trial is what is called the penalty phase

15  of a death penalty litigation.  In the penalty phase, the

16  government has the obligation of putting before the jury

17  whatever aggravating factors it believes would demonstrate to

18  the jury beyond a reasonable doubt that the defendant should

19  not receive the lesser penalty of life in prison without the

20  possibility of release but the greater more severe penalty of

21  the death penalty.

22          They will present information possibly about the

23  defendant's background, other activities of the defendant,

24  possible other criminal acts the defendant is accused of or

25  has been convicted of, his behavior and other information that

1   they believe would be helpful to the jury in reaching the

2   conclusion to impose the death penalty.

3           The defense has the right to present to the jury

4   what we call mitigating factors, factors about the defendant's

5   background and circumstances and his record that would

6   counterbalance anything the government is submitting to you

7   and would justify the continuation of or the imposition of the

8   lesser penalty, which is the life in prison without the

9   possibility of release penalty.  So that will be the second

10  trial.

11          THE PROSPECTIVE JUROR: Yes.

12          THE COURT:  And so you would at that point --

13  remember, the defendant's already been found guilty.  Now the

14  question is what should the penalty be?  So if the jury

15  returns a verdict of guilty of intentional and deliberate

16  murder in the first phase, and after the jury hears the

17  aggravating factors and the mitigating factors in the penalty

18  phase, could you impose a penalty of death on a defendant if

19  circumstances were appropriate?

20          THE PROSPECTIVE JUROR:  Yes.  If appropriate, yes.

21          THE COURT:  And, also, could you impose a penalty of

22  life in prison without the possibility of release against the

23  defendant who had been found guilty of intentional and

24  deliberate murder?

25          THE PROSPECTIVE JUROR:  Yes.

Pospective Juror 68                                605

1      THE COURT:  Now, this is a general question and let

2  me just -- I'll give you a moment to think about it -- sitting

3  in the penalty phase of the trial, is there other

4  circumstances of the background of a defendant which you think

5  would be important to know about in terms of mitigating

6  factors?

7      THE PROSPECTIVE JUROR: You're asking me if it is

8  important to know the background?

9      THE COURT:  Well, yes.  I am.  I'm asking you what

10  kind of information might be important to you to consider

11  about a defendant's background.

12      THE PROSPECTIVE JUROR: Can you repeat the last part

13  again.

14      THE COURT:  What kind of information -- if you're

15  considering the background of the defendant in the penalty

16  phase, what would you like to know about the defendant's

17  personal background or activities that would help you in

18  reaching a decision on the penalty?

19      THE PROSPECTIVE JUROR: That's a hard question.

20      THE COURT:  Of course that's a hard question.

21      THE PROSPECTIVE JUROR: Yes, it is.

22      Well, I would want to know what people they having

23  around before.  What was their routine, like their job.  I

24  don't know, what are their values, what are their family

25  things.  Stuff like that.

1          THE COURT:  If I told you that the defendant was

2    already serving a life sentence for having committed an

3    intentional murder, would you still be able to consider life

4    in prison without the possibility of release?

5          THE PROSPECTIVE JUROR: If he already did it?

6          THE COURT:  No, no.  If -- this is hypothetical --

7          THE PROSPECTIVE JUROR:  Yes, I understand.

8          THE COURT:  -- if there was evidence at the penalty

9    phase that the defendant was already serving a life sentence

10   without the possibility of release for another murder --

11         THE PROSPECTIVE JUROR:  Okay, yes.

12         THE COURT:  -- would you still be able to consider

13   the possibility of imposing a life sentence?

14         THE PROSPECTIVE JUROR: No.

15         THE COURT:  Why not?

16         THE PROSPECTIVE JUROR: Cause he already did one.

17   Right?  Is that what you're telling me?  He already was paying

18   life sentences and he already did it again, is that what

19   you're saying?

20         THE COURT:  Well, he's serving a life sentence for

21   another murder.

22         THE PROSPECTIVE JUROR: And now he is being charged

23   again for another murder, a second murder?

24         THE COURT:  This is a second murder.

25         THE PROSPECTIVE JUROR: Yes.

1          THE COURT:  And the jury has found him guilty of the

2    second murder, and the question is, would you consider, in

3    that situation, a life sentence as opposed to the death

4    penalty?

5          THE PROSPECTIVE JUROR: No.

6          THE COURT:  Why not?

7          THE PROSPECTIVE JUROR: Because if he's guilty

8    because he did it again, it's going to be a second time that

9    he's guilty, right?

10         THE COURT:  He did it twice.

11         THE PROSPECTIVE JUROR: Yes.

12         THE COURT:  Which one happened first is not the

13   issue.

14         THE PROSPECTIVE JUROR: It doesn't matter.  It's that

15   he keeps on doing it.

16         THE COURT:  What would that mean to you?

17         THE PROSPECTIVE JUROR: That he's not going to stop.

18         THE COURT:  Well, is there anything that would cause

19   you to think differently, assuming that were the case, is

20   there anything about a defendant that you might take into

21   account on the other side of the scale, in other words, in

22   favor of a life sentence in that situation?

23         THE PROSPECTIVE JUROR: It could be the

24   circumstances.  Maybe the second time was something that, I

25   don't know --

1          THE COURT:  They are both intentional for our

2    discussion, for this hypothetical.

3          THE PROSPECTIVE JUROR: I have to hear like the whole

4    set of things to make me change my mind.  I have to hear what

5    was the reason or, you know, what evidence were found.  I

6    mean, I have to hear more in order to change my head.  I mean,

7    if you say like with nothing else around, I would say, no.  He

8    did it twice, I mean, that's a bad thing.

9          THE COURT:  It's very difficult --

10          THE PROSPECTIVE JUROR:  It is difficult, yeah.

11          THE COURT:  -- to discuss this in a relative vacuum,

12    so we appreciate, you know, the problem that you have when

13    asked a question like this.  But we still need to ask to get a

14    sense of your views --

15          THE PROSPECTIVE JUROR: Okay.

16          THE COURT:  -- obviously.  Okay?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  In your questionnaire you gave this

19    answer to this question.  The question is:  In your opinion,

20    is the death penalty the only appropriate sentence for a

21    defendant who has been proven guilty beyond a reasonable doubt

22    of deliberately and intentionally killing another person if,

23    as here, the alternative sentence is life imprisonment without

24    the possibility of release?  You checked off yes.  And you

25    answered as follows.  Death what is we fear the most and life

1    in prison will allow that person to continue behaving as they

2    did.

3           Is that always your view with regard to someone who

4    has committed an intentional and deliberate murder?

5           THE PROSPECTIVE JUROR: Yeah.  I mean, I don't know,

6    I should believe that it's hard to change certain -- how you

7    say -- I don't know how to say it.

8           THE COURT:  Are you talking about you or are you

9    talking about the person who committed the crime at this

10   point?

11          THE PROSPECTIVE JUROR:  No, who committed the crime.

12   I believe that there are certain things that you come with

13   inside of you.  I don't know, there are certain things that

14   are -- like you were born with them and, I don't know, or the

15   environment makes you like this, whatever, you know.  So I

16   think there are certain things that won't change.

17          THE COURT:  Let's talk about environment.  That is

18   an excellent term to pursue.

19          If you learned in the penalty phase that the

20   defendant had had a very violent upbringing and had been

21   battered and beaten -- I'm not saying that's the case here or

22   it's not the case --

23          THE PROSPECTIVE JUROR:  Yeah, I understand.

24          THE COURT:  If that were presented to you as a

25   mitigating circumstance, is that something that you would take

Pospective Juror 68                          610

1   into account when deciding what the penalty should be for an

2   intentional murder?

3            THE PROSPECTIVE JUROR: Yes, I would take it into

4   account in the way that sometimes psychologically you are hurt

5   in a way that -- I mean it's very hard to fix it later on in

6   that way.  I would feel like that.

7            THE COURT:  Would that weigh in favor -- what

8   would -- which penalty would that weigh in favor of if you

9   concluded that?

10            THE PROSPECTIVE JUROR:  I just don't know off the

11   top of my head if you're saying the circumstances were those

12   what would I favor?

13            THE COURT:  Well, no.  Which side of the scale would

14   it be on, would it be on the aggravating side of the scale or

15   the mitigating side of the scale?  In terms of deciding the

16   penalty, mitigating is life, aggravating is inclined to death.

17            THE PROSPECTIVE JUROR: I think I would go with

18   death.

19            THE COURT:  You're saying if someone was found to

20   have a terrible childhood and was beaten that would be an

21   aggravating factor in favor of imposing death?

22            THE PROSPECTIVE JUROR:  I think it is because the

23   person is not -- how do you say, his raising, his upbringing

24   made him like it is and you cannot change that.  How would you

25   change the psychological hurt that this person had all -- I'm

Pospective Juror 68                                    611

1  saying, if there was something that the person did

2  intentionally and if they did it over and over, or twice, like

3  you have say previously, I mean the person I don't think had

4  measure, or could measure what he has done.  I think those

5  thing affect how you're going to behave in the future, what

6  you do, what you don't do.

7              THE COURT:  Thank you.

8              MR. JASPER:  Your Honor, could you have us at

9  sidebar?

10             THE COURT:  Yes.

11             (Sidebar.)

12             THE COURT:  Mr. Jasper.

13             MR. JASPER:  Judge, on the basis of what I've heard,

14 this young lady can't sit on this case.  She has already

15 stated very firmly, and her demeanor backed that up, that if

16 he's already serving a sentence of life for another murder,

17 and the issue of whether or not that was previously or not

18 really doesn't make a difference because, as she said in her

19 own words, it doesn't make a difference to her, this would be

20 the second one.

21             Naturally, where we're going with this, and she even

22 believes that -- it's her view that a damaged childhood is

23 actually an aggravator, that a person could never change and

24 the government has noticed as one of the aggravating factors

25 the inability to be rehabilitated.

Burton H. Sulzer - OCR, CM, CRR

Pospective Juror 68                          612

1        This is not a legal term, but she's a very dangerous

2   juror.  She's not qualified under Morgan and I just think

3   there's enough right now --

4        THE COURT:  I hear you.

5        Yes.

6        MS. MERKL:  We think that there are some questions

7   that she indicated could indicate problems, but she seems

8   fixated on whether he was convicted and did it again.

9        That's been the government's concern about, that

10  flagging that as a potential aggravator at this stage would

11  seem to be concerned about future dangerousness and if we're

12  inquiring as to specific aggravators we should inquire as to

13  mitigators, as to whether or not this juror would consider

14  life imprisonment if she learned about the Bureau of Prisons

15  fashioning remedies to prevent the defendant from being a

16  future danger.  Her problem is dangerousness.

17       MR. GOLTZER:  For this particular juror it doesn't

18  seem to make a difference because she is so adamant about what

19  the penalty should be for an intentional murder, both in the

20  questionnaire and in her responses now.

21       THE COURT:  I'll ask her one more question.  The

22  problem with asking about specific aggravators and mitigators

23  is it's a slippery slope.

24       We have asked them in the questionnaire about

25  certain aggravators and we added that, and to focus on a

1  particular one or two creates, I think, a circumstance where

2  you certainly don't get a balanced, thoughtful response

3  because we are fixated on one particular one way or the way.

4         And it could be an all day affair going through

5  aggravators and mitigators.  That may not be the issue here

6  with this juror.  The reason I asked her was because of her

7  other answers.

8         MR. GOLTZER:  Of course.

9         THE COURT:  But it is a problem that we need to

10  grapple with and I'll do my best.

11        MR. GOLTZER:  The stridency of her responses on the

12  questionnaire cause that.

13        MS. MERKL:  In general terms, the government

14  completely agrees with you.  It's a slippery slope, as we have

15  seen over the past couple of days, that's been caused by the

16  repeated re-questioning of these jurors into the same

17  aggravators that they were asked about in the questionnaires.

18  It's trending closer and closer to stakeout questions, and

19  it's not effectively revealing actually bias.

20        MR. JASPER:  I don't know if you want to address it

21  here at the sidebar --

22        THE COURT:  Not really.

23        MR. JASPER:  We can talk about it.  That is just

24  the way these things go.  When they notice all of these

25  aggravators that all focus on his danger, continuing violence,

Pospective Juror 68                                614

1    it has to be brought up and the whole thing about whether it's

2    a stakeout or case specific, as you pointed out in your

3    opinion, is not easy in any of these cases.  All of the courts

4    struggle with this issue.

5         THE COURT:  Right.

6         MR. JASPER:  It's a tough issue.

7         MS. MERKL:  It has been brought up in an appropriate

8    way in the questionnaire.

9         THE COURT:  It has.  And the only question is, how

10   much more does the court need to do to flesh out the views of

11   the juror within reason.

12        MR. JASPER:  Exactly.  In Rimer v. Brown, the

13   Supreme Court and the Second Circuit have said that's what the

14   point of this is all about.  Yes, we have the questionnaires,

15   but it begins the discussion.

16        As you said, the bottom line is we have to figure

17   out with your Honor determining how much more and where we

18   need to tweak and get into it orally when we see the person

19   sitting in front of us.  There is no other way to do it.

20        THE COURT:  That's what we're doing.  We are doing

21   it the best we can.  Thank you.

22        (Open court.)

23        THE COURT:  Let me just ask you one or two more

24   questions.

25        In the penalty phase of the case, you might receive

Pospective Juror 68                                           615

1   evidence that -- the government may say the defendant has a

2   proclivity to be dangerous in the future, but the defense may

3   provide evidence that the prison system can deal with a

4   prisoner who has future dangerousness by limiting that

5   person's access to other human beings, being placed in a

6   secure facility and so that that would severely limit or

7   eliminate, possibly, the future dangerousness of the prisoner.

8            Do you think if it can be shown that the prison

9   system can adequately deal with future dangerousness that that

10  would enter into your consideration as to what the penalty

11  should be?

12           THE PROSPECTIVE JUROR:  Yes.  They have it for a

13  reason.  They have that -- if they could accommodate the

14  person and they have other people there that were like that,

15  yeah.  I could.

16           THE COURT:  In that situation, do you believe you

17  could consider and vote for a life sentence?

18           THE PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Now, the jury will be required in the

20  penalty phase to be unanimous in order or death to be imposed,

21  so everyone would have to vote for it.  Do you understand

22  that?

23           THE PROSPECTIVE JUROR: Yes.

24           THE COURT:  If even one juror decides for a life

25  sentence it's a life sentence.  Do you understand that?

1    THE PROSPECTIVE JUROR:  I read that on there, yes.

2    THE COURT:  Yes.  If you felt strongly that the

3  defendant should receive a life sentence and everybody else

4  was arguing for a death sentence, and after hearing all the

5  arguments you still believed that the defendant should have a

6  life sentence, what would you do in that situation, how would

7  you vote?

8    THE PROSPECTIVE JUROR: If I strongly agree that the

9  person should not have the death penalty then I will keep it.

10  There's a reason why I decided not to vote the death penalty.

11    THE COURT:  Do you understand that the sentence of

12  life is the sentence that we presume is going to be imposed

13  unless it can be proven by the government beyond a reasonable

14  doubt that the aggravators justify a sentence of death.  Do

15  you understand that.

16    THE PROSPECTIVE JUROR: Yes, I understand that.

17    THE COURT:  So the baseline here is life.

18    THE PROSPECTIVE JUROR: Yes.

19    THE COURT:  Can you accept that?

20    THE PROSPECTIVE JUROR: Yes, I can accept that.

21    THE COURT:  Any other questions?

22    MR. JASPER:  Yes, your Honor.

23    (Sidebar.)

24    MR. JASPER:  Judge, I know you covered the burden

25  shifting.  I'm still troubled by the fact that she seems to be

Pospective Juror 68                                    617

1   a burden shifter based upon her previously answered question.

2   She believed that he should die because of the second murder

3   unless something changes her mind.

4         I wonder if we might use some of the phraseology

5   that the law says, that the defendant starts with the

6   principle that he's entitled to live and the government has to

7   prove that he deserves to die -- although you did basically

8   cover the burden shifting problem in your last round of

9   questions, your Honor.

10        THE COURT:  I think if I asked her that question she

11  will say she agrees with it, but I'll ask her.

12        MR. JASPER:  I think you're probably right.  I

13  withdraw that.  I'm ready.

14        THE COURT:  To make your motion?

15        MR. JASPER:  Yes.

16        THE COURT:  All right.  I think I tried to close the

17  loop on that.

18        MR. JASPER:  I think you're right.

19        THE COURT:  In a different way.  Thank you.

20        (Open court.)

21        THE COURT:  Just one more question.

22        I'm going to return to an issue where there may be a

23  possible aggravator and ask you this.  If at the time of the

24  sentencing of the defendant you hear evidence that the

25  defendant has already been convicted of a separate intentional

Pospective Juror 68                          618

1   murder, would you be able to consider mitigating evidence and

2   arguments by defense counsel that a sentence of death is not

3   appropriate in this case and therefore could you consider a

4   life sentence in that circumstance?

5         THE PROSPECTIVE JUROR: Yes, I could consider.  I

6   could consider.

7         THE COURT:  All right.  Thank you for coming in.

8         You could consider what?  You can consider --

9         THE PROSPECTIVE JUROR:  The mitigation -- you say

10  that the defense will provide information for me to reconsider

11  and they saying the death penalty is not what they believe is

12  correct, so I would reconsider.

13        THE COURT:  Is it possible in that situation if you

14  received that mitigating evidence that you could vote in that

15  circumstance for a life sentence?

16        THE PROSPECTIVE JUROR:  Yes.  I believe that

17  everything is possible.  You should have to hear everything

18  around it.

19        THE COURT:  Thank you.

20        (Prospective juror leaves.)

21        THE COURT:  Motions.

22        MR. JASPER:  Move to strike this juror 68 for cause.

23  She has indicated in the earlier part of the court's

24  examination that she is a person who is not qualified to sit

25  under Morgan versus Illinois.

Pospective Juror 68                              619

1        I point again, your Honor, to the firmness and the

2   demeanor that she exhibited when she talked about a defendant

3   who was already serving a separate murder, whether it was

4   previously convicted or not, a separate murder for deliberate

5   intentional murder and her voice elevated.  She leaned

6   forward, she was obviously agitated in my view by that and

7   said, You mean a second one?

8        Her consistent answer on the questionnaire was that

9   this is a person who deserves to die.  She said that in 118.

10  If they have already committed -- quote, if they have already

11  committed murder, death is what they should receive as

12  punishment.

13       That means that she starts off not only believing

14  that death is what they should start off with, but she also

15  shifts the burden, notwithstanding her answers at the end that

16  the defendant clearly has to show some reason to live.

17       This is a person, your Honor, who firmly and clearly

18  indicated -- her answers changed somewhat, but I think that we

19  have to go with what she said initially and, really, Judge,

20  the way she said it.

21       I mean, she said it in such a way that there was

22  just no misunderstanding, no loophole, no way out.  The

23  defendant deserves to die because he did it twice and he's

24  going to do it again.

25       She's also somebody who, when you talked about

Pospective Juror 68                              620

1   childhood background as a mitigator, said that's a reason for

2   a person to be put to death.  I was a bit stunned by that

3   because when you asked her why, which is the next follow-up

4   question, she said well, basically because that's it, that's

5   what they're going to do, that's part of their background,

6   almost as if it was saying that the person is hard wired for

7   violence.

8           What they are going to be saying, the government is

9   going to be saying is that Mr. Basciano is essentially hard

10  wired for violence.  That's going to be their argument.  It's

11  clear throughout the notice of intent.  From the continued

12  pattern and the hammering away as to violence and what they

13  set out in their prior trials, it couldn't be clearer.

14          THE COURT:  Thank you.

15          MS. MERKL:  Your Honor, with respect to the

16  defendant's latter point.  The government is not going to be

17  arguing that the defendant is, quote, hard wired for violence.

18          The government is going to be arguing that the

19  defendant as an adult made a conscious and deliberate choice

20  to join a criminal society and took the oath where you have to

21  commit violence in order to do so on behalf of your superiors,

22  which is an integral part of this.

23          This is a conscious and deliberate choice made by

24  this defendant.  So the question as to whether or not this

25  juror could consider those specific mitigators is really not

Pospective Juror 68                                      621

1   relevant in the context of the court's determination as to

2   this juror's qualifications.

3        Although the juror's questionnaire did indicate at

4   points that she seems to lean towards the death penalty, she

5   also indicated an ability to consider aggravating and

6   mitigating circumstances in her questionnaire.

7        She also indicated in response to question 102 that

8   she would not always vote for the death penalty in a case of

9   intentional and deliberate murder.  She also indicated that

10  she would not always vote for life in prison.

11       The juror's answers on further inquiry from the

12  court suggested that she did not have an obstacle to

13  considering life imprisonment.  She's not substantially

14  impaired.  She will consider the aggravators and mitigators

15  and weigh both and make a determination in accordance with the

16  law.

17       The fact that she finds one particular aggravator

18  problematic does not make her not qualified to serve.

19  Aggravators are specifically for that purpose.  The question

20  is whether she could consider mitigating evidence and

21  arguments against the death penalty in the face of aggravating

22  factors and to that she was unequivocal that she could and the

23  government respectfully submits that she is qualified to

24  serve.  She is both life qualified and death qualified.

25            THE COURT:  What about her statement in response to

Pospective Juror 68                                    622

1   my question about childhood mistreatment, that she view that

2   as an aggravator and not a mitigator?

3        MS. MERKL:  This juror indicated a clear willingness

4   to follow the court's instructions and the government

5   respectfully submits that she would follow the court's

6   instructions if she were to decide that was a mitigating

7   circumstance.

8        MR. GOLTZER:  Your Honor, your very thoughtful

9   decision on the three various motions for cause that you

10   issued today refers to the statute, which states that the

11   juror shall consider character and background as mitigation.

12        This juror can't do that.  This juror has a fixed

13   attitude that it's not mitigation, which renders her

14   substantially impaired in her ability to follow that

15   particular statutory injunction.

16        MS. MERKL:  Before we make that conclusion, your

17   Honor, it would be appropriate to ask her whether or not she

18   could follow the court's instruction in that regard.  And in

19   response to all of the court's questions as to whether she

20   could follow the court's instructions she was unequivocal that

21   she could.

22        THE COURT:  Is she still here?  Bring her back in.

23        (Prospective juror present.)

24        THE COURT:  Please sit down.

25        We have one or two more questions.  You remember

Pospective Juror 68                          623

1   that earlier I asked you about whether you would consider

2   evidence presented by the defense of the defendant's difficult

3   childhood, childhood abuse and so forth, and you indicated

4   that you thought it was an aggravating factor and not a

5   mitigating factor in your mind; is that right?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Well, I would instruct you -- if that

8   were one of the pieces of evidence before you, I would

9   instruct you that the law views the evidence of a difficult

10  childhood, childhood abuse, as a mitigating factor and it

11  should not be used to enhance the aggravators because -- for

12  whatever social reasons you want to give, but that's the

13  general state of the law.

14           If I tell you that that's the law, will you follow

15  the court's instruction and only consider such a piece of

16  evidence as a mitigating factor and weigh that as a mitigating

17  factor to the extent that you think it should be weighed in

18  making your balancing test of mitigators and aggravators?

19           THE PROSPECTIVE JUROR: If I could use it -- if I'm

20  instructed, yes.

21           THE COURT:  You would use it as a mitigating factor?

22           THE WITNESS:  Yes, if that's what the law states,

23  yes.

24           THE COURT:  All right.  Thank you, have a nice day.

25           (Prospective juror leaves.)

1           THE COURT:  Mr. Jasper, I heard all your comments.

2    This only related to one of the comments.  Is there anything

3    you want to follow up on that comment beyond what you've

4    already said?

5           MR. JASPER:  Yes, Judge.

6           THE COURT:  Go ahead.

7           MR. JASPER:  I don't want to be too harsh, but that

8    answer to your Honor's question, with all due respect, is

9    meaningless at this point.  Her true candid responses and

10   feelings was given much earlier before it was highlighted at

11   the end.

12          THE COURT:  Thank you.  Anything else?

13          MS. MERKL:  No, your Honor.

14          THE COURT:  Thank you.  I will reserve.

15          Next is number 90.  Let's bring him in.

16          (Prospective juror present.)

17          THE COURT:  Please be seated, sir.

18          You're Juror No. 90?

19          THE PROSPECTIVE JUROR: Yes, sir.

20          THE COURT:  Since you filled out the questionnaire

21   have you heard, listened to, read or watched anything about

22   this case?

23          THE PROSPECTIVE JUROR: No.

24          THE COURT:  I have a few follow-up questions for you

25   today.

Prospective Juror 90                            625

1          THE PROSPECTIVE JUROR: Okay.

2          THE COURT:  You are retired from the U.S. Postal

3    Service, is that right?

4          THE PROSPECTIVE JUROR: Yes, sir.

5          THE COURT:  How long were you with the Postal

6    Service?

7          THE PROSPECTIVE JUROR: Thirty years.

8          THE COURT:  Thirty years?

9          THE PROSPECTIVE JUROR: Yes, sir.

10         THE COURT:  Are you doing anything in your

11   retirement in terms of employment?  Do you have any other

12   jobs?

13         THE PROSPECTIVE JUROR: No, sir.

14         THE COURT:  You indicated that you have difficulty

15   reading or understanding English.

16         THE PROSPECTIVE JUROR: On certain times, yes.

17         THE COURT:  In what ways do you have difficulty?

18         THE PROSPECTIVE JUROR: Well, most of them are the

19   lawyer talk, and it's often what -- what I say, the daily use

20   of language.

21         THE COURT:  You primarily speak Chinese?

22         THE PROSPECTIVE JUROR: Yes, sir.

23         THE COURT:  And was this a problem when you were

24   with the Postal Service?

25         THE PROSPECTIVE JUROR: Usually on my job I work in

1  maintenance in the post office, the business of computers and

2  machinery and those work, we get training for it so I didn't

3  have any problem with that field.

4          THE COURT:  So because it was a technical job you

5  didn't have any difficulty learning it and doing it; is that

6  right?

7          THE PROSPECTIVE JUROR:  Yes.

8          MR. JASPER:  Your Honor.

9          THE COURT:  Yes.

10         Let me just ask you a question about your jury

11 service.

12         You were once a juror in state court; is that right?

13         THE PROSPECTIVE JUROR: Yes.

14         THE COURT:  And you heard all the evidence in a case

15 involving a stolen vehicle; is that right?

16         THE PROSPECTIVE JUROR: Yes.

17         THE COURT:  Was it a criminal case?

18         THE PROSPECTIVE JUROR: Well, I thought it was a

19 criminal.  It's not civil case.  It was a criminal case.

20         THE COURT:  Did you deliberate to reach a verdict --

21 don't tell me what the verdict was -- did you deliberate?

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And you reached a verdict?

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Okay.  I think that's all our questions

1    for today.  Thank you very much for coming in.

2          Mr. Reccoppa will tell you what to do next.

3          (Prospective juror leaves.)

4          THE COURT:  Yes, Mr. Dennehy.

5          MR. DENNEHY:  Yes?

6          THE COURT:  You're standing.

7          MS. MERKL:  I think the parties all concur that this

8    juror might have some difficulty following the evidence and

9    the court's instructions on the law.

10         THE COURT:  Based on a lack of proficiency in

11   English; is that right?

12         MS. MERKL:  Yes.

13         THE COURT:  You're in agreement?

14         MR. JASPER:  Yes.

15         THE COURT:  I strike the juror number 90 for cause

16   on that basis.

17         We're up to 91.

18         (Prospective juror present.)

19         THE COURT:  Please be seated, ma'am.  Good morning.

20         THE PROSPECTIVE JUROR: Good morning.

21         THE COURT:  You're Juror No. 91; is that right?

22         THE PROSPECTIVE JUROR: Yes, I am.

23         THE COURT:  You are still under oath.  Let me remind

24   you, you are still under oath.

25         THE PROSPECTIVE JUROR: Yes.

Case 1:05-cr-00060-NGG   Document 1096   Filed 03/23/11   Page 32 of 224 PageID #: 9106

1          THE COURT:  Let me ask you this.  Since you filled

2    out the questionnaire, have you heard anything about, read

3    anything about this case?

4          THE PROSPECTIVE JUROR: No, I haven't, sir.

5          THE COURT:  Thank you.  I'm going to follow up on a

6    few questions.

7          THE PROSPECTIVE JUROR: Okay.

8          THE COURT:  You indicate that you have worked for

9    13 years in your current position; is that right?

10          THE PROSPECTIVE JUROR: Yes, sir.

11          THE COURT:  And you are a legal secretary; is that

12    right?

13          THE PROSPECTIVE JUROR: Yes, I am.

14          THE COURT:  And without telling me who you work for,

15    do you work for a private concern or a government agency.

16          THE PROSPECTIVE JUROR: Private concern.

17          THE COURT:  Is it a law firm?

18          THE PROSPECTIVE JUROR: In-house counsel.

19          THE COURT:  For a corporation?

20          THE PROSPECTIVE JUROR: For a corporation.

21          THE COURT:  Is it a large corporation?

22          THE PROSPECTIVE JUROR: Yes, it is.

23          THE COURT:  Before you worked for this employer did

24    you work as a legal secretary then, too?

25          THE PROSPECTIVE JUROR: Yes, I did.

1          THE COURT:  Was that for a law firm --

2          THE PROSPECTIVE JUROR:  Law firm.

3          THE COURT:  What was the kind of practice did they

4   have, if you remember?

5          THE PROSPECTIVE JUROR: Mostly corporate.

6          THE COURT:  Not criminal?

7          THE PROSPECTIVE JUROR: Nothing criminal, no.

8          THE COURT:  Thank you.

9          Now, you indicated the following answer to the

10  following question:  Have you or any close friend or relative

11  ever been treated for substance abuse problem?  You answered

12  yes.  And you explained, all three of my sisters.

13         THE PROSPECTIVE JUROR: Yes.

14         THE COURT:  Is this of recent vintage or something

15  that happened in the distant past?

16         THE PROSPECTIVE JUROR: Way in the distant past.

17         THE COURT:  Have they resolved their --

18         THE PROSPECTIVE JUROR:  They all resolved.  They all

19  living normal lives and everything.  They even have their

20  children back.

21         THE COURT:  Very well.  And so if you heard evidence

22  of drug trafficking in a case, would the experience of your

23  sisters with drugs have any effect on your ability to

24  impartially consider the evidence along with all the other

25  evidence?

Prospective Juror 91                              630

1          THE PROSPECTIVE JUROR: No.  No, sir.  I wasn't

2     around my sisters when they were on it.  It's unfortunate

3     thing I wasn't -- well, it was fortunate that I wasn't around

4     them, but I always kept them up in my prayers.

5          THE COURT:  So you think you could be fair and

6     impartial?

7          THE PROSPECTIVE JUROR: I could be fair and

8     impartial, yes.

9          THE COURT:  In considering that kind of evidence?

10         THE PROSPECTIVE JUROR: Right, yes.

11         THE COURT:  Let me ask you some questions about your

12    views on the death penalty.  You know the death penalty is one

13    of two possible penalties if the defendant is found guilty in

14    the first phase of the trial of intentional and deliberate

15    murder, you understand that?

16         THE PROSPECTIVE JUROR: Yes, I do.

17         THE COURT:  The way it works is that, in the first

18    phase of the trial the defendant will be tried for the

19    charges, which are three: the intentional deliberate murder of

20    another person, conspiracy to murder, and a weapons charge

21    related to the other two charges.

22         The government always has the burden of proof.

23         THE PROSPECTIVE JUROR: Right.

24         THE COURT:  And it's required to prove beyond a

25    reasonable doubt that the defendant has committed each of

1   those crimes.

2           THE PROSPECTIVE JUROR: Yes.

3           THE COURT:  And the defense never has any burden to

4   provide any evidence, the defendant never has to testify.

5   Under our law, the burden is always on the government, it

6   never shifts to the defense.  You understand that?

7           THE PROSPECTIVE JUROR: I understand that.

8           THE COURT:  It must be a unanimous verdict of the

9   jury beyond a reasonable doubt, right?

10           THE PROSPECTIVE JUROR: Yes.

11           THE COURT:  Okay.  Now, if the defendant's found

12   guilty of the intentional murder charge, then there would be a

13   second trial with the same jury, and at that trial the only

14   two possibilities on the table would be a sentence -- it would

15   be a penalty phase -- a sentence of life in prison is the

16   presumed penalty, unless the government can demonstrate by

17   providing evidence to the jury of certain aggravating factors

18   that it wishes to put before the jury that the death penalty

19   is the appropriate penalty.

20           THE PROSPECTIVE JUROR: Correct.

21           THE COURT:  The defense has the right, but is not

22   required to, present mitigating evidence; in other words,

23   evidence as to why the proper penalty continues to be life in

24   prison.  Do you understand that?

25           THE PROSPECTIVE JUROR: Yes, I do.

Case 1:05-cr-00060-NGG   Document 1096   Filed 03/23/11   Page 36 of 224 PageID #: 9110

1        THE COURT:  And so the jury will hear that evidence

2   and then it will have to deliberate on the penalty portion of

3   the case.  And in order to impose the death penalty all 12

4   jurors would have to agree.  If even one juror disagrees and

5   stands by the view that the penalty should be life in prison

6   without the possibility of release, then that's the penalty

7   that's imposed.

8             Do you understand that.

9             THE PROSPECTIVE JUROR: I understand that.

10            THE COURT:  Now, you indicated the following views

11   about the death penalty, you said neither for it or against

12   it.  Well, I am not God.  I don't give life, therefore can't

13   take life.

14            THE PROSPECTIVE JUROR: That's correct.

15            (Continued next page)

16

17

18

19

20

21

22

23

24

25

633

1          THE COURT:  Okay.  So, those two statements on the

2     same page would tend to be contradictory, wouldn't they?

3          THE PROSPECTIVE JUROR:  Right, hmm.

4          THE COURT:  When you say you're neither for it or

5     against it, what do you mean by that, in the context of your

6     second statement?

7          THE PROSPECTIVE JUROR:  Well, I'm not partial to the

8     death penalty, nor am I against the death penalty, because my

9     view is, I don't believe that I can sit in judgment and judge

10    another person, because the death penalty is like you just

11    repeated, is either life in prison, or, you know, they kill

12    you, they take your life --

13         THE COURT:  Right.  And so --

14         THE PROSPECTIVE JUROR:  -- and I don't know how it

15    would weigh upon my conscience if I was to take the latter.

16         THE COURT:  Do you believe there is any time, any

17    circumstance, where you would consider the imposition of the

18    death penalty for someone convicted of intentional, deliberate

19    murder?

20         THE PROSPECTIVE JUROR:  That's a hard question for

21    me to answer.  But I know I have to answer it.

22         THE COURT:  As best you can.  There's no right or

23    wrong answer here.

24         THE PROSPECTIVE JUROR:  I understand that.  My

25    concern is, that person already took a life, and I don't

634

1  believe in an eye for an eye or a tooth for a tooth, which

2  is -- that was one of the adages that is also there.  I don't

3  know, I guess it would have to be based upon the evidence

4  brought forth to the jury at the time of, you know, you going

5  into deliberation.

6          THE COURT:  Well, if the government presented

7  certain aggravating factors --

8          THE PROSPECTIVE JUROR:  Right.

9          THE COURT:  -- and you believed that those factors

10  were compelling to the past behavior and character and record

11  of the defendant, and you considered some mitigating factors,

12  as well, and you felt that the aggravating factors totally

13  overwhelmed the mitigating factors, and I know this is

14  hypothetical, but is there a circumstance -- do you believe

15  there is some circumstance in which you would vote for the

16  death penalty if the aggravating factors that were presented

17  were so austere and serious that -- in that situation?

18          THE PROSPECTIVE JUROR:  Yes, I believe so.  If there

19  were extenuating situations, you know, circumstances that led

20  me to go to that extent, yes.

21          THE COURT:  So, you could vote for the death

22  penalty --

23          THE PROSPECTIVE JUROR:  I could vote for the death

24  penalty.

25          THE COURT:  -- under some limited circumstances?

1      THE PROSPECTIVE JUROR:  Right, under some limited
2  circumstances.
3      THE COURT:  Is your view about the death penalty a
4  moral position or a religious position?
5      THE PROSPECTIVE JUROR:  It's more of a religious
6  position.
7      THE COURT:  Okay.
8      THE COURT:  Any other questions?
9      MS. MERKL:  Yes, your Honor.
10      (Sidebar.)
11      THE COURT:  Yes.
12      MS. MERKL:  Your Honor, the government would just
13  ask you to follow up with regard to Questions 86 and 87.  The
14  juror, as she stated in her initial Question 85, stated:
15  "Again, I am neutral.  Who are we to take a life?"  She
16  indicated that it is her view that the person convicted of
17  life in prison without the possibility -- I'm sorry --
18  convicted of intentional and deliberate murder should receive
19  life in prison.  She indicated that she thought that someone
20  who was convicted of deliberate and intentional murder should
21  receive life in prison, and she reiterated, and I quote,
22  her "consensus" -- this is what she stated on the witness
23  stand:  "My consensus is that person already took a life, and
24  I don't believe in an eye for an eye."  So, the government is
25  truly concerned that this juror would not be able to actually

636

1    impose the death penalty in a given case involving a single

2    deliberate murder.  She stated she would be able to consider

3    it under limited circumstances.  And the government would

4    request follow-up as to whether or not she's thinking of cases

5    of mass-murder, 9/11, categorical types of crimes that do not

6    actually make her death-qualified in a case such as this.

7             THE COURT:  I'll go back and ask the question about

8    an individual murder.

9             MR. JASPER:  I don't think there's any need to lead

10   into mass murder.

11            MS. MERKL:  She was the one who stated "limited

12   circumstances," and I would ask you to follow up as to what

13   she meant.

14            THE COURT:  That's fine.

15            (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

637

1          (In open court.)

2          THE COURT:  Just one or two more questions.

3          You indicated earlier, when I asked you about

4    whether there were any circumstances in which you would

5    consider and vote for the death penalty, you said basically,

6    to paraphrase, that there might be some limited circumstances?

7          THE PROSPECTIVE JUROR:  Hmm.

8          THE COURT:  Is that right?

9          THE PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  What kinds of limited circumstances do

11    you think might justify the imposition of the death penalty?

12          THE PROSPECTIVE JUROR:  Voting against the death

13    penalty, or voting for it?

14          THE COURT:  Voting for it.  You indicated in your

15    questionnaire that, by and large, you believed that life in

16    prison without the possibility of release was an appropriate

17    sentence for the intentional murder of an individual.  That's

18    what you said?

19          THE PROSPECTIVE JUROR:  I guess my "limited

20    circumstances" would be killing of a child.

21          THE COURT:  Is that it?

22          THE PROSPECTIVE JUROR:  More or less, yes.

23          THE COURT:  Anything else?

24          MS. MERKL:  No, your Honor.

25          MR. JASPER:  Yes, your Honor.

638

1          (Sidebar.)

2          THE COURT:  Yes.

3          MR. JASPER:  Obviously, your Honor just asked her if

4    she's aware of the fact that this is not a child-killing case,

5    obviously.  Nevertheless, intentional murder, I would ask her

6    about a case in which a law enforcement official was sought to

7    be killed by a defendant, and the future danger, as well as

8    the organized crime factor, those three.

9          MS. MERKL:  With all due respect, we're going down a

10   slippery slope with those questions.

11         MR. JASPER:  We don't whether or not absolutely the

12   child killing is the only circumstance.  She's here, so let's

13   just ask her.

14         THE COURT:  Thank you.

15         (In open court.)

16         THE COURT:  You understand that this case doesn't

17   involve the killing of a child?

18         THE PROSPECTIVE JUROR:  Hmm.

19         THE COURT:  You have to say yes or no.

20         THE PROSPECTIVE JUROR:  Yes, sir.

21         THE COURT:  And so, the kinds of aggravating factors

22   would not include anything to do with killing a child,

23   molesting a child, anything like that?

24         THE PROSPECTIVE JUROR:  Okay.

25         THE COURT:  If the defendant is found guilty of the

639

1   killing, intentional and deliberate killing of an adult, all

2   right, a single adult, then you would in this case have to

3   hear the second part of the case, which is the evidence of

4   aggravators and mitigators.

5           And so, let me ask you this:  If you learned, for

6   instance, that the defendant was already serving a life

7   sentence for intentional murder, would that -- do you think

8   that would influence, as one factor -- I'm identifying one

9   factor.  There may be many factors in each direction,

10  mitigating and aggravating -- would that factor have any

11  compelling effect on your consideration of the appropriate

12  penalty?

13          THE PROSPECTIVE JUROR:  If he's already serving time

14  for murder?

15          THE COURT:  Intentional murder, another murder.

16          THE PROSPECTIVE JUROR:  And then he's on trial again

17  for another murder?

18          THE COURT:  The murder that he's found guilty of in

19  this trial would be a second murder.

20          THE PROSPECTIVE JUROR:  Whew.

21          THE COURT:  Why ask easy questions?

22          THE PROSPECTIVE JUROR:  You sure don't, sir.  Well,

23  he's already in jail for a murder, and then he's on trial

24  for -- allegedly for another murder?

25          THE COURT:  And he's been found guilty of the murder

640

1    for which he's on trial here, is the hypothetical.

2          THE PROSPECTIVE JUROR:  Well, if he's found guilty

3    for the murder on the trial that he's here for, if they decide

4    on the death penalty, if I'm a juror -- I'm sorry, your Honor.

5    I'm just --

6          THE COURT:  Take your time.  Whatever you answer is

7    your answer.  There's no correct answer.

8          THE PROSPECTIVE JUROR:  No, there isn't.  There

9    isn't a correct answer at all.

10         THE COURT:  And I know you are having difficulty.

11         THE PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Why do you think you're having

13   difficulty with the answer?  That's my preliminary question.

14   Why is it a problem to be able to --

15         THE PROSPECTIVE JUROR:  I guess because the death

16   penalty is a final act.  The death penalty means you're taking

17   that person's life.  But then, the way I look at it, is that

18   person worth the death penalty, or should he just spend the

19   rest of his life in prison.  Either/or, his life is finished,

20   anyway.  But the death penalty is a finality.  It means it's a

21   closure.  It's an end.

22         So, well, I guess, no, it wouldn't.  That's my

23   answer.

24         THE COURT:  No, you wouldn't consider the death

25   penalty?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

641

1              THE PROSPECTIVE JUROR:  No.  The fact that he's

2    already in jail.

3              THE COURT:  It wouldn't affect --

4              THE PROSPECTIVE JUROR:  It wouldn't affect --

5              THE COURT:  You wouldn't consider it a basis upon

6    which to impose the death penalty.

7              THE PROSPECTIVE JUROR:  Exactly.  I wouldn't

8    consider that.  I hope that answered your question.

9              THE COURT:  Well, it's your answer.  Whatever your

10   answer is is your answer.

11             THE PROSPECTIVE JUROR:  My answer.  Thank you.

12             THE COURT:  Anything else?

13             MS. MERKL:  Nothing from the government, your Honor.

14             THE COURT:  I see a wave.  I don't see an answer.

15             MR. GOLTZER:  I'm sorry, your Honor?

16             THE COURT:  Is there an answer?  Is there anything

17   else?

18             MR. GOLTZER:  No, your Honor.

19             THE COURT:  Thank you.

20             Okay.  I want to thank you for coming in.

21   Mr. Recoppa will tell you what to do next.  Have a lovely day.

22             THE PROSPECTIVE JUROR:  Thank you very much.

23             (Prospective juror leaves courtroom.)

24             THE COURT:  Motion?

25             MS. MERKL:  The government would move to excuse this

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

642

1    juror for cause, your Honor.  Based on the totality of her

2    "answer," quote, in the box and on the questionnaire, this

3    juror seems to be substantially impaired.  She indicated she's

4    a Christian and she would have difficulty sitting in judgment.

5    That was her first answer.  She stated, "I can't sit in

6    judgment and judge another person."

7         She also expressed extreme hesitation about whether

8    or not she would be able to impose the death penalty in a case

9    other than a child killing.  The government would respectfully

10   submit this juror is substantially impaired.

11        MR. GOLTZER:  Judge, I don't think she's

12   substantially impaired at all.  We certainly don't want a

13   panel that can glibly or easily impose the death penalty.

14   Quite frankly, they are supposed to struggle with this issue,

15   it's supposed to be difficult, and that's exactly what we saw

16   here.

17        The bottom line is that she said she could impose

18   it.  She could vote for it.  She was aware this wasn't a

19   child-killing case.  But this is also -- when you talk about

20   the slippery slope, we asked her about one aggravating factor.

21   We could ask her about more aggravating factors, if your Honor

22   wants to go down that road.

23        The bottom line is, she said she could impose the

24   death penalty, obviously not easily, but she could do it, and

25   that really is the bottom line with respect to the case law.

643

1   Was she substantially impaired?  She's concerned about it.

2   She has views about it.  And the fact that she said on here

3   that she was a Christian, quite frankly, there are many people

4   who have religious views and they differ with their church and

5   their spiritual advisors.  We've seen that time and time

6   again, as well.  So, she did not indicate that her religious

7   belief would be the end-all answer to this particular issue.

8            MS. MERKL:  Your Honor, I'm certainly not maligning

9   the juror because she's a Christian.  By no means was that the

10  import of what I was suggesting.

11           I was just stating, based on way she phrased her

12  answers, she seemed to have extreme difficulty with the notion

13  of sitting in judgment of another person, which is not an

14  uncommon theme among certain branches of Christianity.

15           With regard to Mr. Jasper's suggestion that we

16  continue to inquire about aggravating circumstances, the

17  government would just respectfully remind Mr. Jasper that your

18  Honor included the questions in the questionnaire regarding

19  specific aggravating facts in this case in order to reveal

20  juror bias with respect to whether those persons would remain

21  life-qualified if they were faced with specific aggravating

22  circumstances.  He was concerned whether or not specific

23  aggravating circumstances would cause certain jurors to, in

24  Mr. Jasper's words, become automatic killers.  The questions

25  are not designed as to the aggravators in order to attempt to

644

1   rehabilitate jurors who are otherwise substantially impaired.

2          I think that even the most staunch opponent of the

3   death penalty could potentially dream up a case involving a

4   congregation of aggravating factors in which they could

5   conceivably impose the death penalty.  But that's not the

6   test.  The test is whether the juror is substantially

7   impaired, whether there's an obstacle, based on her own views,

8   as to whether she could impose the death penalty.  The jurors

9   have to be life-qualified and death-qualified, and based on

10  the totality of the record, the government submits that Juror

11  No. 91 is not death-qualified.

12          MR. JASPER:  Judge, very briefly, we have to ask

13  questions that specifically deal with the case, as your Honor

14  pointed out and, as some of these jurors have pointed out, the

15  difficulty of asking these questions in a vacuum.  We have to

16  have a baseline.  Otherwise, it just becomes totally abstract.

17  It's one thing in the case law and in law schools to be

18  thinking about stake-out and case-specific.  This is very real

19  for us, and the only way we can get at the views is by asking

20  these questions, as your Honor is more than well aware.

21          THE COURT:  All right.  Thank you.

22          MS. MERKL:  Thank you.

23          THE COURT:  First of all, there's nothing abstract

24  at all about what this and the other jurors have been

25  questioned to tell us about.  It's in a sixty-eight page

645

1  questionnaire.  And the objective of the voir dire here is to

2  bring out any ambiguities, inconsistencies, and deal with a

3  lack of response on the part of the jurors, and to learn about

4  the demeanor of the juror, to learn about the attitudes of the

5  juror, to observe the behavior of the juror, and to get a

6  overall picture, because otherwise, we could just decide all

7  this on questionnaires and never talk to anybody.

8          So, I think that it's extremely important, as in the

9  case of this juror, that the Court inquire and try to put the

10  juror at ease about the questions, indicating that there's no

11  right or wrong answer, and making it possible for the juror to

12  think through a problem.  I even asked a question about what

13  the juror was basically concerned about in answering a

14  question at one point.

15          What we have with this juror is someone who can't

16  think of anything or appears not to be able to think of any

17  type of crime that would justify the death penalty, except the

18  murder of a child.  The questionnaire is ridden with the view

19  that the juror is not able, as a Christian or otherwise, to

20  impose the death penalty.

21          And I observed the juror's demeanor.  She tried very

22  hard, but she a hesitated at every turn when it came to any

23  issue involving the imposition of the death penalty.  And

24  while she may have agonized, the agonizing was because it

25  appears that she's substantially impaired and would not impose

Prospective Juror # 94                    646

1  the death penalty in these circumstances even if she learned

2  of the defendant's -- a defendant's prior murder, intentional

3  murder, of an individual and the fact that the person was

4  serving a life sentence.

5          So, the motion is granted.  The juror is struck.

6          MR. GOLTZER:  May we take five, sir?

7          THE COURT:  Sure.  Let's take five minutes.

8          (Recess taken.)

9          (In open court.)

10         THE COURT:  The next one is?

11         THE CLERK:  We're up to Juror No. 94.

12         (Prospective Juror No. 94 entered the courtroom.)

13         THE COURT:  Please be seated, ma'am.  Good morning.

14         THE PROSPECTIVE JUROR:  Good morning.

15         THE COURT:  You are Juror No. 94?

16         THE PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Let me just ask you this:  I remind you

18  that you are still under oath.

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Let me just ask you:  Have you read,

21  seen, heard about, observed anything about this case since you

22  filled out your questionnaire?

23         THE PROSPECTIVE JUROR:  No.

24         THE COURT:  I just have some follow-up questions for

25  you in connection with your jury service.

Prospective Juror # 94                    647

1              You indicated that in 1997, you were a juror in a

2    civil trial; is that right?

3              THE PROSPECTIVE JUROR:  Yes.  I was an alternate.

4              THE COURT:  An alternate.  So, you never deliberated

5    with the jury?

6              THE PROSPECTIVE JUROR:  No, I did not.

7              THE COURT:  Do you know what kind of trial it was?

8              THE PROSPECTIVE JUROR:  Something about a car

9    accident.

10             THE COURT:  I see.  Now, you indicate that you are a

11   senior court clerk for the family court; is that right?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How many persons are in that category?

14   Is this in New York City?

15             THE PROSPECTIVE JUROR:  It's a state.  New York

16   State.

17             THE COURT:  Okay.  What county are you in?

18             THE PROSPECTIVE JUROR:  Queens.

19             THE COURT:  You're in Queens?

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:  How many senior court clerks are there?

22             THE PROSPECTIVE JUROR:  In my building?

23             THE COURT:  Yes.

24             THE PROSPECTIVE JUROR:  Maybe twenty-five.

25             MR. GOLTZER:  Judge, could I have a minute with

Prospective Juror # 98                              648

1   Mr. Goltzer?

2             (Pause.)

3             MR. GOLTZER:  No questions.

4             THE COURT:  Do you have any questions?

5             MS. MERKL:  No questions.

6             THE COURT:  Okay.  That's it.  Thanks for coming in.

7   Have a nice day.  Mr. Recoppa will tell you what to do next.

8             THE PROSPECTIVE JUROR:  Thank you.

9             (Prospective Juror No. 94 leaves courtroom.)

10            THE COURT:  Is there a consent to strike this juror

11  based on anonymity problems?

12            MS. MERKL:  Yes, your Honor.

13            MR. GOLTZER:  Yes, your Honor.

14            THE COURT:  Thank you.  The juror is struck based on

15  anonymity problems.

16            98 is next.

17            (Prospective Juror No. 98 entered the courtroom.)

18            THE COURT:  Please be seated, sir.  Good morning.

19            THE PROSPECTIVE JUROR:  Good morning.

20            THE COURT:  You are Juror No. 98?  You have to say

21  yes or no.

22            THE PROSPECTIVE JUROR:  Yes.

23            THE COURT:  Okay.  I remind you that you are still

24  under oath, and let me ask you, have you read or heard or

25  learned anything about this case since you filled out the

1   questionnaire?

2          THE PROSPECTIVE JUROR:  I had saw one article in the

3   Daily News.  I looked at it.

4          THE COURT:  What was it about?

5          THE PROSPECTIVE JUROR:  Questionnaires or whatever,

6   staples being taken out of the questionnaires or whatever,

7   something like that in the paper.

8          THE COURT:  That's it?

9          THE PROSPECTIVE JUROR:  That's pretty much it, yes.

10         THE COURT:  If you see any further articles, just

11  pass them up, and go to sports or finance or whatever.

12         THE PROSPECTIVE JUROR:  Yes, sir.

13         THE COURT:  You indicated that you have had your

14  present job for twenty-two years; is that right?

15         THE PROSPECTIVE JUROR:  Yes, that's correct.

16         THE COURT:  And you deliver goods; is that right?

17         THE PROSPECTIVE JUROR:  Hmm.  Yes.

18         THE COURT:  And without telling me who you work for,

19  is this a private company that does deliveries that you work

20  for?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Is this like a retailer, or is this just

23  a cargo company that delivers goods?

24         THE PROSPECTIVE JUROR:  Something like a cargo

25  company.

Prospective Juror # 98                    650

1          THE COURT:  You indicated that your wife works as a

2    911 dispatcher; is that right?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Do you discuss your wife's work with her

5    when she comes home?

6          THE PROSPECTIVE JUROR:  Once in a while.

7          THE COURT:  Do you think that the nature of her work

8    and your discussions would have any effect on your ability to

9    be fair and impartial in a criminal case?

10         THE PROSPECTIVE JUROR:  I don't think so.

11         THE COURT:  You also indicated that you were a juror

12   in a federal criminal trial involved with arms dealing back in

13   1988; is that right?

14         THE PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Without telling me what the verdict was,

16   did you deliberate to a verdict?

17         THE PROSPECTIVE JUROR:  I believe they did.  I was

18   an alternate.

19         THE COURT:  You were an alternate.  Okay.

20         You indicated the following answer to the following

21   question: "Have you or anyone you know had experience with

22   illegal gambling using either video poker machines or

23   bookmaking?"  And you answered "Yes."  Is that correct?

24         THE PROSPECTIVE JUROR:  What was the question?

25         THE COURT:  "Have you or anyone you know had

1    experience with illegal gambling using either video poker

2    machines or bookmaking?"

3                THE PROSPECTIVE JUROR:  I guess I might know a

4    friend that gambles somewhat.

5                THE COURT:  I see.  But you don't gamble in this

6    way?

7                THE PROSPECTIVE JUROR:  No.  No.  No.

8                THE COURT:  You're smiling.  Why are you smiling?

9                THE PROSPECTIVE JUROR:  I remember running into my

10   friend at OTB this past weekend.  He bets a crazy amount of

11   money.  I think he does it on line, too, you know.  But I

12   don't do that.

13               THE COURT:  Does OTB still operate?  I thought it

14   was out of business.

15               THE PROSPECTIVE JUROR:  It's still operating.

16               THE COURT:  Really?

17               THE PROSPECTIVE JUROR:  Yes.

18               THE COURT:  You said you think he gambles on line.

19   You mean offshore?

20               THE PROSPECTIVE JUROR:  I believe that's how he does

21   it, yes.

22               THE COURT:  Do you participate in that at all?

23               THE PROSPECTIVE JUROR:  No.  The last time I saw

24   him, he was betting on soccer games in Europe or whatever.  I

25   think he has a serious problem, you know.

Prospective Juror # 98                    652

1          THE COURT:  Now, let me ask you some questions about

2     your responses on the death penalty.

3          THE PROSPECTIVE JUROR:  Aha.

4          THE COURT:  You indicated your views on the death

5     penalty as follows:  "As I've gotten older, I think my feeling

6     on the death penalty has changed.  Life in prison seems

7     horrible enough.  Seeing people getting off of death row,

8     because of new DNA data"?

9          THE PROSPECTIVE JUROR:  There's been some mistakes

10    with the death penalty in the past, I guess, and new evidence

11    is coming out.

12         THE COURT:  Well, let me just tell you how this

13    trial will work.  Once a jury is impaneled, the government

14    will provide the jury with evidence at the first phase of the

15    trial.  It's called the guilt phase, for want of a better

16    term.  The government has the obligation of proving that the

17    defendant is guilty beyond a reasonable doubt unanimously to

18    the jury before the defendant can be convicted.

19         THE PROSPECTIVE JUROR:  Hmm.

20         THE COURT:  And the defense never has any obligation

21    whatsoever.  They have no obligation to provide any evidence.

22    The defendant has no obligation to testify.  The burden is

23    always on the government to provide the evidence to prove that

24    the defendant is guilty of the crime charged.  And there are

25    three crimes charged here.  There's murder, intentional and

1   deliberate murder of another person; there's conspiracy to

2   commit murder; and there's a weapons charge associated with

3   the other two charges.

4           So, assuming that the government proves its case and

5   the defendant is found guilty after the jury deliberates, then

6   there would be a second phase of the trial, which is called

7   the penalty phase, and at that phase of the trial, the jury

8   will be asked to consider certain aggravating, and -- what are

9   called aggravating and mitigating factors about the

10  defendant's background.

11          The government will provide the jury with evidence

12  of what they call aggravating factors -- information on the

13  defendant's background, record, characteristics and other

14  circumstances -- that it believes are sufficient for the jury

15  to, instead of rendering a verdict of life in prison, to

16  render the more serious verdict, the greater verdict, of the

17  death penalty.

18          The defense has the right at the second trial to

19  provide the jury with mitigating factors.  It's not required

20  to, but it may decide to, which would -- they would argue,

21  inform the jury, that the appropriate sentence is life in

22  prison without the possibility of release because those

23  factors outweigh or in some way limit the aggravating factors.

24  And the jury will have to decide whether to impose the death

25  penalty or to impose a sentence of life in prison without the

Case 1:05-cr-00060-NGG   Document 1096   Filed 03/23/11   Page 58 of 224 PageID #: 9132

1    possibility of release.

2           Now, if the jury returns a verdict of guilty of

3    intentional and deliberate murder in the guilt phase and we

4    proceed to a penalty phase, where you receive evidence of

5    aggravating factors and mitigating factors, after hearing

6    those -- that evidence, could you impose a penalty of death on

7    a defendant who killed -- sorry -- was convicted of the

8    killing, deliberately and intentionally, of an individual?

9           THE PROSPECTIVE JUROR:  I'm not sure.  I would have

10   to, I guess, hear all the evidence.  I'm not sure.

11          THE COURT:  Could you impose a penalty of life in

12   prison in that situation?

13          THE PROSPECTIVE JUROR:  It's possible, sure.

14          THE COURT:  Well, this is not a case of accidental

15   murder --

16          You understand?

17          THE PROSPECTIVE JUROR:  Hmm.

18          THE COURT:  -- where the accusation, at least, is

19   that this was intentional murder.  So, the government would

20   have to prove beyond a reasonable doubt that the defendant

21   intentionally committed this murder.  So, do you think that

22   for intentional murder, that life in prison -- I think you

23   said in one of your answers life in prison seems horrible

24   enough.  So, is life in prison satisfactory to you as a

25   punishment for committing an intentional murder?

Prospective Juror # 98                        655

1        THE PROSPECTIVE JUROR:  It's a tough question for
2   me.  I don't know, you know.  I guess so.
3        THE COURT:  Well, are there -- can you imagine any
4   circumstances where you think the death penalty would be
5   justified in principle?
6        THE PROSPECTIVE JUROR:  That stuff in Arizona there
7   and how the guy who shot the politician and those people
8   there, it seems to me like, what I know of the case, that he
9   deserves the death penalty, you know.
10       THE COURT:  So --
11       THE PROSPECTIVE JUROR:  They were innocents.
12       THE COURT:  One was a child.  Let's take the child
13   out of the picture for a second.  Other than the child, maybe
14   how many people were killed, five other people?  So, would you
15   possibly impose the death penalty where someone committed
16   multiple murders at the same time?  Is that the sort of case
17   where you would consider imposing the death penalty?
18       THE PROSPECTIVE JUROR:  I would probably be more
19   likely, yes.
20       THE COURT:  Is there any number that you have in
21   mind?
22       THE PROSPECTIVE JUROR:  Number, no.
23       THE COURT:  Is there anything about that incident,
24   other than the number of people killed, that would have
25   influenced you to impose the death penalty, about the

Prospective Juror # 98                          656

1    circumstances, for instance?

2              THE PROSPECTIVE JUROR:  It seemed like innocent

3    people just going about their lives there, and they were

4    brutally murdered, they were hurt and caused harm to.

5              THE COURT:  What if these persons were somehow

6    involved in the drug business or in other illegal activities?

7              THE PROSPECTIVE JUROR:  Then, I might feel

8    differently about it.

9              THE COURT:  You mentioned that -- you answered a

10   question in which you said -- the question was "Have you ever

11   held a different view on the death penalty?"  And you said --

12   let me go back.

13             "Do you believe in the adage of an eye for an eye?

14   And you said "No.  To hurt someone because they have hurt you

15   doesn't always make you feel better."  And then you said

16   "You hurt or harm me or my loved ones, I hurt and harm you."

17             "Have you ever held a different view on the death

18   penalty?"  And you said "I was all for it," and in

19   parentheses, "(DNA data, false testimony, one innocent

20   sentence to die is wrong)."

21             So, my question of you is:  Would you only impose

22   the death penalty if there were DNA evidence that would link

23   the defendant to the murder of the victim?

24             THE PROSPECTIVE JUROR:  I guess if the facts were

25   there and everything, I guess I could.  It wouldn't always

1   have to be DNA.  I guess, if there were witnesses or whatnot.

2   I just -- my opinion on it has changed since I've gotten

3   older.  It seems like there's always appeals and whatnot and

4   this and that, and it seems to drag on and drag on.  Life in

5   prison, I mean, seems pretty cruel in itself.

6           THE COURT:  You agree that life in prison is a

7   lesser penalty than the death penalty?

8           THE PROSPECTIVE JUROR:  I don't know if it's a

9   lesser penalty.  I don't know.

10          THE COURT:  Why not?

11          THE PROSPECTIVE JUROR:  It's pretty miserable being

12  can in that cell all that day, being around those people all

13  day long, these con victims and whatnot.

14          THE COURT:  So, you think the greater penalty is

15  life in prison?

16          THE PROSPECTIVE JUROR:  It's possible, to some.

17          THE COURT:  If I instruct you that the law that you

18  must apply is that the death penalty is a greater penalty than

19  life in prison, would you follow the law?

20          THE PROSPECTIVE JUROR:  I guess I would have to.

21          THE COURT:  Did that arms-dealing case that you were

22  involved in have any connection to organized crime?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Does anyone have any questions?

25          MR. JASPER:  Yes, your Honor.

Prospective Juror # 98                    658

1        (Sidebar.)

2        THE COURT:  Yes.

3        MR. JASPER:  Judge, in asking him whether or not he

4    will be able to consider the death penalty in certain cases,

5    he mentioned the Arizona shooting involving innocents.  Your

6    Honor correctly pointed out, Take the child out of it.  He

7    seemed to focus on numerous killings.  There's going to be

8    evidence that Mr. Basciano has killed more than just this one

9    person.

10        If you could just ask him whether or not he could

11    consider the death penalty in a case where a defendant was --

12    there would be evidence of numerous murders and conspiracies

13    to commit murder, including solicitation of a law enforcement

14    official -- the murder of a law enforcement official, without

15    using the word "solicitation," and the cooperating witnesses,

16    because I believe some of the 3500 indicates that Mr. Basciano

17    approached Mr. Massino and asked for permission to kill the

18    parents of the one of the cooperating witnesses, and that's

19    pretty clear in the 3500 material, and the children.

20        THE COURT:  What children?

21        MR. JASPER:  Children.

22        MR. GOLTZER:  The adult children of a cooperator,

23    not a minor child.

24        THE COURT:  Not minor children.

25        MR. DENNEHY:  The offspring.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Prospective Juror # 98                    659

1          THE COURT:  The offspring?

2          MR. GOLTZER:  Adult offspring.

3          MS. MERKL:  This juror reminds the government of

4    Juror No. 16, who your Honor ultimately determined was

5    substantially impaired, despite efforts by the defense to ask

6    him an escalating series of questions regarding aggravating

7    factors and whether or not that might bring him back -- to use

8    Mr. Jasper's words -- into the realm of people who might

9    consider the death penalty.

10          This juror stated repeatedly on his questionnaire

11   that life in prison is enough, and when asked for a specific

12   example of a case in which he would consider the death

13   penalty, the only case he could come up with was the recent

14   mass murder, that was extremely violent and arbitrary.

15          The government would request that the Court ask him

16   unequivocally if he could impose the death penalty in a case

17   involving a single intentional murder.  And if your Honor is

18   inclined to go into the aggravators, which the government

19   doesn't think is necessary, we would ask that you also ask him

20   about mitigating factors.  If your Honor does ask about

21   aggravators, we would certainly ask they not be asked in

22   combination for the reasons that your Honor stated in your

23   opinion.  To start asking about mitigating in combination

24   starts to border on stake-out.

25          THE COURT:  You mean aggravators?

Prospective Juror # 98                    660

1      MS. MERKL:  That's what I mean, aggravators in

2   combination.

3      MR. GOLTZER:  I agree that aggravating shouldn't be

4   asked in combination.  They would be asked quite separately.

5   That's what I prefer, the idea that aggravators not be gone

6   into because of stake-out.

7          The aggravators are being used to justify to have

8   the death penalty for Mr. Basciano.  We have to ask them to

9   see if they have a view on life or death.  That's the only

10  reason I raised them right now.  He seems to be focused on

11  number of killings, and the government can't just stand here

12  and act as if it's the sole one murder and they are not going

13  to claim that Basciano killed a whole bunch.

14     MS. MERKL:  Unless the defense is conceding that all

15  of that evidence is coming in, it's not appropriate.

16     THE COURT:  What evidence?

17     MS. MERKL:  The evidence of the other murders, the

18  evidence of all the other solicitations.  We don't expect that

19  Mr. Jasper and Mr. Goltzer are going to stand by idly when the

20  government seems to admit that evidence.

21     MR. GOLTZER:  May I say something?  If the

22  government knows it's not going to use particular evidence, if

23  they told us now, we would be able to formulate better

24  questions, and it would be better for the Court.  We sit here

25  with a February 25 letter that talks about twenty-five acts of

Prospective Juror # 98                    661

1   violence committed by Mr. Basciano, and that's going to be put

2   in in the penalty phase.  There is been no ruling.  We can't

3   assume it's not.

4            THE COURT:  Has there been a motion?

5            MR. GOLTZER:  Liability hearings, yes.

6            MS. MERKL:  There was a motion for a liability

7   hearing, and your Honor indicated that we were to file an

8   affidavit.

9            THE COURT:  I understand your point.  Okay.  Thank

10  you.

11            (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2         THE COURT:  I just have a couple of more questions

3    for you, going back to what you said about Tucson.

4         THE PROSPECTIVE JUROR:  Yes.

5         THE COURT:  What happened in Tucson?  Were there any

6    aspects of that incident that are particularly troubling to

7    you and are the basis for your statement that in a situation

8    like that, you could possibly impose the death penalty?

9         THE PROSPECTIVE JUROR:  What is the question?

10        THE COURT:  What about that incident is so troubling

11   to you that it might if you were on a jury in that case, that

12   you might vote to impose the death penalty if it were

13   available?

14        THE PROSPECTIVE JUROR:  Just the fact that I -- it

15   seemed like it was all innocent people there, just going about

16   their daily lives there.  Whatever they were doing there.

17   Just doing their jobs or whatever.  The politician in one and

18   these people, the organizers or whatever, who is this guy to

19   target them, you know.

20        THE COURT:  If at a penalty phase you heard evidence

21   that the defendant had committed another intentional murder,

22   in addition to the one which you just found him guilty of, and

23   that he was serving a life sentence, hypothetically, might

24   that affect your judgment as to whether to impose the death

25   penalty?

Juror # 98                                            663

1        THE PROSPECTIVE JUROR:  I don't think so.

2        THE COURT:  If the person committed several murders

3   of people who were his associates in crime or who were

4   involved in other crimes, would that affect you in such a way

5   that you might be more likely look to impose the death

6   penalty?

7        THE PROSPECTIVE JUROR:  I guess if you see a pattern

8   like that, I guess it would, sure.

9        THE COURT:  If there were several murders or

10  attempted murders along the way, let's say of drug dealers?  I

11  am not saying it's the case here.

12       THE PROSPECTIVE JUROR:  Absolutely.  I guess it

13  would be the situation, if I found the facts to be what they

14  were, I guess I could.

15       THE COURT:  What if you learned that the defendant

16  had some sort of family history, where he was mistreated as a

17  child, abused and had a difficult upbringing, spent time in

18  foster homes, in your view, would that be a mitigating factor

19  which might be balanced in favor of life in prison?

20       THE PROSPECTIVE JUROR:  Would that be a mitigating

21  balance of what?

22       THE COURT:  In other words, would that offset --

23       THE PROSPECTIVE JUROR:  Offset my decision on that?

24       THE COURT:  Offset the aggravating factors if you

25  learned of a mitigator like that.  It is considered a

GR      OCR      CM      CRR      CSR

1   mitigator if someone has had a troubled childhood and has been

2   abused and so forth.

3          Assume that's a mitigator.  Would that be the kind

4   of mitigator that would counterbalance some of the aggravating

5   factors that you might hear?

6          THE PROSPECTIVE JUROR:  I guess it might possibly.

7          THE COURT:  Is it likely?

8          THE PROSPECTIVE JUROR:  I have to know all the

9   facts, I guess, and the evidence.

10         THE COURT:  Okay.  What if you were told that the

11  defendant attempted or threatened to kill cooperating

12  witnesses against him, would that have any effect on your

13  consideration, your analysis, one way or the other?

14         THE PROSPECTIVE JUROR:  I don't think so.

15         THE COURT:  Okay.  Anything else?

16         MS. MERKL:  Nothing from the government, Your Honor.

17         MR. JASPER:  Nothing, Your Honor.

18         THE COURT:  Thank you for coming in.  Have a nice

19  day.  Mr. Reccoppa will tell you what to do next.

20         THE PROSPECTIVE JUROR:  Take care.

21         (Juror leaves courtroom.)

22         THE COURT:  Motion?

23         MS. MERKL:  The government moves to strike this

24  juror for cause, Your Honor.

25         He indicated repeatedly in his questionnaire that he

1  felt like prison is sufficient punishment for an individual

2  convicted of a single deliberate murder.  Only when Your Honor

3  escalated it to several murders or attempted murders did the

4  juror reluctantly state that I guess I could consider imposing

5  the death penalty.

6        The defendant -- the witness also -- sorry.  The

7  juror also indicated that he would not consider the death

8  penalty in the face of the aggravators that Mr. Jasper

9  inquired, that the Court asked about.

10       Under these circumstances, under the totality of the

11 record, this juror seems impaired.

12       THE COURT:  Okay.  Mr. Jasper?

13       MR. JASPER:  Your Honor, we think that this juror is

14 perfectly qualified to sit.  He gave balanced answers.  He

15 said that certainly the number of people is something that he

16 could consider in terms of the death penalty.  He was not a

17 great admirer of the death penalty, nor does a qualified juror

18 have to be.  He was balanced.  He said consistently that he

19 would have to hear all of the facts and, again, Your Honor, I

20 just think that for us to -- for the government to make it

21 appear as though this is a sole single solitary murder case

22 when we know that they are going to be putting in all kinds of

23 uncharged conduct, at both phases, that indicate that there

24 are numerous murders or conspiracies, just doesn't seem to fit

25 when we talk about these jurors.

Juror # 98                                        666

1          This juror said that he could impose the death

2    penalty and he did it in a balanced way.

3          THE COURT:  Anything else?

4          MS. MERKL:  Under Your Honor's ruling, the only

5    things we know are coming in in the guilt phase is the murder

6    of Frank Santoro and the attempted murder of David Nunez is

7    out.  So we know that the murder of Frank Santoro is coming

8    in.  We know that a solicitation to kill a couple of

9    individuals is in, who I would note were not killed and who

10   this juror indicated -- this juror indicated that the attempt

11   to kill or threats to kill cooperating witnesses would have no

12   impact on his deliberations and that a single additional

13   murder would also not impact his deliberations.

14         For the defense to try to shoehorn this case into a

15   mass murder case of the sort that this juror would consider

16   imposing the death penalty is a gross misstatement of the

17   facts and just does not address the fact that this juror is

18   not substantially impaired.

19         This juror reminds me substantially of juror number

20   16 about whom Your Honor wrote in the opinion issued just this

21   morning, where we can come up with all kinds of escalating

22   hypotheticals.  It doesn't make the person death qualified.

23         THE COURT:  Thank you.

24         Anything else?

25         MR. JASPER:  Your Honor, what has been noticed here

GR        OCR        CM        CRR        CSR

Juror # 98                                      667

1    in the February 19th letter for the penalty phase are numerous

2    acts of continued violence that this juror I'm sure I think

3    will be able to take into consideration in imposing the death

4    penalty.  He gave a balanced view regarding life and death and

5    he's qualified in our view.

6              THE COURT:  Okay.  Thank you, everybody.

7              First of all, I would take issue with Mr. Jasper's

8    description of this juror being perfectly qualified.  I don't

9    think he's perfectly qualified; but I also don't think that he

10   is substantially impaired.

11             I think based on his demeanor that he is somewhat

12   cavalier or offhanded and seemed to be somewhat unresponsive

13   in providing his views.  But based on the questionnaire and

14   his statements here in court, I think that he is certainly not

15   an example of someone who based on moral principle could not

16   impose the death penalty in some circumstances.

17             I am trying to avoid a situation where I provide

18   individual jurors with a laundry list of aggravators and

19   mitigators because we are not trying the penalty phase here.

20   We are trying to get a sense of the philosophy, the thinking,

21   the flexibility of the jurors to decide whether they are both

22   qualified to impose the death penalty and qualified to impose

23   life in prison without the possibility of release.

24             Although I think that the demeanor of this juror is

25   problematical, generally, and I am not sure whether he is

1    taking this process as seriously as I would prefer, he hasn't

2    demonstrated that he is substantially impaired.

3              Therefore, the motion is denied.

4              102.  102 is not here?

5              Let's bring this person in.  103, please.

6              (Juror present.)

7              THE COURT:  Please be seated, sir.

8              THE PROSPECTIVE JUROR:  Thank you.

9              THE COURT:  Good afternoon.

10             You are juror number 103, is that right?

11             THE PROSPECTIVE JUROR:  Correct.

12             THE COURT:  All right.  I remind you that you are

13   still under oath.

14             Let me ask you, in the time between the day you

15   filled out the questionnaire and today, have you read, seen,

16   heard about, become aware of, anything about this case?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Thank you.

19             You indicated in your questionnaire that you are

20   self-employed for the last three years in the home improvement

21   business.  Is that right?

22             THE PROSPECTIVE JUROR:  Yes.

23             THE COURT:  So basically you work alone or with a

24   few other people?

25             THE PROSPECTIVE JUROR:  A few other people.

1          THE COURT:  I see.

2          You answered no to the question, do you have an

3    unusual financial hardship or other serious problem that would

4    prevent you from serving as a juror in this case.

5          You said no.

6          THE PROSPECTIVE JUROR:  Nothing unusual, I guess.

7          THE COURT:  If you were required to serve for six

8    weeks, for instance, would that have a detrimental effect on

9    your ability to earn a living and would that be something that

10   you could endure?

11         THE PROSPECTIVE JUROR:  It would have a detrimental

12   effect on my ability to earn a living, correct, yes.

13         THE COURT:  But you don't view that as a substantial

14   hardship?

15         THE PROSPECTIVE JUROR:  Depends on what I have lined

16   up for those six weeks, I guess.

17         THE COURT:  You work jobs as they come along?

18         THE PROSPECTIVE JUROR:  Right, correct.

19         THE COURT:  So there are times when you are not

20   working; there are times when you are working?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  You are used to periods of

23   non-employment as opposed to unemployment?

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Okay.

Prospective Juror #103                         670

1          THE PROSPECTIVE JUROR:  Can I say something?

2          I served on my state jury over the summer.  I just

3    don't have the sheet.  I was going to go there and get it.  Is

4    that -- does that mean anything?  Do I still have to sit

5    through this until I get the sheet?

6          THE COURT:  What court was that in?

7          THE PROSPECTIVE JUROR:  The Staten Island -- in

8    Staten Island.

9          THE COURT:  You served on jury duty?

10         THE PROSPECTIVE JUROR:  Correct, yes.

11         THE COURT:  For how long?

12         THE PROSPECTIVE JUROR:  A day.

13         THE COURT:  A day.

14         THE PROSPECTIVE JUROR:  But I still got the stamp

15   that I served.

16         THE COURT:  That you served?

17         THE PROSPECTIVE JUROR:  Yes.

18         THE COURT:  If you could be excused based on your

19   state jury service you would like to do so, is that it?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Let me ask you the questions and we will

22   figure that out.

23         THE PROSPECTIVE JUROR:  Okay.

24         THE COURT:  Okay.  We certainly will look into it

25   and if you provide us with a copy of your certificate and we

GR        OCR        CM        CRR        CSR

Prospective Juror #103                               671

1  can take it further, the jury clerk will deal with that

2  downstairs.

3            THE PROSPECTIVE JUROR:  Okay.

4            THE COURT:  Okay?

5            THE PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Now, you have a friend who is a police

7  officer?

8            THE PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Do you discuss his work with him?

10            THE PROSPECTIVE JUROR:  No, not really.

11            THE COURT:  You answered the following question in

12  the following way:  Have you formed an opinion as to the

13  defendant based on anything that you have seen, heard or read?

14       You answered, yes, that he is associated with a mob

15  crime syndicate.

16            THE PROSPECTIVE JUROR:  Yes.

17            THE COURT:  What leads you to reach that conclusion?

18            THE PROSPECTIVE JUROR:  The charges against him.

19            THE COURT:  Now, do you think that would create a

20  problem for you in being fair and impartial in considering the

21  evidence in this case?

22            THE PROSPECTIVE JUROR:  I am guessing the charges

23  aren't baseless.

24            THE COURT:  You understand that in order to find a

25  defendant guilty of a crime, it is necessary for the

1   government, which always has the burden of proof, to prove to

2   the jury beyond a reasonable doubt that the crime that is

3   charged was committed?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  All right.  And that in this case there

6   are three crimes charged, murder, intentional and deliberate

7   murder of an individual; conspiracy to commit murder; and a

8   weapons charge in connection with the other two charges.

9            THE PROSPECTIVE JUROR:  Okay.

10           THE COURT:  So would you be able to put aside any

11  surmise or thoughts that you might have about the defendant's

12  associations in connection or alleged associations in

13  connection with any crime syndicate and just decide the case

14  on the evidence that the government presents to you in this

15  trial, in this courtroom?

16           THE PROSPECTIVE JUROR:  Yes, yes.  That sounds

17  reasonable.

18           THE COURT:  Okay.  You also indicated this answer:

19  Do you have any bias, sympathy or prejudice with reference to

20  the defendant Vincent Basciano that would make it difficult

21  for you to render a fair and impartial judgment based solely

22  on the evidence presented at trial?

23           You said yes, and you explained, I have an

24  unfavorable opinion of organized crime.

25           THE PROSPECTIVE JUROR:  Right.

673

1          THE COURT:  So going back to my previous question.

2          THE PROSPECTIVE JUROR:  Correct, yes.

3          THE COURT:  Would you think that your opinion of

4    organized crime would affect your ability to weigh the

5    evidence of guilt or non-guilt for the crimes that are

6    actually charged in this case?

7          THE PROSPECTIVE JUROR:  Yes, I think so, yes.

8          THE COURT:  Why is that?

9          THE PROSPECTIVE JUROR:  Well, just from the

10   implications that if one is associated with organized crime,

11   then one is more than likely guilty of the charges against

12   him.

13         THE COURT:  Do you think you could put that --

14         THE PROSPECTIVE JUROR:  I mean, I might be able to

15   put it aside.  I mean, it is not a -- but probably not.

16         MR. JASPER:  No questions, Judge.

17         THE COURT:  Okay.  I want to thank you for coming

18   in.  You have a nice day.

19         Mr. Reccoppa will tell you what to do next.

20         THE PROSPECTIVE JUROR:  Thank you.

21         (Juror leaves courtroom.)

22         THE COURT:  Is there a motion?

23         MR. JASPER:  Yes, Your Honor.

24         Strike for cause.

25         MS. MERKL:  No objection, Your Honor.

GR      OCR      CM      CRR      CSR

674

1          THE COURT:  All right.  Number 103 is struck for

2     cause.

3          I am going to check on the question of whether a

4     juror can be excused or must be excused if requested based on

5     recent state jury service.

6          MR. GOLTZER:  I am checking it now.  I'll check.

7          THE COURT:  All right.

8          THE LAW CLERK:  I think it's four years.

9          THE COURT:  I've always believed that there was a

10    window.  My clerk mentions it's four years.  But there was a

11    window during which if you previously served, you are not

12    obligated to serve on jury duty in a different court.  So

13    federal or state.

14         MS. MERKL:  I think he's now served in both.

15    Because he has been excused.  So I think his jury service here

16    is done.

17         THE COURT:  Yes.  I am talking about other potential

18    jurors.

19         MS. MERKL:  Yes.  I am just joking around, Your

20    Honor.

21         THE COURT:  All right.  The next one.

22         THE CLERK:  104.

23         THE COURT:  104.

24         (Continued on the next page.)

25

Prospective Juror #104                            675

```
 1              (Juror number 104 is present.)

 2              THE COURT:  Please be seated, sir.

 3         Good afternoon.

 4              THE PROSPECTIVE JUROR:  Good afternoon.

 5              THE COURT:  You are juror number 104, is that right?

 6              THE PROSPECTIVE JUROR:  That's correct.

 7              THE COURT:  I remind you that you are still under

 8    oath.

 9              THE PROSPECTIVE JUROR:  Yes.

10              THE COURT:  Let me just ask you, in the time between

11    filling out the questionnaire and today, have you read or

12    heard or learned anything about this case?

13              THE PROSPECTIVE JUROR:  No, sir.

14              THE COURT:  Okay.  Thank you.

15         I am just going to follow up on a few things that

16    are in your questionnaire.

17              THE PROSPECTIVE JUROR:  Okay.

18              THE COURT:  Now, you indicated you are currently not

19    employed, is that right?

20              THE PROSPECTIVE JUROR:  Yes.

21              THE COURT:  When you were employed, what kind of

22    work did you do?

23              THE PROSPECTIVE JUROR:  I was a payroll manager for

24    a construction company.

25              THE COURT:  How long did you do that?
```

Prospective Juror #104                        676

1          THE PROSPECTIVE JUROR:  About three years.

2          THE COURT:  Okay.  Were you laid off from that job?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Before that, what kind of work did you

5     do.

6          THE PROSPECTIVE JUROR:  The same.  I was in the

7     construction for a different company.

8          THE COURT:  I see.

9          How long did you do that job?

10          THE PROSPECTIVE JUROR:  About three-and-a-half

11     years.

12          THE COURT:  I see.

13          That's been your career, as a payroll manager in the

14     construction industry?

15          THE PROSPECTIVE JUROR:  That is correct, yes.

16          THE COURT:  Okay.

17          Are you currently looking for work?

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.  I note that you served in 2006 on

20     a state jury trial.  You say it was a criminal case involving

21     an accident, is that right?

22          THE PROSPECTIVE JUROR:  That's correct.

23          THE COURT:  Without telling me what the verdict

24     was -- don't tell me that -- did you deliberate with the jury

25     to a verdict?

GR      OCR      CM      CRR      CSR

Prospective Juror #104                                    677

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.

3          Let me ask you a few things about your views on the

4    death penalty, if I may.

5          You indicate in your questionnaire the following

6    views on the death penalty.

7          Very harsh penalty but again it is on the juror's

8    decision to impose it.

9          And you also indicated, you were asked, please

10   explain why you hold those views.

11         You answered, on a very rational thinking.

12         You also indicated that your views on the death

13   penalty have evolved and that you were asked, please describe

14   your views on the death penalty for a person who has been

15   found guilty of intentional murder.

16         You say, favorable.

17         So could you expand on what you mean by that,

18   favorable?

19         THE PROSPECTIVE JUROR:  Yes, sir.

20         When I said that my theory or my -- I evolved from

21   my previous thinking.  Initially when I was going down my

22   ages, when I was young, I was thinking I was on a religious

23   background, you know, that death penalty is not favorable.

24   When I was young I was thinking on those terms.  But over the

25   subsequent years, you know, I saw the world.  I saw how crime

GR      OCR      CM      CRR      CSR

Prospective Juror #104                              678

1   has developed and my views changed.  That's why I said that my

2   views evolved from my original thinking.  It evolved to

3   different level.

4            THE COURT:  All right.  Let me discuss with you how

5   this case will be tried and then we can go further into that.

6   I would like to go a little further into your views.

7            THE PROSPECTIVE JUROR:  Okay.  Sure.

8            THE COURT:  The first phase of the case is called

9   the guilt phase and in that phase the government will provide

10  evidence that it believes will prove that the defendant

11  committed the crimes charged.  The crimes charged are the

12  intentional and deliberate murder of an individual, conspiracy

13  to commit the murder and a charge involving the use of

14  firearms in connection with the other two charges.

15           THE PROSPECTIVE JUROR:  Okay.

16           THE COURT:  The government has the burden of proving

17  to the jury beyond a reasonable doubt that the defendant

18  committed each of those crimes.

19           THE PROSPECTIVE JUROR:  Correct.

20           THE COURT:  The defense has no obligation at all to

21  do anything in the trial because the law presumes the

22  defendant to be not guilty.  Let's put it this way, to be

23  innocent of the crimes, and that, therefore, the defense

24  doesn't have to put on any case.  The d defendant does not

25  have to testify and you can't hold it against the defendant

GR        OCR        CM        CRR        CSR

1   that he didn't testify or that no defense case was put on.

2          The burden is always on the government to prove the

3   crimes beyond a reasonable doubt to the jury unanimously.

4          THE PROSPECTIVE JUROR:  Okay.

5          THE COURT:  Do you understand that?

6          THE PROSPECTIVE JUROR:  I understood.

7          THE COURT:  Assuming that the jury returns a verdict

8   of guilty on the intentional murder charge, then there will be

9   a second phase of the trial.  If the defendant is found guilty

10  of the intentional murder, the law permits one of two

11  sentences to be imposed.  The basic sentence is life in prison

12  without the possibility of release, but the jury may also

13  impose a sentence, a greater sentence, of the death penalty.

14         In order for the jury to decide what the appropriate

15  sentence is, the government must provide evidence of certain

16  aggravating factors that it believes will convince the jury

17  that the defendant should not receive the sentence of life

18  without the possibility of release, but that the more

19  appropriate sentence is the greater punishment, which is the

20  death penalty.

21         THE PROSPECTIVE JUROR:  Okay.

22         THE COURT:  The defense has the right to provide

23  what are called mitigating factors, information about the

24  defendant's background, characteristics, record,

25  circumstances, that it believes demonstrate that the

1   appropriate sentence is life in prison and not the death

2   penalty.

3            THE PROSPECTIVE JUROR:  Okay.

4            THE COURT:  The jury is required to consider

5   everything and decide what weight it wishes to give, if any,

6   to these various factors in reaching a verdict on the penalty.

7            THE PROSPECTIVE JUROR:  Okay.

8            THE COURT:  The jury is never obligated to impose

9   the death penalty.  The juror must decide individually what

10  his or her decision is.  If eleven of the jurors decide that

11  they vote for the death penalty and one juror votes for life,

12  then the sentence is life.  There must be a unanimous verdict

13  to impose the death penalty.

14           So you understand all of that?

15           THE PROSPECTIVE JUROR:  I understood, yes.

16           THE COURT:  If the defendant is found guilty of

17  intentional and deliberate murder at the guilt phase, and the

18  jury then hears the evidence of the aggravators and the

19  mitigators at the penalty phase, at the end of the penalty

20  phase could you impose a penalty of life in prison without the

21  possibility of release after hearing and considering all the

22  factors?

23           THE PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Could you impose the death penalty after

25  hearing and considering all the factors?

Prospective Juror #104                    681

1        THE PROSPECTIVE JUROR:  Yes.

2        THE COURT:  What would be important for you to know

3   about the defendant's background in order to impose the

4   greater penalty of the death penalty?

5        THE PROSPECTIVE JUROR:  Depends upon the evidence,

6   like the circumstantial evidence, and also the -- I don't know

7   how to put it in court words.

8        THE COURT:  Put it in your own words.

9        THE PROSPECTIVE JUROR:  Okay.  Mainly depends upon

10   the evidence that is presented by the government.

11        THE COURT:  What about the evidence of mitigating

12   factors?

13        THE PROSPECTIVE JUROR:  I will compare and see which

14   one is more stronger.

15        THE COURT:  You understand, this is for a defendant

16   who has already been actually found guilty of the crime of

17   intentional murder of an individual.

18        THE PROSPECTIVE JUROR:  Yes.

19        THE COURT:  Are there any crimes for which the death

20   penalty would always be appropriate?

21        THE PROSPECTIVE JUROR:  There are many.  I mean, you

22   know.

23        THE COURT:  Like what?

24        THE PROSPECTIVE JUROR:  Like I can say a cult

25   leader, suppose he takes so many people on a mass suicide

Prospective Juror #104                    682

1  mission, obviously that person is culpable for death penalty.

2          THE COURT:  So someone who commits many murders?

3          THE PROSPECTIVE JUROR:  In a way, yes.

4          THE COURT:  Is that at the same time or over time?

5          THE PROSPECTIVE JUROR:  Over time.

6          THE COURT:  So they would not all have to be

7  committed at the same time?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Would you always impose the death

10 penalty in that situation?

11         THE PROSPECTIVE JUROR:  I will.

12         THE COURT:  Are there any factors that you think are

13 important, so important, mitigating factors, that it is

14 unlikely you would impose the death penalty for someone who

15 committed an intentional and deliberate murder?

16         THE PROSPECTIVE JUROR:  Again, like I said, it will

17 be again on the evidence that is produced by the government.

18         THE COURT:  You seem to focus on the government's

19 evidence.  You understand that even though the government is

20 obligated to provide evidence, the defense may also, but is

21 not obligated to provide evidence.

22         Do you understand that as well?

23         THE PROSPECTIVE JUROR:  Yes, yes.

24         THE COURT:  My question is that do you think you can

25 be fair and impartial in considering the defense's evidence of

1    the mitigating factors?

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  You were asked this question:  Do you

4    believe that a defendant should first have to prove that he

5    does not deserve the death penalty before the jury should give

6    any consideration as to whether to impose a life sentence?

7              You said yes.

8              Is that your view, that you presume that the death

9    penalty is the appropriate penalty before considering if life

10   is an alternative?

11             THE PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  If I instruct you that that is not the

13   law and the law is that the presumptive penalty, we presume

14   that the penalty for this crime will be life in prison without

15   the possibility of release and it is only after considering

16   the aggravators and the mitigators, if you believe that those

17   aggravators are so significant that the death penalty is then

18   appropriate, you could then impose the death penalty.  Would

19   you follow the law as I give it to you and base your analysis

20   on that formula?

21             THE PROSPECTIVE JUROR:  Yes, I can.

22             THE COURT:  All right.  Does anyone want a side bar?

23             MR. JASPER:  Yes, Your Honor.

24             THE COURT:  Okay.  Side bar.

25

Prospective Juror #104                              684

1              (Side bar.)

2              MR. JASPER:  Judge, what I think we have here is a

3    serious burden shifting problem.  I know that you asked him

4    about that in the last round.  One of the things that he said

5    is that he would -- before you got to that 106 question, he

6    said he would listen to both side and see which was stronger.

7    I think he needs to be -- the point needs to be driven home is

8    that the defendant starts with being entitled to live.  So he

9    starts with that.

10             And that the government has to prove beyond a

11   reasonable doubt that he deserves to die, and if he has a

12   problem with that, or ask him why -- maybe not this juror, but

13   why the jurors believe the presumption is one of death.  What

14   is it that the death penalty makes them think the defendant

15   has to prove that he has to live?  Because that -- the way he

16   said it is almost like if they start off even.  We don't start

17   off even.  We start off with the presumption of life.

18             THE COURT:  All right.  I understand the question.

19             What else?

20             MR. JASPER:  He also on question 56 indicated

21   that -- 56 was hard to explain.

22             THE COURT:  It was on La Cosa Nostra, The Godfather,

23   et cetera?

24             MS. MERKL:  Whether the movies he's seen are

25   realistic.  He doesn't remember what they are, the movies.

GR      OCR      CM      CRR      CSR

Prospective Juror #104                          685

1          MR. JASPER:  The reason we think that's important,

2    Your Honor, is because this juror has indicated that the least

3    admirable people in his view are criminals, drug

4    addicts -- there is going to be evidence that some of the

5    members of organized crime here were addicted to

6    cocaine -- and gamblers, which is quite clearly going to be in

7    the case, and whether or not those either in combination or

8    individually along with the organized crime nature of the case

9    would make it difficult for him to be unbiased.  Both phases,

10   either the guilt/innocent phase or the penalty phase.

11         He also seemed to indicate -- we would like you to

12   question him regarding 87.  I am not sure what he means by his

13   answer to 87, give him a chance -- give her a chance to repent

14   and accept what he has done is wrong.

15         Judge, can I have --

16         THE COURT:  Take your time.  Do you want to consult?

17         MR. JASPER:  Question 95, the --

18         THE COURT:  We are off 87?

19         MR. JASPER:  Forget 87.  I apologize, Your Honor.

20         THE COURT:  No problem.

21         MR. JASPER:   95, if called upon to decide between

22   the death penalty and life in prison without the possibility

23   of parole, would you consider the aggravating factors

24   presented in favor of the death penalty for a person convicted

25   of murder?

Prospective Juror #104                              686

1          Although the answer is yes, please explain is, if

2     the person is convicted, then yes.

3          So I am wondering whether or not he is just thinking

4     that the death penalty has to be applied upon the mere finding

5     of guilt at phase one.

6          THE COURT:  I will follow up on that whole general

7     area.

8          Anything else?

9          MS. MERKL:  Nothing from the government, Your Honor.

10         THE COURT:  All right.  Thank you.

11         (In open court.)

12         THE COURT:  Have you seen a lot of movies about

13    organized crime?

14         THE PROSPECTIVE JUROR:  A couple of them.

15         THE COURT:  Do you think they are realistic?

16         THE PROSPECTIVE JUROR:  I don't know.

17         THE COURT:  Are they entertaining?

18         THE PROSPECTIVE JUROR:  Surely, yes.

19         THE COURT:  But you are not sure about whether they

20    are realistic?

21         THE PROSPECTIVE JUROR:  Yes, I am not sure.

22         THE COURT:  The fact that you watch these movies

23    involving, let's say, the mafia, is that like the Godfather?

24    You mentioned the Godfather in your questionnaire?

25         THE PROSPECTIVE JUROR:  Yes.

Prospective Juror #104                    687

1          THE COURT:  Do you think that your experience

2    watching these movies would have any effect on your ability to

3    be fair and impartial if there were evidence that the

4    defendant and some of his associates have been --

5          THE PROSPECTIVE JUROR:  No, sir.

6          THE COURT:  Let me finish the question, please.

7          -- that the defendant and some of his friends were

8    engaged in organized crime activities?

9          THE PROSPECTIVE JUROR:  No, sir.

10         THE COURT:  Now, in our discussion about the penalty

11   phase, what I said to you was that there is the presumption of

12   life.  In other words, that if the defendant is found guilty

13   of intentional and deliberate murder and we go to a penalty

14   phase, the jury must presume that life in prison without the

15   possibility of release is a sufficient penalty for the crime.

16         Can you accept that as a presumption?

17         THE PROSPECTIVE JUROR:  Yes.

18         THE COURT:  The only way that the jury could reach a

19   death verdict would be if after hearing all the evidence of

20   the aggravating and mitigating factors the jury is convinced

21   that the defendant should not receive a sentence of life in

22   prison but should receive the more harsh sentence of the death

23   penalty.

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Could you follow that philosophical and

1   legal presumption of life?

2          THE PROSPECTIVE JUROR:  Yes.  I will see it in a

3   philosophical way.

4          THE COURT:  It is also in a legal way.  In other

5   words, I would instruct you at the penalty phase that the law

6   is that there is a presumption that the defendant should

7   receive a life sentence and that you would then have to decide

8   whether the government has met its burden of proof beyond a

9   reasonable doubt that the death sentence is the only

10  appropriate sentence.

11         THE PROSPECTIVE JUROR:  Yes.  I will do it the legal

12  way too.

13         THE COURT:  You will follow the law as I have just

14  described it?

15         THE PROSPECTIVE JUROR:  Yes.

16         THE COURT:  If eleven of the jurors vote for the

17  death penalty but you, after you make your individual

18  assessment and you hear the views of the other jurors, you

19  think that a sentence of life in prison without the

20  possibility of release is the appropriate sentence, what would

21  you do?

22         THE PROSPECTIVE JUROR:  I will stand by my views.

23         THE COURT:  Anything else?

24         MR. JASPER:  May I have a moment, Your Honor?

25         THE COURT:  Sure.

1          (Pause.)

2          MR. JASPER:  Your Honor, just a couple.

3          (Side bar.)

4          THE COURT:  Yes, sir?

5          MR. JASPER:  Judge, if you would ask him about the

6    least admired, I had asked you, I don't think you asked about

7    the least admired people being criminals, gamblers and drug

8    addicts or gambling and criminals, what he meant by that.

9    Gambling is a big part of this.  The loansharking, the

10   bookmaking, the sports betting, if that would have an impact

11   upon him.

12         THE COURT:  In more context.

13         MR. JASPER:  If it would affect him, his ability to

14   sit fairly, in phase one.

15         THE COURT:  It is a fairness question?

16         MR. JASPER:  Yes.

17         MR. GOLTZER:  It has to do with the guilt phase.

18         THE COURT:  I understand.

19         MR. GOLTZER:  The standard is lower.

20         THE COURT:  I understand.

21         MR. JASPER:  The other thing what I was trying to

22   formulate before, on 87, he indicated that the death

23   penalty --

24         THE COURT:  I thought --

25         MR. JASPER:  You know, I --

Prospective Juror #104                    690

1          MR. GOLTZER:  You withdrew that.

2          THE COURT:  You withdrew.

3          Do you want to reinstate it?

4          MR. JASPER:  Your Honor, if I could just have one

5    second?

6          THE COURT:  Sure.

7          MR. JASPER:  A lot of information coming at me at

8    the same time here.

9          (Pause.)

10          MR. GOLTZER:  Number 87 seems to indicate yes, that

11   death penalty is appropriate in any intentional murder.  We

12   think it's a mistake, but we would like to clarify it.

13          MS. MERKL:  He gave a contradictory answer in 87,

14   Your Honor.

15          THE COURT:  Let me deal with it.

16          MR. JASPER:  The other thing is the media question,

17   I don't think you asked him if there was anything about the

18   media, the media question.

19          THE COURT:  I asked him about the Godfather and the

20   movie.  I thought the movie question covered it.

21          MR. JASPER:  Just in --

22          THE COURT:  What's the media question?

23          MR. JASPER:  Newspapers, read anything recently?

24          THE COURT:  I didn't ask that question at the

25   beginning?

1          MR. GOLTZER:  I don't think so.

2          MR. JASPER:  No.

3          THE LAW CLERK:  I thought you did.  We can check.

4          THE COURT:  Check.

5          (Record read.)

6          MR. JASPER:  Sorry, Judge.

7          THE COURT:  Always good, belts and suspenders.

8          (In open court.)

9          THE COURT:  Just a few more questions, sir.

10         Thank you for your patience.

11         Let's put it this way, there will be evidence

12  presented at the guilt phase that the government believes

13  proves that the defendant is guilty beyond a reasonable doubt.

14  You'll have to consider that evidence.  Some of the evidence

15  may include evidence of the defendant's involvement in or

16  association with activities of gambling and narcotics.

17         Do you think that you can be fair and impartial on

18  the question of whether the government has proven that the

19  defendant is guilty of intentional murder knowing that there

20  is evidence that the defendant had involvement in those

21  activities?

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Is there anything about involvement in

24  those activities that would preclude you from being fair and

25  impartial on the question which you must answer, which is

Prospective Juror #104                        692

1  whether the defendant is guilty beyond a reasonable doubt of

2  the crimes charged?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  Now, let me just resolve something here.

5            You were asked the following question about your

6  views on the death penalty.

7            The question was:  In your opinion, is the death

8  penalty the only appropriate sentence for a defendant who has

9  been proven guilty beyond a reasonable doubt of deliberately

10 and intentionally killing another person if, as here, the

11 alternative sentence is life in prison without the possibility

12 of release?

13           You answered yes.  Then you said, give him her a

14 chance to repent and accept what he has done is wrong.

15           Was that a mistake where you said yes, the death

16 penalty is the only appropriate sentence?

17           THE PROSPECTIVE JUROR:  I'm sorry.  I didn't hear

18 you, sir.  Can you repeat that question, please?

19           THE COURT:  Sure.

20           The question was whether in your opinion the death

21 sentence is the only appropriate sentence for a defendant who

22 has been proven guilty beyond a reasonable doubt of a

23 deliberate and intentional killing of another person.

24           You said yes, that's the only appropriate sentence

25 if the alternative is life in prison.

Prospective Juror #104                          693

1          Is that your view?

2          THE PROSPECTIVE JUROR:  Yes.

3          That's -- I mean, if he is -- death sentence is the

4   only alternative to life imprisonment, then obviously it has

5   to be a yes.

6          THE COURT:  So you would always vote for the death

7   penalty?

8          THE PROSPECTIVE JUROR:  No.  Again, I said before,

9   depends upon the evidence.

10         THE COURT:  I think we are having a communication

11  issue here.

12         You are being asked where someone is found guilty of

13  an intentional murder and the choices are the death penalty

14  and life in prison without the possibility of release, would

15  you always impose the death penalty for intentional murder?

16         THE PROSPECTIVE JUROR:  Again, I said, depends.  Now

17  the next sentence that I wrote over there is?

18         THE COURT:  Give him/her a chance to repent.

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And accept what he has done is wrong.

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  What does that mean?

23         THE PROSPECTIVE JUROR:  I mean, it can be both ways.

24  We can give him -- according to me, I can give him, not me, I

25  can vote for death penalty, but at the same time I can also

Prospective Juror #104                        694

1   impose the imprisonment for life.  I am go 50/50 way.  That's

2   what I meant it over there.

3           THE COURT:  50/50, meaning you could do one or the

4   other?

5           THE PROSPECTIVE JUROR:  Yes.

6           THE COURT:  What would it depend on?

7           THE PROSPECTIVE JUROR:  Again, the evidence.  If --

8   if I feel that the evidence is correct, then I can go -- I

9   will vote for the death penalty also.

10          THE COURT:  You've already found the person guilty

11  of murder.

12          THE PROSPECTIVE JUROR:  Okay.

13          THE COURT:  The evidence that you must consider is

14  what I have told you before about, the aggravating and

15  mitigating factors involving the background of the defendant,

16  other activities of the defendant, other circumstances that

17  will be brought to your attention at a penalty phase.

18          Will you be able to consider those factors, and

19  assuming that the penalty is life without the possibility of

20  release, but that if you think that the government has proven

21  at the penalty phase that the death penalty is justified, you

22  could then impose the death penalty if it is found beyond a

23  reasonable doubt by you and the entire jury that the death

24  penalty is the more appropriate penalty.

25          THE PROSPECTIVE JUROR:  Yes.  Then I will vote for

1   the death penalty.

2            THE COURT:  But there is a presumption that the

3   penalty of life in prison without the possibility of release

4   is a sufficient penalty.

5            Do you accept that.

6            THE PROSPECTIVE JUROR:  I will accept that too.

7            THE COURT:  Anything else?

8            MR. GOLTZER:  One more question, Judge.

9            (Side bar.)

10           THE COURT:  Yes?

11           MR. GOLTZER:  My sense is there is a language

12  problem.  The one question that may resolve it is, if you find

13  that the evidence is correct in terms of having proved the

14  intentional unjustified murder, would you then always impose

15  the death penalty.  That's the one question I think he should

16  be asked.

17           MS. MERKL:  I don't think there is a language issue.

18  This juror has answer -- his answers in the questionnaire are

19  nuanced.  He seems to be following the Court's question.  I

20  think the question in the questionnaire is very long and it

21  has some clauses.  It is hard to understand when they are read

22  orally.

23           MR. GOLTZER:  He may still be in the guilt phase

24  even though there has been extensive questioning.  My sense is

25  that when he says if the evidence is correct he means the

Prospective Juror #104                              696

1    evidence at the guilt phase.

2              (In open court.)

3              THE COURT:  One more question.  I apologize.

4              THE PROSPECTIVE JUROR:  Yes.

5              THE COURT:  If the jury finds the defendant guilty

6    of intentional unjustified murder at the guilt phase and now

7    we are in the penalty phase and you receive evidence about the

8    aggravating factors and mitigating factors, you believe that

9    because the defendant was found guilty of the murder in the

10   guilt phase that you must impose the death penalty in the

11   penalty phase?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  All the time?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  You would not take into account the

16   mitigating factors that are presented?

17             THE PROSPECTIVE JUROR:  Taking into all the factors,

18   I will say yes.

19             THE COURT:  You would always impose the death

20   penalty?

21             THE PROSPECTIVE JUROR:  Yes, sir.

22             THE COURT:  Why is that?

23             THE PROSPECTIVE JUROR:  Like I told, my thoughts

24   have evolved.  My opinions have evolved.  People should be

25   more strict.  They should consider the value of other people's

Prospective Juror #104                                  697

1    lives too.

2           I am not saying it's an eye for an eye or a tit for

3    a tat.  We should make this understand to the -- to the public

4    that this is wrong and what you did to somebody else applies

5    to you also.

6           THE COURT:  So you would never impose the penalty of

7    life in prison in that situation?

8           THE PROSPECTIVE JUROR:  In that particular

9    situation, no.

10          THE COURT:  All right.  Thank you very much.  Have a

11   nice day.  Mr. Reccoppa will tell you what to do next.

12          THE PROSPECTIVE JUROR:  Thank you, sir.

13          THE COURT:  You are most welcome.

14          (Juror leaves courtroom.)

15          MR. GOLTZER:  Motion to strike for cause, judge.

16          THE COURT:  Any objection?

17          MS. MERKL:  No.

18          THE COURT:  All right.  Number 104 is stricken for

19   cause.

20          105.  Let's bring him in.

21          (Continued on next page.)

22

23

24

25

GR       OCR       CM       CRR       CSR

Prospective Juror 105                    698

1            tHE COURT:  Bring in 105.

2            (Prospective juror present.)

3            THE COURT:  Please be seated, sir, that first chair.

4    Good afternoon, sir.

5            THE PROSPECTIVE JUROR:  Good afternoon.

6            THE COURT:  Please be seated everyone.

7            You are Juror No. 105?

8            THE PROSPECTIVE JUROR:  Yes, sir.

9            THE COURT:  Thank you for your patience.

10           THE PROSPECTIVE JUROR:  Thank you.

11           THE COURT:  I remind you that you are still under

12   oath.  And let me ask you, between the time you filled out the

13   questionnaire and today, have you read or learned or heard or

14   observed anything about this case anywhere?

15           THE PROSPECTIVE JUROR: Not really, just briefly on

16   the newspaper.  But I didn't really -- I just glanced at it.

17           THE COURT:  You didn't read the story?

18           THE PROSPECTIVE JUROR:  No.

19           THE COURT:  So you don't know anything more than you

20   knew before?

21           THE PROSPECTIVE JUROR: About ties.

22           THE COURT:  All right.  Thank you very much for not

23   reading the story.  Continue to follow my instruction.

24           Let me ask you, you indicated that you own a

25   business for the last three years.  Without telling me what

1    the business is, what kind of a business is it?

2            THE PROSPECTIVE JUROR: Transportation industry.

3            THE COURT:  Transportation?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Do you have employees?

6            THE PROSPECTIVE JUROR: Yes.

7            THE COURT:  How many?

8            THE PROSPECTIVE JUROR: Small company, five.

9            THE COURT:  If you were on a trial for 4 to 6 weeks,

10   would that create a financial hardship for you?

11           THE PROSPECTIVE JUROR: It would create a management

12   issue.  But, you know --

13           THE COURT:  You could handle it?

14           THE PROSPECTIVE JUROR: I wouldn't want to, but if I

15   have to it would be done.

16           THE COURT:  All right.  Let me just mention again,

17   as I did before, that when we have the trial it will be four

18   days a week not five days a week, so at least one day a week

19   there will be no trial.

20           THE PROSPECTIVE JUROR:  Right.  I recognize that.

21           THE COURT:  Now, let me ask you about your answer to

22   the following question:  Have you formed an opinion as to the

23   defendant based on anything you have seen or heard or read?

24   You answered yes.  You said, Seems he was accused of being in

25   the mob.

1      THE PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Now, your job as a juror is to listen to

3   the evidence about guilt or nonguilt in the first phase of the

4   trial.

5          The government has the obligation of proving to you

6   beyond a reasonable doubt that the defendant is guilty of the

7   charges that have been brought, intentional murder of an

8   individual, conspiracy to murder and a weapons charge

9   associated with the other two charges.

10         The defense never has the obligation of proving

11  anything because the defendant is presumed to be innocent of

12  all charges and that presumption is carried with him

13  throughout the first phase of the trial until you deliberate

14  and you decide whether the government has met its burden.

15         Okay?  Do you understand that.

16     THE PROSPECTIVE JUROR: Yes.

17     THE COURT:  Now, would the fact that the defendant

18  is accused of being in the mob, if that's what it is, would

19  that make it impossible for you to consider the evidence

20  presented here in court and decide fairly and impartially

21  whether the defendant committed these crimes?

22     THE PROSPECTIVE JUROR: It is not about me making a

23  decision.  It was just an impression.  So I don't think that

24  impression would necessarily have to do anything with any

25  decision.  I was just saying I have a visual impression and it

1    in no way would affect my, my decision ability.

2         THE COURT:  So you would put any thoughts of that

3    aside; is that right?

4         THE PROSPECTIVE JUROR: Yeah.  I don't think that

5    would be fair to anybody.

6         THE COURT:  You indicated that your grandmother was

7    murdered.  What were the circumstances?

8         THE PROSPECTIVE JUROR: She was killed by, by the

9    people that worked at her house.

10        THE COURT:  In other words, she had people working

11   for her?

12        THE PROSPECTIVE JUROR: Yes.

13        THE COURT:  And these were people who --

14        THE PROSPECTIVE JUROR:  First the people was the

15   gardener and -- the gardener and like the --

16        THE COURT:  The cook, handyman --

17        THE PROSPECTIVE JUROR:  The person that helped out

18   in the house, cleaned.

19        THE COURT:  So it was a man and a woman?

20        THE PROSPECTIVE JUROR: Two men.

21        THE COURT:  Were these people ever prosecuted for

22   this crime?

23        THE PROSPECTIVE JUROR: They were prosecuted.  They

24   were convicted.

25        THE COURT:  In your view, was the case properly

1    handled by the criminal justice system?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  You indicated that you spent time in

4    Greenpoint, Brooklyn and there is crime in Greenpoint?

5            THE PROSPECTIVE JUROR: Yeah.  That question was

6    whether I knew the area and whether I've heard of any -- any

7    kind of organized crime and I did hear that there was sizable

8    drug trafficking in the area at the time.

9            THE COURT:  You have no personal --

10           THE PROSPECTIVE JUROR:  I didn't have any personal

11   experience with it.

12           THE COURT:  You indicated the following answer to

13   the following question:  Do you have any bias, sympathy or

14   prejudice with reference to the United States government that

15   would make it difficult for you to render a fair and impartial

16   judgment based solely on the evidence presented at trial?  You

17   checked off yes.  You explained as follows:  I believe that if

18   the U.S. government gets involved there is some reason.

19           What do you mean by that?

20           THE PROSPECTIVE JUROR: When you read it back now it

21   sounds a little harsh, but I think what I meant was that the

22   involvement of federal agents in the operation of a sizable

23   size, I think it would mean that there was -- there was --

24   that this might be reasons whether or not they would want --

25   you know, I'm not really sure what I meant by that, you know.

Prospective Juror 105                    703

1      THE COURT:  Well, you'll be instructed by the court

2  that both sides are equal before the court and that you're not

3  to give any special consideration or favor to the government

4  in connection with this case.

5      So it means that you must decide the case based on

6  the evidence itself, and the government has the obligation to

7  prove to you beyond a reasonable doubt based on the evidence

8  presented at the trial that the defendant is guilty.

9      Can you follow that instruction?

10      THE PROSPECTIVE JUROR:  Yes.

11      THE COURT:  If the defendant is found guilty by the

12  jury of intentional and deliberate murder, then and only then

13  will there be a penalty phase in the case with the same jury.

14  You understand that?

15      THE PROSPECTIVE JUROR:  Yes.  I didn't know that.

16      THE COURT:  Well, there is no reason you should have

17  know it, but I need to explain the structure of the trial.

18      At the penalty phase there are only two possible

19  penalties.  The presumptive penalty is life without the

20  possibility of release then the government will provide

21  evidence at the penalty phase of certain what they call

22  aggravating factors that the government believes that will

23  prove to the jury beyond a reasonable doubt that the penalty

24  of life in prison without the possibility of release is

25  inadequate to meet the objectives of justice and that the jury

1   should impose the more significant penalty of the death

2   penalty.

3           The defense may offer mitigating factors that offset

4   the aggravating factors, but it's not required to, and the

5   jury will then weigh the factors, consider the evidence and

6   decide whether the government has met its burden of proof that

7   would cause the jury to impose the death penalty.

8           Do you understand that?

9           THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  No person on the jury is ever required

11  to vote for the death penalty.  You understand that?

12          THE PROSPECTIVE JUROR:  Yes.

13          THE COURT:  If even one juror decides that the

14  proper penalty is indeed life in prison without the

15  possibility of release then that will be the penalty.  It

16  would be necessary for all 12 jurors to agree that the death

17  penalty is appropriate.

18          You understand that.

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Now, let me read your comments about the

21  death penalty and then we'll discuss it further.

22          You were asked for your views on the death penalty

23  and you say, I don't personally agree with the death penalty

24  because there are instances of people being wrongly convicted.

25  I believe that there are people that have been wrongly

1  convicted.

2          Is that your view?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  My question is, if the jury returns a

5  verdict of guilty on intentional and deliberate murder and

6  there is a penalty phase, and there is evidence presented of

7  aggravating factors, mitigating factors, when it comes to the

8  point where you have to deliberate and decide what the penalty

9  should be, could you impose a penalty of death in that

10  circumstance?

11          THE PROSPECTIVE JUROR: I -- am I instructed to

12  not -- I mean, my question is, are we looking at using the

13  death penalty or are we just saying, okay, that's going --

14  my -- you know, I'm not really -- I have a hard time going

15  through that motion personally.

16          I think it's a big -- I'm not sure how I would act,

17  I think.  I think if -- if I was instructed to proceed with

18  something that I obviously -- the evidence was clear, I'm not

19  really sure, your Honor.

20          THE COURT:  All right.  Let's take it one step at a

21  time.  I know this is very difficult, it's not something you

22  think about every day in your life.

23          We appreciate that you're giving it this much

24  thought and also there is no right or wrong answer here so

25  whatever you think that's what we want to know.  Okay?

Prospective Juror 105                          706

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Are there any circumstances of an

3    intentional and deliberate murder or the background of a

4    defendant that would make you inclined to impose the death

5    penalty?

6          THE PROSPECTIVE JUROR: Your Honor, I'm a very

7    talkative person and I have an opinion about everything and --

8    you know, this is something that I -- I don't think I've ever

9    thought of being in this position and I think it's a -- it's a

10   little overwhelming, to be honest with you.  You know  --

11         THE COURT:  Is this an issue that creates some sort

12   of an emotional problem for you?

13         THE PROSPECTIVE JUROR: Well, just by --

14         THE COURT:  I don't mean that in a negative way.

15   Does it affect you in some way emotionally?

16         THE PROSPECTIVE JUROR: Well, just by the way I'm

17   feeling right now, it obviously does.

18         THE COURT:  Tell me how you're feeling right now.

19         THE PROSPECTIVE JUROR:  I feel the same way when you

20   first mentioned it the first day that I saw you, I felt my

21   stomach drop, and I felt, you know, literally, you know, sick

22   to my stomach.

23         I'm very nervous right now just speaking about it.

24   I think it's a great burden, but you know, if -- you know,

25   seeing that the process has to go that way and if -- you know,

1   if the rule is given to the jury at the time would be that,

2   with that kind of evidence then it would show that he -- that

3   the defendant -- that he does deserve the death penalty, then

4   I think I -- I would probably agree with the decision.  It

5   would not be an easy decision.  I think it would -- all right.

6           THE COURT:  In what kind of case involving what

7   circumstances of a murder that is an intentional and

8   deliberate murder would you impose the death penalty, what

9   kind of a case, if you can think of a kind of case?

10          THE PROSPECTIVE JUROR:  Well, just to give my

11  personal experience.  I didn't wish the death penalty on the

12  two men that killed my grandmother.  They got killed in jail

13  in different circumstances, but at the time of the prosecution

14  like I wasn't screaming for blood.  You know, so I think --

15          THE COURT:  Do you still feel the same way about it

16  as you felt then?

17          THE PROSPECTIVE JUROR:  The way I felt then, I

18  didn't have -- I didn't feel like there was a cloud over me to

19  put these people away.  I mean, I think I wrote in my notes

20  there that I -- I don't think that there's any kind of

21  retribution that I could get, we as a family could get, so

22  there was no -- I wasn't going to get anything from it.

23          THE COURT:  Any other questions?

24          MR. JASPER:  No, your Honor.

25          MS. MERKL:  No, your Honor.

Prospective Juror 105                      708

1          THE COURT:  We want to thank you for coming in, sir,

2     and for your thoughts, which we appreciate.

3          Mr. Reccoppa will tell you what to do next.  You

4     have a good day.

5          THE PROSPECTIVE JUROR: Thank you.

6          THE COURT:  You're most welcome.

7          (Prospective juror leaves.)

8          MS. MERKL:  Your Honor, the government would move to

9     dismiss this juror for cause.  He's clearly emotional and in

10    his own words sick to his stomach regarding the very prospect

11    of being here.

12         He stated that he would have a hard time, that he

13    was not really sure he could make the decision.  He indicated

14    that he was extremely uncomfortable about the whole situation

15    and even in a situation of somebody killing a close family

16    member he indicated that he was unwilling to impose the death

17    penalty.

18         Given the totality of his answers in the

19    questionnaire combined with his demeanor the government

20    believes this juror is substantially impaired.

21         MR. JASPER:  I disagree with that view.  What he

22    said was his stomach dropped when he heard the death penalty

23    was on the table.  I don't think he said that he was sick to

24    his stomach, but I won't argue with that.

25         Your stomach is supposed to drop.  This is a serious

1  thing and he reflected that.  And he also indicated that he

2  would be able to impose it again, reluctantly, yes, but taking

3  a person's life -- anytime the government, the state takes a

4  person's life, we want people who take that seriously.

5          The only question is, would it be blocked, would it

6  be an obstacle, and I don't think it was from this juror's

7  comments.  It's an emotional situation for all jurors.

8          That's what the different studies have told us in

9  the post-verdict interviews in capital cases.  So I would say

10 if that's the government's main objection and from what

11 they've said here, I think that is rebutted by this juror's

12 demeanor in answer to very thoughtful answers to your Honor's

13 questions.

14         MS. MERKL:  He did say that he was sick to his

15 stomach.  He also stated he was very nervous.

16         I would note in regards to demeanor, the juror was

17 extremely gravely trying to assert that he could if instructed

18 by the court follow the rule, but he was very clear that he is

19 obstructed in his ability to fairly and impartially evaluate

20 the imposition of the death penalty.

21         The government feels that he is totally unqualified.

22 That is based not just on his responses while being questioned

23 by also in response in the questionnaire he stated repeatedly

24 that he feels that the worst punishment is imprisonment for

25 life.

1          He thinks the death penalty should be -- he's

2     opposed to it with very few exceptions.  He stated that he

3     thinks life in prison is the worst punishment.

4          There are some follow-up questions that could

5     potentially be appropriate with regard to penalty inversion.

6          THE COURT:  The penalty inversion question I never

7     got to.  It was on my list.  I'd like to ask him that

8     question.  Let me ask him that.

9          MS. MERKL:  In addition, if you are going to bring

10    him back, the government apologizes, we had a typographical

11    error in our letter.

12          The questions indicated for Juror 106 were in fact

13    for Juror 105 as Juror number 106 was excused.  The juror

14    himself has a little bit of a criminal record, as indicated in

15    question 46.

16          So if your Honor is inclined to question him

17    further, we would inquire about that.  We would also ask, your

18    Honor, if this juror could vote to impose the death penalty

19    against this defendant in a case involving a single deliberate

20    murder.

21          MR. JASPER:  Your Honor, I'm not sure if I heard

22    that last proposed question right.  It sounds like a stakeout

23    question, but it exactly shows that when we get in the real

24    time of the courtroom questions sometimes get case specific,

25    and I just wanted the court to be aware of what that last

1   question sought to do.

2        MS. MERKL:  It's by no means a stakeout question.

3   It's the issue in the case, whether this juror could vote for

4   the death penalty.  That is not a stakeout question in the

5   slightest.  Based on his prior answers, it's the issue in the

6   case, but based on his prior answers there is a very, very

7   clear reluctance on his part.

8        MR. JASPER:  The government said for this particular

9   defendant.  I don't know that he said that he had any problem

10  with a single sole murder case.  I don't think that that was

11  put to him.  I could be wrong, but --

12       THE COURT:  But he said that he didn't support the

13  death penalty for the murder of his grandparents.

14       MS. MERKL:  Grandmother.

15       THE COURT:  Grandmother.

16       MR. JASPER:  He did say that.  You want to ask him

17  that question I have no problem with that question.  I just

18  wanted to indicate that --

19       THE COURT:  Well, no.  It may be that the question

20  should not be whether for this particular defendant, but for a

21  single intentional deliberate murder, which is what is charged

22  in this case.

23       MR. JASPER:  Your Honor, it's the similar, I think,

24  back and forth, legitimate back and forth that we go through.

25  If you're asking that, then he should be asked the aggravator

1   that the defendant is already serving a life sentence for a

2   separate murder as well.

3              MS. MERKL:  Your Honor, the --

4              MR. JASPER:  That is ruled that it's coming in.  The

5   previously convicted of an offense involving a firearm in 2008

6   conviction is in.  It's a statutory aggravator.  So they would

7   have to reach that in order to get to the selection process.

8              MS. MERKL:  With all due respect, the juror has

9   already been asked those questions in the questionnaire.

10             THE COURT:  Bring him in.

11             MR. JASPER:  I think what this --

12             THE COURT:  I'm bringing him in.

13             (Prospective juror present.)

14             THE COURT:  I just have a couple more questions, if

15  I may.

16             The law states that the penalty of life in prison

17  without the possibility of release is the lesser penalty and

18  the death penalty is the greater penalty.

19             Do you accept that rule of law and would you in your

20  deliberations in a penalty phase, would you follow that rule

21  of law?

22             THE PROSPECTIVE JUROR:  Yes.

23             THE COURT:  If during a penalty phase for someone

24  who has been convicted by the jury of an intentional and

25  deliberate murder, let's say you learned that the defendant

1   had also been convicted of another murder and was serving a

2   life sentence without possibility of release for that murder,

3   would that have any bearing on your consideration of what

4   penalty to impose?

5             That is just one potential factor.  I'm just giving

6   you a for instance.  There may be other factors, aggravators

7   and mitigators, but I'm just mentioning that factor and asking

8   how that might affect your thinking.

9             THE PROSPECTIVE JUROR:  Would this issue be brought

10  up by the judge and told --

11            THE COURT:  No.  The factors, the aggravating

12  factors -- and this might be one of them hypothetically --

13  would be brought up by the government and evidence would be

14  provided by the government.  There might be mitigating factors

15  brought up by the defense, although it's not required to bring

16  up any mitigation, the burden is always on the government --

17            THE PROSPECTIVE JUROR:  Right.

18            THE COURT:  -- to prove beyond a reasonable doubt

19  that, number one, life in prison is not sufficient to meet the

20  purposes of justice but that the death penalty is required in

21  order to achieve the purposes of justice in the case.

22            So, I go back to my question.  If you're given

23  evidence of that nature at the penalty phase, would that have

24  any affect on your consideration of what the penalty should

25  be?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Why would that be?

3          THE PROSPECTIVE JUROR: I think -- I think it would

4    point to the fact that the defendant is clearly a -- maybe --

5    I don't know if the word is unrepairable -- this person is

6    beyond any human remorse.

7          THE COURT:  If that's the case, if you reach that

8    conclusion, do you think that a sentence of death might be

9    appropriate?

10         THE PROSPECTIVE JUROR: Well, if there is to be a

11   scale of a really hard decision to make, I would probably make

12   it -- you know, a little more towards that.  It would add

13   weight, it would definitely add weight of consideration to

14   that, it would add weight to that consideration.  But it would

15   still be extremely difficult to make, I think.

16         THE COURT:  Do you believe that there is any

17   circumstance in which you could vote for the death penalty for

18   someone who is convicted of the intentional and deliberate

19   murder of another individual?

20         THE PROSPECTIVE JUROR: I think if there is a death

21   penalty -- remembering those questions that were presented

22   before, you know, the options coming up more and more where

23   you wouldn't see someone more -- where the death penalty would

24   apply to, somebody that -- that was previously convicted, as

25   you said before, that there was premeditation --

1       THE COURT:  Well, the premeditation for the crime

2   that's charged in this case is the subject of the guilt phase

3   not the penalty phase.  He's already been convicted of

4   intentionally and deliberately committing a murder in this

5   case, so premeditation is already resolved.

6       The issue is what the penalty should be based on the

7   evidence of the aggravators and the mitigators.

8       THE PROSPECTIVE JUROR:  Okay.  I was just stating to

9   the questionnaire that was given to me, I'm sorry.  Yes, I

10  think if the person was -- I think that would -- that would --

11  weighing it in consideration of the death penalty.

12      THE COURT:  You haven't answered my question, sir.

13  Do you believe that you could impose the death penalty under

14  any circumstances for someone convicted of a deliberate and

15  intentional murder?  Can you answer the question?

16      I just want to know what you think.  There is no

17  right or wrong answer.  Don't worry about it.  I just want to

18  know what you sincerely think in answer to that question,

19  that's all.

20      THE PROSPECTIVE JUROR:  You know, I'm -- I

21  apologize.

22      THE COURT:  Don't apologize.

23      THE PROSPECTIVE JUROR:  It sounds easy to say --

24      THE COURT:  It's not easy.  None of this is easy.  I

25  just want to know what your views are.  There is no right

1   answer or wrong answer, there is only your answer.

2           THE PROSPECTIVE JUROR:  No.  My answer is that

3   there's no -- I think from my -- there would -- I think I

4   would ultimately -- I would decide yes to a heinous crime and

5   that I would -- I think I would decide yes.

6           THE COURT:  What's a heinous crime, in your view?

7           THE PROSPECTIVE JUROR: Well, obviously like

8   something what happened to my family member would be heinous,

9   I think.  Cold murder, you know, murder of children, something

10  like that.  I think that would --

11          THE COURT:  So the murder of your grandmother is a

12  heinous crime?

13          THE PROSPECTIVE JUROR:  Yes.

14          THE COURT:  But you didn't support the death penalty

15  in that case?

16          THE PROSPECTIVE JUROR: It wasn't an option, first of

17  all.  I just -- I wasn't -- what I was bringing up to the

18  court was that I wasn't screaming for, I didn't see a need for

19  it.  Like, it wasn't going to satisfy me as -- you know.

20          THE COURT:  I see.  And so you believe you could

21  vote for the death penalty for the intentional deliberate

22  murder of an individual, is that what you're saying?

23          THE PROSPECTIVE JUROR:  Yes.  I think that if the

24  death penalty was available for the murder of my grandmother,

25  then I think I would have -- you know.

1             THE COURT:  You would have --

2             THE PROSPECTIVE JUROR:  I would have accepted it.

3             THE COURT:  You would have supported it or accepted

4    it?

5             THE PROSPECTIVE JUROR: I would have supported it,

6    yeah.

7             THE COURT:  Let me go back to what you said about,

8    you know, the feeling in the pit of your stomach.

9             THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  Is there any reason why you think you

11   would not be able to serve as a juror based upon your feelings

12   about this case -- or about the type of case, rather?

13            THE PROSPECTIVE JUROR:  Well, I don't think my

14   circumstances is different from any other juror.  I think it's

15   a hard case to deal with so there's no question about that, so

16   I think anybody would be subject to the same things.

17            You know, would I be able to?  I think I would, but

18   it's not something desirable, you know, I think, because of

19   the nature of the -- you know, it's a very hard thing to deal

20   with.

21            THE COURT:  All right.  I thank you very much.  You

22   have a good day.

23            Mr. Reccoppa will tell you what to do next.

24            (Prospective juror leaves.)

25            MS. MERKL:  Your Honor, the government will renew

1   it's motion and ask for additional follow-up if the court is

2   inclined to reserve on this juror.

3            THE COURT:  Anything else?

4            MR. JASPER:  We oppose that, your Honor.

5            The key question you asked him was whether or not he

6   would be able to impose this on a single murder.  He said yes.

7            You asked him also whether or not if the defendant

8   had been convicted or was serving life for another murder, he

9   said yes.  This is a guy, most respectfully, who takes

10  seriously the role that he has here.

11           It's not an easy thing, we all know it.  We said it

12  before, it's not supposed to be easy, Judge.  What we saw here

13  through the very thorough examination was that he could do it,

14  he could do it, he could impose the death penalty.  He could

15  pull the lever, but it wouldn't be an easy thing and I don't

16  think it's easy for any of these people.

17           If we had jurors who didn't reflect upon it we would

18  have a panel, a jury box full of killers, and that's not what

19  we want.

20           THE COURT:  That's a very dramatic statement.

21           MR. JASPER:  I apologize, your Honor.

22           THE COURT:  That's all right.  I said it was

23  dramatic, I didn't say it was inappropriate.

24           I understand the government's position.  I asked the

25  juror directly whether he could impose the death penalty.  His

1  demeanor is that it's very troubling to him, very difficult

2  but in the end he said he could do so under some circumstances

3  and I think he's a thoughtful individual and that he is

4  definitely not substantially impaired.

5          The motion is denied.

6          MS. MERKL:  Your Honor, in that event, the

7  government does have additional follow-up that the court

8  failed to ask with regard to his criminal history.

9          We also had a question regarding whether or not he's

10 going to hold the government to a higher burden of proof.  He

11 himself served time in prison, your Honor, and we would like

12 to know more about that.

13         THE COURT:  I'll ask him about the criminal history

14 just so we can close this out.  I think that he indicated he

15 could follow the court's instructions as to what the law is on

16 penalty inversion.  I think the same would be true for other

17 instructions that I would give.

18         (Prospective juror present.)

19         THE COURT:  I forgot to ask you a question.  I bet

20 you thought you were done.  I'm glad you're smiling.

21         In your questionnaire you indicated that you had a

22 conviction for some sort of a marijuana offense?

23         THE PROSPECTIVE JUROR: Yes.

24         THE COURT:  Can you tell us what that was.

25         THE PROSPECTIVE JUROR:  Yeah.  I was Upstate New

Prospective Juror 105                    720

1  York and I had purchased some marijuana from some friends and

2  I was bringing it back and we got stopped by the police.

3          THE COURT:  All right.  Now, you had purchased

4  marijuana for your personal use or to sell to other people?

5          THE PROSPECTIVE JUROR: Well, mixed.  It was, you

6  know, to sell to my friends and stuff like that.

7          THE COURT:  And was this an isolated instance or had

8  you done this before?

9          THE PROSPECTIVE JUROR:  It probably was a blessing

10  in disguise because at the time I was -- I didn't have much

11  money so I was probably going to try to start doing it, you

12  know -- as you said, like on a more consistent basis.  So that

13  put a stop to it.

14          THE COURT:  How long ago was this?

15          THE PROSPECTIVE JUROR: This was '04.

16          THE COURT:  What was the outcome of the case?

17          THE PROSPECTIVE JUROR:  Well, they gave -- it was

18  originally a belony but then it got reduced to a ?isdemeanor.

19          THE COURT:  Where was this, what county?

20          THE PROSPECTIVE JUROR: Jefberson County Upstate.

21          THE COURT:  Way Upstate?

22          THE PROSPECTIVE JUROR: Yeah, yeah.

23          THE COURT:  Up by Lake ;eorge?

24          THE PROSPECTIVE JUROR:  Well, a little further.  I

25  have friends up there.

BHS     OCR     CM     CRR     CSR

Prospective Juror 105                              721

1              THE COURT:  Lake Champlain?

2              And have you had any subsequent involvement in

3    purchasing marijuana?

4              THE PROSPECTIVE JUROR: No.

5              THE COURT:  Do you think that your experience in

6    that situation would have any affect on your ability to be

7    fair and impartial in a situation where there may be evidence

8    of narcotics trafficking in this case?

9              THE PROSPECTIVE JUROR:  No.  I wasn't really in much

10   sense in the business to know much about it or to really get

11   any really -- real experience, you know.

12             THE COURT:  Why did you go all the way upstate to do

13   this?

14             THE PROSPECTIVE JUROR: I have friends there and

15   that's when I kind of found out about, you know, people that

16   sell up there.  So --

17             THE COURT:  Since then?

18             THE PROSPECTIVE JUROR: No, well, I was in college at

19   the time.  I came back, finished school and opened -- been in

20   business ever since.

21             THE COURT:  What was the first business you opened?

22             THE PROSPECTIVE JUROR:  I had -- I created a

23   computer business for a touch screen system for cars.

24             THE COURT:  What kind of system?

25             THE PROSPECTIVE JUROR: Touch screen system for cars

1   and then I was installing them in limousines, you know, other

2   kind of vehicles, show cars.  But that -- when the financial

3   situation happened a couple of years ago, a couple of my

4   dealers went bankrupt and so did I.

5           THE COURT:  Did you do this mainly for car dealers?

6           THE PROSPECTIVE JUROR:   Yes.

7           THE COURT:  You didn't do it for individuals?

8           THE PROSPECTIVE JUROR: I dealt with individuals, but

9   mostly car dealers.

10          THE COURT:  How did you get your individual

11  customers?

12          THE PROSPECTIVE JUROR:  They were -- I dealt with a

13  couple of custom shops that put car stereos and -- one did a

14  leather, you know, leather seats so then guys would go with a

15  nice car and put everything in it.

16          THE COURT:  How did you hook up with these shops?

17          THE PROSPECTIVE JUROR:  I just basically started

18  going shop to shop.

19          THE COURT:  So you'd go and solicit them?

20          THE PROSPECTIVE JUROR: Yes.

21          THE COURT:  You would do your own marketing; is that

22  right?

23          THE PROSPECTIVE JUROR: Yeah, it was just me and a

24  couple of guys, really, just --

25          THE COURT:  Are they the same people you will were

Prospective Juror 105                    723

1   in Jefferson County with?

2          THE PROSPECTIVE JUROR: No, that was a whole

3   different life.

4          THE COURT:  That was a different life?

5          THE PROSPECTIVE JUROR: Yep.

6          THE COURT:  Okay.  Thank you very much.

7          (Prospective juror leaves.)

8          THE COURT:  Ms. Merkl, anything else?

9          MS. MERKL:  Your Honor, the government feels that

10  this juror, although he calls it a different life, it was

11  frankly not that long ago that he seriously contemplated

12  becoming a drug dealer and became arrested.

13         In New York State for felony marijuana possession

14  there needs to be a lot of marijuana involved.  The government

15  just has concerns about this juror's ability to respect the

16  law and participate in this process in light of the recency of

17  that conviction.

18         Certainly as far as turning his life around, he

19  seems to be to be doing a very good job about that, but we

20  have very serious concerns about this juror.

21         MR. GOLTZER:  He pled to a misdemeanor which renders

22  him qualified for jury service.  He has no felony conviction.

23  He said it was a mixed blessing.  The fact that he may have

24  contemplated something is not applicable here..

25         MS. MERKL:  He didn't just contemplate it, your

BHS     OCR     CM     CRR     CSR

1  Honor.  He to Lake Champlain and purchased a huge quantity of

2  marijuana that he was planning to distribute.

3          MR. GOLTZER:  There is no evidence that it was a

4  huge quantity of marijuana.  You just needed a few ounces to

5  be guilty of a felony in New York at that time.

6          THE COURT:  Not with marijuana?

7          MR. GOLTZER:  Yes, eight ounces.  We don't know how

8  much it was, but --

9          THE COURT:  Should I bring him back and ask him how

10  much?  I don't think that is the issue here.

11          MR. GOLTZER:  Jefferson County is not exactly a

12  liberal part of the state.  I don't minimize any criminality,

13  but it's a misdemeanor.

14          THE COURT:  I don't want to go into the relative

15  penalties in different counties in this case.

16          MR. GOLTZER:  I don't either, but --

17          THE COURT:  He pled to a misdemeanor.  That's what

18  the record is.

19          MR. GOLTZER:  Right.

20          MS. MERKL:  He served 30 days in jail.  It's not

21  just a misdemeanor slap on the wrist ticket, your Honor.

22          THE COURT:  Understood.

23          MR. GOLTZER:  It's not a disqualification as a

24  matter of law.

25          THE COURT:  I understand.

1           MS. MERKL:  I'm not suggesting that it is a

2    disqualification as a matter of law, Mr. Goltzer.

3           THE COURT:  If I change my mind I'll let you know

4    but I've already ruled and I'm standing by my ruling.

5           Thank you.  I will see you all at half past two.

6           (Luncheon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Juror # 107                          726

1              A F T E R N O O N        S E S S I O N
2         (The following occurred in the absence of the jury)
3         THE COURT:  All set?
4         Okay.  107, please.
5         (Juror number 107 present.)
6         THE COURT:  Please be seated.
7         Good afternoon.
8         THE PROSPECTIVE JUROR:  Good afternoon.
9         THE COURT:  You are juror number 107?
10        THE PROSPECTIVE JUROR:  Correct.
11        THE COURT:  I remind you that you are still under
12   oath.
13        THE PROSPECTIVE JUROR:  Okay.
14        THE COURT:  Let me ask you, between the time you
15   filled out the questionnaire and today, have you read, heard,
16   listened to or observed any information about the case
17   anywhere?
18        THE PROSPECTIVE JUROR:  No.
19        THE COURT:  Okay.  You indicated on your
20   questionnaire that you have been a manager for 28 years with
21   the same organization, is that right?
22        THE PROSPECTIVE JUROR:  Yes.
23        THE COURT:  Without telling me the name, don't tell
24   me the name, is it a company or is it a governmental agency or
25   not-for-profit?  What kind of organization?

GR      OCR      CM      CRR      CSR

1              THE PROSPECTIVE JUROR:  Government.

2              THE COURT:  Okay.  Is it a law enforcement agency or

3    other?

4              THE PROSPECTIVE JUROR:  Other.

5              THE COURT:  Okay.  When you say you are a manager,

6    before you were manager what kind of work did you do?

7              THE PROSPECTIVE JUROR:  I was -- that would say

8    where I worked, if that's okay.

9              THE COURT:  No, don't.

10             THE PROSPECTIVE JUROR:  I was a worker.

11             THE COURT:  All right.  Is it a large organization?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  In New York City?

14             THE PROSPECTIVE JUROR:  Throughout the United

15   States.

16             THE COURT:  Okay.  Then don't tell me.

17             THE PROSPECTIVE JUROR:  Okay.

18             THE COURT:  Is it federal, state or city?

19             THE PROSPECTIVE JUROR:  Quasi federal, I guess.

20             THE COURT:  Quasi federal.

21        Now, you indicated that you served as a grand juror

22   back in 1995.  Is that right?

23             THE PROSPECTIVE JUROR:  Correct.

24             THE COURT:  You served in 1998 on a civil trial in

25   state court, is that right?

Juror # 107                                728

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  In that trial the jury reached a verdict

3    in a negligence case.

4          Let me just ask you this, did you deliberate with

5    the jury?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.  The jury reached a verdict.

8    Don't tell me what it was.

9          THE PROSPECTIVE JUROR:  Correct.

10          THE COURT:  In 2002, in the state civil trial

11    involving negligence, you were also on a jury?

12          THE PROSPECTIVE JUROR:  Correct.

13          THE COURT:  And the jury reached a verdict in that

14    case as well?

15          THE PROSPECTIVE JUROR:  Correct.

16          THE COURT:  Okay.  Now, let me just ask you, the

17    distinction between a grand jury and a trial jury, do you

18    understand what that is?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  What is it?

21          THE PROSPECTIVE JUROR:  The grand jury was to see if

22    people were going to get indicted, to see if it was going to

23    go to court; and the civil was for negligence or, you know,

24    what -- it wasn't necessarily something against the law.

25          THE COURT:  All right.  As opposed to a criminal

1   case?

2           THE PROSPECTIVE JUROR:  Correct.

3           THE COURT:  Now you are being considered to be a

4   juror in a criminal trial in federal court.  In this case, the

5   way it works is that, as in all other criminal cases, it is

6   the burden of the government to prove beyond a reasonable

7   doubt that the defendant has committed the crimes that he is

8   charged with.  Right?

9           THE PROSPECTIVE JUROR:  Correct.

10          THE COURT:  This defendant is charged with three

11  crimes, the intentional deliberate murder of an individual;

12  conspiracy to commit the murder; and a weapons charge in

13  connection with the other two charges.

14          Do you understand that?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Okay.  But it is also a death penalty

17  trial.  So if the jury -- oh, and the burden is always on the

18  government to prove beyond a reasonable doubt that the

19  defendant is guilty of the crimes.

20          Do you understand that?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  The defendant doesn't have to prove

23  anything.

24          THE PROSPECTIVE JUROR:  Correct.

25          THE COURT:  The defendant is presumed to be innocent

1    for all purposes unless and until the jury decides after

2    hearing all the evidence and deliberating that he is actually

3    guilty beyond a reasonable doubt.

4              Do you understand that?

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Okay.  Should the defendant be found

7    guilty of the intentional and deliberate murder charge, then

8    and only then would the jury have to be reconvened for a

9    second trial, the same jury, to consider the appropriate

10   penalty.

11             There are only two penalties available to this

12   murder charge.  The presumptive penalty is life without the

13   possibility of release, meaning generally that is the penalty

14   that is exacted for this crime.

15             But in this case the death penalty is also

16   available.  So at a second phase of the trial, which we call

17   the penalty phase, the jury will be obliged to hear evidence

18   from the government about certain aggravating factors that the

19   government believes will demonstrate beyond a reasonable doubt

20   that the jury should not impose the lesser penalty of life

21   without the possibility of release but should impose the more

22   severe penalty of death.

23             The defense may offer evidence, what is called

24   mitigating evidence, which it believes would demonstrate to

25   the jury that the appropriate penalty is the lesser penalty,

1    the life without the possibility of release penalty, and that

2    the government has not proven beyond a reasonable doubt that

3    it is necessary to impose the more severe penalty of death.

4           The jury will listen to all the evidence and then

5    will weigh the evidence, consider the evidence and make a

6    decision.

7           The only way that a death penalty can be imposed is

8    if all the jurors agree, all 12.  If even one juror decides

9    that the death penalty is not appropriate but that life is the

10   proper penalty, then the penalty will be life in prison

11   without the possibility of release.  Each individual juror is

12   obligated to decide for him or herself what the penalty should

13   be.

14          THE PROSPECTIVE JUROR:  Okay.

15          THE COURT:  But to discuss it with the other jurors

16   in an effort to reach a unanimous verdict if the jury can.

17   But if a juror has a strongly held view that life without

18   possibility of release is the appropriate penalty, jurors are

19   under no obligation to change his or her mind.

20          Do you understand that as well?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  It is strictly a personal decision.

23          All right.  Now let me go over some of the death

24   penalty questions and follow-up on them with you.

25          THE PROSPECTIVE JUROR:  Okay.

1           THE COURT:  Now, in stating your views on the death

2    penalty, you said, I believe the death sentence is a case by

3    case decision.  Each case is different.  If someone cannot be

4    rehabilitated and continues killing.

5           Is that your general view about the death penalty?

6           THE PROSPECTIVE JUROR:  Basically.

7           THE COURT:  You also indicated as to whether you

8    were strongly in favor or strongly opposed, you circled the

9    six, which is right in the middle.  You said you didn't know

10   how long you held this view of the death penalty.  You also

11   said that the imposition of the death penalty for an

12   intentional murder depends on the circumstances.

13          Could you elucidate me on that?

14          THE PROSPECTIVE JUROR:  I've never really been under

15   that -- you know, to make that decision and really never got

16   into it.  But I don't believe -- I believe in some

17   circumstances, you know --

18          THE COURT:  Are there certain types of cases where

19   you think the death penalty is more appropriate than others?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Okay.  Please share with us the types of

22   cases that you think are more appropriate for the imposition

23   of the death penalty than others.

24          THE PROSPECTIVE JUROR:  Mass murders, intentional.

25          THE COURT:  They are all intentional.  This case

1    involves an alleged intentional murder, so let's put aside

2    that issue --

3              THE PROSPECTIVE JUROR:  Okay.

4              THE COURT:  -- and talk about the kind of

5    intentional murder that you think should be potentially

6    subject to the death penalty.

7              THE PROSPECTIVE JUROR:

8              THE COURT:  Mass murder, you said?

9              THE PROSPECTIVE JUROR:  Yes.

10             Unable to be rehabilitated.  I don't know.

11             THE COURT:  What evidence would you look to

12   regarding the ability or inability to be rehabilitated?  What

13   kind of evidence would you be interested in hearing?

14             THE PROSPECTIVE JUROR:  The history, maybe why they

15   did it.  I don't know.

16             THE COURT:  Okay.  History.

17             Would you be interested in other crimes that the

18   person had committed?

19             THE PROSPECTIVE JUROR:  Yes, that too.  That would

20   be a factor.  I don't know.

21             THE COURT:  If you received evidence at the penalty

22   phase that the defendant was already serving a life sentence

23   would you tell the possibility of release, for instance, in

24   connection with another homicide, would that have any

25   potential effect on your consideration of what the penalty

Juror # 107                                               734

1   should be?

2          THE PROSPECTIVE JUROR:  I don't know.

3          THE COURT:  Is it possible?

4          THE PROSPECTIVE JUROR:  Either way maybe.

5          THE COURT:  When you say either way?

6          THE PROSPECTIVE JUROR:  You know, well, if -- if

7   they -- they are serving life anyway without parole or -- I'm

8   trying to explain myself.  I'm sorry.

9          THE COURT:  That's all right.  Just whatever your

10  answer is.

11         THE PROSPECTIVE JUROR:  Right.

12         When you say would sway me?

13         THE COURT:  No.  Would that have an effect on your

14  consideration of what the penalty should be, whether the

15  penalty should be a life sentence or a death sentence?

16         THE PROSPECTIVE JUROR:  I don't think so.

17         THE COURT:  Apart from a mass murder, is there any

18  other type of murder situation where you would be more likely

19  to impose the death penalty?

20         THE PROSPECTIVE JUROR:  I've never really been in

21  that situation.  So I don't know.

22         THE COURT:  Fortunately.

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  What is the definition of a mass murder

25  to you?

1          THE PROSPECTIVE JUROR:  Doesn't have to be all at

2    once.  You know, a lot of --

3          THE COURT:  A lot?

4          THE PROSPECTIVE JUROR:  Multiple.

5          THE COURT:  Multiple murders?

6          THE PROSPECTIVE JUROR:  Yes, or how horrific, you

7    know.

8          THE COURT:  Do you have a number in mind?

9          THE PROSPECTIVE JUROR:  Not really.

10         THE COURT:  Okay.  Now, you answered the following

11   question in the following way:

12         Do you believe that life imprisonment without the

13   possibility of release is a sufficiently harsh sentence for a

14   person who has been found guilty of the crime of murder?

15         You answered yes.

16         Then you said, sometimes that can be more punishment

17   than death.

18         What did you mean by that?

19         THE PROSPECTIVE JUROR:  If you had to stay alive and

20   be in prison, maybe you just want to get over with.  Again, I

21   don't know.

22         THE COURT:  You mean, that the defendant might

23   prefer --

24         THE PROSPECTIVE JUROR:  To die, yes.

25         THE COURT:  To die?

GR      OCR      CM      CRR      CSR

Juror # 107                                      736

1          Well, under the law, I will instruct you, that the

2   lesser penalty is life imprisonment without the possibility of

3   release.

4          THE PROSPECTIVE JUROR:  I know.

5          THE COURT:  The greater, more severe penalty is the

6   death penalty.

7          In considering which penalty to impose, the greater

8   penalty or the lesser penalty, will you accept that rule of

9   the relative nature of the two penalties, one is the lesser,

10  meaning life, and the death penalty is the greater?

11         THE PROSPECTIVE JUROR:  Yes, yes.

12         THE COURT:  Okay.  You put down DK for some of these

13  answers.

14         THE PROSPECTIVE JUROR:  Don't know.

15         THE COURT:  Don't know.

16         THE PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Let me ask you again and maybe you know.

18         THE PROSPECTIVE JUROR:  Okay.

19         THE COURT:  But just tell me what you sincerely

20  think.

21         THE PROSPECTIVE JUROR:  Okay.

22         THE COURT:  All right.  Are your views on the death

23  penalty such that you would be unable to consider a sentence

24  of life without the possibility of release if the evidence at

25  trial showed a defendant presented a future danger to others?

GR      OCR      CM      CRR      CSR

Juror # 107                                    737

1          THE PROSPECTIVE JUROR:  Repeat the question.  I'm

2    sorry.

3          THE COURT:  Are your views of the death penalty such

4    that you would be unable to consider a sentence of life

5    without the possibility of release if the evidence at trial

6    showed a defendant presented a future danger to others?

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  Are your views on the death penalty such

9    that you would be unable to consider a sentence of life

10   without the possibility of release if the evidence at trial

11   showed a defendant sought the murder of a cooperating witness?

12         THE PROSPECTIVE JUROR:  Repeat the first part.

13         THE COURT:  That's fine.  I am happy to repeat it as

14   often as you like.

15         THE PROSPECTIVE JUROR:  Okay.

16         THE COURT:  We are in no hurry.  This is very

17   important.

18         THE PROSPECTIVE JUROR:  Okay.

19         THE COURT:  Are your views on the death penalty such

20   that you would be unable to consider a sentence of life

21   without the possibility of release if the evidence at trial

22   showed a defendant sought the murder of a cooperating witness?

23         THE PROSPECTIVE JUROR:  No.

24         THE COURT:  Are your views on the death penalty such

25   that you would be unable to consider a sentence of life

1   without the possibility of release if the evidence at trial

2   showed a defendant is already serving a sentence of life

3   imprisonment?

4           You already answered that question.

5           THE PROSPECTIVE JUROR:  Okay.

6           THE COURT:  What is your answer?

7           THE PROSPECTIVE JUROR:  No.

8           THE COURT:  Are your views on the death penalty such

9   that you would be unable to consider a sentence of life

10  without the possibility of release if the evidence at trial

11  showed a defendant was previously convicted of intentional

12  murder?

13          THE PROSPECTIVE JUROR:  No.

14          THE COURT:  Any other questions?

15          MR. JASPER:  No, Your Honor.

16          THE COURT:  Okay.  We want to thank you for coming

17  in.  Mr. Reccoppa will tell you what to do next.

18          Have a good afternoon.

19          THE PROSPECTIVE JUROR:  Okay.  You too.

20          (Juror leaves courtroom.)

21          THE COURT:  Do I hear any motion?

22          I hear no motion.

23          Juror number 107 is approved.

24          We are up to 110.

25

GR      OCR      CM      CRR      CSR

Juror # 110                                    739

1           (Juror number one ten is present.)

2           THE COURT:  Please be seated.

3           Good afternoon.

4           THE PROSPECTIVE JUROR:  Good afternoon.

5           THE COURT:  You are juror number 110?

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  All right.  I remind you you are still

8    under oath.

9           THE PROSPECTIVE JUROR:  Okay.

10          THE COURT:  Let me ask you, since you filled out the

11   questionnaire until today, have you learned or heard or read

12   or been advised of anything concerning this case?

13          THE PROSPECTIVE JUROR:  No.

14          THE COURT:  Okay.  I am just going to follow up on a

15   few questions.

16          I note that your job is as a legal secretary.  Is

17   that right?

18          THE PROSPECTIVE JUROR:   Right.

19          THE COURT:  And that you have been in your current

20   position for seven years, is that right?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Without telling me who you work for,

23   please,THU                firm,           firm or some other

24   of legal business?

25          THE PROSPECTIVE JUROR:  It's a corporation.

GR      OCR      CM      CRR      CSR

Juror # 110                                740

1          THE COURT:  You work for a corporation?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  You have been doing this with this

4     corporation for seven years?

5          THE PROSPECTIVE JUROR:  Seven years.

6          THE COURT:  Before that?

7          THE PROSPECTIVE JUROR:  Various -- I was just in --

8     in Staten Island, small job in Staten Island.  For a period of

9     time I wasn't -- I was home.

10          THE COURT:  I see.  Okay.

11          Your husband is a clerk in Supreme Court?

12          THE PROSPECTIVE JUROR:  Right.

13          THE COURT:  Okay.  I would like to ask you a few

14     follow-up questions about your views of the death penalty.

15          THE PROSPECTIVE JUROR:  A hum.

16          THE COURT:  You stated that, just sentence if proven

17     by beyond a reasonable doubt.  No one has a right to take a

18     life.

19          THE PROSPECTIVE JUROR:  Right.

20          THE COURT:  Let me just go over the way this case

21     will be tried.

22          This case has potentially two phases.  The trial

23     will begin with what is called the guilt phase.  The defendant

24     has been accused of three crimes; intentional and deliberate

25     murder of another individual; conspiracy to commit the murder;

GR        OCR        CM        CRR        CSR

1   and a weapons charge associated with the first two charges.

2        The government has the obligation at a trial of

3   proving that the defendant is guilty beyond a reasonable

4   doubt.  The defendant has no burden at all.  The defendant

5   doesn't have to present any evidence.  The defendant does not

6   have to testify in the case.  In fact, I will instruct the

7   jury that if the defendant does not testify, that they can't

8   hold that against the defendant in any way.  No adverse

9   inference against the defendant for not testifying.

10        The burden is always on the government to prove the

11   defendant guilty of the charges beyond a reasonable doubt.

12        If the defendant is found guilty of the charge of

13   intentionally and deliberately murdering another person, then

14   there will be a second phase of the trial, where the two

15   different options for the penalty will be on the table for the

16   jury to consider.

17        The presumptive penalty is life without the

18   possibility of release.  That is generally the penalty for

19   this crime.  But in this case there is also the possibility

20   that a more severe penalty may be imposed by the jury, and

21   that is death.

22        The jury would have to decide the penalty of death

23   unanimously.  Every single juror would have to agree.  If even

24   one juror decided that a penalty of death was not appropriate

25   and the penalty of life was the appropriate penalty, then the

Juror # 110                                          742

1   penalty would be life in prison without the possibility of

2   release.

3           Every juror has the right to decide for him or

4   herself what the penalty should be.  No juror ever has to

5   impose a death penalty.

6           Do you understand all of those principles?

7           THE PROSPECTIVE JUROR:  Right.

8           THE COURT:  Okay.  Let me ask you this.  If the jury

9   should return a verdict of guilty for intentional and

10  deliberate murder against the defendant and there is a penalty

11  phase -- let me just say this, the government will provide to

12  the jury at the penalty phase information on some aggravating

13  factors that it believes drives this case out of the life

14  sentence area and makes it beyond a reasonable doubt

15  appropriate to impose the death penalty.  Once again, the

16  government has that burden.

17          The defense could provide the jury with certain

18  mitigating factors, which would augur in favor of a life

19  sentence offsetting the aggravating factors that the

20  government provides to the jury.  The defense is under no

21  obligation to provide any evidence but it may, if it wishes

22  to, provide those mitigating factors.

23          Once you have heard the aggravating factors -- you

24  don't know what they are yet -- and the mitigating factors and

25  you've already reached a verdict of guilty of intentional and

1  deliberate murder, do you believe that you could impose the

2  penalty of death on a defendant?

3              THE PROSPECTIVE JUROR:  Yes.  If I am comfortable at

4  that point, yes.

5              THE COURT:  And conversely, after hearing the

6  aggravating and mitigating factors, could you impose a penalty

7  of life in prison without the possibility of release?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  We are talking about in a case where

10 someone is convicted of an intentionally and deliberate murder

11 of another person.

12             You understand that?

13             THE PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Okay.  Now, let me ask you, is there any

15 kind of murder or circumstance of murder that would cause you

16 to be more willing to impose the death penalty on a defendant?

17             THE PROSPECTIVE JUROR:  I don't see why.  As long as

18 it -- it was with intent, I don't see -- what would matter.

19             THE COURT:  We are only talking about intentional

20 murder here.  We are not talk about accidents.  We are not

21 talking about negligence.  We are talking about intentional

22 murder.

23             THE PROSPECTIVE JUROR:  Right.

24             THE COURT:  So you could impose the death penalty in

25 any situation of intentional murder potentially?

1            THE PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Would you accept the Court's instruction

3    that the penalty of life in prison without the possibility of

4    release is the presumptive appropriate penalty for this crime?

5            THE PROSPECTIVE JUROR:  Yes, sure.

6            THE COURT:  Let me ask you, if at the penalty phase

7    you received evidence that a defendant had committed another

8    murder and was serving life sentence for that murder, would

9    you always impose the death penalty for that, in that

10   situation?

11           THE PROSPECTIVE JUROR:  Well, I thought it was only

12   for this particular charge.  I don't think you could consider

13   anything else.

14           THE COURT:  For the purpose of the first phase, the

15   guilt phase, you can only consider the charge and the evidence

16   on the charge.

17           THE PROSPECTIVE JUROR:  Right.

18           THE COURT:  But once the defendant is found guilty,

19   if he is, of that charge of murder, intentional murder, then

20   there is the second phase, where you will be asked to consider

21   other information about the defendant.  Some of it is

22   aggravating, presented by the government; and then the defense

23   may present other information that is mitigating.  In other

24   words, that would counterbalance, if you will, whatever the

25   aggravating information is. This is information about the

1  background, the history, the circumstances of the defendant

2  and his activities and other information.

3          It is hard to say exactly what it will be but I am

4  just giving you a for instance.  If for instance one of the

5  aggravating factors that is brought to light by the government

6  is that the defendant is serving a life sentence without

7  possibility of release for another murder, would you always

8  impose the death penalty, possibly impose the death penalty,

9  or not impose the death penalty?

10          THE PROSPECTIVE JUROR:  Possibly.

11          THE COURT:  Possibly.

12          THE PROSPECTIVE JUROR:  Possibly.

13          THE COURT:  What else would you want to know about

14  the defendant's background before making a decision as to what

15  the proper penalty is?

16          THE PROSPECTIVE JUROR:  Well, convictions.

17          THE COURT:  You mean, other convictions?

18          THE PROSPECTIVE JUROR:  Other convictions.

19          THE COURT:  Anything else?

20          THE PROSPECTIVE JUROR:  That's it.

21          THE COURT:  Are there any factors or is there any

22  information that you think might act as a mitigation that

23  would overcome some of these aggravating factors?

24          Is there something that you would want to know about

25  the person's background that might help you in balancing out

1    the aggravators as against the mitigators?

2             I know it is --

3             THE PROSPECTIVE JUROR:  It is pretty broad.  Not

4    that I can --

5             THE COURT:  It is a very hard question.

6             THE PROSPECTIVE JUROR:  -- think of.

7             THE COURT:  Let me see what else I can ask you.

8             Do you understand that this case has no relationship

9    to an accidental or an unintentional act of murder?

10            Do you understand?

11            This is strictly about intentional murder.

12            THE PROSPECTIVE JUROR:  Okay.

13            (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

The Prospective Juror # 110                747

1          THE COURT:  And the death penalty would not apply.

2   First of all, the defendant can't be convicted of an

3   intentional murder if it's accidental.  If you find the murder

4   is accidental, then the person can't be convicted of an

5   intentional murder.

6          Do you understand that?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Let me ask the parties:  Any questions?

9          MR. GOLTZER:  Yes, your Honor.

10          THE COURT:  Okay.

11          (Sidebar.)

12          THE COURT:  Mr. Jasper.

13          MR. JASPER:  Judge, could you follow up on Question

14   107?  That's the cost-to-taxpayer question.  She indicated

15   society shouldn't have to pay for the worst murderers.

16          THE COURT:  Okay.  What else?

17          MR. JASPER:  Also, there seems to be a disconnect in

18   the role of intentional murder with this particular juror.

19   105 is: "Do you believe that everyone who commits murder

20   should receive the death penalty?"

21          She says "No, and it should be unintentional."

22          You covered that.  If we can just get at "You're

23   sitting on a jury and the jury returns a verdict for a

24   deliberate, planned murder.  At that point before you hear

25   anything, what is your view towards the death penalty with

1  respect to a convicted murderer?."

2         The other question that I would like you to follow

3  up on is, she said that convictions would be something she

4  would be interested in knowing about, and I know we kind of

5  touched on it.  If she finds out that the defendant, at the

6  time the penalty phase begins, has been previously convicted

7  of deliberating planning an intentional murder, would that be

8  a situation where she could consider a life sentence, in that

9  situation?

10        If you could also ask her -- it's similar to that

11 question -- when would life without the possibility of release

12 be appropriate, or would she ever be able to consider it, what

13 examples she might give for that?

14        Judge, if you'd give me one second.

15        Judge, could you ask her what the impact of learning

16 that a defendant sought to kill a law enforcement official

17 might be?

18        MS. MERKL:  Your Honor, the juror already answered

19 that question in the questionnaire.  The juror also answered

20 your Honor's question about whether she would always impose a

21 sentence of death in the event that somebody was serving a

22 sentence of life for another murder conviction.  Your Honor

23 was very clear in explaining that issue, and she answered that

24 she would possibly impose the death penalty.  She certainly

25 didn't indicate she would always impose the death penalty.  I

1   don't think any follow-up is necessary as to that question.

2          In regards to cost, your Honor, the juror indicated

3   in the questionnaire that it would not compel her to vote.

4   Your Honor asked the question in a similar manner to the way

5   the parties formulated it in the questionnaire, would that tip

6   the scales in such a way that she would always vote for death

7   because of her concerns about the costs?

8          MR. JASPER:  What she said, society shouldn't have

9   to pay for the worst murderers, who have no regard for human

10  life.

11         THE COURT:  I'll discuss it with her.

12         MS. MERKL:  Then she stated that would not compel

13  her to vote for the death penalty.

14         THE COURT:  I'll ask her.  Thank you.

15         (In open court.)

16         THE COURT:  I just have a couple of more questions.

17         Let me ask you:  You answered the following question

18  in the following way: "Is the cost to taxpayers for housing an

19  inmate for a life sentence a concern to you?"

20         You said "Yes.  Society shouldn't have to pay for

21  the worst murderers, who have no regard for human life."

22         Would the -- in your view, is the cost of

23  incarceration a consideration in whether to impose a penalty

24  of death as opposed to a life sentence?

25         THE PROSPECTIVE JUROR:  No.

1          THE COURT:  And do you accept the principle, legal

2    principle, that a death sentence is a more severe penalty than

3    a life sentence?

4          THE PROSPECTIVE JUROR:  Yes.  It should be.  I

5    believe so.  But maybe some people, not everybody, might see

6    it that way.

7          THE COURT:  But I'll instruct you that for your

8    consideration at a penalty phase, that's the law.

9          THE PROSPECTIVE JUROR:  Right.

10          THE COURT:  And that's the law that you must apply.

11          THE PROSPECTIVE JUROR:  Hmm.

12          THE COURT:  So, if you find, if the jury finds, that

13    the lesser penalty is the appropriate penalty, that's a life

14    sentence.

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  You understand that?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Can you follow that rule?

19          THE PROSPECTIVE JUROR:  Absolutely.

20          THE COURT:  Let me go back to one of the potential

21    aggravators in the case.  I think you may have covered this.

22    Let me just ask you again.

23          If the government presents evidence in the penalty

24    phase that the defendant is currently serving a life sentence

25    for committing another murder, would you -- is it more likely

1    that you will impose the death penalty, taking all the other

2    factors into consideration?

3              THE PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Would you always impose the death

5    penalty in that situation?

6              THE PROSPECTIVE JUROR:  Always?  That's hard to

7    say "always."

8              THE COURT:  That's why I asked you the question.

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Is it likely that you would impose the

11   death penalty?

12             THE PROSPECTIVE JUROR:  Yes, very likely.

13             THE COURT:  Very likely?

14             THE PROSPECTIVE JUROR:  Very likely.

15             THE COURT:  But would you always impose it?

16             THE PROSPECTIVE JUROR:  Without hearing everything?

17             THE COURT:  Let me follow up on that.

18             Do you believe it's possible that you would learn

19   about -- let me put it this way:  If you learned about certain

20   mitigating factors, is it possible that those mitigating

21   factors would counterbalance and overcome the likelihood that

22   you would impose the death penalty for that aggravating factor

23   that I just described?

24             THE PROSPECTIVE JUROR:  It's a possibility.  It's a

25   possibility.

The Prospective Juror # 110                          752

1          THE COURT:  But it's not likely?

2          THE PROSPECTIVE JUROR:  Probably not likely, but

3   possible.

4          THE COURT:  Is there anything else that you would

5   like to know about the defendant's background at the penalty

6   phase before making a decision as to what the appropriate

7   penalty should be?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  And if you were the last person on the

10  jury, and everyone else voted for the death penalty but you

11  weren't so sure, and you indicated that you're going to vote

12  for life without the possibility of release, what would you do

13  in that case?

14         THE PROSPECTIVE JUROR:  First, the only one not

15  sure?

16         THE COURT:  Well, let me put it more specifically.

17         If you had reservations and believed that the

18  government had not proven beyond a reasonable doubt that the

19  defendant deserved the death penalty, what would you do?

20         THE PROSPECTIVE JUROR:  Follow the charge, probably

21  not give the death penalty, if that's -- you know, I have to

22  follow the charge.

23         THE COURT:  Anything else?

24         MR. JASPER:  No, your Honor.

25         MS. MERKL:  No, your Honor.

1      THE COURT:  We want to thank you for coming in.

2  Have a good afternoon.  Mr. Recoppa will tell you what to do

3  next.

4      THE PROSPECTIVE JUROR:  Okay.

5      (Prospective Juror No. 110 leaves the courtroom.)

6      MR. JASPER:  Judge, the defendant moves to strike

7  this juror in line with the observation by the Supreme Court

8  in Uttecht vs. Brown.  Looking at her demeanor, her demeanor,

9  she said "very likely" to impose the death penalty where

10  convicted of another murder.  That was what we asked your

11  Honor to specifically focus on.  You did.  She said "very

12  likely."  Would it be possible?  And she said it would be

13  possible for life.  She was kind of like shaking her head back

14  and forth.  She seemed pretty clear that she very likely would

15  be for the death penalty if the second conviction came out.

16  That's what I base this on, your Honor.

17      MS. MERKL:  Your Honor, the government disagrees.

18  The juror stated she could possibly vote for life imprisonment

19  under those circumstances, and she said she would consider

20  mitigators and aggravators consistent with her questionnaire

21  and what she indicated that she would consider aggravating and

22  mitigating factors.  And we would note that the preference for

23  a life -- the preference for a death sentence does not

24  disqualify a juror.  If they would fairly and impartially

25  consider the mitigating factors, as well.  She indicated she

The Prospective Juror # 111                    754

1    would.  She indicated more than one time in her questionnaire

2    that all of the facts need to be considered, and that she had

3    evaluate both mitigators and aggravators.

4            In light of the totality of the record as to this

5    juror, including her answers under the Court's questioning,

6    the government believes that she is both life-qualified and

7    death-qualfiied.

8            THE COURT:  All right.

9            I'll reserve.  We're up to 111.

10           MS. MERKL:  Your Honor, as I intended to state,

11   perhaps I did or did not, under United States vs. Fulks, a

12   juror's preference for voting for the death penalty does not

13   automatically disqualify them if they are willing to consider

14   mitigating circumstances.

15           THE COURT:  Thank you.

16           (Prospective Juror No. 111 enters the courtroom.)

17           THE COURT:  Good afternoon.  You are Juror No. 111?

18           THE PROSPECTIVE JUROR:  Yes.

19           THE COURT:  I remind you you are still under oath.

20   And let me ask:  Since you filled out the questionnaire, have

21   you read, learned, observed or been advised of anything about

22   this case?

23           THE PROSPECTIVE JUROR:  No.

24           THE COURT:  You indicated that you are a letter

25   carrier; is that right?

The Prospective Juror # 111                     755

1           THE PROSPECTIVE JUROR:  Yes.

2           THE COURT:  And you have been doing that for eight

3    years?

4           THE PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Before that, were you employed?

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  What kind of work did you do?

8           THE PROSPECTIVE JUROR:  Operate -- telephone

9    operator.

10          THE COURT:  How long did you do that?

11          THE PROSPECTIVE JUROR:  About three years.

12          THE COURT:  Was that for a private company or a

13   public organization of some type?

14          THE PROSPECTIVE JUROR:  It was for a major telephone

15   company, yes.

16          THE COURT:  You indicated that your father was a

17   New York City Policeman and your uncle was a detective?

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Did you ever discuss their work with

20   them.

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  Do you know what kind of detective work

23   your uncle did.

24          THE PROSPECTIVE JUROR:  No.

25          THE COURT:  Let me ask you:  You indicated that last

The Prospective Juror # 111                756

1    September, you sat on a state grand jury; is that right?

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And how long did you sit on a grand

4    jury?

5              THE PROSPECTIVE JUROR:  It was for four weeks,

6    Monday through Friday.

7              THE COURT:  It was a four-week period?

8

9              THE PROSPECTIVE JUROR:  Hmm.

10             THE COURT:  What kinds of cases did you consider?

11             THE PROSPECTIVE JUROR:  They were mostly DWI,

12   larceny, burglary.

13             THE COURT:  Any homicides?

14             THE PROSPECTIVE JUROR:  No.

15             THE COURT:  Now, you left this out, so I'm going to

16   ask you this question, and I'm going to ask you to respond.  I

17   think you must missed the page.

18             The question is:  Please describe your views on the

19   death penalty.

20             THE PROSPECTIVE JUROR:  Actually, I didn't answer

21   it, because I really never thought about it.

22             THE COURT:  You said that on the next page.

23             THE PROSPECTIVE JUROR:  Yes.  I really, before this

24   situation, I never really thought about it.  I mean, I guess

25   I'm not against the death penalty.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

The Prospective Juror # 111                    757

1      THE COURT:  Okay.

2      THE PROSPECTIVE JUROR:  But as I also said, I'm not

3  really sure if I would be able to make that kind of a decision

4  in regards to somebody else's life.

5      THE COURT:  Let me just describe what the process is

6  in this case.  The case is divided into two parts.  In the

7  first part of the case, which is called the guilt phase, once

8  the jury is impaneled, the jury will hear evidence from the

9  government which the government believes will prove beyond a

10  reasonable doubt that the defendant committed the crimes

11  charged.  The three crimes charged are intentional and

12  deliberate murder of another person; conspiracy to commit

13  murder; and a weapons charge in association with the other two

14  crimes.

15      The burden of proof is always on the government.

16  The defendant never has to prove anything.  The defendant

17  never has to testify.  You can't hold it against the defendant

18  that he didn't testify.  The government has the sole

19  obligation to prove its case beyond a reasonable doubt.

20      Do you understand that?

21      THE PROSPECTIVE JUROR:  Yes.

22      THE COURT:  If the government, in the view of the

23  jury, has met its burden and the jury finds the defendant

24  guilty beyond a reasonable doubt, then there will be a second

25  phase of the trial.  It's called the penalty phase, and in

1   this case, there are only two penalties that are available to

2   the jury.  The first penalty, which is the presumptive penalty

3   that is normally imposed, is life without the possibility of

4   release.

5           In this case, there's also a second penalty, a more

6   serious penalty than life in prison, and that is the death

7   penalty.

8           So, the jury needs to decide whether to impose the

9   life sentence or whether the death sentence is more

10  appropriate.

11          Now, the way the jury goes about doing this is that

12  the government is required to provide what are called

13  aggravating factors to the jury, evidence of circumstances,

14  the background of the defendant, certain other -- his

15  activities and so forth that the government believes would

16  require beyond a reasonable doubt or show beyond a reasonable

17  doubt that the more severe penalty, the death penalty, should

18  be imposed.

19          The defense may offer mitigating factors --

20  information about the defendant's background, circumstances,

21  record and so on -- that it believes would demonstrate that

22  the appropriate penalty is life in prison without the

23  possibility of release and that the more severe penalty is not

24  appropriate.

25          So, after hearing all of that, the jury will return

1    to the jury room and consider a verdict.  All twelve jurors

2    will have to vote in favor of the death penalty in order to

3    impose the death penalty.  If even one juror decides that life

4    in prison is the appropriate sentence, and not the more severe

5    sentence of death, then the defendant will get life in prison.

6    Each individual juror has the right to decide for him or

7    herself.  But I will instruct the jury that you should hear

8    each other out before you make your decision, and consider the

9    views of the other jurors.

10          In the end, if you personally believe that the death

11   penalty -- it has not been demonstrated beyond a reasonable

12   doubt by the government that the death penalty is the only

13   appropriate sentence and you vote for life, then the defendant

14   will get life even if the other eleven jurors vote for death,

15   and that's the way it works.

16          Now, I know it's difficult for you, not knowing what

17   these factors are.  If the jury returns a verdict of guilty

18   for the intentional and deliberate murder of an individual and

19   we go into a penalty phase and you see the evidence of

20   aggravators and mitigators, do you believe that in any

21   circumstance, you could impose the penalty of death?

22          THE PROSPECTIVE JUROR:  I would have to listen to

23   the aggravating or -- I would have to hear what the

24   circumstances are.

25          THE COURT:  Okay.  Are there any circumstances --

1    let me withdraw that.

2              Is there any type of intentional murder that would

3    cause you to be more likely to impose a death sentence?

4              THE PROSPECTIVE JUROR:  No.  Again, I would have to

5    know exactly what the circumstances behind it were.  I

6    wouldn't just, you know, blanket say, yes, for this type of

7    murder.

8              THE COURT:  Now, you answered this question: "The

9    question of whether a defendant should live or die is a moral

10   decision each juror must makes himself or herself.  Do you

11   feel you can make such a decision?"  And you said "No.  I

12   really don't know if I can make a decision that would end

13   another life."

14             Is that your position?

15             THE PROSPECTIVE JUROR:  That is my decision.  I

16   really don't know if I could, you know.  I just really don't

17   know.

18             THE COURT:  And then you said, when asked: "Which of

19   the following best describes your view of the death penalty,

20   check one:  Support in some cases, inappropriate in most

21   cases?," and you explained your answer, "When someone

22   intentionally murders someone else, they show disregard for

23   that person's life, family, etcetera.  They put no value on

24   life.  Should their life have value?"  That's a question, not

25   an answer.  You put a question mark after that.

The Prospective Juror # 111                761

1        So, your answer was that you supported the death
2    penalty in some cases.  And my question is:  In what cases can
3    you imagine imposing the death penalty?
4        THE PROSPECTIVE JUROR:  The thing is, like I said,
5    I'm not opposed to the death penalty.  I do believe that it is
6    appropriate.  I just don't know if I could be the one to make
7    the decision to put somebody to death.
8        MR. GOLTZER:  Your Honor, can we have a sidebar, or
9    is it too early?
10       THE COURT:  No.  That's fine.  Whenever you are
11   ready.
12       (Sidebar.)
13       THE COURT:  Okay.
14       MR. JASPER:  Judge, my thinking is this:  I don't
15   know what the government's view of this is, but the point is.
16   She seems really not to be able to make an individual choice.
17   I don't think it helps either side to have a juror in there
18   who is just subject to the vicissitudes of the jury.
19       THE COURT:  I agree with you.  I don't want to
20   presume that's your view.  That's why I kept trying to pin her
21   down to get some sort of valuable response.
22       MR. JASPER:  I appreciate it, Judge, because
23   although she seems kind of, you know, in the abstract or a
24   general principle supports it, the issue is, can she
25   personally deliver a personal moral decision with any way or

The Prospective Juror # 111                762

1  the other?  If she's sitting there, it doesn't help either one

2  of us, because there's no strong --

3          THE COURT:  I hear you.

4          Do you agree?

5          MS. MERKL:  Is he on the prosecution team all of a

6  sudden?

7          THE COURT:  No.  He has right reason.

8          MR. GOLTZER:  He's righteous.

9          THE COURT:  Do you have anything to add to that?

10          MS. MERKL:  A follow-up question along the lines

11  Mr. Jasper suggests.

12          THE COURT:  You have a question?

13          MR. JASPER:  No, I don't.

14          THE COURT:  I don't have a question, either.

15          (In open court.)

16          THE COURT:  I know how difficult it is to deal with

17  these kinds of questions.  It's not what you do every day in

18  your life.  We all appreciate your efforts to provide answers

19  to us.  We thank you for coming in.

20          Mr. Recoppa will tell you what to do next.

21          THE PROSPECTIVE JUROR:  Okay.

22          THE COURT:  Have a nice day.

23          THE PROSPECTIVE JUROR:  Thank you.

24          (Prospective Juror No. 111 leaves the courtroom.)

25          THE COURT:  Is there a consent to strike the juror?

The Prospective Juror # 112                763

1          MR. JASPER:  Yes, your Honor.

2          MS. MERKL:  Yes, your Honor.

3          THE COURT:  All right.

4          Number 111 is struck for cause on consent.

5          We're up to 112.

6          (Prospective Juror No. 112 enters the courtroom.)

7          THE COURT:  Please be seated, sir.  Good afternoon.

8          THE PROSPECTIVE JUROR:  Good afternoon.

9          THE COURT:  You are Juror No. 112?

10         THE PROSPECTIVE JUROR:  Yes.

11         THE COURT:  You're still under oath.

12         Have you read, heard or learned anything about this

13    case since you filled out the questionnaire?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  All right.  Thank you.

16         I'm just going to ask you a few follow-up questions

17    based on your questionnaire.

18         You indicated that you worked for the last year and

19    three-quarters in the heating business; is that right?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Without telling me who you work for,

22    what kind of work do you do?

23         THE PROSPECTIVE JUROR:  Basically, I'm a helper.  I

24    do treating.

25         THE COURT:  What does it mean to do heat treating?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

The Prospective Juror # 112                    764

1  What do you do?

2           THE PROSPECTIVE JUROR:  They get -- the company that

3  I work, they get the pieces from another company.

4           THE COURT:  A manufacturer?

5           THE PROSPECTIVE JUROR:  I guess.

6           THE COURT:  And then what do they do?

7           THE PROSPECTIVE JUROR:  And the treating is by heat.

8           THE COURT:  Is that in order to strengthen the part?

9           THE PROSPECTIVE JUROR:  No exactly.  Making it

10  harder.

11          THE COURT:  Then when you finish treating it, it

12  goes back to the manufacturer, who uses it in some sort of

13  machine?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And before you did this job, what did

16  you do for a living?

17          THE PROSPECTIVE JUROR:  Parking.

18          THE COURT:  What?

19          THE PROSPECTIVE JUROR:  Parking.  Parking attendant.

20          THE COURT:  How long did you do that?

21          THE PROSPECTIVE JUROR:  Ten years.

22          THE COURT:  You like this job better?

23          THE PROSPECTIVE JUROR:  This one?

24          THE COURT:  Yes.

25          THE PROSPECTIVE JUROR:  The benefits.

The Prospective Juror # 112                765

1           THE COURT:  The benefits.

2           THE PROSPECTIVE JUROR:  The other was, I loved it.

3           THE COURT:  You like the other one?

4           THE PROSPECTIVE JUROR:  Yes.

5           THE COURT:  In the other job, did you work for one

6   company for the whole time?

7           THE PROSPECTIVE JUROR:  No.

8           THE COURT:  How many different companies did you

9   work for?

10          THE PROSPECTIVE JUROR:  Around four.  But mostly in

11  two.  The other one was for just one month.

12          THE COURT:  You were asked for your views on the

13  death penalty, and you said "As a Christian, I think that God

14  is Who gives and can take away lives, but as men law, it is

15  acceptable.  Give God what is belong to him, and to Caesar

16  what is belong to Caesar."

17          What did you mean by that?

18          THE PROSPECTIVE JUROR:  Well, the means is right

19  there.  I don't know if you read in the Bible when the people

20  was attending Jesus Christ, the emperors charging too much

21  taxes, and then God said -- I mean, Jesus said to them like

22  the taxes are for the emperor, and give God what is God's.

23  That means the mans do some rule.  That's okay.  So, if you

24  believe in God, you believe in God first, and then if in your

25  society, you follow what the rules are.

1          THE COURT:  So, if in a case where someone has been

2     convicted of killing another person intentionally, do you

3     think that the death penalty is an appropriate penalty?

4          THE PROSPECTIVE JUROR:  Like I write on the paper,

5     as the men rule or men law, if what takes to those events men

6     law to any determine, like the man law say.

7          THE COURT:  Anything else?

8          MR. JASPER:  Nothing, your Honor.

9          MS. MERKL:  No, your Honor.

10          THE COURT:  I want to thank you for coming in, sir.

11     Recoppa will tell you what to do next.  Have a nice day.

12          THE PROSPECTIVE JUROR:  Thank you.

13          (Juror No. 112 leaves the courtroom.)

14          THE COURT:  All right.

15          Is there any objection to striking this individual?

16          MR. JASPER:  No, your Honor.

17          THE COURT:  I think based on --

18          MS. MERKL:  Language, your Honor.  He indicated in

19     Question Number Two that his reading is not perfect, and his

20     answers in the box suggest he has a little bit of a language

21     issue.

22          THE COURT:  All right.  112 is struck.

23          Let's take a five-minute break.

24          (Recess taken.)

25          (Continued on next page.)

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

767

1              (Open court.)

2              (The defendant is present.)

3         THE COURT:  This is 114.

4              (Prospective juror present.)

5         THE COURT:  You are Juror No. 114?

6         THE PROSPECTIVE JUROR:  Yes.

7         THE COURT:  I remind you that you are still under

8    oath.  Let me ask you, since you filled out the questionnaire,

9    have you heard, listened to, observed any information about

10   this case?

11        THE PROSPECTIVE JUROR: Yes, I have.

12        THE COURT:  What information is that?

13        THE PROSPECTIVE JUROR:  Basically from by chance

14   going through Google it came up and it was in the news.  I

15   read a little bit about it.

16        THE COURT:  What did you Google?

17        THE PROSPECTIVE JUROR: I Googled his name,

18   basically.  It just sounded so familiar to me.

19        THE COURT:  Sidebar.

20        (Sidebar.)

21        THE COURT:  Mr. Goltzer.

22        MR. GOLTZER:  I too have Googled Mr. Basciano just

23   to see what is going on out there.  One of the first thing

24   that comes up is a Wikipedia article on Mr. Basciano which was

25   amended by whom we do not know on February 5, 2011 to reflect

1   the theory that Mr. Basciano was the boss of the Bonanno

2   family while he was incarcerated.

3            I don't know where that came from, I can't imagine,

4   but if that's what he's been doing, I don't think he can sit.

5   I don't know what he read.  If he went out of his way to

6   Google Basciano, he shouldn't be a juror.

7            THE COURT:  In the first place, he completely

8   ignored my instructions.  So this is not a good start.  I

9   would dismiss him out of hand.

10           MR. GOLTZER:  Right.

11           MS. MERKL:  The government would note that Mr.

12  Goltzer's suggestion that in some way the government was

13  responsible for the Wikipedia entry is ludicrous.

14           MR. GOLTZER:  I'm not suggesting anybody in this

15  room.  It happened.  The judge didn't do it.

16           MS. MERKL:  Neither did the government.

17           THE COURT:  Thank you.

18           MR. GOLTZER:  I'm noting for the record that I too

19  Googled it.  The reason I noted it now is if this guy Googled

20  Basciano the second thing he would see is a Wikipedia article

21  that claims that Basciano was the actual boss of the family

22  after he was arrested after Massino flipped.

23           I don't know where that came from on February 5,

24  2011.  I'm making everybody aware of it.

25           THE COURT:  The Internet is a whole new element in

1    that we have to deal with in the criminal justice system and

2    it's very, very difficult.  If people are going to have to

3    completely ignore my instructions -- he's the first one.

4            MR. GOLTZER:  That we know of.

5            THE COURT:  I think generally from demeanor of the

6    other people who I've asked, it wouldn't appear that they were

7    hiding anything.

8            MR. GOLTZER:  We have no reason to believe they were

9    lying.

10           THE COURT:  Thank you.

11           (Open court.)

12           THE COURT:  What did you learn about Mr. Basciano

13   when you Googled him?

14           THE PROSPECTIVE JUROR: Basically that, you know, he

15   is serving a life sentence currently.  But it talked more

16   about your opinion on the case.

17           THE COURT:  My opinion?

18           THE PROSPECTIVE JUROR:  Yeah, I believe that's what

19   the news said, that you were against the case, that you were

20   against it going forward.

21           THE COURT:  Against the case going forward?

22           THE PROSPECTIVE JUROR:  Yeah, because you thought it

23   was a waste of time.  I'm just being honest.

24           THE COURT:  That's why I asked you the question.

25   What else did you learn?  I'm interested because it will be

1   useful to know how it appeared to you.

2          THE PROSPECTIVE JUROR:  I really didn't take

3   anything to heart or to really -- I didn't delve into it that

4   much.  I just read a few paragraphs.

5          THE COURT:  You will recall that I asked you not to

6   do any research on the case.  Why did you decide to do this,

7   why did you decide to Google it, which is very easy to do?

8          THE PROSPECTIVE JUROR: That's really what it was.

9   It was so easy.  It really didn't have anything to do against

10  what you said.

11         It wasn't that I went home and did that.  I waited a

12  few days.  It was sitting there, I saw his name there and I

13  said, let me Google his name.

14         THE COURT:  You saw his name where, in the paper?

15         THE PROSPECTIVE JUROR:  The Internet is the paper

16  nowadays.

17         THE COURT:  You said you saw his name there?

18         THE PROSPECTIVE JUROR:  On the paper that we have.

19         THE COURT:  The paper from the court?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Thanks for coming in.

22         Mr. Reccoppa will tell you what to do next.  Have a

23  good day.

24         THE PROSPECTIVE JUROR:  You too.

25         (Prospective juror leaves.)

1          THE COURT:  Consent to strike the juror for failing

2    to follow the instructions of the court?

3          MS. MERKL:  Yes, your Honor.

4          MR. JASPER:  Yes, Judge.

5          THE COURT:  Number 114 is struck on consent.

6          (Pause.)

7          THE COURT:  We're up to 117.

8          (Prospective juror present.)

9          THE COURT:  Please be seated, sir.

10          THE PROSPECTIVE JUROR:  Hello, Judge, your Honor.

11          THE COURT:  Good afternoon.

12    You're Juror No. 117.

13          THE PROSPECTIVE JUROR: Yes, sir.

14          THE COURT:  Let me ask you, since you filled out the

15    questionnaire have you read, learned of, observed, been

16    advised of anything regarding this case?

17          THE PROSPECTIVE JUROR:  I know about as much of this

18    today as I know when I left here about a month ago.  When I

19    came in I never heard of it.  This is not stuff I really

20    follow.

21          THE COURT:  So you didn't learn anything more than

22    you already knew?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  What did you already know about the case

25    before you came to court to fill out the questionnaire?

1           THE PROSPECTIVE JUROR:  About this case?  I remember

2    seeing the headline about a very big arrest, I think it was

3    127 people, but this case I've never heard of before.

4           THE COURT:  Thank you.

5           Now, you have been doing your current job for the

6    last ten years; is that right?

7           THE PROSPECTIVE JUROR:  Almost 11.

8           THE COURT:  Okay.  And it involves something having

9    to do with payroll?

10          THE PROSPECTIVE JUROR: I do --

11          THE COURT:  What is the general type of work that

12   you do?

13          THE PROSPECTIVE JUROR:  I do database, spreadsheets,

14   I do reports for clients, call-in files.  I work with the

15   bookkeeper on the payroll.

16          THE COURT:  Are you self-employed or do you work --

17          THE PROSPECTIVE JUROR:  No.

18          THE COURT:  You work for a company?

19          THE PROSPECTIVE JUROR: Yes.

20          THE COURT:  You've worked for the same company for

21   ten years?

22          THE PROSPECTIVE JUROR: It was kind of part-time for

23   awhile but it's just about 11 years now.

24          THE COURT:  Your father was with the Nassau County

25   Police --

Prospective Juror 117                    773

1          THE PROSPECTIVE JUROR:  He was Nassau County police.

2          THE COURT:  Did he also work for the Treasury?

3          THE PROSPECTIVE JUROR:  He was a U.S. Customs

4    officer.  He worked as a Nassau County policeman.  His

5    academic background was engineering so he left the police

6    force, he worked as an engineer for maybe 20 years, he

7    retired, he went into security work and he eventually ended up

8    working, I'd say, for 8 or 10 years as Customs at Kennedy

9    Airport.

10         THE COURT:  You indicated in answer to questions

11   about your medical condition, that you have a short attention

12   span and that if you were going to school today you might be

13   diagnosed with ADHD or ADD?

14         THE PROSPECTIVE JUROR:  Yes.  Anyone who works with

15   me can tell you, they'll say, Can you do this for me?  I need

16   to know the answer in five minutes.  They come back five

17   minutes later, What happened?  I'll do it right now.

18         I have on my iPods a series of lectures for a

19   certification exam that I'll be taking later on.  I think I

20   listened to the lectures three times and I don't remember half

21   of them.  I start day dreaming.

22         Teachers all the way through elementary school, they

23   tried putting me up front and center just to get me to pay

24   attention.  I've got a wandering, day dreaming mind.

25         THE COURT:  Have you ever served on a jury?

Prospective Juror 117                    774

1        THE PROSPECTIVE JUROR: I was called for jury duty a

2    couple of times in Nassau, never served on a regular jury.  In

3    '93 I did a month as a Nassau County grand juror.

4        THE COURT:  You put a question mark next to the yes

5    to this answer:  Do you have any opinions about lawyers that

6    would make it difficult for you to render a fair and impartial

7    verdict?  You put a question mark and said well, some lawyers

8    do --

9        THE PROSPECTIVE JUROR:  Some lawyers, they do what

10   they're paid to do.

11       THE COURT:  I'm sorry.  What does that mean?

12       THE PROSPECTIVE JUROR:  In other words, I remember

13   on TV years ago one lawyer who said that for a $25,000 fee he

14   could get almost anyone off even a third drunk driving --

15   what's the word I want?  -- arrest.

16       THE COURT:  This is a while ago?

17       THE PROSPECTIVE JUROR: That was a wile ago.  But,

18   you know --

19       THE COURT:  All right.  You also answered yes to

20   this question:  Have you or has a family member or close

21   friend ever been a witness to or victim of a crime?

22       THE PROSPECTIVE JUROR:  Yes.  I had an aunt who came

23   home one day and was held up at gunpoint.

24       THE COURT:  Who?

25       THE PROSPECTIVE JUROR: An aunt.  I had a somewhat

Prospective Juror 117                              775

1   more distant relative.  One day her house was broken into and

2   she was, as I recall correctly, kind of badly beaten up.

3          I have had a few bicycles stolen.  I've never really

4   been a victim of a serious crime.  My father when he was a cop

5   had his elbow broken when he caught a guy trying to hot wire a

6   car under the dashboard.

7          THE COURT:  Who got caught, the person --

8          THE PROSPECTIVE JUROR:  My father saw feet sticking

9   out a car door and went to see what was going on.  The guy was

10  trying to hot wire the car -- this was years ago -- and the

11  guy kicked him in the elbow so hard he broke his elbow.  I

12  remember he had a very long scar on his elbow.

13         THE COURT:  Sidebar.

14         (Sidebar.)

15         MR. GOLTZER:  I think he would find it difficult to

16  concentrate on a case of this magnitude.

17         MS. MERKL:  Your Honor, the government agrees.  His

18  questionnaire indicated at a couple of points that he'd have

19  difficulty sitting still and being able to pay attention, and

20  given his overall demeanor, we think that --

21         THE COURT:  He's hyper.  His demeanor appears to be

22  a hyperactive demeanor and I think it would be very difficult

23  for him to sit for long periods of time listening to evidence

24  in a case of this complexity and this duration.

25         MR. GOLTZER:  We certainly agree.  We think it would

1   be difficult for jurors to sit with him.

2              THE COURT:  I think you're right about that, too.

3              MR. GOLTZER:  I mean it.  It wasn't a quip.

4              THE COURT:  It would be difficult in the juryroom as

5   well.  Thank you everyone.

6              (Open court.)

7              THE COURT:  Okay.  I think that does it.  We thank

8   you for coming in.  Mr. Reccoppa will tell you what to do

9   next.

10             THE PROSPECTIVE JUROR: Thank you very much.

11             THE COURT:  Have a good day, sir.

12             (Prospective juror leaves.)

13             THE COURT:  Let's have a formal motion, please.

14             MS. MERKL:  Your Honor, the government has no

15  objection to dismissing this juror for cause.  I think it's a

16  joint application.

17             The juror indicated in his questionnaire that he

18  that has difficulty sitting still.  That was in question 123.

19  He also indicated in question four that he has ADD and

20  difficulty concentrating, lapses in attention, things of that

21  nature.

22             His demeanor in the box suggested that he may have

23  some sort of issue along those lines and the government's

24  concerned that he will not be able to sit on a trial for

25  several weeks for hours at a time closely following the

1    evidence.

2              MR. JASPER:  We agree.

3              THE COURT:  You agree?

4              MR. GOLTZER:  Yes.

5              THE COURT:  The juror is struck on those grounds by

6    consent.

7              Next juror is 118.

8              (Prospective juror present.)

9              THE COURT:  Please be seated, sir.

10             Good afternoon.

11             THE PROSPECTIVE JUROR:  Good afternoon.

12             THE COURT:  You are juror 118?

13             THE PROSPECTIVE JUROR: Yes, I am.

14             THE COURT:  Very well.  Let me ask you

15   preliminarily.  Since you filled out the questionnaire have

16   you read or learned or been advised of anything about this

17   case?

18             THE PROSPECTIVE JUROR: Here and there, just hearsay.

19             THE COURT:  Well, here or there hearsay, what kind

20   of here or there hearsay?

21             THE PROSPECTIVE JUROR: Basically, I would say not

22   more than what you told us the day we were here to fill out

23   the questionnaire, as far as the charges and the fact that

24   he's serving time now and stuff like that.

25             THE COURT:  Where did you learn that he was serving

Prospective Juror 118                          778

1   time now?

2          THE PROSPECTIVE JUROR: In discussions with other

3   people.

4          THE COURT:  What people are you talking about?

5          THE PROSPECTIVE JUROR: Just other jurors and stuff

6   like that that we have been discussing.

7          THE COURT:  You've been talking to other jurors

8   about it?

9          THE PROSPECTIVE JUROR: Just in topics, you know,

10  about the case and stuff.  What they know, what they've heard.

11         THE COURT:  You mean other jurors in this case?

12         THE PROSPECTIVE JUROR: Yeah.

13         THE COURT:  Where have you had those conversations?

14         THE PROSPECTIVE JUROR: Just sitting around, just

15  shooting the breeze.

16         THE COURT:  Back there?

17         THE PROSPECTIVE JUROR: Back there, in the other room

18  and stuff.

19         THE COURT:  Do you remember who told you that the

20  defendant was serving time?

21         THE PROSPECTIVE JUROR: No, just -- we just all were

22  talking and stuff like that.  It just came up.

23         THE COURT:  What else did you learn?

24         THE PROSPECTIVE JUROR:  Not much else.

25         MR. GOLTZER:  May we have a sidebar?

1        THE COURT:  When you say not much else, obviously

2   that means there is something else?

3        THE PROSPECTIVE JUROR: No, there was nothing else

4   really to discuss, nothing else besides what you initial read

5   the day we did the questionnaire.

6        THE COURT:  Did you read anything in the papers

7   about it?

8        THE PROSPECTIVE JUROR: No.

9        THE COURT:  Did you Google it on the Internet?

10       THE PROSPECTIVE JUROR: Nope.

11       THE COURT:  Would you like a sidebar?

12       MR. GOLTZER:  Please.

13       (Sidebar.)

14       MR. GOLTZER:  The juror, the prospective juror has

15   obviously brought up a potential issue that is of concern.  We

16   are not sure -- not only the defense but everybody in the

17   courtroom -- as to whether there have been numerous

18   conversations among perhaps qualified jurors or prospective

19   jurors to come about Mr. Basciano and facts that are not

20   within the evidence yet in this case.

21       We would ask that the court conduct further inquiry

22   of this particular juror with respect to which days he had

23   those conversations, how many people took part in the

24   conversations, whether they were today with the folks who were

25   here.  We just would like to see this developed.

1        MR. JASPER:  I think we certainly need to find out a

2   little bit more about what happened, who told who what, how

3   many people.

4        It is a bit disturbing if it happened today and this

5   is the first time we're hearing about it.  I'm not sure how we

6   want to proceed beyond pursuing it now.

7        These are people we think are good jurors and it's

8   not something that we're jumping for joy about, but it's a

9   question in my mind.

10        MR. GOLTZER:  Certainly I think it would call for,

11   at the least, to have a few more questions of him and then ask

12   prospective jurors who come in over the next couple of days

13   whether they have had such conversations.

14        MS. MERKL:  I think it would help to draw down when

15   he heard about the fact of the defendant serving time and

16   whether or not he learned it from Googling friends who

17   potentially came to this afternoon's panel.  Perhaps the taint

18   is in that fashion, perhaps it isn't, but it would help to

19   draw down on that point.

20        MR. GOLTZER:  We're not taking a position or making

21   a motion, we're asking to develop it.

22        THE COURT:  For information.  Thank you.

23        (Open court.)

24        THE COURT:  Let me just follow up on what you

25   mentioned earlier.  With respect to having learned that the

1  defendant was already serving time, did you learn that today

2  back in the jury deliberation room?

3           THE PROSPECTIVE JUROR: Not necessarily.  I was --

4           THE COURT:  No, no.  Please.  I asked you a specific

5  question.  I expect an answer to the question.

6           THE PROSPECTIVE JUROR:  No.

7           THE COURT:  Not necessarily is not the answer?

8           THE PROSPECTIVE JUROR:  No.

9           THE COURT:  When did you learn it?

10           THE PROSPECTIVE JUROR: When I did the questionnaire,

11  I was pretty much ascertaining from the way the questions were

12  asked about somebody serving, already serving, how would you

13  feel about the penalty and stuff like that, and I kind of

14  ascertained from that that it was related.

15           THE COURT:  Did you discuss it with anybody?

16           THE PROSPECTIVE JUROR: No.

17           THE COURT:  Well, were there any discussion back in

18  the jury deliberation room while you were waiting today about

19  any of the facts of the case?

20           THE PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Tell me what was said.

22           THE PROSPECTIVE JUROR:  Just the fact that he's

23  presently serving time.

24           THE COURT:  Who --

25           THE PROSPECTIVE JUROR:  That was it.

1          THE COURT:  Who said that he was serving time?

2          THE PROSPECTIVE JUROR: One of the other jurors.  I

3     don't know his name.  One of the other jurors that we were

4     talking to.

5          THE COURT:  So you surmised it from the

6     questionnaire --

7          THE PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  But it was confirmed by this other

9     person's statement?

10         THE PROSPECTIVE JUROR: Correct.

11         THE COURT:  And did this person indicate the source

12    of his or her information?

13         THE PROSPECTIVE JUROR: No.

14         THE COURT:  And did this person have any other

15    information -- it's important that you try to recall this

16    because it's very important to us that we know the type of

17    information that may be out and about some of which may be

18    accurate, some of which may be erroneous, and it's important

19    for the integrity of the process.

20         Let me just explain why we're concerned about it;

21    for the integrity of the process, and in fairness to someone

22    accused of a very serious crime, it is important that everyone

23    follow the rules that we establish so as to protect the

24    defendant's rights and he get a fair trial.

25         That's our objective here, to provide the defendant,

1  who is accused of a serious, very serious crime, to provide

2  him with a fair trial.  So that's why I'm asking you this and

3  that's why it's of such concern to us.  It's not about you,

4  it's about the process.

5           So when I ask you the question, it's not an

6  accusation, it's just that I need to know.  This person who

7  made that statement, did he know or she -- was it a he?

8           THE PROSPECTIVE JUROR:  Yes.

9           THE COURT:  All right.  And just describe him.

10          THE PROSPECTIVE JUROR:  He was the youngest, I

11  guess, appeared to be the youngest of the bunch.

12          THE COURT:  Was he short, tall.

13          THE PROSPECTIVE JUROR:  Average height, six-foot.

14          THE COURT:  Stocky or thin?

15          THE PROSPECTIVE JUROR: Medium build, I guess.  He

16  had the short hair.

17          THE COURT:  And did he have any other intelligence

18  to report?

19          THE PROSPECTIVE JUROR: No.

20          THE COURT:  So other than this one item, have you

21  learned anything about this case?

22          THE PROSPECTIVE JUROR: No, nothing -- no.

23          THE COURT:  When you were down in the jury assembly

24  area, did you also have an opportunity to talk to these other

25  folks about the case?

1          THE PROSPECTIVE JUROR:  Well, talk about the case?

2   We discussed it as far as what we knew from the questionnaire.

3   We were more talking about the questionnaire, what went on the

4   day we had to fill out the questionnaire and stuff.

5          THE COURT:  And so specifically what about the

6   questionnaire did you --

7          THE PROSPECTIVE JUROR:  Just the questions, the

8   variety of questions that they asked, the endless, you know,

9   questions about certain points and multiple questions and so

10  on and so forth.

11         THE COURT:  And in terms of topics, what topics were

12  mentioned by someone or another down there, any particular --

13  there are lots of different topics in the questionnaire.

14         THE PROSPECTIVE JUROR:  Right.

15         THE COURT:  What topics were of interest to some of

16  the jurors?

17         THE PROSPECTIVE JUROR: We discussed the repeated

18  questioning about the penalties, the death penalty, the life

19  without parole and -- what else was there?  -- if you knew

20  anybody who was a police officer.  Some of the guys -- some of

21  people have police officers in the family and stuff, so on and

22  so forth.

23         THE COURT: This afternoon's group was only seven

24  people?

25         THE PROSPECTIVE JUROR: Right.

1          THE COURT:  There were seven people down there

2   chatting?

3          THE PROSPECTIVE JUROR: Six of us were talking.

4   There was one gentleman who didn't really have much to say.

5          THE COURT:  Do you have any other questions for the

6   juror?

7          MR. JASPER:  No, your Honor.

8          THE COURT:  Do you have any questions for the juror?

9          MS. MERKL:  No, your Honor.

10          THE COURT:  I thank you for coming in.  You have a

11   nice day.  Mr. Reccoppa will tell you what to do next.

12          THE PROSPECTIVE JUROR:  Thank you.

13          THE COURT:  Take care now.

14          (Jury leaves.)

15          (Continued next page)

16

17

18

19

20

21

22

23

24

25

786

1          THE COURT:  All right.  Is there a motion on 118?

2          MR. GOLTZER:  We obviously move to strike him for

3  violating the Court's instructions and the like.

4          MS. MERKL:  Your Honor, the government does not

5  object.

6          THE COURT:  All right.  Number 118 is struck.

7          MR. GOLTZER:  We have a further suggestion.

8          THE COURT:  All right.

9          That's on consent.

10         That completes the interviews for today.  Do you

11  have something further?

12         MR. GOLTZER:  We are kind of curious as to what the

13  Court suggests.  Our view, if you would like to hear it?

14         THE COURT:  Of course.

15         MR. GOLTZER:  As I understand it, there were

16  only -- with respect to this afternoon's  group of seven

17  people, only number 107 was actually qualified.  There was one

18  other juror upon which the Court reserved.

19         THE COURT:  Right.

20         MR. GOLTZER:  It might be prudent to strike those

21  two for being tainted by whatever did happen in the back this

22  afternoon.

23         It is also our view with respect to those jurors who

24  have already been qualified, we are unaware of any basis upon

25  which to move to disqualify them.

787

1          If the Court in its discretion when they are brought

2     back wants to make a neutral inquiry as to whether they heard

3     anything, we would have no objection to that.

4          In the future, with respect to jurors who come in,

5     I'm sure the Court can fashion a direction or instruction or

6     an inquiry to make sure that nothing like this happens again.

7          We are not specifically moving for a mistrial or

8     anything like that.

9          MR. JASPER:  That's correct, Your Honor.

10          MR. GOLTZER:  We --

11          THE COURT:  The only thing that I would do, even if

12     you did, is I'd call in more jurors.

13          MR. GOLTZER:  I understand that.

14          THE COURT:  And just add to the 650 people that you

15     have already reviewed.  I could call in 50, 100, 500.

16          MR. GOLTZER:  I know.

17          THE COURT:  We will just keep going.  I haven't made

18     any plans until Christmas.

19          MR. GOLTZER:  We are not suggesting anything to the

20     contrary.  We wanted to make our position clear so the

21     record --

22          THE COURT:  I appreciate that.

23          Here is the thing.

24          Let me hear from -- is that it from your side?

25          MR. JASPER:  Yes.

GR      OCR      CM      CRR      CSR

788

1          MR. GOLTZER:  It is.

2          THE COURT:  Let me hear from the government.  Then I

3    will tell you what my preliminary view is on it.

4          Go ahead.

5          MS. MERKL:  Your Honor, both of the jurors as to who

6    may or may not have been exposed to this information in the

7    jury room are jurors 107 and 110 to be clear for the record.

8    107 was qualified; 110 defense moved to strike for cause and

9    Your Honor reserved.

10          Both of these jurors, if memory serves correctly,

11   were asked if they'd heard anything about the case.  They said

12   no.  We have no reason to believe that they were lying about

13   that fact.

14          In addition, in the Court's colloquy with those two

15   jurors they were asked in various permutations whether or not

16   they would be able to consider the evidence in this case

17   knowing that the defendant was previously serving a term of

18   life for a deliberate additional murder.

19          These jurors are getting this information through

20   the Court process.  I think what these two jurors, rather than

21   just striking them on the assumption that they may have been

22   tainted, we should inquire of them before we do that.

23          THE COURT:  I am willing to bring them back and ask

24   them.

25          MR. GOLTZER:  We have no problem with that,

789

1   certainly.  But I should simply note that we seem to

2   have -- either they didn't understand the full import of the

3   inquiry but there seems to be a contradiction between the

4   responses that they gave and the responses of the last

5   gentleman.

6            THE COURT:  I think --

7            MR. GOLTZER:  Except for one juror.  I don't know

8   who that was who didn't take part.  Whether they heard or not

9   I don't know.

10           THE COURT:  One of the potential jurors was

11  extremely loquacious and another one completely defied the

12  Court's instruction and did Internet research.

13           MR. GOLTZER:  Right.

14           THE COURT:  So we have two people who were in the

15  room back there who might have a lot to say or might have

16  information to impart.

17           MR. GOLTZER:  Yes.

18           THE COURT:  All right.  I've never had this problem

19  with people sitting back there in the last ten years, but --

20           MR. GOLTZER:  I have seen it once before.

21           THE COURT:  I think the question is, how do we

22  preempt it for the rest of the venire.  That is really the

23  question.

24           It is possible that when they arrive the jury clerk

25  can instruct them that they are not to -- we can agree on some

790

1   language to be read to them, they are not to discuss anything

2   about the case with each other.

3        MR. GOLTZER:  It is my sense that such an

4   instruction needs to come from the Court.  So it might be

5   prudent to bring them in.

6        THE COURT:  I am listening.

7        MR. GOLTZER:  As I understand the process,

8   Mr. Reccoppa literally walks the whole group by the door.  I

9   have seen it.  I happen to see them walk by the door.

10        So if he simply brings them into court and the Court

11   puts them in the jury box and tells them, you are going to be

12   interviewed one at a time.  It's very important that while you

13   are waiting back there, you can discuss the weather, the

14   basketball games but not this case, not anything you may have

15   read in the newspapers.

16        THE COURT:  I can do it up here.  It is better up

17   here.

18        MR. GOLTZER:  That's it.

19        THE COURT:  What we will try to do is as soon as all

20   of them have arrived, I will have them brought up and put in

21   the jury box and I will instruct them.

22        MR. GOLTZER:  Mr. Jasper also suggests that there

23   might be a sign, a written sign, wherever they wait in the

24   jury room, not to discuss the case, as a reminder.

25        MR. JASPER:  Judge, it might be helpful but I

791

1   certainly believe that if they are all up here and see the

2   Court and are in this venue and this forum and you just

3   explain to them, this is important, just don't talk about the

4   case.  Coming from you, Judge, I think that that --

5            THE COURT:  I will remind them.  On Thursday

6   morning, as soon as they all here, I will have them brought

7   up.  The defendant will be brought in before they arrive.

8   They will come in and I will instruct them and then they will

9   retire to the jury room.

10           Let see how that works.

11           MR. GOLTZER:  Fine.

12           THE COURT:  I will still ask my question at the

13  beginning of each interview to find out whether they've done

14  any research on the case since the questionnaires were prepare

15  prepared.

16           All right?

17           MR. GOLTZER:  Yes.

18           That still leaves with us the question of the two

19  people from this afternoon, I guess.

20           THE COURT:  I haven't ruled on one of them.

21           MR. GOLTZER:  Right.

22           THE COURT:  I could bring the other one back in the

23  next few days, just to ask the question.

24           MR. GOLTZER:  Perfect.

25           THE COURT:  The one that I haven't ruled on, I can

792

1    bring that one back too before I rule.

2          MR. GOLTZER:  True.

3          THE COURT:  We will work it out.

4          MR. GOLTZER:  Sure.

5          THE COURT:  All right.  Is that agreeable to the

6    government?

7          MS. MERKL:  It is, Your Honor.

8          THE COURT:  Okay.  We are not convening tomorrow but

9    we will be back Thursday at 9:30 --

10          MR. GOLTZER:  Yes.

11          THE COURT:  -- for the next session.

12          Do we have the list?

13          MR. GOLTZER:  We have the list.

14          Do I assume you have stricken the last juror on the

15    record?  I didn't --

16          THE COURT:  Yes.  I believe I did strike the last

17    juror and both sides gave their reasons and I agreed and the

18    juror, that's 119?  118.

19          MR. GOLTZER:  118.

20          THE COURT:  118 was stricken by consent.

21          All right.  Is there anything else for this

22    afternoon?  From the government?

23          MS. MERKL:  Just as a housekeeping matter, juror 102

24    who did not show up, is that person scheduled for Thursday?

25          THE CLERK:  We will try for Thursday.

1          THE COURT:  Thursday is the day for 102.

2          MR. GOLTZER:  As a housekeeping matter, there had

3     been an inquiry made of the government about a visiting issue.

4          THE COURT:  Yes?

5          MR. GOLTZER:  Mr. Basciano at the MDC had been able

6     to have two people visit him at once from his family.  He has

7     been notified by the MCC, they refuse to do it.  We asked the

8     government if it would require a modification of the SAM's.

9     The government was kind enough to say they would look into it.

10          Presumably, Mr. Basciano has been advised by the MCC

11     that even if the government modifies the SAM's, they won't

12     hear of it, which I find rather presumptuous on their part.

13     We will ask the Court to make inquiry of the government if

14     they will make an effort to modify the SAM's.  I'm sure if the

15     SAM's are modified, the MCC won't go along with it, we'll have

16     a further application.

17          MS. MERKL:  Your Honor, the SAM's process, perhaps

18     contrary to Mr. Goltzer's belief, is not a unilateral decision

19     that the government makes.  The government, meaning the

20     Department of Justice in Washington, DC, makes determinations

21     about SAM's provisions in consultation with the BOP and in

22     this instance the BOP is of the view that having more than one

23     adult visitor is inappropriate under the SAM's.

24          At this juncture I have discussed it with the MCC

25     and have not had very much time, of course, during the work

794

1  day to discuss it with Main Justice because I have been in

2  court.

3          But at this point it is a correct summary that the

4  BOP is not amenable to visits with more than one adult.

5  Whether or not Washington and the BOP would modify the SAM's

6  is unknown to the representatives of the government who are

7  presently in court.

8          MR. GOLTZER:  I guess that will cause us to write a

9  letter to the Court.

10          THE COURT:  Yes, why don't you do that?  I will take

11  it under consideration.

12          MR. GOLTZER:  Thank you.

13          THE COURT:  All right.  Anything else?

14          MR. JASPER:  No, Judge.

15          THE COURT:  All right.  Thank you very much,

16  everyone.  Have a good night.

17          (Recess taken until March 10, 2011, at 9:30 am.)

18

19

20

21

22

23

24

25

**$**

**$25,000** [1] - 774:13

**'**

**'04** [1] - 720:15
**'93** [1] - 774:3

**0**

**05cr060** [1] - 597:3

**1**

**10** [3] - 598:22, 773:8, 794:17
**100** [1] - 787:15
**102** [5] - 621:7, 668:4, 792:23, 793:1
**103** [3] - 668:5, 668:10, 674:1
**104** [5] - 674:22, 674:23, 675:1, 675:5, 697:18
**105** [5] - 697:20, 698:1, 698:7, 710:13, 747:19
**106** [3] - 684:5, 710:12, 710:13
**107** [8] - 726:4, 726:5, 726:9, 738:23, 747:14, 786:17, 788:7, 788:8
**11** [2] - 772:7, 772:23
**110** [5] - 738:24, 739:5, 753:5, 788:7, 788:8
**111** [5] - 754:9, 754:16, 754:17, 762:24, 763:4
**112** [5] - 763:5, 763:6, 763:9, 766:13, 766:22
**11201** [2] - 597:16, 597:21
**114** [3] - 767:3, 767:5, 771:5
**117** [2] - 771:7, 771:12
**118** [8] - 619:9, 777:7, 777:12, 786:1, 786:6, 792:18, 792:19, 792:20
**119** [1] - 792:18
**12** [4] - 598:23, 632:3, 704:16, 731:8
**123** [1] - 776:18
**127** [1] - 772:3
**13** [1] - 628:9
**16** [2] - 659:4, 666:20
**1988** [1] - 650:13
**1995** [1] - 727:22
**1997** [1] - 647:1
**1998** [1] - 727:24
**19th** [1] - 667:1

**2**

**20** [1] - 773:6
**2002** [1] - 728:10
**2006** [1] - 676:19
**2008** [1] - 712:5
**2011** [4] - 597:5, 767:25, 768:24,

794:17
**225** [1] - 597:21
**25** [1] - 660:25
**271** [1] - 597:16
**28** [1] - 726:20

**3**

**30** [1] - 724:20
**3500** [2] - 658:16, 658:19

**4**

**4** [1] - 699:9
**46** [1] - 710:15

**5**

**5** [2] - 767:25, 768:23
**50** [4] - 598:17, 599:1, 599:15, 787:15
**50/50** [2] - 694:1, 694:3
**500** [1] - 787:15
**56** [2] - 684:20, 684:21
**5:30** [2] - 599:19, 599:20

**6**

**6** [1] - 699:9
**613-2481** [1] - 597:22
**613-2505** [1] - 597:22
**64** [1] - 599:24
**650** [1] - 787:14
**68** [4] - 599:17, 600:5, 600:8, 618:22

**7**

**7** [1] - 598:23
**718** [2] - 597:22, 597:22

**8**

**8** [2] - 597:5, 773:8
**85** [1] - 635:14
**86** [1] - 635:13
**87** [8] - 635:13, 685:12, 685:13, 685:18, 685:19, 689:22, 690:10, 690:13

**9**

**9/11** [1] - 636:5
**90** [3] - 624:15, 624:18, 627:15
**91** [3] - 627:17, 627:21, 644:11
**911** [1] - 650:2
**94** [4] - 646:11, 646:12, 646:15, 648:9
**95** [2] - 685:17, 685:21
**98** [3] - 648:16, 648:17, 648:20

**9:30** [3] - 597:6, 792:9, 794:17

**A**

**a.m** [1] - 597:6
**ability** [14] - 621:5, 622:14, 629:23, 650:8, 669:9, 669:12, 673:4, 687:2, 689:13, 701:1, 709:19, 721:6, 723:15, 733:12
**able** [26] - 606:3, 606:12, 618:1, 635:25, 636:2, 640:14, 642:8, 645:16, 645:19, 658:4, 660:23, 667:3, 672:10, 673:14, 694:18, 709:2, 717:11, 717:17, 718:6, 748:12, 757:3, 761:16, 775:19, 776:24, 788:16, 793:5
**absence** [1] - 726:2
**absolutely** [3] - 638:11, 663:12, 750:19
**abstract** [1] - 644:16, 644:23, 761:23
**abuse** [3] - 623:3, 623:10, 629:11
**abused** [2] - 663:17, 664:2
**academic** [1] - 773:5
**accept** [13] - 602:6, 616:19, 616:20, 685:14, 687:16, 692:14, 693:20, 695:5, 695:6, 712:19, 736:8, 744:2, 750:1
**acceptable** [1] - 765:15
**accepted** [2] - 717:2, 717:3
**access** [1] - 615:5
**accident** [2] - 647:9, 676:21
**accidental** [4] - 654:14, 746:9, 747:3, 747:4
**accidents** [1] - 743:20
**accommodate** [1] - 615:13
**accordance** [1] - 621:15
**according** [1] - 693:24
**account** [4] - 607:21, 610:1, 610:4, 696:15
**accountant** [2] - 600:24, 601:3
**accurate** [2] - 600:3, 782:18
**accusation** [2] - 654:18, 783:6
**accused** [6] - 603:24, 699:24, 700:18, 740:24, 782:22, 783:1
**achieve** [1] - 713:21
**act** [5] - 640:16, 660:12, 705:16, 745:22, 746:9
**activities** [10] - 603:23, 605:17, 656:6, 687:8, 691:16, 691:21, 691:24, 694:16, 745:2, 758:15
**acts** [3] - 603:24, 660:25, 667:2
**actual** [2] - 598:25, 768:21
**adage** [1] - 656:13
**adages** [1] - 634:2
**adamant** [1] - 612:18
**ADD** [2] - 773:13, 776:19
**add** [5] - 714:12, 714:13, 714:14, 762:9, 787:14
**added** [1] - 612:25
**addicted** [1] - 685:5
**addicts** [2] - 685:4, 689:8
**addition** [3] - 662:22, 710:9, 788:14

**additional** [4] - 666:12, 718:1, 719:7, 788:18
**address** [2] - 613:20, 666:17
**adequately** [1] - 615:9
**ADHD** [1] - 773:13
**administrative** [1] - 598:18
**admirable** [1] - 685:3
**admired** [2] - 689:6, 689:7
**admirer** [1] - 665:17
**admit** [1] - 660:20
**adult** [7] - 620:19, 639:1, 639:2, 658:22, 659:2, 793:23, 794:4
**adverse** [1] - 741:8
**advised** [5] - 739:12, 754:21, 771:16, 777:16, 793:10
**advisors** [1] - 643:5
**affair** [1] - 613:4
**affect** [12] - 611:5, 641:3, 641:4, 662:24, 663:4, 673:4, 689:13, 701:1, 706:15, 713:8, 713:24, 721:6
**affidavit** [1] - 661:8
**afternoon** [20] - 668:9, 675:3, 675:4, 698:4, 698:5, 726:7, 726:8, 738:18, 739:3, 739:4, 753:2, 754:17, 763:7, 763:8, 771:11, 777:10, 777:11, 786:22, 791:19, 792:22
**afternoon's** [3] - 780:17, 784:23, 786:16
**agency** [3] - 628:15, 726:24, 727:2
**agent** [1] - 600:18
**agents** [1] - 702:22
**ages** [1] - 677:22
**aggravating** [53] - 603:17, 604:17, 610:14, 610:16, 610:21, 611:24, 621:5, 621:21, 623:4, 631:17, 634:7, 634:12, 634:16, 638:21, 639:10, 642:20, 642:21, 643:16, 643:19, 643:21, 643:23, 644:4, 653:8, 653:9, 653:12, 653:23, 654:5, 659:6, 660:3, 663:24, 664:4, 679:16, 685:23, 687:20, 694:14, 696:8, 703:22, 704:4, 705:7, 713:11, 730:18, 742:12, 742:19, 742:23, 743:6, 744:22, 744:25, 745:5, 745:23, 751:22, 753:21, 758:13, 759:23
**aggravator** [7] - 611:23, 612:10, 617:23, 621:17, 622:2, 711:25, 712:6
**aggravators** [31] - 612:12, 612:22, 612:25, 613:5, 613:17, 613:25, 616:14, 621:14, 621:19, 623:11, 623:18, 639:4, 643:25, 659:18, 659:21, 659:25, 660:1, 660:5, 660:7, 665:8, 667:18, 680:18, 683:16, 683:17, 713:6, 715:7, 746:1, 750:21, 753:20, 754:3, 759:20
**agitated** [1] - 619:6
**ago** [8] - 720:14, 722:3, 723:11, 771:18, 774:13, 774:16, 774:17, 775:10
**agonized** [1] - 645:24
**agonizing** [1] - 645:24
**agree** [16] - 599:13, 616:8, 632:4, 657:6, 660:3, 704:16, 704:23, 707:4, 731:8, 741:23, 761:19, 762:4, 775:25,

**agreeable** [1] - 792:5
**agreed** [1] - 792:17
**agreement** [1] - 627:13
**agrees** [3] - 613:14, 617:11, 775:17
**aha** [1] - 652:3
**ahead** [2] - 624:6, 788:4
**Airport** [1] - 773:9
**alive** [1] - 735:19
**alleged** [2] - 672:12, 733:1
**allegedly** [1] - 639:24
**allow** [1] - 609:1
**allows** [1] - 602:2
**almost** [3] - 620:6, 684:16, 772:7, 774:14
**alone** [1] - 668:23
**alternate** [4] - 647:3, 647:4, 650:18, 650:19
**alternative** [5] - 608:23, 683:10, 692:11, 692:25, 693:4
**ambiguities** [1] - 645:2
**amenable** [1] - 794:4
**amended** [1] - 767:25
**AMERICA** [1] - 597:3
**amount** [1] - 651:10
**analysis** [2] - 664:13, 683:19
**anonymity** [4] - 599:4, 599:16, 648:11, 648:15
**answer** [53] - 601:8, 608:19, 619:8, 624:8, 629:9, 633:21, 633:23, 640:6, 640:7, 640:9, 640:13, 640:23, 641:9, 641:10, 641:11, 641:14, 641:16, 642:2, 642:5, 643:7, 645:11, 650:20, 672:18, 685:13, 686:1, 690:13, 691:25, 695:18, 699:21, 702:12, 705:24, 709:12, 715:15, 715:17, 715:18, 716:1, 716:2, 734:10, 738:6, 756:20, 760:21, 760:25, 761:1, 773:10, 773:16, 774:5, 781:5, 781:7
**answered** [23] - 601:10, 608:25, 617:1, 629:11, 641:8, 650:23, 656:9, 669:2, 671:11, 671:14, 677:11, 692:13, 699:24, 715:12, 735:10, 735:15, 738:4, 748:18, 748:19, 748:23, 749:17, 760:8, 774:19
**answering** [1] - 645:13
**answers** [17] - 601:20, 613:7, 619:15, 619:18, 621:11, 643:12, 654:23, 665:14, 695:18, 708:18, 709:12, 711:5, 711:6, 736:13, 754:5, 762:18, 766:20
**anytime** [1] - 709:3
**anyway** [2] - 640:20, 734:7
**apart** [1] - 734:17
**apologize** [5] - 685:19, 696:3, 715:21, 715:22, 718:21
**apologizes** [1] - 710:10
**appeals** [1] - 657:3
**appear** [3] - 599:3, 665:21, 769:6
**APPEARANCES** [1] - 597:11
**appeared** [2] - 770:1, 783:11
**applicable** [1] - 723:24

**application** [2] - 776:16, 793:16
**applied** [1] - 686:4
**applies** [1] - 697:4
**apply** [4] - 657:18, 714:24, 747:1, 750:10
**appreciate** [6] - 608:12, 705:23, 708:2, 761:22, 762:18, 787:22
**approached** [1] - 658:17
**appropriate** [49] - 599:9, 604:19, 604:20, 608:20, 614:7, 618:3, 622:17, 631:19, 637:16, 639:11, 653:21, 660:15, 679:14, 679:19, 680:1, 681:20, 683:9, 683:18, 688:10, 688:20, 690:11, 692:8, 692:16, 692:21, 692:24, 694:24, 704:17, 710:5, 714:9, 730:9, 730:25, 731:9, 731:18, 732:19, 732:22, 741:24, 741:25, 742:15, 744:4, 748:12, 750:13, 752:6, 758:10, 758:22, 758:24, 759:4, 759:13, 761:6, 766:3
**approved** [1] - 738:23
**arbitrary** [1] - 659:14
**area** [5] - 686:7, 702:6, 702:8, 742:14, 783:24
**ARGENTIERI** [1] - 597:14
**argue** [2] - 653:20, 708:24
**arguing** [3] - 616:4, 620:17, 620:18
**argument** [1] - 620:10
**arguments** [3] - 616:5, 618:2, 621:21
**Arizona** [2] - 655:6, 658:5
**arms** [2] - 650:12, 657:21
**arms-dealing** [1] - 657:21
**arrest** [2] - 772:2, 774:15
**arrested** [2] - 723:12, 768:22
**arrive** [2] - 789:24, 791:7
**arrived** [1] - 790:20
**article** [3] - 649:2, 767:24, 768:20
**articles** [1] - 649:10
**ascertained** [1] - 781:14
**ascertaining** [1] - 781:11
**aside** [4] - 672:10, 673:15, 701:3, 733:1
**aspects** [1] - 662:6
**assembly** [1] - 783:23
**assert** [1] - 709:17
**assessment** [1] - 688:18
**assistant** [2] - 598:18, 598:24
**Assistant** [1] - 597:15
**assistants** [1] - 598:25
**associated** [5] - 653:2, 671:14, 673:10, 700:9, 741:1
**associates** [2] - 663:3, 687:4
**association** [2] - 691:16, 757:13
**associations** [2] - 672:12
**assume** [3] - 661:3, 664:3, 792:14
**assuming** [4] - 607:19, 653:4, 679:7, 694:19
**assumption** [1] - 788:21
**attempt** [2] - 643:25, 666:10
**attempted** [4] - 663:10, 664:11, 665:3, 666:6
**attendant** [1] - 764:19

**attending** [1] - 765:20
**attention** [5] - 694:17, 773:11, 773:24, 775:19, 776:20
**attitude** [1] - 622:13
**attitudes** [1] - 645:4
**Attorney** [1] - 597:13
**attorneys** [1] - 599:6
**Attorneys** [1] - 597:15
**augur** [1] - 742:18
**aunt** [2] - 774:22, 774:25
**austere** [1] - 634:17
**automatic** [1] - 643:24
**automatically** [1] - 754:13
**available** [5] - 662:13, 716:24, 730:11, 730:16, 758:1
**average** [1] - 783:13
**avoid** [1] - 667:17
**aware** [6] - 638:4, 642:18, 644:20, 668:16, 710:25, 768:24
**awhile** [1] - 772:23

**B**

**bachelor's** [1] - 600:25
**backed** [1] - 611:15
**background** [24] - 603:23, 604:5, 605:4, 605:8, 605:11, 605:15, 605:17, 620:1, 620:5, 622:11, 653:10, 653:13, 677:23, 679:24, 681:3, 694:15, 706:3, 745:1, 745:14, 745:25, 752:5, 758:14, 758:20, 773:5
**bad** [1] - 608:8
**badly** [1] - 775:2
**balance** [1] - 663:21
**balanced** [6] - 613:2, 663:19, 665:14, 665:18, 666:2, 667:4
**balancing** [2] - 623:18, 745:25
**bankrupt** [1] - 722:4
**Bankruptcy** [1] - 598:19
**bankruptcy** [2] - 598:20, 598:23
**bar** [5] - 683:22, 683:24, 684:1, 689:3, 695:9
**BASCIANO** [1] - 597:5
**Basciano** [17] - 620:9, 658:8, 658:16, 660:8, 660:13, 661:1, 672:20, 767:22, 767:24, 768:1, 768:6, 768:20, 768:21, 769:12, 779:19, 793:5, 793:10
**base** [2] - 683:19, 753:16
**based** [27] - 617:1, 627:10, 634:3, 642:1, 643:11, 644:7, 644:9, 648:11, 648:14, 667:11, 667:13, 667:15, 670:18, 671:13, 672:21, 674:4, 699:23, 702:16, 703:5, 703:7, 709:22, 711:5, 711:6, 715:6, 717:11, 763:17, 766:17
**baseless** [1] - 671:23
**baseline** [2] - 616:17, 644:16
**basic** [1] - 679:11
**basis** [6] - 611:13, 627:16, 641:5, 662:7, 720:12, 786:24
**basketball** [1] - 790:14

**battered** [1] - 609:21
**bearing** [1] - 713:3
**beaten** [3] - 609:21, 610:20, 775:2
**became** [1] - 723:12
**become** [2] - 643:24, 668:16
**becomes** [1] - 644:16
**becoming** [1] - 723:12
**BEFORE** [1] - 597:9
**begin** [1] - 740:23
**beginning** [2] - 690:25, 791:13
**begins** [2] - 614:15, 748:6
**behalf** [1] - 620:21
**behave** [1] - 611:5
**behaving** [1] - 609:1
**behavior** [3] - 603:25, 634:10, 645:5
**behind** [1] - 760:5
**beings** [1] - 615:5
**belief** [2] - 643:7, 793:18
**believes** [17] - 598:22, 603:17, 611:22, 653:14, 678:10, 679:16, 679:25, 691:12, 703:22, 708:20, 730:19, 730:24, 742:13, 754:6, 757:9, 758:15, 759:4
**belong** [2] - 765:15, 765:16
**belts** [1] - 691:7
**benefits** [2] - 764:25, 765:1
**best** [4] - 613:10, 614:21, 633:22, 760:19
**bet** [1] - 719:19
**Beth** [1] - 598:8
**bets** [1] - 651:10
**better** [6] - 652:15, 656:15, 660:23, 660:24, 764:22, 790:16
**betting** [2] - 651:24, 689:10
**between** [7] - 668:14, 675:10, 685:21, 698:12, 726:14, 728:17, 789:3
**beyond** [42] - 602:22, 603:3, 603:18, 608:21, 616:13, 624:3, 630:24, 631:9, 652:17, 654:20, 672:2, 678:17, 679:3, 684:10, 688:8, 691:13, 692:1, 692:9, 692:22, 694:22, 700:6, 703:7, 703:23, 713:18, 714:6, 729:6, 729:18, 730:3, 730:19, 731:2, 740:17, 741:3, 741:11, 742:14, 752:18, 757:9, 757:19, 757:24, 758:16, 759:11, 780:6
**bias** [4] - 613:19, 643:20, 672:19, 702:13
**Bible** [1] - 765:19
**bicycles** [1] - 775:3
**big** [3] - 689:9, 705:16, 772:2
**bit** [6] - 620:2, 710:14, 766:20, 767:15, 780:2, 780:4
**blanket** [1] - 760:6
**blessing** [2] - 720:9, 723:23
**blocked** [1] - 709:5
**blood** [1] - 707:14
**Bochnak** [1] - 598:8
**Bonanno** [1] - 768:1
**bookkeeper** [1] - 772:15
**bookmaking** [3] - 650:23, 651:2, 689:10

**BOP** [4] - 793:21, 793:22, 794:4, 794:5
**border** [1] - 659:24
**born** [1] - 609:14
**boss** [2] - 768:1, 768:21
**bottom** [4] - 614:16, 642:17, 642:23, 642:25
**box** [6] - 642:2, 718:18, 766:20, 776:22, 790:11, 790:21
**branches** [1] - 643:14
**breach** [1] - 599:16
**break** [1] - 766:23
**breeze** [1] - 778:15
**briefly** [2] - 614:2, 698:15
**Bring** [1] - 698:1
**bring** [14] - 622:22, 624:15, 645:2, 659:7, 668:5, 697:20, 710:9, 712:10, 713:15, 724:9, 788:23, 790:5, 791:22, 792:1
**bringing** [3] - 712:12, 716:17, 720:2
**brings** [1] - 790:10
**broad** [1] - 746:3
**broke** [1] - 775:11
**broken** [2] - 775:1, 775:5
**Brooklyn** [4] - 597:4, 597:16, 597:21, 702:4
**brought** [14] - 614:1, 614:7, 634:4, 694:17, 700:7, 713:9, 713:13, 713:15, 745:5, 779:15, 787:1, 790:20, 791:6, 791:7
**Brown** [2] - 614:12, 753:8
**brutally** [1] - 656:4
**build** [1] - 783:15
**building** [1] - 647:22
**bunch** [2] - 660:13, 783:11
**burden** [26] - 603:1, 616:24, 617:1, 617:8, 619:15, 630:22, 631:3, 631:5, 652:22, 672:1, 678:16, 679:2, 684:3, 688:8, 700:14, 704:6, 706:24, 713:16, 719:10, 729:6, 729:17, 741:4, 741:10, 742:16, 757:15, 757:23
**Bureau** [1] - 612:14
**burglary** [1] - 756:12
**Burton** [1] - 597:20
**business** [13] - 626:1, 651:14, 656:6, 668:21, 698:25, 699:1, 721:10, 721:20, 721:21, 721:23, 739:24, 763:19

**C**

**Cadman** [2] - 597:16, 597:21
**Caesar** [2] - 765:15, 765:16
**call-in** [1] - 772:14
**candid** [1] - 624:9
**cannot** [2] - 610:24, 732:3
**capital** [1] - 709:9
**car** [18] - 647:8, 722:5, 722:9, 722:13, 722:15, 775:6, 775:9, 775:10
**care** [2] - 664:20, 785:13
**career** [1] - 676:13
**careful** [1] - 601:18

**cargo** [2] - 649:23, 649:24
**carried** [1] - 700:12
**carrier** [1] - 754:25
**cars** [3] - 721:23, 721:25, 722:2
**case** [152] - 598:4, 600:13, 602:10, 602:11, 602:14, 602:18, 602:20, 602:25, 607:19, 609:21, 609:22, 611:14, 614:2, 614:25, 618:3, 621:8, 624:22, 626:14, 626:17, 626:19, 628:3, 629:22, 632:3, 636:1, 636:6, 638:4, 638:6, 638:16, 639:2, 639:3, 642:8, 642:19, 642:25, 643:19, 644:3, 644:13, 644:17, 644:18, 645:9, 646:21, 648:25, 650:9, 653:4, 654:14, 655:8, 655:16, 657:21, 658:11, 659:12, 659:13, 659:16, 662:11, 663:11, 665:21, 666:14, 666:15, 668:16, 669:4, 671:21, 672:5, 672:13, 673:6, 675:12, 676:20, 678:5, 678:8, 678:24, 679:1, 685:7, 685:8, 698:14, 701:25, 703:4, 703:5, 703:13, 707:6, 707:9, 710:19, 710:24, 711:3, 711:6, 711:10, 711:22, 713:21, 714:7, 715:2, 715:5, 716:15, 717:12, 717:15, 720:16, 721:8, 724:15, 726:16, 728:3, 728:14, 729:1, 729:4, 730:15, 732:2, 732:3, 732:25, 739:12, 740:20, 740:22, 741:6, 741:19, 742:13, 743:9, 746:8, 750:21, 752:13, 754:22, 757:6, 757:7, 757:19, 758:1, 758:5, 763:13, 766:1, 767:10, 769:16, 769:19, 769:21, 770:6, 771:16, 771:24, 772:1, 772:3, 775:16, 775:24, 777:17, 778:10, 778:11, 779:20, 781:19, 783:21, 783:25, 784:1, 788:11, 788:16, 790:2, 790:14, 790:24, 791:4, 791:14
**case-specific** [1] - 644:18
**cases** [13] - 602:11, 614:3, 636:4, 658:4, 709:9, 729:5, 732:18, 732:22, 756:10, 760:20, 760:21, 761:2
**CAT** [1] - 597:25
**categorical** [1] - 636:5
**category** [1] - 647:13
**caught** [2] - 775:5, 775:7
**caused** [2] - 613:15, 656:4
**cavalier** [1] - 667:12
**cell** [1] - 657:12
**center** [1] - 773:23
**Central** [2] - 598:19, 599:2
**certain** [20] - 609:6, 609:12, 609:13, 609:16, 612:25, 625:16, 631:17, 634:7, 643:14, 643:23, 653:8, 658:4, 679:15, 703:21, 730:18, 732:18, 742:17, 751:19, 758:14, 784:9
**certainly** [14] - 613:2, 642:12, 643:8, 659:21, 665:15, 667:14, 670:24, 723:18, 748:24, 775:25, 780:1, 780:10, 789:1, 791:1
**certificate** [1] - 670:25
**certification** [1] - 773:19
**cetera** [1] - 684:23
**chair** [1] - 698:3

**Champlain** [2] - 721:1, 724:1
**chance** [5] - 685:13, 692:14, 693:18, 767:13
**change** [9] - 608:4, 608:6, 609:6, 609:16, 610:24, 610:25, 611:23, 725:3, 731:19
**changed** [4] - 619:18, 652:6, 657:2, 678:1
**changes** [1] - 617:3
**Chapter** [1] - 598:23
**character** [2] - 622:11, 634:10
**characteristics** [2] - 653:13, 679:24
**charge** [20] - 602:16, 630:20, 631:12, 653:2, 672:8, 678:13, 679:8, 700:8, 729:12, 730:7, 730:12, 741:1, 741:12, 744:12, 744:15, 744:16, 744:19, 752:20, 752:22, 757:13
**charged** [16] - 602:14, 606:22, 652:24, 652:25, 672:3, 672:6, 673:6, 678:11, 692:2, 711:21, 711:22, 715:2, 729:8, 729:10, 757:11
**charges** [12] - 602:17, 602:23, 630:19, 630:21, 653:3, 671:18, 671:22, 672:8, 673:11, 678:14, 700:7, 700:9, 700:12, 729:13, 741:1, 741:11, 777:23
**charging** [1] - 765:20
**chatting** [1] - 785:2
**check** [6] - 600:4, 674:3, 674:6, 691:3, 691:4, 760:20
**checked** [2] - 608:24, 702:17
**checking** [1] - 674:6
**child** [15] - 637:20, 638:4, 638:12, 638:17, 638:22, 638:23, 642:9, 642:19, 645:18, 655:12, 655:13, 658:6, 658:23, 663:17
**child-killing** [2] - 638:4, 642:19
**childhood** [9] - 610:20, 611:22, 620:1, 622:1, 623:3, 623:10, 664:1
**children** [7] - 629:20, 658:19, 658:20, 658:21, 658:22, 658:24, 716:9
**Chinese** [1] - 625:21
**choice** [3] - 620:19, 620:23, 761:16
**choices** [1] - 693:13
**Christ** [1] - 765:20
**Christian** [5] - 642:4, 643:3, 643:9, 645:19, 765:13
**Christianity** [1] - 643:14
**Christmas** [1] - 787:18
**church** [1] - 643:4
**circled** [1] - 732:8
**Circuit** [1] - 614:13
**circumstance** [3] - 609:25, 613:1, 618:4, 618:15, 622:7, 633:17, 634:14, 634:15, 638:12, 705:10, 714:17, 743:15, 759:21
**circumstances** [43] - 604:5, 604:19, 605:4, 607:24, 610:11, 621:6, 634:19, 634:25, 635:2, 636:3, 636:12, 637:4, 637:6, 637:10, 637:20, 643:16, 643:22, 643:23, 646:1, 653:14, 655:4, 656:1, 665:10, 667:16, 679:25, 694:16, 701:7,

706:2, 707:7, 707:13, 715:14, 717:14, 719:2, 732:12, 732:17, 745:1, 753:19, 754:14, 758:13, 758:20, 759:24, 759:25, 760:5
**circumstantial** [1] - 681:6
**City** [3] - 647:14, 727:13, 755:17
**city** [1] - 727:18
**civil** [5] - 626:19, 647:2, 727:24, 728:10, 728:23
**claim** [1] - 660:13
**claims** [1] - 768:21
**clarify** [1] - 690:12
**clauses** [1] - 695:21
**cleaned** [1] - 701:18
**clear** [10] - 620:11, 622:3, 658:19, 705:18, 709:18, 711:7, 748:23, 753:14, 787:20, 788:7
**clearer** [1] - 620:13
**clearly** [5] - 619:16, 619:17, 685:6, 708:9, 714:4
**CLERK** [5] - 646:11, 674:8, 674:22, 691:3, 792:25
**clerk** [6] - 598:10, 647:11, 671:1, 674:10, 740:11, 789:24
**clerks** [1] - 647:21
**clients** [1] - 772:14
**close** [5] - 617:16, 629:10, 708:15, 719:14, 774:20
**closely** [1] - 776:25
**closer** [2] - 613:18
**closure** [1] - 640:21
**cloud** [1] - 707:18
**cocaine** [1] - 685:6
**cold** [1] - 716:9
**college** [1] - 721:18
**colloquy** [1] - 788:14
**combination** [5] - 659:22, 659:23, 660:2, 660:4, 685:7
**combined** [1] - 708:19
**comfortable** [1] - 743:3
**coming** [22] - 618:7, 627:1, 641:20, 648:6, 652:11, 660:15, 664:18, 666:5, 666:7, 673:17, 690:7, 708:1, 712:4, 714:22, 738:16, 753:1, 762:19, 766:10, 770:21, 776:8, 785:10, 791:4
**comment** [1] - 624:3
**comments** [4] - 624:1, 624:2, 704:20, 709:7
**commit** [8] - 620:21, 653:2, 658:13, 672:7, 678:13, 729:12, 740:25, 757:12
**commits** [2] - 682:2, 747:19
**committed** [25] - 602:15, 602:23, 603:2, 606:2, 609:4, 609:9, 609:11, 619:10, 619:11, 630:25, 654:21, 655:15, 661:1, 662:21, 663:2, 672:3, 678:11, 678:18, 682:7, 682:15, 700:21, 729:7, 733:18, 744:7, 757:10
**committing** [3] - 654:25, 715:4, 750:25
**communication** [1] - 693:10
**companies** [1] - 765:8
**company** [17] - 600:21, 600:22,

600:23, 649:19, 649:23, 649:25, 675:24, 676:7, 699:8, 726:24, 755:12, 755:15, 764:2, 764:3, 765:6, 772:18, 772:20

**compare** [1] - 681:13
**compel** [2] - 749:3, 749:12
**compelling** [2] - 634:10, 639:11
**completely** [5] - 603:6, 613:14, 768:7, 769:3, 789:11
**completes** [1] - 786:10
**complex** [1] - 602:6
**complexity** [1] - 775:24
**comprised** [1] - 599:4
**computer** [1] - 721:23
**computers** [1] - 626:1
**con** [1] - 657:13
**conceding** [1] - 660:14
**conceivably** [1] - 644:5
**concentrate** [1] - 775:16
**concentrating** [1] - 776:20
**concern** [7] - 612:9, 628:15, 628:16, 633:25, 749:19, 779:15, 783:3
**concerned** [7] - 612:11, 635:25, 643:1, 643:22, 645:13, 776:24, 782:20
**concerning** [1] - 739:12
**concerns** [3] - 723:15, 723:20, 749:7
**concluded** [1] - 610:9
**conclusion** [4] - 604:2, 622:16, 671:17, 714:8
**concur** [1] - 627:7
**condition** [1] - 773:11
**conduct** [3] - 603:12, 665:23, 779:21
**confirmed** [1] - 782:8
**congregation** [1] - 644:4
**connection** [10] - 602:17, 646:25, 657:22, 672:8, 672:12, 672:13, 678:14, 703:4, 729:13, 733:24
**conscience** [1] - 633:15
**conscious** [2] - 620:19, 620:23
**consensus** [2] - 635:22, 635:23
**consent** [8] - 648:10, 762:25, 763:4, 771:1, 771:5, 777:6, 786:9, 792:20
**consider** [66] - 605:10, 606:3, 606:12, 607:2, 612:13, 615:17, 618:1, 618:3, 618:5, 618:6, 618:8, 620:25, 621:5, 621:14, 621:20, 622:11, 623:1, 623:15, 629:24, 633:17, 636:2, 637:5, 640:24, 641:5, 641:8, 653:8, 655:17, 658:4, 658:11, 659:9, 659:12, 665:4, 665:7, 665:16, 666:15, 680:4, 685:23, 691:14, 694:13, 694:18, 696:25, 700:19, 704:5, 730:9, 731:5, 736:23, 737:4, 737:9, 737:20, 737:25, 738:9, 741:16, 744:12, 744:15, 744:20, 748:8, 748:12, 753:19, 753:21, 753:25, 754:13, 756:10, 759:1, 759:8, 788:16
**consideration** [17] - 615:10, 639:11, 664:13, 667:3, 683:6, 703:3, 713:3, 713:24, 714:13, 714:14, 715:11, 733:25, 734:14, 749:23, 750:8, 751:2, 794:11

**considered** [4] - 634:11, 663:25, 729:3, 754:2
**considering** [10] - 605:15, 621:13, 630:9, 671:20, 680:21, 680:25, 682:25, 683:9, 683:15, 736:7
**consistent** [3] - 619:8, 720:12, 753:20
**consistently** [1] - 665:18
**conspiracies** [2] - 658:12, 665:24
**conspiracy** [9] - 602:16, 630:20, 653:1, 672:7, 678:12, 700:8, 729:12, 740:25, 757:12
**construction** [3] - 675:24, 676:7, 676:14
**consult** [1] - 685:16
**consultation** [1] - 793:21
**contemplate** [1] - 723:25
**contemplated** [2] - 723:11, 723:24
**context** [3] - 621:1, 633:5, 689:12
**continuation** [1] - 604:7
**continue** [4] - 602:2, 609:1, 643:16, 698:23
**Continued** [7] - 632:15, 636:15, 674:24, 697:21, 746:13, 766:25, 785:15
**continued** [2] - 620:11, 661:11, 667:2
**continues** [2] - 631:23, 732:4
**continuing** [1] - 631:23
**contradiction** [1] - 789:3
**contradictory** [2] - 633:2, 690:13
**contrary** [2] - 787:20, 793:18
**convening** [1] - 792:8
**conversations** [5] - 778:13, 779:18, 779:23, 779:24, 780:13
**conversely** [1] - 743:5
**convicted** [32] - 603:25, 612:8, 617:25, 619:4, 633:18, 635:16, 635:18, 635:20, 652:18, 654:7, 665:2, 685:24, 686:2, 701:24, 704:24, 705:1, 712:5, 712:24, 713:1, 714:18, 714:24, 715:3, 715:14, 718:8, 738:11, 743:10, 747:2, 747:4, 748:1, 748:6, 753:10, 766:2
**conviction** [6] - 712:6, 719:22, 723:17, 723:22, 748:22, 753:15
**convictions** [4] - 745:16, 745:17, 745:18, 748:3
**convince** [1] - 679:16
**convinced** [1] - 687:20
**cook** [1] - 701:16
**cooperating** [6] - 658:15, 658:18, 664:11, 666:11, 737:11, 737:22
**cooperator** [1] - 658:22
**cop** [1] - 775:4
**copy** [1] - 670:25
**corporate** [1] - 629:5
**corporation** [6] - 628:19, 628:20, 628:21, 739:25, 740:1, 740:4
**correct** [30] - 618:12, 631:20, 632:14, 640:7, 640:9, 649:15, 650:23, 668:11, 669:12, 669:18, 670:10, 673:2, 675:6, 676:15, 676:22, 678:19, 694:8, 695:13, 695:25, 726:10, 727:23, 728:9, 728:12, 728:15, 729:2, 729:9, 729:24, 782:10,

787:9, 794:3
**correctly** [3] - 658:6, 775:2, 788:10
**Cosa** [1] - 684:22
**cost** [4] - 747:14, 749:2, 749:18, 749:22
**cost-to-taxpayer** [1] - 747:14
**costs** [1] - 749:7
**counsel** [2] - 618:2, 628:18
**counterbalance** [4] - 604:6, 664:4, 744:24, 751:21
**counties** [1] - 724:15
**county** [2] - 647:17, 720:19
**County** [7] - 720:20, 723:1, 724:11, 772:24, 773:1, 773:4, 774:3
**couple** [14] - 613:15, 662:2, 666:8, 686:14, 689:2, 712:14, 722:3, 722:13, 722:24, 749:16, 774:2, 775:18, 780:12
**course** [4] - 605:20, 613:8, 786:14, 793:25
**COURT** [1] - 597:1
**court** [32] - 598:1, 614:22, 617:20, 626:12, 637:1, 638:15, 646:9, 647:11, 647:21, 662:1, 667:14, 670:6, 674:12, 681:7, 686:11, 691:8, 696:2, 700:20, 727:25, 728:23, 729:4, 749:15, 762:15, 767:1, 769:11, 771:25, 776:6, 780:23, 790:10, 794:2, 794:7
**Court** [4] - 597:20, 614:13, 740:11, 753:7
**Court's** [4] - 695:19, 744:2, 754:5, 786:3, 788:14, 789:12
**court's** [10] - 618:23, 621:1, 622:4, 622:5, 622:18, 622:19, 622:20, 623:15, 627:9, 719:15
**Courthouse** [1] - 597:4
**courtroom** [16] - 641:23, 646:12, 648:9, 648:17, 664:21, 672:15, 673:21, 697:14, 710:24, 738:20, 753:5, 754:16, 762:24, 763:6, 766:13, 779:17
**courts** [1] - 614:3
**cover** [1] - 617:8
**covered** [4] - 616:24, 690:20, 747:22, 750:21
**crazy** [1] - 651:10
**create** [3] - 671:19, 699:10, 699:11
**created** [1] - 721:22
**creates** [2] - 613:1, 706:11
**crime** [38] - 602:12, 609:9, 609:11, 638:8, 645:17, 652:24, 657:22, 663:3, 671:15, 671:25, 672:2, 672:13, 672:24, 673:4, 673:10, 677:25, 681:16, 683:14, 685:5, 685:8, 686:13, 687:8, 687:15, 701:22, 702:4, 702:7, 715:1, 716:4, 716:6, 716:12, 730:14, 735:14, 741:19, 744:4, 774:21, 775:4, 782:22, 783:1
**crimes** [24] - 602:23, 603:2, 631:1, 636:5, 652:25, 663:4, 672:6, 673:5, 678:11, 678:18, 678:23, 679:3, 681:19, 692:2, 700:21, 729:7, 729:11, 729:19, 733:17, 740:24, 757:10, 757:11, 757:14
**criminal** [18] - 603:24, 620:20, 626:17,

626:19, 629:6, 629:7, 650:9, 650:12, 676:20, 702:1, 710:14, 719:8, 719:13, 728:25, 729:4, 729:5, 769:1
   **criminality** [1] - 724:12
   **criminals** [3] - 685:3, 689:7, 689:8
   **cruel** [1] - 657:5
   **culpable** [1] - 682:1
   **cult** [1] - 681:24
   **curious** [1] - 786:12
   **current** [4] - 600:16, 628:9, 739:19, 772:5
   **custom** [1] - 722:13
   **customers** [1] - 722:11
   **Customs** [2] - 773:3, 773:8

# D

   **daily** [2] - 625:19, 662:16
   **Daily** [1] - 649:3
   **damaged** [1] - 611:22
   **danger** [5] - 612:16, 613:25, 638:7, 736:25, 737:6
   **dangerous** [2] - 612:1, 615:2
   **dangerousness** [5] - 612:11, 612:16, 615:4, 615:7, 615:9
   **dashboard** [1] - 775:6
   **data** [2] - 652:8, 656:19
   **database** [1] - 772:13
   **David** [1] - 666:6
   **days** [8] - 613:15, 699:18, 724:20, 770:12, 779:22, 780:12, 791:23
   **DC** [1] - 793:20
   **deal** [10] - 615:3, 615:9, 644:13, 645:2, 671:1, 690:15, 717:15, 717:19, 762:16, 769:1
   **dealer** [1] - 723:12
   **dealers** [4] - 663:10, 722:4, 722:5, 722:9
   **dealing** [2] - 650:12, 657:21
   **dealt** [2] - 722:8, 722:12
   **death** [270] - 601:20, 601:25, 602:3, 602:5, 602:12, 603:15, 603:21, 604:2, 604:18, 607:3, 608:20, 608:25, 610:16, 610:18, 610:21, 615:20, 616:4, 616:9, 616:10, 616:14, 618:2, 618:11, 619:11, 619:14, 620:2, 621:4, 621:8, 621:21, 621:24, 630:12, 631:18, 632:3, 632:11, 633:8, 633:10, 633:18, 634:16, 634:21, 634:23, 635:3, 636:1, 636:6, 637:5, 637:11, 637:12, 640:4, 640:15, 640:16, 640:18, 640:20, 640:24, 641:6, 642:8, 642:13, 642:24, 644:3, 644:5, 644:8, 644:9, 644:11, 645:17, 645:20, 645:23, 646:1, 652:2, 652:4, 652:6, 652:7, 652:10, 653:17, 653:24, 654:6, 655:4, 655:9, 655:15, 655:17, 655:25, 656:11, 656:17, 656:22, 657:7, 657:18, 658:4, 658:11, 659:9, 659:12, 659:16, 660:8, 660:9, 662:8, 662:12, 662:24, 663:5, 665:5, 665:7, 665:16, 665:17, 666:1, 666:16, 666:22, 667:3, 667:4, 667:16,

667:22, 677:4, 677:6, 677:12, 677:14, 677:23, 679:13, 679:20, 680:1, 680:9, 680:11, 680:13, 680:24, 681:4, 681:19, 682:1, 682:9, 682:14, 683:5, 683:8, 683:17, 683:18, 684:13, 684:14, 685:22, 685:24, 686:4, 687:19, 687:22, 688:9, 688:17, 689:22, 690:11, 692:6, 692:7, 692:15, 692:20, 693:3, 693:6, 693:13, 693:15, 693:25, 694:9, 694:21, 694:22, 694:23, 695:1, 695:15, 696:10, 696:19, 704:1, 704:7, 704:11, 704:16, 704:21, 704:22, 704:23, 705:9, 705:13, 706:4, 707:3, 707:8, 707:11, 708:16, 708:22, 709:20, 710:1, 710:18, 711:4, 711:13, 712:18, 713:20, 714:8, 714:17, 714:20, 714:23, 715:11, 715:13, 716:14, 716:21, 716:24, 718:14, 718:25, 729:16, 730:15, 730:22, 731:3, 731:7, 731:9, 731:23, 732:1, 732:2, 732:5, 732:10, 732:11, 732:19, 732:23, 733:6, 734:15, 734:19, 735:17, 736:6, 736:10, 736:22, 737:3, 737:8, 737:19, 737:24, 738:8, 740:14, 741:21, 741:22, 741:24, 742:5, 742:15, 743:2, 743:16, 743:24, 744:9, 745:8, 745:9, 747:1, 747:20, 747:25, 748:21, 748:24, 748:25, 749:6, 749:13, 749:24, 750:2, 751:1, 751:4, 751:11, 751:22, 752:10, 752:19, 752:21, 753:9, 753:15, 753:23, 754:7, 754:12, 756:19, 756:25, 758:6, 758:9, 758:17, 759:2, 759:3, 759:5, 759:10, 759:12, 759:14, 759:21, 760:3, 760:19, 761:1, 761:3, 761:5, 761:7, 765:13, 766:3, 784:18
   **death-qualfiied** [1] - 754:7
   **death-qualified** [3] - 636:6, 644:9, 644:11
   **decide** [27] - 622:6, 640:3, 645:6, 653:20, 653:24, 667:21, 672:13, 679:14, 680:5, 680:9, 680:10, 685:21, 688:7, 700:14, 700:20, 703:5, 704:6, 705:8, 716:4, 716:5, 731:12, 741:22, 742:3, 758:8, 759:6, 770:6, 770:7
   **decided** [2] - 616:10, 741:24
   **decides** [5] - 615:24, 704:13, 730:1, 731:8, 759:3
   **deciding** [2] - 610:1, 610:15
   **decision** [28] - 598:11, 605:18, 622:9, 663:23, 677:8, 680:10, 700:23, 700:25, 701:1, 707:4, 707:5, 708:13, 714:11, 731:6, 731:22, 732:3, 732:15, 745:14, 752:6, 757:3, 759:8, 760:10, 760:11, 760:12, 760:15, 761:7, 761:25, 793:18
   **Defendant** [1] - 597:6, 597:17
   **defendant** [154] - 598:3, 598:8, 598:9, 602:15, 602:23, 602:24, 602:25, 603:2, 603:18, 603:23, 603:24, 604:18, 604:23, 605:4, 605:15, 606:1, 606:9, 607:20, 608:21, 609:20, 612:15, 615:1, 616:3, 616:5, 617:5, 617:24, 617:25, 619:2, 619:16, 619:23, 620:17, 620:19, 620:24, 630:13, 630:18, 630:25, 631:4,

634:11, 638:7, 638:25, 639:6, 652:17, 652:18, 652:22, 652:24, 653:5, 654:7, 654:20, 656:23, 658:11, 662:21, 663:15, 664:11, 665:6, 671:13, 671:25, 672:20, 678:10, 678:17, 678:22, 678:24, 678:25, 679:9, 679:17, 680:16, 681:15, 683:4, 684:8, 684:14, 687:4, 687:7, 687:12, 687:21, 688:6, 691:13, 691:19, 691:20, 692:1, 692:8, 692:21, 694:15, 694:16, 696:5, 696:9, 699:23, 700:6, 700:11, 700:17, 700:21, 703:8, 703:11, 706:4, 707:3, 710:19, 711:9, 711:20, 712:1, 712:25, 714:4, 718:7, 729:7, 729:10, 729:19, 729:22, 729:25, 730:6, 733:22, 735:22, 736:25, 737:6, 737:11, 737:22, 738:2, 738:11, 740:23, 741:3, 741:4, 741:5, 741:7, 741:8, 741:9, 741:11, 741:12, 742:10, 743:2, 743:16, 744:7, 744:18, 744:21, 745:1, 745:6, 747:2, 748:5, 748:16, 750:24, 752:19, 753:6, 757:10, 757:16, 757:17, 757:23, 758:14, 759:5, 759:13, 760:9, 767:2, 778:20, 780:15, 781:1, 782:25, 788:17, 791:7
   **defendant's** [20] - 603:23, 604:4, 604:13, 605:11, 605:16, 620:16, 623:2, 631:11, 646:2, 653:10, 653:13, 672:11, 679:24, 681:3, 691:15, 745:14, 752:5, 758:20, 782:24
   **defense** [29] - 599:11, 604:3, 615:2, 618:2, 618:10, 623:2, 631:3, 631:6, 631:21, 652:20, 653:18, 659:5, 660:14, 666:14, 678:20, 678:23, 679:1, 679:22, 682:20, 700:10, 704:3, 713:15, 730:23, 742:17, 742:20, 744:22, 758:19, 779:16, 788:8
   **defense's** [1] - 682:25
   **defied** [1] - 789:11
   **definitely** [2] - 714:13, 719:4
   **definition** [1] - 734:24
   **deliberate** [54] - 602:13, 602:15, 603:11, 604:15, 604:24, 609:4, 619:4, 620:19, 620:23, 621:9, 626:20, 626:21, 630:14, 630:19, 632:2, 633:18, 635:18, 635:20, 636:2, 639:1, 650:16, 653:1, 654:3, 665:2, 672:6, 676:24, 678:12, 680:17, 682:15, 687:13, 692:23, 700:13, 703:12, 705:5, 705:8, 706:3, 707:8, 710:19, 711:21, 712:25, 714:18, 715:14, 716:21, 728:4, 729:11, 730:7, 740:24, 742:10, 743:1, 743:10, 747:24, 757:12, 759:18, 788:18
   **deliberated** [1] - 647:4
   **deliberately** [5] - 608:22, 654:8, 692:9, 715:4, 741:13
   **deliberates** [1] - 653:5
   **deliberating** [3] - 603:9, 730:2, 748:7
   **deliberation** [3] - 634:5, 781:2, 781:18
   **deliberations** [3] - 666:12, 666:13, 712:20
   **deliver** [2] - 649:16, 761:25
   **deliveries** [1] - 649:19

**delivers** [1] - 649:23
**delve** [1] - 770:3
**demeanor** [17] - 611:15, 619:2, 645:4, 645:21, 667:11, 667:24, 708:19, 709:12, 709:16, 719:1, 753:8, 769:5, 775:20, 775:21, 775:22, 776:22
**demonstrate** [6] - 603:17, 631:16, 679:25, 730:19, 730:24, 758:21
**demonstrated** [2] - 668:2, 759:11
**denied** [2] - 668:3, 719:5
**Dennehey** [1] - 598:5
**Dennehy** [1] - 627:4
**DENNEHY** [3] - 597:15, 627:5, 658:25
**Department** [1] - 793:20
**describe** [5] - 601:24, 677:13, 756:18, 757:5, 783:9
**described** [2] - 688:14, 751:23
**describes** [1] - 760:19
**description** [1] - 667:8
**deserve** [2] - 683:5, 707:3
**deserved** [1] - 752:19
**deserves** [5] - 617:7, 619:9, 619:23, 655:9, 684:11
**designed** [1] - 643:25
**desirable** [1] - 717:18
**despite** [1] - 659:5
**detective** [2] - 755:17, 755:22
**determination** [2] - 621:1, 621:15
**determinations** [1] - 793:20
**determine** [1] - 766:6
**determined** [1] - 659:4
**determining** [1] - 614:17
**detrimental** [2] - 669:8, 669:11
**develop** [1] - 780:21
**developed** [2] - 678:1, 779:25
**diagnosed** [1] - 773:13
**die** [9] - 617:2, 617:7, 619:9, 619:23, 656:20, 684:11, 735:24, 735:25, 760:9
**differ** [1] - 643:4
**difference** [3] - 611:18, 611:19, 612:18
**different** [18] - 602:11, 617:19, 656:11, 656:17, 674:12, 676:7, 678:3, 707:13, 709:8, 717:14, 723:3, 723:4, 723:10, 724:15, 732:3, 741:15, 765:8, 784:13
**differently** [2] - 607:19, 656:8
**difficult** [20] - 608:9, 608:10, 623:2, 623:9, 642:15, 663:17, 672:20, 685:9, 702:15, 705:21, 714:15, 719:1, 759:16, 762:16, 769:2, 774:6, 775:15, 775:22, 776:1, 776:4
**difficulty** [12] - 625:14, 625:17, 626:5, 627:8, 640:10, 640:13, 642:4, 643:12, 644:15, 775:19, 776:18, 776:20
**DIRE** [1] - 597:9
**dire** [1] - 645:1
**direction** [2] - 639:9, 787:5
**directly** [1] - 718:25
**disagree** [1] - 708:21
**disagrees** [2] - 632:4, 753:17
**disconnect** [1] - 747:17
**discretion** [1] - 787:1

**discrimination** [1] - 602:4
**discuss** [14] - 608:11, 650:4, 671:9, 678:4, 704:21, 731:15, 749:11, 755:19, 779:4, 781:15, 790:1, 790:13, 790:24, 794:1
**discussed** [3] - 784:2, 784:17, 793:24
**discussing** [1] - 778:6
**discussion** [4] - 608:2, 614:15, 687:10, 781:17
**discussions** [2] - 650:8, 778:2
**disguise** [1] - 720:10
**dismiss** [2] - 708:9, 768:9
**dismissing** [1] - 776:15
**dispatcher** [1] - 650:2
**disqualification** [2] - 724:23, 725:2
**disqualify** [3] - 753:24, 754:13, 786:25
**disregard** [1] - 760:22
**distant** [3] - 629:15, 629:16, 775:1
**distinction** [1] - 728:17
**distribute** [1] - 724:2
**distributed** [1] - 598:11
**DISTRICT** [3] - 597:1, 597:1, 597:10
**disturbing** [1] - 780:4
**divided** [1] - 757:6
**DK** [1] - 736:12
**DNA** [4] - 652:8, 656:19, 656:22, 657:1
**done** [10] - 599:19, 611:4, 674:16, 685:14, 692:14, 693:20, 699:15, 719:20, 720:8, 791:13
**door** [3] - 775:9, 790:8, 790:9
**double** [1] - 600:4
**doubt** [39] - 602:22, 603:3, 603:18, 608:21, 616:14, 630:25, 631:9, 652:17, 654:20, 672:2, 678:17, 679:3, 684:11, 688:9, 691:13, 692:1, 692:9, 692:22, 694:23, 700:6, 703:7, 703:23, 713:18, 729:7, 729:18, 730:3, 730:19, 731:2, 740:17, 741:4, 741:11, 742:14, 752:18, 757:10, 757:19, 757:24, 758:16, 758:17, 759:12
**down** [10] - 622:24, 638:9, 642:22, 677:21, 736:12, 761:21, 780:14, 780:19, 783:23, 784:12, 785:1
**downstairs** [1] - 671:2
**dozen** [1] - 599:1
**drag** [2] - 657:4
**dramatic** [2] - 718:20, 718:23
**draw** [2] - 780:14, 780:19
**dream** [1] - 644:3
**dreaming** [2] - 773:21, 773:24
**driven** [1] - 684:7
**drives** [1] - 742:13
**driving** [1] - 774:14
**drop** [2] - 706:21, 708:25
**dropped** [1] - 708:22
**drug** [7] - 629:22, 656:6, 663:10, 685:3, 689:7, 702:8, 723:12
**drugs** [1] - 629:23
**drunk** [1] - 774:14
**due** [3] - 624:8, 638:9, 712:8
**duration** [1] - 775:24

**during** [3] - 674:11, 712:23, 793:25
**duty** [2] - 670:9, 674:12, 774:1
**DWI** [1] - 756:11

**E**

**early** [1] - 761:9
**earn** [2] - 669:9, 669:12
**ease** [1] - 645:10
**easily** [2] - 642:13, 642:24
**East** [2] - 597:16, 597:21
**EASTERN** [1] - 597:1
**easy** [12] - 614:3, 639:21, 707:5, 715:23, 715:24, 718:11, 718:12, 718:15, 718:16, 770:7, 770:9
**ECF** [1] - 598:16
**effect** [9] - 629:23, 639:11, 650:8, 664:12, 669:8, 669:12, 687:2, 733:25, 734:13
**effectively** [1] - 613:19
**effort** [2] - 731:16, 793:14
**efforts** [2] - 659:5, 762:18
**eight** [3] - 644:25, 724:7, 755:2
**either** [12] - 633:11, 650:22, 651:1, 685:7, 685:10, 724:16, 734:4, 734:5, 761:17, 762:1, 762:14, 789:2
**either/or** [1] - 640:19
**elbow** [4] - 775:5, 775:11, 775:12
**element** [1] - 768:25
**elementary** [1] - 773:22
**elevated** [1] - 619:5
**eleven** [3] - 680:10, 688:16, 759:14
**eliminate** [1] - 615:7
**elucidate** [1] - 732:13
**emotional** [3] - 706:12, 708:9, 709:7
**emotionally** [1] - 706:15
**emperor** [1] - 765:22
**emperors** [1] - 765:20
**employed** [5] - 668:20, 675:19, 675:21, 755:5, 772:16
**employees** [1] - 699:5
**employer** [1] - 628:23
**employment** [2] - 625:11, 669:23
**end** [8] - 619:15, 624:11, 640:21, 643:7, 680:19, 719:2, 759:10, 760:12
**end-all** [1] - 643:7
**ended** [1] - 773:7
**endless** [1] - 784:8
**endure** [1] - 669:10
**enforcement** [5] - 638:6, 658:13, 658:14, 727:2, 748:16
**engaged** [1] - 687:8
**engineer** [1] - 773:6
**engineering** [1] - 773:5
**English** [2] - 625:15, 627:11
**enhance** [1] - 623:11
**enter** [1] - 615:10
**entered** [2] - 646:12, 648:17
**enters** [2] - 754:16, 763:6
**entertaining** [1] - 686:17

**entire** [1] - 694:23
**entitled** [2] - 617:6, 684:8
**entry** [1] - 768:13
**environment** [2] - 609:15, 609:17
**equal** [1] - 703:2
**erroneous** [1] - 782:18
**error** [1] - 710:11
**escalated** [1] - 665:3
**escalating** [2] - 659:6, 666:21
**ESQ** [4] - 597:12, 597:17, 597:18, 597:18
**essentially** [1] - 620:9
**establish** [1] - 782:23
**estate** [1] - 600:18
**et** [1] - 684:23
**etcetera** [1] - 760:23
**Europe** [1] - 651:24
**evaluate** [2] - 709:19, 754:3
**event** [4] - 601:15, 601:16, 719:6, 748:21
**events** [1] - 766:5
**eventually** [1] - 773:7
**evidence** [120] - 603:8, 606:8, 608:5, 615:1, 615:3, 617:24, 618:1, 618:14, 621:20, 623:2, 623:8, 623:9, 623:16, 626:14, 627:8, 629:21, 629:24, 629:25, 630:9, 631:4, 631:17, 631:22, 631:23, 632:1, 634:3, 639:3, 652:10, 652:14, 652:21, 652:23, 653:11, 654:4, 654:6, 654:10, 656:22, 658:8, 658:12, 660:15, 660:16, 660:17, 660:18, 660:20, 660:22, 662:20, 664:9, 671:21, 672:14, 672:22, 673:5, 678:10, 679:15, 680:18, 681:5, 681:6, 681:10, 681:11, 682:17, 682:19, 682:20, 682:21, 682:25, 685:4, 687:3, 687:19, 691:11, 691:14, 691:15, 691:20, 693:9, 694:7, 694:8, 694:13, 695:13, 695:25, 696:1, 696:7, 700:3, 700:19, 702:16, 703:6, 703:7, 703:21, 704:5, 705:6, 705:18, 707:2, 713:13, 713:23, 715:7, 721:7, 724:3, 730:2, 730:17, 730:23, 730:24, 731:4, 731:5, 733:11, 733:13, 733:21, 736:24, 737:5, 737:10, 737:21, 738:1, 738:10, 741:5, 742:21, 744:7, 744:15, 750:23, 757:8, 758:13, 759:19, 775:23, 777:1, 779:20, 788:16
**evolved** [6] - 677:13, 677:20, 678:2, 696:24
**exacted** [1] - 730:14
**exactly** [8] - 614:12, 641:7, 642:15, 710:23, 724:11, 745:3, 760:5, 764:9
**exam** [1] - 773:19
**examination** [2] - 618:24, 718:13
**example** [2] - 659:12, 667:15
**examples** [1] - 748:13
**excellent** [1] - 609:18
**except** [2] - 645:17, 789:7
**exceptions** [1] - 710:2
**excuse** [1] - 641:25
**excused** [5] - 670:18, 674:4, 674:15,

710:13
**exhibited** [1] - 619:2
**expand** [1] - 677:17
**expect** [2] - 660:18, 781:5
**experience** [8] - 629:22, 650:21, 651:1, 687:1, 702:11, 707:11, 721:5, 721:11
**explain** [7] - 677:10, 684:21, 686:1, 703:17, 734:8, 782:20, 791:3
**explained** [4] - 629:12, 672:23, 702:17, 760:21
**explaining** [1] - 748:23
**exposed** [1] - 788:6
**expressed** [1] - 642:7
**extensive** [1] - 695:24
**extent** [2] - 623:17, 634:20
**extenuating** [1] - 634:19
**extreme** [2] - 642:7, 643:12
**extremely** [6] - 645:8, 659:14, 708:14, 709:17, 714:15, 789:11
**eye** [8] - 634:1, 635:24, 656:13, 697:2

**F**

**face** [2] - 621:21, 665:8
**faced** [1] - 643:21
**facility** [1] - 615:6
**fact** [18] - 616:25, 621:17, 638:4, 641:1, 643:2, 646:3, 662:14, 666:17, 686:22, 700:17, 710:12, 714:4, 723:23, 741:6, 777:23, 780:15, 781:22, 788:13
**factor** [17] - 610:21, 623:4, 623:5, 623:10, 623:16, 623:17, 623:21, 638:8, 639:8, 639:9, 639:10, 642:20, 663:18, 713:5, 713:7, 733:20, 751:22
**factors** [76] - 603:17, 604:4, 604:17, 605:6, 611:24, 621:22, 631:17, 634:7, 634:9, 634:11, 634:12, 634:13, 634:16, 638:21, 639:9, 642:21, 644:4, 653:9, 653:12, 653:19, 653:23, 654:5, 659:7, 659:20, 663:24, 664:5, 679:16, 679:23, 680:6, 680:22, 680:25, 681:12, 682:12, 682:13, 683:1, 685:23, 687:20, 694:15, 694:18, 696:8, 696:16, 696:17, 703:22, 704:3, 704:4, 704:5, 705:7, 713:6, 713:11, 713:12, 713:14, 730:18, 742:13, 742:18, 742:19, 742:22, 742:23, 742:24, 743:6, 745:5, 745:21, 745:23, 751:2, 751:20, 751:21, 753:22, 753:25, 758:13, 758:19, 759:17
**facts** [9] - 643:19, 656:24, 663:13, 664:9, 665:19, 666:17, 754:2, 779:19, 781:19
**failed** [1] - 719:8
**failing** [1] - 771:1
**fair** [15] - 630:5, 630:7, 650:9, 671:20, 672:21, 682:25, 687:3, 691:17, 691:24, 701:5, 702:15, 721:7, 774:6, 782:24, 783:2
**fairly** [4] - 689:14, 700:20, 709:19, 753:24

**fairness** [2] - 689:15, 782:21
**false** [1] - 656:19
**familiar** [2] - 601:9, 767:18
**family** [12] - 605:24, 647:11, 663:16, 707:21, 708:15, 716:8, 760:23, 768:2, 768:21, 774:20, 784:21, 793:6
**far** [3] - 723:18, 777:23, 784:2
**fashion** [2] - 780:18, 787:5
**fashioning** [1] - 612:15
**father** [4] - 755:16, 772:24, 775:4, 775:8
**favor** [12] - 602:1, 607:22, 610:7, 610:8, 610:12, 610:21, 663:19, 685:24, 703:3, 732:8, 742:18, 759:2
**favorable** [3] - 677:16, 677:18, 677:23
**Fax** [1] - 597:22
**fear** [2] - 602:3, 608:25
**February** [4] - 650:12, 674:13, 702:22, 727:18, 727:19, 727:20, 729:4
**federal** [3] - 650:12, 674:13, 702:22, 727:18, 727:19, 727:20, 729:4
**fee** [1] - 774:13
**feelings** [2] - 624:10, 717:11
**feet** [1] - 775:8
**felony** [4] - 720:18, 723:13, 723:22, 724:5
**felt** [7] - 616:2, 634:12, 665:1, 706:20, 706:21, 707:16, 707:17
**few** [18] - 598:10, 624:24, 628:6, 668:24, 668:25, 675:15, 677:3, 691:9, 710:2, 724:4, 739:15, 740:13, 763:16, 770:4, 770:12, 775:3, 780:11, 791:23
**field** [1] - 626:3
**figure** [2] - 614:16, 670:22
**file** [1] - 661:7
**files** [1] - 772:14
**fill** [3] - 771:25, 777:22, 784:4
**filled** [14] - 600:11, 624:20, 628:1, 646:22, 648:25, 668:15, 698:12, 726:15, 739:10, 754:20, 763:13, 767:8, 771:14, 777:15
**filling** [1] - 675:11
**final** [1] - 640:16
**finality** [1] - 640:20
**finance** [1] - 649:11
**financial** [3] - 669:3, 699:10, 722:2
**fine** [4] - 636:14, 737:13, 761:10, 791:11
**finish** [3] - 599:19, 687:6, 764:11
**finished** [2] - 640:19, 721:19
**firearm** [1] - 712:5
**firearms** [1] - 678:14
**firm** [6] - 601:5, 628:17, 629:1, 629:2, 739:23
**firmly** [1] - 611:15, 619:17
**firmness** [1] - 619:1
**first** [32] - 602:18, 604:16, 607:12, 630:14, 630:17, 642:5, 644:23, 652:14, 667:7, 678:8, 683:4, 698:3, 700:3, 700:13, 701:14, 706:20, 716:16, 721:21, 737:12, 741:1, 744:14, 747:2,

752:14, 757:7, 758:2, 765:24, 767:23, 768:7, 769:3, 780:5
**fit** [1] - 665:24
**five** [11] - 600:16, 646:6, 646:7, 647:24, 655:14, 660:25, 699:8, 699:18, 766:23, 773:16
**five-minute** [1] - 766:23
**fix** [1] - 610:5
**fixated** [2] - 612:8, 613:3
**fixed** [1] - 622:12
**flagging** [1] - 612:10
**flesh** [1] - 614:10
**flexibility** [1] - 667:21
**flipped** [1] - 768:22
**focus** [5] - 612:25, 613:25, 658:7, 682:18, 753:11
**focused** [1] - 660:10
**folks** [2] - 779:24, 783:25
**follow** [45] - 620:3, 622:4, 622:5, 622:14, 622:18, 622:20, 623:14, 624:3, 624:24, 628:5, 635:13, 636:4, 636:12, 646:24, 657:19, 675:15, 683:19, 686:6, 687:25, 688:13, 698:23, 703:9, 709:18, 710:4, 712:20, 718:1, 719:7, 719:15, 731:24, 739:14, 740:14, 747:13, 748:2, 749:1, 750:18, 751:17, 752:20, 752:22, 762:10, 763:16, 765:25, 771:2, 771:20, 780:24, 782:23
**follow-up** [12] - 620:3, 624:24, 636:4, 646:24, 710:4, 718:1, 719:7, 731:24, 740:14, 749:1, 762:10, 763:16
**following** [21] - 627:8, 629:9, 629:10, 632:10, 650:20, 671:11, 671:12, 677:5, 692:5, 695:19, 699:22, 702:12, 702:13, 726:2, 735:10, 735:11, 749:17, 749:18, 760:19, 776:25
**follows** [3] - 608:25, 652:5, 702:17
**foot** [1] - 783:13
**force** [1] - 773:6
**forget** [1] - 685:19
**forgot** [1] - 719:19
**form** [1] - 739:23
**formal** [1] - 776:13
**formed** [2] - 671:12, 699:22
**formula** [1] - 683:20
**formulate** [2] - 660:23, 689:22
**formulated** [1] - 749:5
**forth** [9] - 623:3, 634:4, 664:2, 711:24, 753:14, 758:15, 784:10, 784:22
**fortunate** [1] - 630:3
**fortunately** [1] - 734:22
**forum** [1] - 791:2
**forward** [3] - 619:6, 769:20, 769:21
**foster** [1] - 663:18
**four** [8] - 601:5, 674:8, 674:10, 699:17, 756:5, 756:7, 765:10, 776:19
**four-week** [1] - 756:7
**FRANK** [1] - 597:14
**Frank** [2] - 666:6, 666:7
**frankly** [3] - 642:14, 643:3, 723:11
**Friday** [1] - 756:6

**friend** [5] - 629:1υ, 6ɔ1:.4, 651:10, 671:6, 774:21
**friends** [6] - 687:7, 720:1, 720:6, 720:25, 721:14, 780:16
**front** [2] - 614:19, 773:23
**Fulks** [1] - 754:11
**full** [2] - 718:18, 789:2
**future** [12] - 599:25, 611:5, 612:11, 612:16, 615:2, 615:4, 615:7, 615:9, 638:7, 736:25, 737:6, 787:4

## G

**gamble** [1] - 651:5
**gamblers** [2] - 685:6, 689:7
**gambles** [2] - 651:4, 651:18
**gambling** [5] - 650:22, 651:1, 689:8, 689:9, 691:16
**games** [2] - 651:24, 790:14
**GARAUFIS** [1] - 597:9
**gardener** [2] - 701:15
**general** [7] - 605:1, 613:13, 623:13, 686:6, 732:5, 761:24, 772:11
**generally** [4] - 667:25, 730:13, 741:18, 769:5
**gentleman** [2] - 785:4, 789:5
**George** [2] - 598:7, 720:23
**gEORGE** [1] - 597:17
**given** [7] - 624:10, 636:1, 707:1, 708:18, 713:22, 715:9, 775:20
**glad** [1] - 719:20
**glanced** [1] - 698:16
**glibly** [1] - 642:13
**God** [7] - 632:12, 765:13, 765:15, 765:21, 765:22, 765:24
**God's** [1] - 765:22
**Godfather** [4] - 684:22, 686:23, 686:24, 690:19
**Goltzer** [5] - 598:7, 648:1, 660:19, 725:2, 767:21
**GOLTZER** [84] - 597:17, 612:17, 613:8, 613:11, 622:8, 641:15, 641:18, 642:11, 646:6, 647:25, 648:3, 648:13, 658:22, 659:2, 660:3, 660:21, 661:5, 674:6, 689:17, 689:19, 690:1, 690:10, 691:1, 695:8, 695:11, 695:23, 697:15, 723:21, 724:3, 724:7, 724:11, 724:16, 724:19, 724:23, 747:9, 761:8, 762:8, 767:22, 768:10, 768:14, 768:18, 769:4, 769:8, 775:15, 775:25, 776:3, 777:4, 778:25, 779:12, 779:14, 780:10, 780:20, 786:2, 786:7, 786:12, 786:15, 786:20, 787:10, 787:13, 787:16, 787:19, 788:1, 788:25, 789:7, 789:13, 789:17, 789:20, 790:3, 790:7, 790:18, 790:22, 791:11, 791:17, 791:21, 791:24, 792:2, 792:4, 792:10, 792:13, 792:19, 793:2, 793:3, 794:8, 794:12
**Goltzer's** [2] - 768:12, 793:18
**goods** [2] - 649:16, 649:23

**Google** [6] - 767:14, 767:16, 768:6, 770:7, 770:13, 779:9
**Googled** [5] - 767:17, 767:22, 768:19, 769:13
**Googling** [1] - 780:16
**Government** [1] - 597:12
**government** [126] - 599:7, 599:22, 602:14, 602:19, 602:21, 603:2, 603:16, 604:6, 611:24, 613:13, 615:1, 616:13, 617:6, 620:8, 620:16, 620:18, 621:23, 622:4, 628:15, 630:22, 631:5, 631:16, 634:6, 635:12, 635:24, 636:3, 641:13, 641:25, 642:9, 643:17, 644:10, 652:13, 652:16, 652:23, 653:4, 653:11, 654:19, 659:3, 659:15, 659:18, 660:11, 660:20, 660:22, 664:16, 664:23, 665:20, 672:1, 672:14, 678:9, 678:16, 679:2, 679:15, 681:10, 682:17, 682:19, 684:10, 686:9, 688:8, 691:12, 691:18, 694:20, 700:5, 700:14, 702:14, 702:18, 703:3, 703:6, 703:20, 703:22, 704:6, 708:8, 708:19, 709:3, 709:21, 710:10, 711:8, 713:13, 713:14, 713:16, 717:25, 719:7, 719:10, 723:9, 723:14, 727:1, 729:6, 729:18, 730:18, 730:19, 731:2, 741:2, 741:10, 742:11, 742:16, 742:20, 744:22, 745:5, 750:23, 752:18, 753:17, 754:6, 757:9, 757:15, 757:18, 757:22, 758:12, 758:15, 759:12, 768:11, 768:12, 768:16, 775:17, 776:14, 786:4, 788:2, 792:6, 792:22, 793:3, 793:8, 793:9, 793:11, 793:13, 793:19, 794:6
**government's** [7] - 599:8, 612:9, 682:18, 709:10, 718:24, 761:15, 776:23
**governmental** [1] - 726:24
**grand** [6] - 727:21, 728:17, 728:21, 756:1, 756:5, 764:3
**grandmother** [6] - 701:6, 707:12, 711:14, 711:15, 716:11, 716:24
**grandparents** [1] - 711:13
**granted** [1] - 646:5
**grapple** [1] - 613:10
**gravely** [1] - 709:17
**great** [2] - 665:17, 706:24
**greater** [11] - 603:20, 653:16, 657:14, 657:18, 679:13, 679:19, 681:4, 712:18, 736:5, 736:7, 736:10
**Greenpoint** [2] - 702:4
**grimaced** [1] - 601:21
**gross** [1] - 666:16
**grounds** [1] - 777:5
**group** [3] - 784:23, 786:16, 790:8
**guess** [28] - 634:3, 637:19, 640:15, 640:22, 651:3, 652:10, 654:10, 655:2, 656:24, 656:25, 657:1, 657:20, 663:7, 663:8, 663:12, 663:14, 664:6, 664:9, 665:4, 669:6, 669:16, 727:19, 756:24, 764:5, 783:11, 783:15, 791:19, 794:8
**guessing** [1] - 671:22
**guilt** [21] - 602:20, 603:9, 652:15, 654:3, 666:5, 673:5, 678:9, 680:17,

686:5, 689:17, 691:12, 695:23, 696:1, 696:6, 696:10, 700:3, 715:2, 740:23, 744:15, 757:7

**guilt/innocent** [1] - 685:10

**guilty** [55] - 602:25, 603:10, 604:13, 604:15, 604:23, 607:1, 607:7, 607:9, 608:21, 630:13, 631:12, 638:25, 639:18, 639:25, 640:2, 652:17, 652:24, 653:5, 654:2, 662:22, 671:25, 673:11, 677:15, 678:22, 679:8, 679:9, 680:16, 681:16, 687:12, 691:13, 691:19, 692:1, 692:9, 692:22, 693:12, 694:10, 696:5, 696:9, 700:6, 703:8, 703:11, 705:5, 724:5, 729:19, 730:3, 730:7, 735:14, 741:3, 741:11, 741:12, 742:9, 742:25, 744:18, 757:24, 759:17

**gunpoint** [1] - 774:23

**guy** [7] - 655:7, 662:18, 718:9, 768:19, 775:5, 775:9, 775:11

**guys** [3] - 722:14, 722:24, 784:20

## H

**hair** [1] - 783:16

**half** [4] - 601:1, 676:10, 725:5, 773:20

**hammering** [1] - 620:12

**hand** [1] - 768:9

**handle** [1] - 699:13

**handled** [1] - 702:1

**handyman** [1] - 701:16

**happy** [1] - 737:13

**hard** [20] - 605:19, 605:20, 609:6, 610:5, 620:6, 620:9, 620:17, 633:20, 645:22, 684:21, 695:21, 705:14, 708:12, 714:11, 717:15, 717:19, 745:3, 746:5, 751:6, 775:11

**harder** [1] - 764:10

**hardship** [3] - 669:3, 669:14, 699:10

**harm** [1] - 656:4, 656:16

**harsh** [1] - 624:7, 677:7, 687:22, 702:21, 735:13

**head** [3] - 608:6, 610:11, 753:13

**headline** [1] - 772:2

**hear** [21] - 599:6, 608:3, 608:4, 608:6, 612:4, 617:24, 618:17, 632:1, 639:3, 654:10, 664:5, 665:19, 688:18, 692:17, 702:7, 730:17, 738:21, 738:22, 747:24, 757:8, 759:7, 759:23, 762:3, 786:13, 787:24, 788:2, 793:12

**heard** [31] - 601:14, 601:17, 611:13, 624:1, 624:21, 626:14, 628:2, 629:21, 646:21, 648:24, 662:20, 668:16, 671:13, 675:12, 698:13, 699:23, 702:6, 708:22, 710:21, 726:15, 739:11, 742:23, 763:12, 767:9, 771:19, 772:3, 778:10, 780:15, 787:2, 788:11, 789:8

**hearing** [14] - 603:8, 616:4, 654:5, 661:7, 680:21, 680:25, 687:19, 730:2, 733:13, 743:5, 751:16, 758:25, 780:5

**hearings** [3] - 598:25, 599:1, 661:5

**hears** [2] - 604:16, 680:18

**hearsay** [3] - 777:18, 777:19, 777:20

**heart** [1] - 770:3

**heat** [2] - 763:25, 764:7

**heating** [1] - 763:19

**height** [1] - 783:13

**heinous** [4] - 716:4, 716:6, 716:8, 716:12

**held** [5] - 656:11, 656:17, 731:17, 732:10, 774:23

**hello** [1] - 771:10

**help** [5] - 605:17, 745:25, 762:1, 780:14, 780:18

**helped** [1] - 701:17

**helper** [1] - 763:23

**helpful** [2] - 604:1, 790:25

**helps** [2] - 598:24, 761:17

**here.** [1] - 723:24

**herself** [4] - 731:12, 742:4, 759:7, 760:10

**hesitated** [1] - 645:22

**hesitation** [1] - 642:7

**hiding** [1] - 769:7

**higher** [1] - 719:10

**highlighted** [1] - 624:10

**him/her** [1] - 693:18

**himself** [3] - 710:14, 719:11, 760:10

**history** [6] - 663:16, 719:8, 719:13, 733:14, 733:16, 745:1

**hmm** [14] - 633:3, 637:7, 649:17, 652:19, 654:17, 750:11, 756:9

**Hmm** [1] - 638:18

**hold** [5] - 677:10, 678:25, 719:10, 741:8, 757:17

**home** [6] - 650:5, 668:20, 684:7, 740:9, 770:11, 774:23

**homes** [1] - 663:18

**homicide** [1] - 733:24

**homicides** [1] - 756:13

**honest** [2] - 706:10, 769:23

**Honor** [106] - 598:14, 599:7, 599:13, 611:8, 614:17, 616:22, 617:9, 619:1, 619:17, 620:15, 622:8, 622:17, 624:13, 626:8, 635:9, 635:12, 637:24, 637:25, 638:3, 640:4, 641:13, 641:15, 641:18, 642:1, 642:21, 643:8, 643:18, 644:13, 644:20, 648:12, 648:13, 657:25, 658:6, 659:4, 659:17, 659:20, 659:22, 661:7, 664:16, 664:17, 664:24, 665:2, 665:13, 665:19, 666:20, 666:25, 673:23, 673:25, 674:20, 683:23, 685:2, 685:19, 686:9, 688:24, 689:2, 690:4, 690:14, 705:19, 706:6, 707:24, 707:25, 708:8, 710:16, 710:18, 710:21, 711:23, 712:3, 717:25, 718:4, 718:21, 719:6, 719:11, 723:9, 724:1, 724:21, 738:15, 747:9, 748:18, 748:22, 749:2, 749:4, 752:24, 752:25, 753:11, 753:16, 753:17, 754:10, 761:8, 763:1, 763:2, 766:8, 766:9, 766:16, 766:18, 771:3, 771:10, 775:17, 776:14, 785:7, 785:9, 786:4, 787:9, 788:5, 788:9, 792:7, 793:17

**Honor's** [1] - 624:8, 666:4, 709:12, 748:20

**HONORABLE** [1] - 597:9

**hook** [1] - 722:16

**hope** [1] - 641:8

**horrible** [2] - 652:7, 654:23

**horrific** [1] - 735:6

**hot** [2] - 775:5, 775:10

**hours** [1] - 776:25

**house** [4] - 628:18, 701:9, 701:18, 775:1

**housekeeping** [3] - 598:10, 792:23, 793:2

**housing** [1] - 749:18

**huge** [2] - 724:1, 724:4

**hum** [1] - 740:15

**human** [4] - 615:5, 714:6, 749:9, 749:21

**humans** [1] - 602:3

**hurry** [1] - 737:16

**hurt** [7] - 610:4, 610:25, 656:4, 656:14, 656:16

**husband** [1] - 740:11

**hyper** [1] - 775:21

**hyperactive** [1] - 775:22

**hypothetical** [4] - 606:6, 608:2, 634:14, 640:1

**hypothetically** [2] - 662:23, 713:12

**hypotheticals** [1] - 666:22

## I

**idea** [1] - 660:5

**identifiable** [1] - 599:10

**identifying** [1] - 639:8

**idly** [1] - 660:19

**ignore** [1] - 769:3

**ignored** [1] - 768:8

**illegal** [3] - 650:22, 651:1, 656:6

**Illinois** [1] - 618:25

**imagine** [3] - 655:3, 761:3, 768:3

**impact** [4] - 666:12, 666:13, 689:10, 748:15

**impaired** [16] - 621:14, 622:14, 642:3, 642:10, 642:12, 643:1, 644:1, 644:7, 645:25, 659:5, 659:15, 666:18, 667:10, 668:2, 708:20, 719:4

**impaneled** [2] - 652:13, 757:8

**impart** [1] - 789:16

**impartial** [12] - 630:6, 630:8, 650:9, 671:20, 672:21, 682:25, 687:3, 691:17, 691:25, 702:15, 721:7, 774:6

**impartially** [4] - 629:24, 700:20, 709:19, 753:24

**implications** [1] - 673:10

**import** [2] - 643:10, 789:2

**important** [11] - 605:5, 605:8, 605:10, 645:8, 681:2, 682:13, 685:1, 737:17, 782:15, 782:16, 782:18, 782:22, 790:12, 791:3

**impose** [90] - 604:2, 604:18, 604:21, 632:3, 636:1, 641:6, 642:8, 642:13, 642:17, 642:23, 644:5, 644:8, 645:20, 645:25, 653:24, 653:25, 654:6, 654:11, 655:15, 655:25, 656:21, 659:16, 662:8, 662:12, 662:24, 663:5, 666:1, 667:16, 667:22, 677:8, 679:13, 680:8, 680:13, 680:20, 680:24, 681:3, 682:9, 682:14, 683:6, 683:18, 693:15, 694:1, 694:22, 695:14, 696:10, 696:19, 697:6, 704:1, 704:7, 705:9, 706:4, 707:8, 708:16, 709:2, 710:18, 713:4, 715:13, 718:6, 718:14, 718:25, 730:20, 730:21, 731:3, 734:19, 736:7, 742:5, 742:15, 743:1, 743:6, 743:16, 743:24, 744:9, 745:8, 745:9, 748:20, 748:24, 748:25, 749:23, 751:1, 751:4, 751:10, 751:15, 751:22, 753:9, 758:8, 759:3, 759:21, 760:3
**imposed** [8] - 615:20, 616:12, 632:7, 679:11, 731:7, 741:20, 758:3, 758:18
**imposing** [7] - 606:13, 610:21, 655:17, 665:4, 666:16, 667:3, 761:3
**imposition** [7] - 604:7, 633:17, 637:11, 645:23, 709:20, 732:11, 732:22
**impossible** [1] - 700:19
**impression** [4] - 599:23, 700:23, 700:24, 700:25
**imprisonment** [11] - 602:2, 608:23, 612:14, 621:13, 693:4, 694:1, 709:24, 735:12, 736:2, 738:3, 753:18
**improvement** [1] - 668:20
**in-house** [1] - 628:18
**inability** [2] - 611:25, 733:12
**inadequate** [1] - 703:25
**inappropriate** [3] - 718:23, 760:20, 793:23
**incarcerated** [1] - 768:2
**incarceration** [1] - 749:23
**incident** [3] - 655:23, 662:6, 662:10
**inclined** [5] - 610:16, 659:18, 706:4, 710:16, 718:2
**include** [2] - 638:22, 691:15
**included** [1] - 643:18
**including** [2] - 658:13, 754:5
**inconsistencies** [1] - 645:2
**indeed** [1] - 704:14
**indicate** [12] - 612:7, 621:3, 628:8, 643:6, 647:10, 665:23, 677:5, 685:11, 690:10, 711:18, 748:25, 782:11
**indicated** [66] - 598:22, 600:15, 612:7, 618:23, 619:18, 621:5, 621:7, 621:9, 622:3, 623:3, 625:14, 629:9, 632:10, 635:16, 635:19, 637:3, 637:14, 642:3, 647:1, 649:13, 650:1, 650:11, 650:20, 652:4, 661:7, 664:25, 665:7, 666:10, 668:19, 672:18, 675:18, 677:9, 677:12, 684:20, 685:2, 689:22, 698:24, 701:6, 702:3, 702:12, 708:13, 708:16, 709:1, 710:12, 710:14, 719:14, 719:21, 726:19, 727:21, 732:7, 747:14, 749:2, 752:11, 753:21, 753:25, 754:1, 754:24,

755:16, 755:25, 765:18, 766:18, 773:10, 775:18, 776:17, 776:19
**indicates** [1] - 658:16
**indicating** [1] - 645:10
**indicted** [1] - 728:22
**individual** [23] - 603:11, 636:8, 637:17, 646:3, 654:8, 665:1, 667:18, 672:7, 678:12, 681:17, 688:17, 700:8, 714:19, 716:22, 719:3, 722:10, 729:11, 731:11, 740:25, 759:6, 759:18, 761:16, 766:15
**individually** [2] - 680:9, 685:8
**individuals** [4] - 599:5, 666:9, 722:7, 722:8
**industry** [2] - 676:14, 699:2
**inference** [1] - 741:9
**influence** [1] - 639:8
**influenced** [1] - 655:25
**inform** [1] - 653:21
**information** [27] - 598:20, 603:22, 603:25, 605:10, 605:14, 618:10, 653:12, 679:23, 690:7, 726:16, 742:12, 744:21, 744:23, 744:25, 745:2, 745:22, 758:20, 767:9, 767:12, 780:22, 782:12, 782:15, 782:17, 788:6, 788:19, 789:16
**initial** [2] - 635:14, 779:4
**injunction** [1] - 622:15
**inmate** [1] - 749:19
**innocent** [7] - 602:24, 656:2, 656:19, 662:15, 678:23, 700:11, 729:25
**innocents** [2] - 655:11, 658:5
**inquire** [5] - 612:12, 643:16, 645:9, 710:17, 788:22
**inquired** [1] - 665:9
**inquiring** [1] - 612:12
**inquiry** [7] - 621:11, 779:21, 787:2, 787:6, 789:3, 793:3, 793:13
**inside** [1] - 609:13
**installing** [1] - 722:1
**instance** [9] - 639:6, 656:1, 669:8, 713:6, 720:7, 733:23, 745:4, 793:22
**instances** [1] - 704:24
**instead** [1] - 653:15
**instruct** [12] - 623:7, 623:9, 657:17, 683:12, 688:5, 736:1, 741:6, 750:7, 759:7, 789:25, 790:21, 791:8
**instructed** [5] - 623:20, 703:1, 705:11, 705:17, 709:17
**instruction** [8] - 622:18, 623:15, 698:23, 703:9, 744:2, 787:5, 789:12, 790:4
**instructions** [10] - 622:4, 622:6, 622:20, 627:9, 719:15, 719:17, 768:8, 769:3, 771:2, 786:3
**integral** [1] - 620:22
**integrity** [2] - 782:19, 782:21
**intelligence** [1] - 783:17
**intended** [1] - 754:10
**intent** [2] - 620:11, 743:18
**intentional** [81] - 602:13, 602:15, 603:10, 604:15, 604:23, 606:3, 608:1, 609:4, 610:2, 612:19, 617:25, 619:5,

621:9, 630:14, 630:19, 631:12, 633:18, 635:18, 635:20, 637:17, 638:5, 639:1, 639:7, 639:15, 646:2, 652:25, 654:3, 654:19, 654:22, 654:25, 659:17, 662:21, 672:6, 677:15, 678:12, 679:8, 679:10, 680:17, 681:17, 682:15, 687:13, 690:11, 691:19, 692:23, 693:13, 693:15, 695:14, 696:6, 700:7, 703:12, 705:5, 706:3, 707:7, 711:21, 712:24, 714:18, 715:15, 716:21, 729:11, 730:7, 732:12, 732:24, 732:25, 733:1, 733:5, 738:11, 740:24, 742:9, 742:25, 743:19, 743:21, 743:25, 744:19, 746:11, 747:3, 747:5, 747:18, 748:7, 757:11, 759:18, 760:2
**intentionally** [10] - 608:22, 611:2, 654:8, 654:21, 692:10, 715:4, 741:13, 743:10, 760:22, 766:2
**interest** [1] - 784:15
**interested** [4] - 733:13, 733:17, 748:4, 769:25
**Internet** [4] - 768:25, 770:15, 779:9, 789:12
**interview** [1] - 791:13
**interviewed** [1] - 790:12
**interviews** [2] - 709:9, 786:10
**inversion** [3] - 710:5, 710:6, 719:16
**involve** [1] - 638:17
**involved** [6] - 650:12, 656:6, 657:22, 663:4, 702:18, 723:14
**involvement** [5] - 691:15, 691:20, 691:23, 702:22, 721:2
**involves** [2] - 733:1, 772:8
**involving** [14] - 626:15, 636:1, 644:3, 645:23, 658:5, 659:17, 676:20, 678:13, 686:23, 694:15, 707:6, 710:19, 712:5, 728:11
**iPods** [1] - 773:18
**Island** [4] - 670:7, 670:8, 740:8
**Islip** [2] - 598:19, 599:2
**isolated** [1] - 720:7
**issue** [26] - 607:13, 611:17, 613:5, 614:4, 614:6, 617:22, 642:14, 643:7, 645:23, 667:7, 693:11, 695:17, 699:12, 706:11, 711:3, 711:5, 713:9, 715:6, 724:10, 733:2, 748:23, 761:24, 766:21, 776:23, 779:15, 793:3
**issued** [2] - 622:10, 666:20
**item** [1] - 783:20
**itself** [2] - 657:5, 703:6

**J**

**JACK** [1] - 597:15
**Jack** [1] - 598:5
**jail** [4] - 639:23, 641:2, 707:12, 724:20
**Jasper** [10] - 598:7, 611:12, 624:1, 643:17, 660:19, 665:8, 665:12, 747:12, 762:11, 790:22
**JASPER** [84] - 597:18, 598:7, 598:15, 599:13, 611:8, 611:13, 613:20, 613:23,

614:6, 614:12, 616:22, 616:24, 617:12, 617:15, 617:18, 618:22, 624:5, 624:7, 626:8, 627:14, 636:9, 637:25, 638:3, 638:11, 644:12, 657:25, 658:3, 658:21, 664:17, 665:13, 666:25, 673:16, 673:23, 683:23, 684:2, 684:20, 685:1, 685:17, 685:19, 685:21, 688:24, 689:2, 689:5, 689:13, 689:16, 689:21, 689:25, 690:4, 690:7, 690:16, 690:21, 690:23, 691:2, 691:6, 707:24, 708:21, 710:21, 711:8, 711:16, 711:23, 712:4, 712:11, 718:4, 718:21, 738:15, 747:13, 747:17, 749:8, 752:24, 753:6, 761:14, 761:22, 762:13, 763:1, 766:8, 766:16, 771:4, 777:2, 780:1, 785:7, 787:9, 787:25, 790:25, 794:14

**Jasper's** [4] - 643:15, 643:24, 659:8, 667:7

**Jefferson** [3] - 720:20, 723:1, 724:11

**Jesus** [2] - 765:20, 765:21

**job** [15] - 600:16, 605:23, 625:25, 626:4, 649:14, 676:2, 676:9, 700:2, 723:19, 739:16, 740:8, 764:15, 764:22, 765:5, 772:5

**jobs** [3] - 625:12, 662:17, 669:17

**join** [1] - 620:20

**joint** [1] - 776:16

**joking** [1] - 674:19

**joy** [1] - 780:8

**judge** [19] - 611:13, 616:24, 633:9, 642:6, 642:11, 644:12, 647:25, 658:3, 684:2, 685:15, 689:5, 697:15, 713:10, 748:14, 748:15, 753:6, 761:14, 768:15, 790:25

**JUDGE** [1] - 597:10

**Judge** [12] - 619:19, 624:5, 673:16, 691:6, 695:8, 718:12, 747:13, 761:22, 771:4, 771:10, 791:4, 794:14

**judges** [1] - 598:20

**judgment** [7] - 633:9, 642:4, 642:6, 643:13, 662:24, 672:21, 702:16

**jumping** [1] - 780:8

**juncture** [1] - 793:24

**juror** [154] - 599:9, 599:24, 600:6, 612:2, 612:13, 612:17, 613:6, 614:11, 615:24, 618:20, 618:22, 620:25, 622:3, 622:11, 622:12, 622:23, 623:25, 624:16, 626:12, 627:3, 627:8, 627:15, 627:18, 632:4, 635:14, 635:25, 640:4, 641:23, 642:1, 642:3, 642:10, 643:9, 643:20, 644:6, 645:4, 645:5, 645:9, 645:10, 645:11, 645:13, 645:15, 645:19, 646:5, 647:1, 648:10, 648:14, 650:11, 659:3, 659:10, 664:21, 664:24, 665:4, 665:7, 665:11, 665:13, 665:17, 666:1, 666:10, 666:15, 666:17, 666:19, 667:2, 667:8, 667:24, 668:6, 668:10, 669:4, 673:21, 674:4, 675:1, 675:5, 680:9, 680:11, 684:12, 685:2, 695:18, 697:14, 698:2, 700:2, 704:13, 708:7, 708:9, 708:20, 709:16, 710:13, 710:18, 711:3, 712:8, 712:13, 717:11, 717:14,

717:24, 718:2, 718:25, 719:18, 723:7, 723:10, 723:20, 726:5, 726:9, 727:21, 729:4, 731:8, 731:11, 731:17, 738:20, 738:23, 739:1, 739:5, 741:23, 741:24, 742:3, 742:4, 747:18, 748:18, 748:19, 749:2, 753:7, 753:18, 753:24, 754:5, 759:3, 759:6, 760:10, 761:17, 762:25, 767:4, 768:6, 770:25, 771:1, 771:8, 774:3, 776:12, 776:15, 776:17, 777:5, 777:7, 777:8, 777:12, 779:14, 779:22, 785:6, 785:8, 786:18, 789:7, 792:14, 792:17, 792:18, 792:23

**Juror** [27] - 598:17, 599:1, 599:15, 600:8, 624:18, 627:21, 644:10, 646:11, 646:12, 646:15, 648:9, 648:17, 648:20, 659:4, 698:7, 710:12, 710:13, 753:5, 754:16, 754:17, 762:24, 763:6, 763:9, 766:13, 767:5, 771:12

**JUROR** [641] - 600:9, 600:14, 600:17, 600:19, 600:23, 600:25, 601:4, 601:7, 601:13, 601:17, 601:22, 602:8, 603:5, 604:11, 604:20, 604:25, 605:7, 605:12, 605:19, 605:21, 606:5, 606:7, 606:11, 606:14, 606:16, 606:22, 606:25, 607:5, 607:7, 607:11, 607:14, 607:17, 607:23, 608:3, 608:10, 608:15, 608:17, 609:5, 609:11, 609:23, 610:3, 610:10, 610:17, 610:22, 615:12, 615:18, 615:23, 616:1, 616:8, 616:16, 616:18, 616:20, 618:5, 618:9, 618:16, 623:6, 623:19, 624:19, 624:23, 625:1, 625:4, 625:7, 625:9, 625:13, 625:16, 625:18, 625:22, 625:25, 626:7, 626:13, 626:16, 626:18, 626:22, 626:24, 627:20, 627:22, 627:25, 628:4, 628:7, 628:10, 628:13, 628:16, 628:18, 628:20, 628:22, 628:25, 629:2, 629:5, 629:7, 629:13, 629:16, 629:18, 630:1, 630:7, 630:10, 630:16, 630:23, 631:2, 631:7, 631:10, 631:20, 631:25, 632:9, 632:14, 633:3, 633:7, 633:14, 633:20, 633:24, 634:8, 634:18, 634:23, 635:1, 635:5, 637:7, 637:9, 637:12, 637:19, 637:22, 638:18, 638:20, 638:24, 639:13, 639:16, 639:20, 639:22, 640:2, 640:8, 640:11, 640:15, 641:1, 641:4, 641:7, 641:11, 641:22, 646:14, 646:16, 646:19, 646:23, 647:3, 647:6, 647:8, 647:12, 647:15, 647:18, 647:20, 647:22, 647:24, 648:8, 648:19, 648:22, 649:2, 649:5, 649:9, 649:12, 649:15, 649:17, 649:21, 649:24, 650:3, 650:6, 650:10, 650:14, 650:17, 650:24, 651:3, 651:7, 651:9, 651:15, 651:17, 651:20, 651:23, 652:3, 652:9, 652:19, 654:9, 654:13, 654:17, 655:1, 655:6, 655:11, 655:18, 655:22, 656:2, 656:7, 656:24, 657:8, 657:11, 657:16, 657:20, 657:23, 662:4, 662:9, 662:14, 663:1, 663:7, 663:12, 663:20, 663:23, 664:6, 664:8, 664:14, 664:20, 668:8, 668:11, 668:17, 668:22, 668:25, 669:6, 669:11, 669:15, 669:18,

669:21, 669:24, 670:1, 670:7, 670:10, 670:12, 670:14, 670:17, 670:20, 670:23, 671:3, 671:5, 671:8, 671:10, 671:16, 671:18, 671:22, 672:4, 672:9, 672:16, 672:25, 673:2, 673:7, 673:9, 673:14, 673:20, 675:4, 675:6, 675:9, 675:13, 675:17, 675:20, 675:23, 676:1, 676:3, 676:6, 676:10, 676:15, 676:18, 676:22, 677:1, 677:19, 678:7, 678:15, 678:19, 679:4, 679:6, 679:21, 680:3, 680:7, 680:15, 680:23, 681:1, 681:5, 681:9, 681:13, 681:18, 681:21, 681:24, 682:3, 682:5, 682:8, 682:11, 682:16, 682:23, 683:2, 683:11, 683:21, 686:14, 686:16, 686:18, 686:21, 686:25, 687:5, 687:9, 687:17, 687:24, 688:2, 688:11, 688:15, 688:22, 691:22, 692:3, 692:17, 693:2, 693:8, 693:16, 693:19, 693:21, 693:23, 694:5, 694:7, 694:12, 694:25, 695:6, 696:4, 696:12, 696:14, 696:17, 696:21, 696:23, 697:8, 697:12, 698:5, 698:8, 698:10, 698:15, 698:18, 698:21, 699:2, 699:4, 699:6, 699:8, 699:11, 699:14, 699:20, 700:1, 700:16, 700:22, 701:4, 701:8, 701:12, 701:14, 701:17, 701:20, 701:23, 702:2, 702:5, 702:10, 702:20, 703:10, 703:15, 704:9, 704:12, 704:19, 705:3, 705:11, 706:1, 706:6, 706:13, 706:16, 706:19, 707:10, 707:17, 708:5, 712:22, 713:9, 713:17, 714:1, 714:3, 714:10, 714:20, 715:8, 715:20, 715:23, 716:2, 716:7, 716:13, 716:16, 716:23, 717:2, 717:5, 717:9, 717:13, 719:23, 719:25, 720:5, 720:9, 720:15, 720:17, 720:20, 720:22, 720:24, 721:4, 721:9, 721:14, 721:18, 721:22, 721:25, 722:6, 722:8, 722:12, 722:17, 722:20, 722:23, 723:2, 723:5, 726:8, 726:10, 726:13, 726:18, 726:22, 727:1, 727:4, 727:7, 727:10, 727:12, 727:14, 727:17, 727:19, 727:23, 728:1, 728:6, 728:9, 728:12, 728:15, 728:19, 728:21, 729:2, 729:9, 729:15, 729:21, 729:24, 730:5, 731:14, 731:21, 731:25, 732:6, 732:14, 732:20, 732:24, 733:3, 733:7, 733:9, 733:14, 733:19, 734:2, 734:4, 734:6, 734:11, 734:16, 734:20, 734:23, 735:1, 735:4, 735:6, 735:9, 735:19, 735:24, 736:4, 736:11, 736:14, 736:16, 736:18, 736:21, 737:1, 737:7, 737:12, 737:15, 737:18, 737:23, 738:5, 738:7, 738:13, 738:19, 739:4, 739:6, 739:9, 739:13, 739:18, 739:21, 739:25, 740:2, 740:5, 740:7, 740:12, 740:15, 740:19, 742:7, 742:3, 743:8, 743:13, 743:17, 743:23, 744:1, 744:5, 744:11, 744:17, 745:10, 745:12, 745:16, 745:18, 745:20, 746:3, 746:6, 746:12, 747:7, 749:25, 750:4, 750:9, 750:11, 750:15, 750:17, 750:19, 751:3, 751:6, 751:9, 751:12, 751:14, 751:16, 751:24, 752:2, 752:8, 752:14, 752:20, 753:4,

754:18, 754:23, 755:1, 755:4, 755:6, 755:8, 755:11, 755:14, 755:18, 755:21, 755:24, 756:2, 756:5, 756:9, 756:11, 756:14, 756:20, 756:23, 757:2, 757:21, 759:22, 760:4, 760:15, 761:4, 762:21, 762:23, 763:8, 763:10, 763:14, 763:20, 763:23, 764:2, 764:5, 764:7, 764:9, 764:14, 764:17, 764:19, 764:21, 764:23, 764:25, 765:2, 765:4, 765:7, 765:10, 765:18, 766:4, 766:12, 767:6, 767:11, 767:13, 767:17, 769:14, 769:18, 769:22, 770:2, 770:8, 770:15, 770:18, 770:20, 770:24, 771:10, 771:13, 771:17, 771:23, 772:1, 772:7, 772:10, 772:13, 772:17, 772:19, 772:22, 773:1, 773:3, 773:14, 774:1, 774:9, 774:12, 774:17, 774:22, 774:25, 775:8, 776:10, 777:11, 777:13, 777:18, 777:21, 778:2, 778:5, 778:9, 778:12, 778:14, 778:17, 778:21, 778:24, 779:3, 779:8, 779:10, 781:3, 781:6, 781:8, 781:10, 781:16, 781:20, 781:22, 781:25, 782:2, 782:7, 782:10, 782:13, 783:8, 783:10, 783:13, 783:15, 783:19, 783:22, 784:1, 784:7, 784:14, 784:17, 784:25, 785:3, 785:12

**juror's** [10] - 599:3, 621:2, 621:3, 621:11, 645:21, 677:7, 709:6, 709:11, 723:15, 754:12

**jurors** [47] - 598:11, 613:16, 632:4, 643:23, 644:1, 644:8, 644:14, 644:24, 645:3, 665:25, 667:18, 667:21, 674:18, 680:10, 684:13, 688:16, 688:18, 704:16, 709:7, 718:17, 731:8, 731:15, 731:18, 759:1, 759:9, 759:14, 776:1, 778:5, 778:7, 778:11, 779:18, 779:19, 780:7, 780:12, 782:2, 782:3, 784:16, 786:23, 787:4, 787:12, 788:5, 788:7, 788:10, 788:18, 788:19, 788:20, 789:10

**Jury** [1] - 785:14

**jury** [129] - 602:19, 602:22, 603:7, 603:9, 603:10, 603:12, 603:16, 603:18, 604:1, 604:3, 604:14, 604:16, 607:1, 615:19, 626:10, 631:9, 631:13, 631:17, 631:18, 632:1, 634:4, 646:25, 647:5, 652:13, 652:14, 652:18, 653:5, 653:7, 653:11, 653:14, 653:19, 653:21, 653:24, 654:2, 662:11, 670:2, 670:9, 670:19, 671:1, 672:2, 674:5, 674:12, 674:15, 676:20, 676:24, 678:17, 679:3, 679:7, 679:12, 679:14, 679:16, 680:4, 680:8, 680:18, 683:5, 687:14, 687:18, 687:20, 694:23, 696:5, 703:12, 703:13, 703:23, 703:25, 704:5, 704:7, 704:10, 705:4, 707:1, 712:24, 718:18, 723:22, 726:2, 728:2, 728:5, 728:7, 728:11, 728:13, 728:17, 728:21, 729:17, 730:1, 730:8, 730:9, 730:17, 730:20, 730:25, 731:4, 731:16, 741:7, 741:16, 741:20, 741:22, 742:8, 742:12, 742:17, 742:20, 747:23, 750:12, 752:10, 756:1, 756:4, 757:8, 757:23, 758:2, 758:8, 758:11,

758:13, 758:25, 759:1, 759:7, 759:17, 761:18, 773:25, 774:1, 774:2, 781:2, 781:18, 783:23, 788:7, 789:24, 790:11, 790:21, 790:24, 791:9

**juryroom** [1] - 776:4

**justice** [5] - 702:1, 703:25, 713:20, 713:21, 769:1

**Justice** [1] - 793:20, 794:1

**justified** [2] - 655:5, 694:21

**justify** [5] - 604:7, 616:14, 637:11, 645:17, 660:7

## K

**keep** [2] - 616:9, 787:17
**keeps** [1] - 607:15
**Kennedy** [1] - 773:8
**kept** [2] - 630:4, 761:20
**key** [1] - 718:5
**kicked** [1] - 775:11
**kill** [7] - 633:11, 658:17, 664:11, 666:8, 666:11, 748:16
**killed** [11] - 602:3, 638:7, 654:7, 655:14, 655:24, 658:8, 660:13, 666:9, 701:8, 707:12
**killers** [2] - 643:24, 718:18
**killing** [16] - 608:22, 637:20, 638:4, 638:12, 638:17, 638:22, 639:1, 642:9, 642:19, 654:8, 692:10, 692:23, 708:15, 732:4, 766:2
**killings** [2] - 658:7, 660:11
**kind** [37] - 602:10, 605:10, 605:14, 629:3, 630:9, 647:7, 664:3, 675:21, 676:4, 699:1, 702:7, 707:2, 707:6, 707:9, 707:20, 721:15, 721:24, 722:2, 726:25, 727:6, 733:4, 733:13, 743:15, 748:4, 753:13, 755:7, 755:22, 757:3, 761:23, 763:22, 772:22, 775:2, 777:19, 781:13, 786:12, 793:9
**kinds** [6] - 637:10, 638:21, 665:22, 666:21, 756:10, 762:17
**knowing** [4] - 691:19, 748:4, 759:16, 788:17
**known** [1] - 601:10
**knows** [1] - 660:22

## L

**lack** [2] - 627:10, 645:3
**lady** [1] - 611:14
**laid** [1] - 676:2
**Lake** [2] - 720:23, 724:1
**lake** [1] - 721:1
**language** [6] - 625:20, 695:11, 695:17, 766:18, 766:20, 790:1
**lapses** [1] - 776:20
**larceny** [1] - 756:12
**large** [5] - 600:21, 628:21, 637:15, 727:11, 739:23
**last** [16] - 605:12, 617:8, 651:23,

668:20, 684:4, 698:25, 710:22, 710:25, 752:9, 755:25, 763:18, 772:6, 789:4, 789:19, 792:14, 792:16
**latter** [2] - 620:16, 633:15
**laundry** [1] - 667:18
**LAW** [2] - 674:8, 691:3
**law** [45] - 601:25, 603:8, 617:5, 621:16, 623:9, 623:13, 623:14, 623:22, 627:9, 628:17, 629:1, 629:2, 631:5, 638:6, 642:25, 644:17, 657:17, 657:19, 658:13, 658:14, 678:21, 679:10, 683:13, 683:19, 688:5, 688:13, 712:16, 712:19, 712:21, 719:15, 723:16, 724:24, 725:2, 727:2, 728:24, 736:1, 748:16, 750:8, 750:10, 765:14, 766:5, 766:6
**lawyer** [2] - 625:19, 774:13
**lawyers** [3] - 774:5, 774:7, 774:9
**lead** [1] - 636:9
**leader** [1] - 681:25
**leads** [1] - 671:17
**lean** [1] - 621:4
**leaned** [1] - 619:5
**learn** [10] - 645:3, 645:4, 751:18, 769:12, 769:25, 771:21, 777:25, 778:23, 781:1, 781:9
**learned** [20] - 600:13, 609:19, 612:14, 639:5, 646:1, 648:25, 663:15, 663:25, 675:12, 698:13, 712:25, 739:11, 751:19, 754:21, 763:12, 771:15, 777:16, 780:16, 780:25, 783:21
**learning** [2] - 626:5, 748:15
**least** [6] - 654:18, 685:2, 689:6, 689:7, 699:18, 780:11
**leather** [2] - 722:14
**leaves** [19] - 618:20, 623:25, 627:3, 641:23, 648:9, 664:21, 673:21, 697:14, 708:7, 717:24, 723:7, 738:20, 753:5, 762:24, 766:13, 770:25, 776:12, 785:14, 791:18
**lectures** [2] - 773:18, 773:20
**led** [1] - 634:19
**left** [4] - 599:20, 756:15, 771:18, 773:5
**legal** [9] - 612:1, 628:11, 628:24, 688:1, 688:4, 688:11, 739:16, 739:24, 750:1
**legitimate** [1] - 711:24
**less** [1] - 637:22
**lesser** [11] - 603:19, 604:8, 657:7, 657:9, 712:17, 730:20, 730:25, 736:2, 736:8, 736:9, 750:13
**letter** [5] - 660:25, 667:1, 710:11, 754:24, 794:9
**level** [1] - 678:3
**lever** [1] - 718:15
**liability** [2] - 661:5, 661:6
**liberal** [1] - 724:12
**life** [171] - 602:1, 603:19, 604:8, 604:22, 606:2, 606:3, 606:9, 606:13, 606:18, 606:20, 607:3, 607:22, 608:23, 608:25, 610:16, 611:16, 612:14,

615:17, 615:24, 615:25, 616:3, 616:6, 616:12, 616:17, 618:4, 618:15, 621:10, 621:13, 621:24, 631:15, 631:23, 632:5, 632:12, 632:13, 633:11, 633:12, 633:25, 635:15, 635:17, 635:19, 635:21, 635:23, 637:15, 639:6, 640:17, 640:19, 643:21, 644:9, 646:4, 652:6, 653:15, 653:21, 653:25, 654:11, 654:22, 654:23, 654:24, 657:4, 657:6, 657:15, 657:19, 659:11, 660:9, 662:23, 663:19, 667:4, 667:23, 679:11, 679:17, 680:1, 680:11, 680:12, 680:20, 683:6, 683:9, 683:14, 684:17, 685:22, 687:12, 687:14, 687:21, 688:1, 688:7, 688:19, 692:11, 692:25, 693:4, 693:14, 694:11, 694:19, 695:3, 697:7, 703:19, 703:24, 704:14, 705:22, 709:3, 709:4, 709:25, 710:3, 712:1, 712:16, 713:2, 713:19, 718:8, 723:3, 723:4, 723:10, 723:18, 730:12, 730:20, 731:1, 731:9, 731:10, 731:17, 733:22, 734:7, 734:15, 735:12, 736:2, 736:10, 736:24, 737:4, 737:9, 737:20, 737:25, 738:2, 738:9, 740:18, 741:17, 741:25, 742:1, 742:13, 742:18, 743:7, 744:3, 744:8, 745:6, 748:8, 748:11, 748:22, 749:10, 749:19, 749:21, 749:24, 750:3, 750:13, 750:24, 752:12, 753:13, 753:18, 753:23, 754:6, 757:4, 758:3, 758:6, 758:9, 758:22, 759:3, 759:5, 759:13, 759:14, 760:13, 760:23, 760:24, 762:18, 769:15, 784:18, 788:18

**life-qualified** [3] - 643:21, 644:9, 754:6
**light** [3] - 723:16, 745:5, 754:4
**likelihood** [1] - 751:21
**likely** [16] - 655:19, 663:5, 664:7, 673:11, 734:18, 750:25, 751:10, 751:12, 751:13, 751:14, 752:1, 752:2, 753:9, 753:12, 753:14, 760:3
**limit** [2] - 615:6, 653:23
**limited** [7] - 634:25, 635:1, 636:3, 636:11, 637:6, 637:10, 637:19
**limiting** [1] - 615:4
**limousines** [1] - 722:1
**line** [7] - 614:16, 642:17, 642:23, 642:25, 651:11, 651:18, 753:7
**lined** [1] - 669:15
**lines** [2] - 762:10, 776:23
**link** [1] - 656:22
**list** [4] - 667:18, 710:7, 792:12, 792:13
**listen** [1] - 684:6, 700:2, 731:4, 759:22
**listened** [5] - 600:12, 624:21, 726:16, 767:9, 773:20
**listening** [2] - 775:23, 790:6
**literally** [2] - 706:21, 790:8
**litigation** [1] - 603:15
**live** [5] - 617:6, 619:16, 684:8, 684:15, 760:9
**lives** [5] - 629:19, 656:3, 662:16, 697:1, 765:14
**living** [5] - 602:2, 629:19, 669:9,

669:12, 764:16
**loansharking** [1] - 689:9
**location** [1] - 599:6
**look** [5] - 640:17, 663:5, 670:24, 733:11, 793:9
**looked** [1] - 649:3
**Looking** [1] - 753:8
**looking** [2] - 676:17, 705:12
**loop** [1] - 617:17
**loophole** [1] - 619:22
**loquacious** [1] - 789:11
**lORETTA** [1] - 597:12
**loved** [2] - 656:16, 765:2
**lovely** [1] - 641:21
**lower** [1] - 689:19
**ludicrous** [1] - 768:13
**luncheon** [1] - 725:6
**lying** [2] - 769:9, 788:12
**LYNCH** [1] - 597:12

## M

**ma'am** [2] - 627:19, 646:13
**machine** [1] - 764:13
**machinery** [1] - 626:2
**machines** [2] - 650:22, 651:2
**mafia** [1] - 686:23
**magnitude** [1] - 775:16
**main** [1] - 709:10
**Main** [1] - 794:1
**maintain** [1] - 599:8
**maintenance** [1] - 626:1
**major** [1] - 755:14
**maligning** [1] - 643:8
**man** [2] - 701:19, 766:6
**management** [1] - 699:11
**manager** [5] - 675:23, 676:13, 726:20, 727:5, 727:6
**manner** [1] - 749:4
**mans** [1] - 765:23
**manufacturer** [2] - 764:4, 764:12
**March** [2] - 597:5, 794:17
**marijuana** [9] - 719:22, 720:1, 720:4, 721:3, 723:13, 723:14, 724:2, 724:4, 724:6
**mark** [3] - 760:25, 774:4, 774:7
**marketing** [1] - 722:21
**mass** [9] - 636:5, 636:10, 659:14, 666:15, 681:25, 732:24, 733:8, 734:17, 734:24
**mass-murder** [1] - 636:5
**Massino** [2] - 658:17, 768:22
**material** [1] - 658:19
**matter** [6] - 607:14, 724:24, 725:2, 743:18, 792:23, 793:2
**matters** [2] - 598:10, 598:24
**MCC** [4] - 793:7, 793:10, 793:15, 793:24
**MDC** [1] - 793:5
**mean** [38] - 601:13, 607:16, 608:6,

608:8, 609:5, 610:5, 611:3, 619:7, 619:21, 633:5, 651:19, 657:5, 659:25, 660:1, 670:4, 673:14, 673:15, 677:17, 681:21, 693:3, 693:22, 693:23, 702:19, 702:23, 705:12, 706:14, 707:19, 735:18, 735:22, 745:17, 756:24, 763:25, 765:17, 765:21, 774:11, 776:3, 778:11
**meaning** [4] - 694:3, 730:13, 736:10, 793:19
**meaningless** [1] - 624:9
**means** [1] - 619:13, 640:16, 640:20, 643:9, 685:12, 695:25, 705:5, 711:2, 765:18, 765:23, 779:2
**meant** [5] - 636:13, 689:8, 694:2, 702:21, 702:25
**measure** [2] - 611:4
**mechanical** [1] - 597:25
**media** [4] - 690:16, 690:18, 690:22
**medical** [1] - 773:11
**medium** [1] - 783:15
**meet** [2] - 703:25, 713:19
**member** [3] - 708:16, 716:8, 774:20
**members** [1] - 685:5
**memory** [1] - 788:10
**men** [6] - 701:20, 707:12, 765:14, 766:5
**mention** [2] - 599:18, 699:16
**mentioned** [7] - 601:8, 656:9, 658:5, 686:24, 706:20, 780:25, 784:12
**mentioning** [1] - 713:7
**mentions** [1] - 674:10
**mere** [1] - 686:4
**Merkl** [2] - 598:5, 723:8
**MERKL** [78] - 597:13, 598:5, 598:14, 599:7, 599:22, 600:2, 612:6, 613:13, 614:7, 620:15, 622:3, 622:16, 624:13, 627:7, 627:12, 635:9, 635:12, 636:11, 637:24, 638:9, 641:13, 641:25, 643:8, 644:22, 648:5, 648:12, 659:3, 660:1, 660:14, 660:17, 661:6, 664:16, 664:23, 666:4, 673:25, 674:14, 674:19, 684:24, 686:9, 690:13, 695:17, 697:17, 707:25, 708:8, 709:14, 710:9, 711:2, 711:14, 712:3, 712:8, 717:25, 719:6, 723:9, 723:25, 724:20, 725:1, 748:18, 749:12, 752:25, 753:17, 754:10, 762:5, 762:10, 763:2, 766:9, 766:18, 768:11, 768:16, 771:3, 775:17, 776:14, 780:14, 785:9, 786:4, 788:5, 792:7, 792:23, 793:17
**met** [4] - 688:8, 700:14, 704:6, 757:23
**middle** [1] - 732:9
**might** [38] - 605:10, 607:20, 614:25, 617:4, 627:8, 637:6, 637:11, 651:3, 656:7, 659:7, 659:8, 662:11, 662:12, 662:23, 663:5, 663:19, 664:5, 664:6, 672:11, 673:14, 702:24, 713:8, 713:12, 713:14, 714:8, 735:22, 745:22, 745:25, 748:13, 748:17, 750:5, 773:12, 786:20, 789:15, 790:4, 790:23, 790:25
**mind** [9] - 608:4, 617:3, 623:5, 655:21,

725:3, 731:19, 735:8, 773:24, 780:9
**minimize** [1] - 724:12
**minor** [2] - 658:23, 658:24
**minute** [2] - 647:25, 766:23
**minutes** [3] - 646:7, 773:16, 773:17
**misdemeanor** [5] - 720:18, 723:21, 724:13, 724:17, 724:21
**miserable** [1] - 657:11
**missed** [1] - 756:17
**mission** [1] - 682:1
**misstatement** [1] - 666:16
**mistake** [2] - 690:12, 692:15
**mistakes** [1] - 652:9
**mistreated** [1] - 663:16
**mistreatment** [1] - 622:1
**mistrial** [1] - 787:7
**misunderstanding** [1] - 619:22
**mitigating** [50] - 604:4, 604:17, 605:5, 609:25, 610:15, 610:16, 618:1, 618:14, 621:6, 621:20, 622:6, 623:5, 623:10, 623:16, 623:21, 631:22, 634:11, 634:13, 639:10, 653:9, 653:19, 654:5, 659:20, 659:23, 663:18, 663:20, 679:23, 681:11, 682:13, 683:1, 687:20, 694:15, 696:8, 696:16, 704:3, 705:7, 713:14, 730:24, 742:18, 742:22, 742:24, 743:6, 744:23, 751:20, 753:22, 753:25, 754:14, 758:19
**mitigation** [5] - 618:9, 622:11, 622:13, 713:16, 745:22
**mitigator** [6] - 620:1, 622:2, 663:25, 664:1, 664:3, 664:4
**mitigators** [16] - 612:13, 612:22, 613:5, 620:25, 621:14, 623:18, 639:4, 667:19, 680:19, 683:16, 713:7, 715:7, 746:1, 753:20, 754:3, 759:20
**mixed** [2] - 720:5, 723:23
**mob** [3] - 671:14, 699:25, 700:18
**modification** [1] - 793:8
**modified** [1] - 793:15
**modifies** [1] - 793:11
**modify** [2] - 793:14, 794:5
**molesting** [1] - 638:23
**moment** [2] - 605:2, 688:24
**Monday** [1] - 756:6
**money** [2] - 651:11, 720:11
**month** [3] - 765:11, 771:18, 774:3
**moral** [4] - 635:4, 667:15, 760:9, 761:25
**Morgan** [2] - 612:2, 618:25
**morning** [10] - 598:2, 600:7, 627:19, 627:20, 646:13, 646:14, 648:18, 648:19, 666:21, 791:6
**most** [8] - 602:3, 608:25, 625:18, 644:2, 697:13, 708:6, 718:9, 760:20
**mostly** [4] - 629:5, 722:9, 756:11, 765:10
**motion** [18] - 599:8, 617:14, 641:24, 646:5, 661:4, 661:6, 664:22, 668:3, 673:22, 697:15, 705:15, 718:1, 719:5, 738:21, 738:22, 776:13, 780:21, 786:1

**motions** [2] - 618:21, 622:9
**move** [5] - 618:22, 641:25, 708:8, 786:2, 786:25
**moved** [1] - 788:8
**moves** [2] - 664:23, 753:6
**movie** [1] - 690:20
**movies** [5] - 684:24, 684:25, 686:12, 686:22, 687:2
**moving** [1] - 787:7
**MR** [168] - 598:7, 598:15, 599:13, 611:8, 611:13, 612:17, 613:8, 613:11, 613:20, 613:23, 614:6, 614:12, 616:22, 616:24, 617:12, 617:15, 617:18, 618:22, 622:8, 624:5, 624:7, 626:8, 627:5, 627:14, 636:9, 637:25, 638:3, 638:11, 641:15, 641:18, 642:11, 644:12, 646:6, 647:25, 648:3, 648:13, 657:25, 658:3, 658:21, 658:22, 658:25, 659:2, 660:3, 660:21, 661:5, 664:17, 665:13, 666:25, 673:16, 673:23, 674:6, 683:23, 684:2, 684:20, 685:1, 685:17, 685:19, 685:21, 688:24, 689:2, 689:5, 689:13, 689:16, 689:17, 689:19, 689:21, 689:25, 690:1, 690:4, 690:7, 690:10, 690:16, 690:21, 690:23, 691:1, 691:2, 691:6, 695:8, 695:11, 695:23, 697:15, 707:24, 708:21, 710:21, 711:8, 711:16, 711:23, 712:4, 712:11, 718:4, 718:21, 723:21, 724:3, 724:7, 724:11, 724:16, 724:19, 724:23, 738:15, 747:9, 747:13, 747:17, 749:8, 752:24, 753:6, 761:8, 761:14, 761:22, 762:8, 762:13, 763:1, 766:8, 766:16, 767:22, 768:10, 768:14, 768:18, 769:4, 769:8, 771:4, 775:15, 775:25, 776:3, 777:2, 777:4, 778:25, 779:12, 779:14, 780:1, 780:10, 780:20, 785:7, 786:2, 786:7, 786:12, 786:15, 786:20, 787:9, 787:10, 787:13, 787:16, 787:19, 787:25, 788:1, 788:25, 789:7, 789:13, 789:17, 789:20, 790:3, 790:7, 790:18, 790:22, 790:25, 791:11, 791:17, 791:21, 791:24, 792:2, 792:4, 792:10, 792:13, 792:19, 793:2, 793:5, 794:8, 794:12, 794:14
**MS** [77] - 598:5, 598:14, 599:7, 599:22, 600:2, 612:6, 613:13, 614:7, 620:15, 622:3, 622:16, 624:13, 627:7, 627:12, 635:9, 635:12, 636:11, 637:24, 638:9, 641:13, 641:25, 643:8, 644:22, 648:5, 648:12, 659:3, 660:1, 660:14, 660:17, 661:6, 664:16, 664:23, 666:4, 673:25, 674:14, 674:19, 684:24, 686:9, 690:13, 695:17, 697:17, 707:25, 708:8, 709:14, 710:9, 711:2, 711:14, 712:3, 712:8, 717:25, 719:6, 723:9, 723:25, 724:20, 725:1, 748:18, 749:12, 752:25, 753:17, 754:10, 762:5, 762:10, 763:2, 766:9, 766:18, 768:11, 768:16, 771:3, 775:17, 776:14, 780:14, 785:9, 786:4, 788:5, 792:7, 792:23, 793:17
**multiple** [4] - 655:16, 735:4, 735:5, 784:9

**murder** [170] - 602:4, 602:13, 602:16, 603:11, 604:16, 604:24, 606:3, 606:10, 606:21, 606:23, 606:24, 607:2, 609:4, 610:2, 611:16, 612:19, 617:2, 618:1, 619:3, 619:4, 619:5, 619:11, 621:9, 630:15, 630:19, 630:20, 631:12, 633:19, 635:18, 635:20, 636:2, 636:5, 636:8, 636:10, 637:17, 638:5, 639:7, 639:14, 639:15, 639:17, 639:18, 639:19, 639:23, 639:24, 639:25, 640:3, 645:18, 646:2, 646:3, 652:25, 653:1, 653:2, 654:3, 654:15, 654:19, 654:21, 654:22, 654:25, 656:23, 658:13, 658:14, 659:14, 659:17, 660:12, 662:21, 665:2, 665:21, 666:5, 666:6, 666:7, 666:13, 666:15, 672:6, 672:7, 677:15, 678:12, 678:13, 679:8, 679:10, 680:17, 681:17, 682:15, 685:25, 687:13, 690:11, 691:19, 693:13, 693:15, 694:11, 695:14, 696:6, 696:9, 700:7, 700:8, 703:12, 705:5, 706:3, 707:7, 707:8, 710:20, 711:10, 711:13, 711:21, 712:2, 712:25, 713:1, 713:2, 714:19, 715:4, 715:15, 716:9, 716:11, 716:22, 716:24, 718:6, 718:8, 729:11, 729:12, 730:7, 730:12, 732:12, 733:1, 733:5, 733:8, 734:17, 734:18, 734:24, 735:14, 737:11, 737:22, 738:12, 740:25, 742:10, 743:1, 743:10, 743:15, 743:20, 743:22, 743:25, 744:8, 744:19, 745:7, 746:9, 746:11, 747:3, 747:5, 747:18, 747:19, 747:24, 748:7, 748:22, 750:25, 753:10, 757:12, 757:13, 759:18, 760:2, 760:7, 760:7, 788:18
**murdered** [2] - 656:4, 701:7
**murderer?** [1] - 748:1
**murderers** [3] - 747:15, 749:9, 749:21
**murdering** [1] - 741:13
**murders** [13] - 655:16, 658:12, 660:17, 663:2, 663:9, 663:10, 665:3, 665:24, 682:2, 732:24, 735:5, 760:22
**must** [16] - 602:1, 631:8, 657:18, 674:4, 679:15, 680:9, 680:12, 687:14, 691:25, 694:13, 696:10, 703:5, 750:10, 756:17, 760:10

## N

**name** [8] - 726:23, 726:24, 767:17, 770:12, 770:13, 770:14, 770:17, 782:3
**narcotics** [2] - 691:16, 721:8
**narrow** [1] - 599:4
**narrowly** [1] - 599:9
**Nassau** [5] - 772:24, 773:1, 773:4, 774:2, 774:3
**naturally** [1] - 611:21
**nature** [6] - 650:7, 685:8, 713:23, 717:19, 736:9, 776:21
**necessarily** [4] - 700:24, 728:24, 781:3, 781:7
**necessary** [5] - 659:19, 671:25,

704:16, 731:3, 749:1
**need** [11] - 608:13, 613:9, 614:10, 614:18, 636:9, 703:17, 716:18, 754:2, 773:15, 780:1, 783:6
**needed** [1] - 724:4
**needs** [5] - 684:7, 723:14, 758:8, 790:4
**negative** [1] - 706:14
**negligence** [4] - 728:3, 728:11, 728:23, 743:21
**nervous** [2] - 706:23, 709:15
**neutral** [2] - 635:15, 787:2
**never** [23] - 611:23, 631:3, 631:4, 631:6, 645:7, 647:4, 652:20, 680:8, 697:6, 700:10, 710:6, 732:14, 732:15, 734:20, 756:21, 756:24, 757:16, 757:17, 771:19, 772:3, 774:2, 775:3, 789:18
**nevertheless** [1] - 638:5
**new** [3] - 652:8, 652:10, 768:25
**NEW** [1] - 597:1
**New** [11] - 597:4, 597:16, 597:21, 601:25, 647:14, 647:15, 719:25, 723:13, 724:5, 727:13, 755:17
**news** [2] - 767:14, 769:19
**News** [1] - 649:3
**newspaper** [1] - 698:16
**newspapers** [2] - 690:23, 790:15
**next** [35] - 620:3, 624:15, 627:2, 632:15, 636:15, 641:21, 646:10, 648:7, 648:16, 661:11, 664:19, 673:19, 674:21, 674:24, 693:17, 697:11, 697:21, 708:3, 717:23, 738:17, 746:13, 753:3, 756:22, 762:20, 766:11, 766:25, 770:22, 774:4, 776:9, 777:7, 780:12, 785:11, 785:15, 791:23, 792:11
**nice** [9] - 623:24, 648:7, 664:18, 673:18, 697:11, 722:15, 762:22, 766:11, 785:11
**NICHOLAS** [1] - 597:9
**NICOLE** [1] - 597:14
**night** [1] - 794:16
**non** [2] - 669:23, 673:5
**non-employment** [1] - 669:23
**non-guilt** [1] - 673:5
**none** [1] - 715:24
**nonguilt** [2] - 603:9, 700:3
**normal** [1] - 629:19
**normally** [1] - 758:3
**Nostra** [1] - 684:22
**not-for-profit** [1] - 726:25
**note** [7] - 666:9, 676:19, 709:16, 739:16, 753:22, 768:11, 789:1
**noted** [1] - 768:19
**notes** [1] - 707:19
**nothing** [13] - 608:7, 629:7, 641:13, 644:23, 664:16, 664:17, 669:6, 686:9, 766:8, 779:3, 779:4, 783:22, 787:6
**notice** [2] - 613:24, 620:11
**noticed** [2] - 611:24, 666:25
**notified** [1] - 793:7
**noting** [1] - 768:18

**notion** [1] - 643:12
**notwithstanding** [1] - 619:15
**nowadays** [1] - 770:16
**nuanced** [1] - 695:19
**Number** [1] - 766:19
**number** [27] - 599:5, 624:15, 627:15, 655:20, 655:22, 655:24, 660:11, 665:15, 666:19, 668:10, 674:1, 675:1, 675:5, 690:10, 697:18, 710:13, 713:19, 726:5, 726:9, 735:8, 738:23, 739:1, 739:5, 763:4, 771:5, 786:6, 786:17
**numerous** [5] - 658:7, 658:12, 665:24, 667:1, 779:17
**Nunez** [1] - 666:6

## O

**oath** [14] - 600:11, 620:20, 627:23, 627:24, 646:18, 648:24, 668:13, 675:8, 698:12, 726:12, 739:8, 754:19, 763:11, 767:8
**object** [1] - 786:5
**objection** [8] - 673:25, 697:16, 709:10, 766:15, 776:15, 787:3
**objective** [2] - 645:1, 782:25
**objectives** [1] - 703:25
**obligated** [5] - 674:12, 680:8, 682:20, 682:21, 731:12
**obligation** [15] - 602:25, 603:1, 603:16, 652:16, 652:20, 652:21, 652:22, 678:20, 700:5, 700:10, 703:6, 731:19, 741:2, 742:21, 757:19
**obliged** [1] - 730:17
**observation** [1] - 753:7
**observe** [1] - 645:5
**observed** [8] - 600:12, 645:21, 646:21, 698:14, 726:16, 754:21, 767:9, 771:15
**obstacle** [3] - 621:12, 644:7, 709:6
**obstructed** [1] - 709:19
**obviously** [13] - 608:16, 619:6, 638:3, 638:5, 642:24, 682:1, 693:4, 705:18, 706:17, 716:7, 779:1, 779:15, 786:2
**occurred** [1] - 726:2
**OF** [3] - 597:1, 597:3, 597:9
**offense** [2] - 712:5, 719:22
**offer** [3] - 704:3, 730:23, 758:19
**offhanded** [1] - 667:12
**office** [1] - 626:1
**officer** [3] - 671:7, 773:4, 784:20
**officers** [1] - 784:21
**official** [4] - 638:6, 658:14, 748:16
**offset** [4] - 663:22, 663:23, 663:24, 704:3
**offsetting** [1] - 742:19
**offshore** [1] - 651:19
**offspring** [3] - 658:25, 659:1, 659:2
**often** [2] - 625:19, 737:14
**older** [2] - 652:5, 657:3
**once** [10] - 626:12, 650:6, 652:13, 735:2, 742:15, 742:23, 744:18, 757:7,

789:20, 793:6
**one** [105] - 598:20, 598:23, 599:1, 599:18, 599:23, 602:12, 606:16, 607:12, 611:20, 611:24, 612:21, 613:1, 613:3, 614:23, 615:24, 617:21, 619:7, 621:17, 622:25, 623:8, 624:2, 630:12, 632:4, 634:2, 636:11, 637:2, 639:8, 642:20, 644:17, 645:14, 646:10, 649:2, 654:23, 655:12, 656:19, 658:8, 658:18, 660:12, 662:17, 662:22, 664:13, 673:10, 673:11, 674:21, 679:10, 680:11, 681:14, 684:4, 684:13, 686:5, 689:14, 690:4, 694:3, 695:8, 695:12, 695:15, 696:3, 699:18, 704:13, 705:20, 713:5, 713:12, 713:19, 722:13, 731:8, 736:9, 739:1, 740:17, 741:24, 745:4, 748:14, 750:20, 752:14, 754:1, 759:3, 760:20, 761:6, 762:1, 764:23, 765:3, 765:5, 765:11, 767:23, 769:3, 774:13, 774:23, 775:1, 782:2, 782:3, 783:20, 785:4, 786:17, 789:7, 789:10, 789:11, 790:12, 791:20, 791:22, 791:25, 792:1, 793:22, 794:4
**ones** [1] - 656:16
**open** [11] - 614:22, 637:1, 638:15, 646:9, 662:1, 686:11, 691:8, 696:2, 749:15, 762:15, 767:1
**Open** [5] - 598:1, 617:20, 769:11, 776:6, 780:23
**opened** [2] - 721:19, 721:21
**operate** [2] - 651:13, 755:8
**operating** [1] - 651:15
**operation** [1] - 702:22
**operator** [1] - 755:9
**opinion** [14] - 608:19, 614:3, 657:2, 659:23, 666:20, 671:12, 672:24, 673:3, 692:7, 692:20, 699:22, 706:7, 769:16, 769:17
**opinions** [2] - 696:24, 774:5
**opponent** [1] - 644:2
**opportunity** [1] - 783:24
**oppose** [1] - 718:4
**opposed** [7] - 607:3, 669:23, 710:2, 728:25, 732:8, 749:24, 761:5
**option** [1] - 716:16
**options** [2] - 714:22, 741:15
**orally** [2] - 614:18, 695:22
**order** [13] - 608:6, 615:20, 620:21, 632:3, 643:19, 643:25, 671:24, 679:14, 681:3, 712:7, 713:21, 759:2, 764:8
**organization** [4] - 726:21, 726:25, 727:11, 755:13
**organized** [10] - 638:8, 657:22, 672:24, 673:4, 673:10, 685:5, 685:8, 686:13, 687:8, 702:7
**organizers** [1] - 662:18
**original** [1] - 678:2
**originally** [1] - 720:18
**OTB** [2] - 651:10, 651:13
**otherwise** [4] - 644:1, 644:16, 645:6, 645:19

**ounces** [2] - 724:4, 724:7
**outcome** [1] - 720:16
**outstanding** [1] - 599:24
**outweigh** [1] - 653:23
**overall** [2] - 645:6, 775:20
**overcome** [2] - 745:23, 751:21
**overwhelmed** [1] - 634:13
**overwhelming** [1] - 706:10
**own** [6] - 611:19, 644:7, 681:8, 698:24, 708:10, 722:21

**P**

**page** [12] - 632:15, 633:2, 636:15, 644:25, 661:11, 674:24, 697:21, 746:13, 756:17, 756:22, 766:25, 785:15
**paid** [1] - 774:10
**panel** [3] - 642:13, 718:18, 780:17
**paper** [6] - 649:7, 766:4, 770:14, 770:15, 770:18, 770:19
**papers** [1] - 779:6
**paragraphs** [1] - 770:4
**paralegal** [1] - 598:18
**paraphrase** [1] - 637:6
**parentheses** [1] - 656:19
**parents** [1] - 658:18
**parking** [3] - 764:17, 764:19
**parole** [3] - 685:23, 734:7, 784:19
**part** [17] - 602:18, 605:12, 618:23, 620:5, 620:22, 639:3, 645:3, 689:9, 711:7, 724:12, 737:12, 757:7, 764:8, 772:22, 779:23, 789:8, 793:12
**part-time** [1] - 772:22
**partial** [1] - 633:7
**participate** [3] - 603:12, 651:22, 723:16
**particular** [14] - 612:17, 613:1, 613:3, 621:17, 622:15, 643:7, 660:22, 697:8, 711:8, 711:20, 744:12, 747:18, 779:22, 784:12
**particularly** [1] - 662:6
**parties** [3] - 627:7, 747:8, 749:5
**parts** [1] - 757:6
**pass** [1] - 649:11
**past** [7] - 613:15, 629:15, 629:16, 634:10, 651:10, 652:10, 725:5
**patience** [2] - 691:10, 698:9
**pattern** [2] - 620:12, 663:7
**Pause** [2] - 648:2, 771:6
**pause** [2] - 689:1, 690:9
**pay** [5] - 747:15, 749:9, 749:20, 773:23, 775:19
**paying** [1] - 606:17
**payroll** [4] - 675:23, 676:13, 772:9, 772:15
**penalties** [8] - 602:12, 630:13, 703:19, 724:15, 730:11, 736:9, 758:1, 784:18
**penalty** [370] - 601:20, 601:25, 602:12, 603:14, 603:15, 603:19, 603:20, 603:21, 604:2, 604:8, 604:9, 604:14,

604:17, 604:18, 604:21, 605:3, 605:15, 605:18, 606:8, 607:4, 608:20, 609:19, 610:1, 610:8, 610:16, 612:19, 614:25, 615:10, 615:20, 616:9, 616:10, 618:11, 621:4, 621:8, 621:21, 630:12, 631:15, 631:16, 631:18, 631:19, 631:23, 632:2, 632:3, 632:5, 632:6, 632:11, 633:8, 633:10, 633:18, 634:16, 634:22, 634:24, 635:3, 636:1, 637:5, 637:11, 637:13, 639:12, 640:4, 640:16, 640:18, 640:20, 640:25, 641:6, 642:8, 642:13, 642:24, 644:3, 644:5, 644:8, 645:17, 645:20, 645:23, 646:1, 652:2, 652:5, 652:6, 652:10, 653:7, 653:17, 653:25, 654:4, 654:6, 654:11, 655:4, 655:9, 655:15, 655:17, 655:25, 656:11, 656:18, 656:22, 657:7, 657:9, 657:14, 657:18, 658:4, 658:11, 659:9, 659:13, 659:16, 660:8, 661:2, 662:8, 662:12, 662:20, 662:25, 663:6, 665:5, 665:8, 665:16, 665:17, 666:2, 666:16, 667:1, 667:4, 667:16, 667:19, 667:22, 677:4, 677:6, 677:7, 677:13, 677:14, 677:23, 679:13, 679:20, 680:2, 680:6, 680:9, 680:11, 680:13, 680:19, 680:20, 680:24, 681:4, 681:20, 682:1, 682:10, 682:14, 683:5, 683:9, 683:13, 683:14, 683:17, 683:18, 684:14, 685:10, 685:22, 685:24, 686:4, 687:10, 687:13, 687:15, 687:23, 688:5, 688:17, 689:23, 690:11, 692:6, 692:8, 692:16, 693:7, 693:13, 693:15, 693:25, 694:9, 694:17, 694:19, 694:21, 694:22, 694:24, 695:1, 695:3, 695:4, 695:15, 696:7, 696:10, 696:11, 696:20, 697:6, 703:13, 703:18, 703:19, 703:21, 703:22, 704:1, 704:2, 704:7, 704:11, 704:14, 704:15, 704:17, 704:21, 704:22, 704:23, 705:6, 705:8, 705:9, 705:13, 706:5, 707:3, 707:8, 707:11, 708:17, 708:22, 709:20, 710:1, 710:5, 710:6, 710:18, 711:4, 711:13, 712:16, 712:17, 712:18, 712:20, 712:23, 713:4, 713:20, 713:23, 713:24, 714:17, 714:21, 714:23, 715:3, 715:6, 715:11, 715:13, 716:14, 716:21, 716:24, 718:14, 718:25, 719:16, 729:16, 730:10, 730:12, 730:13, 730:15, 730:17, 730:20, 730:22, 730:25, 731:1, 731:3, 731:7, 731:9, 731:10, 731:12, 731:18, 731:24, 732:2, 732:5, 732:10, 732:11, 732:19, 732:23, 733:6, 733:21, 733:25, 734:14, 734:15, 734:19, 736:2, 736:5, 736:6, 736:7, 736:8, 736:10, 736:23, 737:3, 737:8, 737:19, 737:24, 738:8, 740:14, 741:15, 741:17, 741:18, 741:20, 741:22, 741:24, 741:25, 742:1, 742:4, 742:5, 742:10, 742:12, 742:15, 743:2, 743:6, 743:16, 743:24, 744:3, 744:4, 744:6, 744:9, 745:8, 745:9, 745:15, 747:1, 747:20, 747:25, 748:6, 748:24, 748:25, 749:13, 749:23, 750:2, 750:8, 750:13,

750:23, 751:1, 751:5, 751:11, 751:22, 752:5, 752:7, 752:10, 752:19, 752:21, 753:9, 753:15, 754:12, 756:19, 756:25, 757:25, 758:2, 758:5, 758:6, 758:7, 758:17, 758:22, 758:23, 759:2, 759:3, 759:11, 759:12, 759:19, 759:21, 760:19, 761:2, 761:3, 761:5, 765:13, 766:3, 781:13, 784:18
**people** [56] - 599:2, 601:18, 605:22, 615:14, 643:3, 652:7, 655:7, 655:14, 655:24, 656:3, 657:12, 659:8, 662:15, 662:18, 663:3, 665:15, 668:24, 668:25, 681:25, 685:3, 689:7, 696:24, 701:9, 701:10, 701:13, 701:14, 701:21, 704:24, 704:25, 707:19, 709:4, 718:16, 720:4, 721:15, 722:25, 728:22, 750:5, 765:19, 769:2, 769:6, 772:3, 778:3, 778:4, 779:23, 780:3, 780:7, 784:21, 784:24, 785:1, 786:17, 787:14, 789:14, 789:19, 791:19, 793:6
**People** [1] - 601:12
**people's** [1] - 696:25
**perfect** [2] - 766:19, 791:24
**perfectly** [3] - 665:14, 667:8, 667:9
**perhaps** [5] - 754:11, 779:18, 780:17, 780:18, 793:17
**period** [2] - 740:8, 756:7
**periods** [2] - 669:22, 775:23
**permission** [1] - 658:17
**permits** [1] - 679:10
**permutations** [1] - 788:15
**person** [57] - 598:18, 602:2, 608:22, 609:1, 609:9, 610:23, 610:25, 611:1, 611:3, 611:23, 614:18, 615:14, 616:9, 618:24, 619:9, 619:17, 620:2, 620:6, 630:20, 633:10, 633:25, 635:16, 635:23, 640:18, 642:6, 643:13, 646:3, 653:1, 658:9, 663:2, 666:22, 668:5, 677:14, 682:1, 685:24, 686:2, 692:10, 692:23, 694:10, 701:17, 704:10, 706:7, 714:5, 715:10, 733:18, 735:14, 741:13, 743:11, 747:4, 752:9, 757:12, 766:2, 775:7, 782:11, 782:14, 783:6, 792:24
**person's** [7] - 615:5, 640:17, 709:3, 709:4, 745:25, 760:23, 782:9
**personal** [7] - 605:17, 702:9, 702:10, 707:11, 720:4, 731:22, 761:25
**personally** [4] - 704:23, 705:15, 759:10, 761:25
**persons** [3] - 643:20, 647:13, 656:5
**perspective** [1] - 602:7
**phase** [79] - 603:14, 603:15, 604:16, 604:18, 605:3, 605:16, 606:9, 609:19, 614:25, 615:20, 630:14, 630:18, 631:15, 652:14, 652:15, 653:6, 653:7, 654:3, 654:4, 661:2, 662:20, 666:5, 667:1, 667:19, 678:8, 678:9, 679:9, 680:17, 680:19, 680:20, 685:10, 686:5, 687:11, 687:14, 688:5, 689:14, 689:17, 691:12, 694:17, 694:21, 695:23, 696:1, 696:6, 696:7, 696:10, 696:11, 700:3,

700:13, 703:13, 703:18, 703:21, 705:6, 712:20, 712:23, 713:23, 715:2, 715:3, 730:16, 730:17, 733:22, 740:23, 741:14, 742:11, 742:12, 744:6, 744:14, 744:15, 744:20, 748:6, 750:8, 750:24, 752:6, 757:7, 757:25, 759:19

**phases** [3] - 665:23, 685:9, 740:22
**philosophical** [2] - 687:25, 688:3
**philosophy** [1] - 667:20
**phrased** [1] - 643:11
**phraseology** [1] - 617:4
**picture** [2] - 645:6, 655:13
**piece** [1] - 623:15
**pieces** [2] - 623:8, 764:3
**pin** [1] - 761:20
**pit** [1] - 717:8
**place** [1] - 768:7
**placed** [1] - 615:5
**planned** [1] - 747:24
**planning** [2] - 724:2, 748:7
**plans** [1] - 787:18
**Plaza** [2] - 597:16, 597:21
**pled** [2] - 723:21, 724:17
**point** [17] - 601:23, 604:12, 609:10, 614:14, 619:1, 620:16, 624:9, 645:14, 661:9, 684:7, 705:8, 714:4, 743:4, 747:24, 761:15, 780:19, 794:3
**pointed** [4] - 614:2, 644:14, 658:6
**points** [3] - 621:4, 775:18, 784:9
**poker** [2] - 650:22, 651:1
**police** [6] - 671:6, 720:2, 773:1, 773:5, 784:20, 784:21
**Police** [1] - 772:25
**Policeman** [1] - 755:17
**policeman** [1] - 773:4
**politician** [2] - 655:7, 662:17
**portion** [2] - 602:20, 632:2
**position** [12] - 599:11, 599:25, 628:9, 635:4, 635:6, 706:9, 718:24, 739:20, 760:14, 780:20, 787:20
**possession** [1] - 723:13
**possibilities** [1] - 631:14
**possibility** [55] - 603:20, 604:9, 604:22, 606:4, 606:10, 606:13, 608:24, 632:6, 635:17, 637:16, 653:22, 654:1, 667:23, 679:12, 679:18, 680:21, 683:15, 685:22, 687:15, 688:20, 692:11, 693:14, 694:19, 695:3, 703:20, 703:24, 704:15, 712:17, 713:2, 730:13, 730:21, 731:1, 731:11, 731:18, 733:23, 735:13, 736:2, 736:24, 737:5, 737:10, 737:21, 738:1, 738:10, 741:18, 741:19, 742:1, 743:7, 744:3, 745:7, 748:11, 751:24, 751:25, 752:12, 758:3, 758:23
**possible** [16] - 603:24, 617:23, 618:13, 618:17, 630:13, 645:11, 654:13, 657:16, 703:18, 734:3, 751:18, 751:20, 752:3, 753:12, 753:13, 789:24
**possibly** [11] - 603:22, 615:7, 655:15, 662:8, 664:6, 745:8, 745:10, 745:11, 745:12, 748:24, 753:18

**post** [2] - 626:1, 709:9
**post-verdict** [1] - 709:9
**Postal** [3] - 625:2, 625:5, 625:24
**posted** [1] - 598:16
**potential** [9] - 599:15, 602:12, 612:10, 674:17, 713:5, 733:25, 750:20, 779:15, 789:10
**potentially** [6] - 644:3, 710:5, 733:5, 740:22, 743:25, 780:17
**practice** [2] - 601:9, 629:3
**prayers** [1] - 630:4
**preclude** [1] - 691:24
**preempt** [1] - 789:22
**prefer** [3] - 660:5, 668:1, 735:23
**preference** [3] - 753:22, 753:23, 754:12
**prejudice** [2] - 672:19, 702:14
**preliminarily** [1] - 777:15
**preliminary** [2] - 640:13, 788:3
**premeditation** [3] - 714:25, 715:1, 715:5
**prep** [1] - 599:1
**prepare** [1] - 791:14
**prepared** [1] - 791:15
**preparing** [1] - 598:24
**present** [23] - 598:3, 598:9, 600:6, 603:22, 604:3, 622:23, 624:16, 627:18, 631:22, 649:14, 668:6, 675:1, 698:2, 712:13, 719:18, 726:5, 739:1, 741:5, 744:23, 767:2, 767:4, 771:8, 777:8
**presented** [17] - 609:24, 623:2, 634:6, 634:16, 672:22, 681:10, 685:24, 691:12, 696:16, 700:20, 702:16, 703:8, 705:6, 714:21, 736:25, 737:6, 744:22
**presently** [2] - 781:23, 794:7
**presents** [2] - 672:14, 750:23
**presumably** [1] - 793:10
**presume** [5] - 616:12, 683:8, 683:13, 687:14, 761:20
**presumed** [4] - 602:24, 631:16, 700:11, 729:25
**presumes** [1] - 678:21
**presumption** [6] - 684:13, 684:17, 687:11, 687:16, 688:1, 688:6, 695:2, 700:12
**presumptive** [6] - 683:13, 703:19, 730:12, 741:17, 744:4, 758:2
**presumptuous** [1] - 793:12
**pretty** [7] - 649:9, 657:5, 657:11, 658:19, 746:3, 753:14, 781:11
**prevent** [2] - 612:15, 669:4
**previous** [2] - 673:1, 677:21
**previously** [10] - 611:3, 611:17, 617:1, 619:4, 674:11, 712:5, 714:24, 738:11, 748:6, 788:17
**primarily** [1] - 625:21
**principle** [6] - 617:6, 655:5, 667:15, 750:1, 750:2, 761:24
**principles** [1] - 742:6
**prison** [61] - 603:19, 604:8, 604:22, 606:4, 609:1, 615:3, 615:8, 621:10,

631:15, 631:24, 632:5, 633:11, 635:17, 635:19, 635:21, 637:16, 640:19, 652:6, 653:15, 653:22, 653:25, 654:12, 654:22, 654:23, 654:24, 657:5, 657:6, 657:15, 657:19, 659:11, 663:19, 665:1, 667:23, 679:11, 680:1, 680:20, 683:14, 685:22, 687:14, 687:22, 688:19, 692:11, 692:25, 693:14, 695:3, 697:7, 703:24, 704:14, 710:3, 712:16, 713:19, 719:11, 731:10, 735:20, 742:1, 743:7, 744:3, 758:6, 758:22, 759:4, 759:25

**prisoner** [2] - 615:4, 615:7
**Prisons** [1] - 612:14
**private** [4] - 628:15, 628:16, 649:19, 755:12
**problem** [22] - 608:12, 612:16, 612:22, 613:9, 617:8, 625:23, 626:3, 629:11, 640:14, 645:12, 651:25, 669:3, 671:20, 684:3, 684:12, 685:20, 695:12, 706:12, 711:9, 711:17, 788:25, 789:18
**problematic** [1] - 621:18
**problematical** [1] - 667:25
**problems** [3] - 612:7, 648:11, 648:15
**proceed** [3] - 654:4, 705:17, 780:6
**Proceedings** [1] - 597:25
**process** [12] - 602:10, 668:1, 706:25, 712:7, 723:16, 757:5, 782:19, 782:21, 783:4, 788:20, 790:7, 793:17
**proclivity** [1] - 615:2
**produced** [2] - 597:25, 682:17
**proficiency** [1] - 627:10
**profit** [1] - 726:25
**proof** [6] - 630:22, 672:1, 688:8, 704:6, 719:10, 757:15
**proper** [4] - 631:23, 704:14, 731:10, 745:15
**properly** [1] - 701:25
**proposed** [1] - 710:22
**prosecuted** [2] - 701:21, 701:23
**prosecution** [2] - 707:13, 762:5
**prospect** [1] - 708:10
**Prospective** [2] - 754:16, 763:6
**prospective** [27] - 600:6, 618:20, 622:23, 623:25, 624:16, 627:3, 627:18, 641:23, 646:12, 648:9, 648:17, 698:2, 708:7, 712:13, 717:24, 719:18, 723:7, 753:5, 762:24, 767:4, 770:25, 771:8, 776:12, 777:8, 779:14, 779:18, 780:12
**PROSPECTIVE** [641] - 600:9, 600:14, 600:17, 600:19, 600:23, 600:25, 601:4, 601:7, 601:13, 601:17, 601:22, 602:8, 603:5, 604:11, 604:20, 604:25, 605:7, 605:12, 605:19, 605:21, 606:5, 606:7, 606:11, 606:14, 606:16, 606:22, 606:25, 607:5, 607:7, 607:11, 607:14, 607:17, 607:23, 608:3, 608:10, 608:15, 608:17, 609:5, 609:11, 609:23, 610:3, 610:10, 610:17, 610:22, 615:12, 615:18, 615:23, 616:1, 616:8, 616:16, 616:18, 616:20, 618:5, 618:9, 618:16, 623:6, 623:19, 624:19, 624:23, 625:1,

625:4, 625:7, 625:9, 625:13, 625:16, 625:18, 625:22, 625:25, 626:7, 626:13, 626:16, 626:18, 626:22, 626:24, 627:20, 627:22, 627:25, 628:4, 628:7, 628:10, 628:13, 628:16, 628:18, 628:20, 628:22, 628:25, 629:2, 629:5, 629:7, 629:13, 629:16, 629:18, 630:1, 630:7, 630:10, 630:16, 630:23, 631:2, 631:7, 631:10, 631:20, 631:25, 632:9, 632:14, 633:3, 633:7, 633:14, 633:20, 633:24, 634:8, 634:18, 634:23, 635:1, 635:5, 637:7, 637:9, 637:12, 637:19, 637:22, 638:18, 638:20, 638:24, 639:13, 639:16, 639:20, 639:22, 640:2, 640:8, 640:11, 640:15, 641:1, 641:4, 641:7, 641:11, 641:22, 646:14, 646:16, 646:19, 646:23, 647:3, 647:6, 647:8, 647:12, 647:15, 647:18, 647:20, 647:22, 647:24, 648:8, 648:19, 648:22, 649:2, 649:5, 649:9, 649:12, 649:15, 649:17, 649:21, 649:24, 650:3, 650:6, 650:10, 650:14, 650:17, 650:24, 651:3, 651:7, 651:9, 651:15, 651:17, 651:20, 651:23, 652:3, 652:9, 652:19, 654:9, 654:13, 654:17, 655:1, 655:6, 655:11, 655:18, 655:22, 656:2, 656:7, 656:24, 657:8, 657:11, 657:16, 657:20, 657:23, 662:4, 662:9, 662:14, 663:1, 663:7, 663:12, 663:20, 663:23, 664:6, 664:8, 664:14, 664:20, 668:8, 668:11, 668:17, 668:22, 668:25, 669:6, 669:11, 669:15, 669:18, 669:21, 669:24, 670:1, 670:7, 670:10, 670:12, 670:14, 670:17, 670:20, 670:23, 671:3, 671:5, 671:8, 671:10, 671:16, 671:18, 671:22, 672:4, 672:9, 672:16, 672:25, 673:2, 673:7, 673:9, 673:14, 673:20, 675:4, 675:6, 675:9, 675:13, 675:17, 675:20, 675:23, 676:1, 676:3, 676:6, 676:10, 676:15, 676:18, 676:22, 677:1, 677:19, 678:7, 678:15, 678:19, 679:4, 679:6, 679:21, 680:3, 680:7, 680:15, 680:23, 681:1, 681:5, 681:9, 681:13, 681:18, 681:21, 681:24, 682:3, 682:5, 682:8, 682:11, 682:16, 682:23, 683:2, 683:11, 683:21, 686:14, 686:16, 686:18, 686:21, 686:25, 687:5, 687:9, 687:17, 687:24, 688:2, 688:11, 688:15, 688:22, 691:22, 692:3, 692:17, 693:2, 693:8, 693:16, 693:19, 693:21, 693:23, 694:5, 694:7, 694:12, 694:25, 695:6, 696:4, 696:12, 696:14, 696:17, 696:21, 696:23, 697:8, 697:12, 698:5, 698:8, 698:10, 698:15, 698:18, 698:21, 699:2, 699:4, 699:6, 699:8, 699:11, 699:14, 699:20, 700:1, 700:16, 700:22, 701:4, 701:8, 701:12, 701:14, 701:17, 701:20, 701:23, 702:2, 702:5, 702:10, 702:20, 703:10, 703:15, 704:9, 704:12, 704:19, 705:3, 705:11, 706:1, 706:6, 706:13, 706:16, 706:19, 707:10, 707:17, 708:5, 712:22, 713:9, 713:17, 714:1, 714:3, 714:10, 714:20,

715:8, 715:20, 715:23, 716:2, 716:7, 716:13, 716:16, 716:23, 717:2, 717:5, 717:9, 717:13, 719:23, 719:25, 720:5, 720:9, 720:15, 720:17, 720:20, 720:22, 720:24, 721:4, 721:9, 721:14, 721:18, 721:22, 721:25, 722:6, 722:8, 722:12, 722:17, 722:20, 722:23, 723:2, 723:5, 726:8, 726:10, 726:13, 726:18, 726:22, 727:1, 727:4, 727:7, 727:10, 727:12, 727:14, 727:17, 727:19, 727:23, 728:1, 728:6, 728:9, 728:12, 728:15, 728:19, 728:21, 729:2, 729:9, 729:15, 729:21, 729:24, 730:5, 731:14, 731:21, 731:25, 732:6, 732:14, 732:20, 732:24, 733:3, 733:7, 733:9, 733:14, 733:19, 734:2, 734:4, 734:6, 734:11, 734:16, 734:20, 734:23, 735:1, 735:4, 735:6, 735:9, 735:19, 735:24, 736:4, 736:11, 736:14, 736:16, 736:18, 736:21, 737:1, 737:7, 737:12, 737:15, 737:18, 737:23, 738:5, 738:7, 738:13, 738:19, 739:4, 739:6, 739:9, 739:13, 739:18, 739:21, 739:25, 740:2, 740:5, 740:7, 740:12, 740:15, 740:19, 742:7, 743:3, 743:8, 743:13, 743:17, 743:23, 744:1, 744:5, 744:11, 744:17, 745:10, 745:12, 745:16, 745:18, 745:20, 746:3, 746:6, 746:12, 747:7, 749:25, 750:4, 750:9, 750:11, 750:15, 750:17, 750:19, 751:3, 751:6, 751:9, 751:12, 751:14, 751:16, 751:24, 752:2, 752:8, 752:14, 752:20, 753:4, 754:18, 754:23, 755:1, 755:4, 755:6, 755:8, 755:11, 755:14, 755:18, 755:21, 755:24, 756:2, 756:5, 756:9, 756:11, 756:14, 756:20, 756:23, 757:2, 757:21, 759:22, 760:4, 760:15, 761:4, 762:21, 762:23, 763:8, 763:10, 763:14, 763:20, 763:23, 764:2, 764:5, 764:7, 764:9, 764:14, 764:17, 764:19, 764:21, 764:23, 764:25, 765:2, 765:4, 765:7, 765:10, 765:18, 766:4, 766:12, 767:6, 767:11, 767:13, 767:17, 769:14, 769:18, 769:22, 770:2, 770:8, 770:15, 770:18, 770:20, 770:24, 771:10, 771:13, 771:17, 771:23, 772:1, 772:7, 772:10, 772:13, 772:17, 772:19, 772:22, 773:1, 773:3, 773:14, 774:1, 774:9, 774:12, 774:17, 774:22, 774:25, 775:8, 776:10, 777:11, 777:13, 777:18, 777:21, 778:2, 778:5, 778:9, 778:12, 778:14, 778:17, 778:21, 778:24, 779:3, 779:8, 779:10, 781:3, 781:6, 781:8, 781:10, 781:16, 781:20, 781:22, 781:25, 782:2, 782:7, 782:10, 782:13, 783:8, 783:10, 783:13, 783:15, 783:19, 783:22, 784:1, 784:7, 784:14, 784:17, 784:25, 785:3, 785:12

**protect** [1] - 782:23
**prove** [22] - 602:22, 603:2, 617:7, 630:24, 652:23, 654:20, 672:1, 678:10, 679:2, 683:4, 684:10, 684:15, 703:7, 703:23, 713:18, 729:6, 729:18, 729:22,

741:10, 757:9, 757:16, 757:19
**proved** [1] - 695:13
**proven** [10] - 602:24, 608:21, 616:13, 691:18, 692:9, 692:22, 694:20, 731:2, 740:16, 752:18
**proves** [2] - 653:4, 691:13
**provide** [24] - 615:3, 618:10, 631:4, 652:14, 652:21, 652:23, 653:11, 653:19, 667:17, 670:25, 678:9, 679:15, 679:22, 682:20, 682:21, 703:20, 742:11, 742:17, 742:21, 742:22, 758:12, 762:18, 782:25, 783:1
**provided** [1] - 713:14
**provides** [1] - 742:20
**providing** [2] - 631:17, 667:13
**proving** [5] - 652:16, 678:16, 700:5, 700:10, 741:3
**provisions** [1] - 793:21
**prudent** [2] - 786:20, 790:5
**psychological** [1] - 610:25
**psychologically** [1] - 610:4
**public** [2] - 697:3, 755:13
**pull** [1] - 718:15
**punished** [1] - 602:5
**punishment** [8] - 602:6, 619:12, 654:25, 665:1, 679:19, 709:24, 710:3, 735:16
**purchased** [3] - 720:1, 720:3, 724:1
**purchasing** [1] - 721:3
**purpose** [2] - 621:19, 744:14
**purposes** [3] - 713:20, 713:21, 730:1
**pursue** [1] - 609:18
**pursuing** [1] - 780:6
**put** [31] - 602:19, 602:25, 620:2, 631:18, 645:9, 661:1, 672:10, 673:13, 673:15, 678:22, 678:24, 679:1, 681:7, 681:8, 691:11, 701:2, 707:19, 711:11, 720:13, 722:13, 722:15, 733:1, 736:12, 751:19, 752:16, 760:23, 760:25, 761:7, 774:4, 774:7, 790:20
**puts** [1] - 790:11
**putting** [3] - 603:16, 665:22, 773:23

## Q

**qualfiied** [1] - 754:7
**qualifications** [1] - 621:2
**qualified** [25] - 612:2, 618:24, 621:18, 621:23, 621:24, 636:6, 643:21, 644:9, 644:11, 665:14, 665:17, 666:22, 667:5, 667:8, 667:9, 667:22, 723:22, 754:6, 779:18, 786:17, 786:24, 788:8
**quantity** [2] - 724:1, 724:4
**quarters** [1] - 763:19
**quasi** [2] - 727:19, 727:20
**Queens** [2] - 647:18, 647:19
**questioned** [2] - 644:25, 709:22
**questioning** [4] - 613:16, 695:24, 754:5, 784:18
**questionnaire** [61] - 600:12, 608:18,

612:20, 612:24, 613:12, 614:8, 619:8, 621:3, 621:6, 624:20, 628:2, 637:15, 642:2, 643:18, 645:1, 645:18, 646:22, 649:1, 659:10, 664:25, 667:13, 668:15, 668:19, 675:11, 675:16, 677:5, 686:24, 695:18, 695:20, 698:13, 708:19, 709:23, 712:9, 715:9, 719:21, 726:15, 726:20, 739:11, 748:19, 749:3, 749:5, 753:20, 754:1, 754:20, 763:13, 763:17, 767:8, 771:15, 771:25, 775:18, 776:17, 777:15, 777:23, 779:5, 781:10, 782:6, 784:2, 784:3, 784:4, 784:6, 784:13
**questionnaires** [6] - 613:17, 614:14, 645:7, 649:5, 649:6, 791:14
**Questions** [1] - 635:13
**questions** [58] - 612:6, 613:18, 614:24, 616:21, 617:9, 622:19, 622:25, 624:24, 626:25, 628:6, 630:11, 635:8, 637:2, 638:10, 639:21, 643:18, 643:24, 644:13, 644:15, 644:20, 645:10, 646:24, 648:3, 648:4, 648:5, 652:1, 657:24, 659:6, 660:24, 662:2, 670:21, 673:16, 691:9, 707:23, 709:13, 710:4, 710:12, 710:24, 712:9, 712:14, 714:21, 731:24, 738:14, 739:15, 740:14, 747:8, 749:16, 762:17, 763:16, 773:10, 780:11, 781:11, 784:7, 784:8, 784:9, 785:5, 785:8
**quip** [1] - 776:3
**quite** [4] - 642:14, 643:3, 660:4, 685:6
**quote** [4] - 619:10, 620:17, 635:21, 642:2

# R

**raised** [1] - 660:10
**raising** [1] - 610:23
**rather** [3] - 717:12, 788:20, 793:12
**rational** [1] - 677:11
**re** [1] - 613:16
**re-questioning** [1] - 613:16
**reach** [6] - 626:20, 671:17, 687:18, 712:7, 714:7, 731:16
**reached** [5] - 626:23, 728:2, 728:7, 728:13, 742:25
**reaching** [3] - 604:1, 605:18, 680:6
**read** [31] - 600:12, 616:1, 624:21, 628:2, 646:20, 648:24, 668:15, 671:13, 675:11, 690:23, 691:5, 695:21, 698:13, 698:17, 699:23, 702:20, 704:20, 726:15, 739:11, 754:21, 763:12, 765:19, 767:15, 768:5, 770:4, 771:15, 777:16, 779:4, 779:6, 790:1, 790:15
**reading** [3] - 625:15, 698:23, 766:19
**ready** [2] - 617:13, 761:11
**real** [4] - 600:18, 644:18, 710:23, 721:11
**realistic** [3] - 684:25, 686:15, 686:20
**really** [39] - 611:18, 613:22, 619:19, 620:25, 642:25, 651:16, 671:10, 698:15, 698:16, 702:25, 705:14,

705:19, 708:13, 7¹⁴:¹¹, 721:9, 721:10, 721:11, 722:24, 732:14, 732:15, 734:20, 735:9, 756:21, 756:23, 756:24, 757:3, 760:12, 760:16, 761:16, 770:2, 770:3, 770:8, 770:9, 771:19, 775:3, 779:4, 785:4, 789:22
**realm** [1] - 659:8
**reason** [20] - 601:21, 601:23, 602:1, 602:3, 608:5, 613:6, 614:11, 615:13, 616:10, 619:16, 620:1, 660:10, 685:1, 702:18, 703:16, 717:10, 762:7, 768:19, 769:8, 788:12
**reasonable** [40] - 602:22, 603:3, 603:18, 608:21, 616:13, 630:25, 631:9, 652:17, 654:20, 672:2, 672:17, 678:17, 679:3, 684:11, 688:9, 691:13, 692:1, 692:9, 692:22, 694:23, 700:6, 703:7, 703:23, 713:18, 729:6, 729:18, 730:3, 730:19, 731:2, 740:17, 741:3, 741:11, 742:14, 752:18, 757:10, 757:19, 757:24, 758:16, 759:11
**reasons** [4] - 623:12, 659:22, 702:24, 792:17
**rebutted** [1] - 709:11
**Reccoppa** [11] - 627:2, 664:19, 673:19, 697:11, 708:3, 717:23, 738:17, 770:22, 776:8, 785:11, 790:8
**receive** [13] - 603:19, 614:25, 616:3, 619:11, 635:18, 635:21, 654:4, 679:17, 687:21, 687:22, 688:7, 696:7, 747:20
**received** [3] - 618:14, 733:21, 744:7
**recency** [1] - 723:16
**recent** [3] - 629:14, 659:13, 674:5
**recently** [1] - 690:23
**recess** [4] - 646:8, 725:6, 766:24, 794:17
**recognize** [1] - 699:20
**reconsider** [2] - 618:10, 618:12
**reconvened** [1] - 730:8
**Recoppa** [5] - 641:21, 648:7, 753:2, 762:20, 766:11
**record** [15] - 604:5, 634:10, 644:10, 653:13, 665:11, 679:24, 691:5, 710:14, 724:18, 754:4, 758:21, 768:18, 787:21, 788:7, 792:15
**recorded** [1] - 597:25
**recordkeeping** [2] - 599:22, 600:2
**reduced** [1] - 720:18
**reference** [2] - 672:19, 702:14
**refers** [1] - 672:19
**reflect** [2] - 718:17, 767:25
**reflected** [1] - 709:1
**refuse** [1] - 793:7
**regard** [9] - 598:17, 609:3, 622:18, 635:13, 643:15, 710:5, 719:8, 749:9, 749:21
**regarding** [8] - 643:18, 659:6, 667:4, 685:12, 708:10, 719:9, 733:12, 771:16
**regards** [3] - 709:16, 749:2, 757:4
**regular** [1] - 774:2
**rehabilitate** [1] - 644:1

**rehabilitated** [4] - 611:25, 732:4, 733:10, 733:12
**reinstate** [1] - 690:3
**reiterated** [1] - 635:21
**related** [3] - 624:2, 630:21, 781:14
**relationship** [1] - 746:8
**relative** [3] - 608:11, 629:10, 724:14, 736:9, 775:1
**release** [49] - 603:20, 604:9, 604:22, 606:4, 606:10, 608:24, 632:6, 637:16, 653:22, 654:1, 667:23, 679:12, 679:18, 680:21, 683:15, 687:15, 688:20, 692:12, 693:14, 694:20, 695:3, 703:20, 703:24, 704:15, 712:17, 713:2, 730:13, 730:21, 731:1, 731:11, 731:18, 733:23, 735:13, 736:3, 736:24, 737:5, 737:10, 737:21, 738:1, 738:10, 741:18, 742:2, 743:7, 744:4, 745:7, 748:11, 752:12, 758:4, 758:23
**relevant** [1] - 621:1
**religion** [1] - 601:9
**religious** [5] - 635:4, 635:5, 643:4, 643:6, 677:22
**reluctance** [1] - 711:7
**reluctantly** [3] - 599:13, 665:4, 709:2
**remain** [1] - 643:20
**remedies** [1] - 612:15
**remember** [10] - 604:13, 622:25, 629:4, 651:9, 684:25, 772:1, 773:20, 774:12, 775:12, 778:19
**remembering** [1] - 714:21
**remind** [13] - 600:10, 627:23, 643:17, 646:17, 648:23, 668:12, 675:7, 698:11, 726:11, 739:7, 754:19, 767:7, 791:5
**reminder** [1] - 790:24
**reminds** [2] - 659:3, 666:19
**remorse** [1] - 714:6
**render** [4] - 653:16, 672:21, 702:15, 774:6
**rendering** [1] - 653:15
**renders** [2] - 622:13, 723:21
**renew** [1] - 717:25
**repeat** [5] - 605:12, 692:18, 737:1, 737:12, 737:13
**repeated** [3] - 613:16, 633:11, 784:17
**repeatedly** [3] - 659:10, 664:25, 709:23
**repent** [3] - 685:13, 692:14, 693:18
**report** [1] - 783:18
**Reporter** [1] - 597:20
**reports** [1] - 772:14
**representatives** [1] - 794:6
**request** [2] - 636:4, 659:15
**requested** [1] - 674:4
**require** [2] - 758:16, 793:8
**required** [11] - 615:19, 630:24, 631:22, 653:19, 666:7, 680:4, 704:4, 704:10, 713:15, 713:20, 758:12
**research** [3] - 770:6, 789:12, 791:14
**reservations** [1] - 752:17
**reserve** [3] - 624:14, 718:2, 754:9

**reserved** [3] - 598:12, 786:18, 788:9
**resolve** [2] - 692:4, 695:12
**resolved** [3] - 629:17, 629:18, 715:5
**respect** [13] - 620:15, 624:8, 638:9, 642:25, 643:20, 712:8, 723:15, 748:1, 779:22, 780:25, 786:16, 786:23, 787:4
**respectfully** [5] - 621:23, 622:5, 642:9, 643:17, 718:9
**respond** [1] - 756:16
**response** [7] - 613:2, 621:7, 621:25, 622:19, 645:3, 709:23, 761:21
**responses** [7] - 612:20, 613:11, 624:9, 652:2, 709:22, 789:4
**responsible** [1] - 768:13
**rest** [2] - 640:19, 789:22
**retailer** [1] - 649:22
**retire** [1] - 791:9
**retired** [2] - 625:2, 773:7
**retirement** [1] - 625:11
**retribution** [1] - 707:21
**return** [3] - 617:22, 742:9, 758:25
**returns** [7] - 603:10, 604:15, 654:2, 679:7, 705:4, 747:23, 759:17
**reveal** [1] - 643:19
**revealing** [1] - 613:19
**reviewed** [1] - 787:15
**RICHARD** [1] - 597:18
**Richard** [1] - 598:7
**ridden** [1] - 645:18
**righteous** [1] - 762:8
**rights** [1] - 782:24
**Rimer** [1] - 614:12
**road** [1] - 642:22
**role** [2] - 718:10, 747:18
**room** [9] - 759:1, 768:15, 778:17, 781:2, 781:18, 788:7, 789:15, 790:24, 791:9
**round** [2] - 617:8, 684:4
**routine** [1] - 605:23
**row** [1] - 652:7
**rule** [9] - 707:1, 709:18, 712:19, 712:20, 736:8, 750:18, 765:23, 766:5, 792:1
**ruled** [4] - 712:4, 725:4, 791:20, 791:25
**rules** [2] - 765:25, 782:23
**ruling** [3] - 661:2, 666:4, 725:4
**running** [1] - 651:9

**S**

**SAM's** [8] - 793:8, 793:11, 793:14, 793:15, 793:17, 793:21, 793:23, 794:5
**Santaria** [2] - 601:10, 601:16
**Santoro** [2] - 666:6, 666:7
**sat** [1] - 756:1
**satisfactory** [1] - 654:24
**satisfy** [1] - 716:19
**saw** [11] - 642:15, 649:2, 651:23, 677:25, 706:20, 718:12, 770:12,

770:14, 770:17, 775:8
**scale** [5] - 607:21, 610:13, 610:14, 610:15, 714:11
**scales** [1] - 749:6
**scar** [1] - 775:12
**scheduled** [1] - 792:24
**school** [3] - 721:19, 773:12, 773:22
**schools** [1] - 644:17
**screaming** [2] - 707:14, 716:18
**screen** [2] - 721:23, 721:25
**seat** [1] - 599:9
**seated** [14] - 600:7, 624:17, 627:19, 646:13, 648:18, 668:7, 675:2, 698:3, 698:6, 726:6, 739:2, 763:7, 771:9, 777:9
**seats** [1] - 722:14
**second** [29] - 603:12, 603:14, 604:9, 606:23, 606:24, 607:2, 607:8, 607:24, 611:20, 617:2, 619:7, 631:13, 633:6, 639:3, 639:19, 653:6, 653:18, 655:13, 679:9, 690:5, 730:9, 730:16, 741:14, 744:20, 748:14, 753:15, 757:24, 758:5, 768:20
**Second** [1] - 614:13
**secretary** [3] - 628:11, 628:24, 739:16
**secure** [1] - 615:6
**security** [1] - 773:7
**see** [35] - 601:2, 601:19, 614:18, 641:14, 647:10, 649:10, 651:5, 660:9, 663:7, 669:1, 676:8, 676:12, 681:13, 684:6, 688:2, 714:23, 716:18, 716:20, 725:5, 728:21, 728:22, 740:10, 743:17, 743:18, 746:7, 750:5, 759:19, 767:23, 768:20, 775:9, 779:25, 790:9, 791:1, 791:10
**seeing** [3] - 652:7, 706:25, 772:2
**seem** [5] - 612:11, 612:18, 665:24, 682:18, 789:1
**select** [1] - 602:19
**selection** [1] - 712:7
**self** [2] - 668:20, 772:16
**self-employed** [2] - 668:20, 772:16
**sell** [2] - 720:4, 720:6, 721:16
**senior** [2] - 647:11, 647:21
**sense** [6] - 608:14, 667:20, 695:11, 695:24, 721:10, 790:3
**sentence** [91] - 606:2, 606:9, 606:13, 606:20, 607:3, 607:22, 608:20, 608:23, 611:16, 615:17, 615:25, 616:3, 616:4, 616:6, 616:11, 616:12, 616:14, 618:2, 618:4, 618:15, 631:14, 631:15, 637:17, 639:7, 646:4, 653:21, 653:25, 656:20, 662:23, 679:11, 679:13, 679:15, 679:17, 679:19, 680:1, 680:12, 683:6, 687:21, 687:22, 688:7, 688:9, 688:10, 688:19, 688:20, 692:8, 692:11, 692:16, 692:21, 692:24, 693:3, 693:17, 712:1, 713:2, 714:8, 732:2, 733:22, 734:15, 735:13, 736:23, 737:4, 737:9, 737:20, 737:25, 738:2, 738:9, 740:16, 742:14, 742:19, 744:8, 745:6, 748:8, 748:21,

748:22, 749:19, 749:24, 750:2, 750:3, 750:14, 750:24, 753:23, 758:9, 759:4, 759:5, 759:13, 760:3, 769:15
**sentences** [2] - 606:18, 679:11
**sentencing** [1] - 617:24
**separate** [4] - 617:25, 619:3, 619:4, 712:2
**separately** [1] - 660:4
**September** [1] - 756:1
**series** [2] - 659:6, 773:18
**serious** [12] - 634:17, 651:25, 653:16, 669:3, 684:3, 708:25, 723:20, 758:6, 775:4, 782:22, 783:1
**seriously** [4] - 668:1, 709:4, 718:10, 723:11
**serve** [5] - 621:18, 621:24, 669:7, 674:12, 717:11
**served** [13] - 670:2, 670:9, 670:15, 670:16, 674:11, 674:14, 676:19, 719:11, 724:20, 727:21, 727:24, 773:25, 774:2
**serves** [1] - 788:10
**service** [6] - 626:11, 646:25, 670:19, 674:5, 674:15, 723:22
**Service** [3] - 625:3, 625:16, 625:24
**serving** [31] - 606:2, 606:9, 606:20, 611:16, 619:3, 639:6, 639:13, 646:4, 662:23, 669:4, 712:1, 713:1, 718:8, 733:22, 734:7, 738:2, 744:8, 745:6, 748:21, 750:24, 769:15, 777:24, 777:25, 778:20, 780:15, 781:1, 781:12, 781:23, 782:1, 788:17
**session** [1] - 792:11
**set** [3] - 608:4, 620:13, 726:3
**seven** [2] - 739:20, 740:4, 740:5, 784:23, 785:1, 786:16
**several** [4] - 663:2, 663:9, 665:3, 776:25
**severe** [9] - 603:20, 730:22, 731:3, 736:5,    :2 , 750:2, 758:17,    :2 , 759:4
**severely** [1] - 615:6
**shaking** [1] - 753:13
**shall** [1] - 622:11
**share** [1] - 732:21
**sheet** [2] - 670:3, 670:5
**shifter** [1] - 617:1
**shifting** [3] - 616:25, 617:8, 684:3
**shifts** [2] - 619:15, 631:6
**shoehorn** [1] - 666:14
**shooting** [2] - 658:5, 778:15
**shop** [2] - 722:18
**shops** [2] - 722:13, 722:16
**short** [3] - 773:11, 783:12, 783:16
**shot** [1] - 655:7
**show** [6] - 619:16, 707:2, 722:2, 758:16, 760:22, 792:24
**showed** [6] - 736:25, 737:6, 737:11, 737:22, 738:2, 738:11
**shown** [1] - 615:8
**shows** [1] - 710:23

**sick** [4] - 706:21, 708:10, 708:23, 709:14
**Side** [2] - 684:1, 695:9
**side** [10] - 607:21, 610:13, 610:14, 610:15, 683:22, 683:24, 684:6, 689:3, 761:17, 787:24
**sidebar** [7] - 611:9, 613:21, 761:8, 767:19, 775:13, 778:25, 779:11
**Sidebar** [10] - 611:11, 616:23, 635:10, 638:1, 658:1, 747:11, 761:12, 767:20, 775:14, 779:13
**sides** [2] - 703:2, 792:17
**sign** [2] - 790:23
**significant** [2] - 683:17, 704:1
**similar** [3] - 711:23, 748:10, 749:4
**simply** [3] - 599:20, 789:1, 790:10
**sincerely** [2] - 715:18, 736:19
**single** [11] - 636:1, 639:2, 659:17, 665:2, 665:21, 666:12, 710:19, 711:10, 711:21, 718:6, 741:23
**sisters** [3] - 629:12, 629:23, 630:2
**sit** [14] - 611:14, 618:24, 622:24, 633:9, 642:5, 660:24, 665:14, 670:4, 689:14, 756:3, 768:4, 775:23, 776:1, 776:24
**sitting** [11] - 605:2, 614:19, 642:4, 643:13, 747:23, 762:1, 770:12, 775:19, 776:18, 778:14, 789:19
**situation** [27] - 607:3, 607:22, 615:16, 616:6, 618:13, 634:17, 654:12, 662:7, 663:13, 667:17, 682:10, 697:7, 697:9, 708:14, 708:15, 709:7, 721:6, 721:7, 722:3, 734:18, 734:21, 743:25, 744:10, 748:8, 748:9, 751:5, 756:24
**situations** [1] - 634:19
**six** [5] - 669:7, 669:16, 732:9, 783:13, 785:3
**six-foot** [1] - 783:13
**sixty** [1] - 644:25
**sixty-eight** [1] - 644:25
**sizable** [2] - 702:7, 702:22
**size** [1] - 702:23
**slap** [1] - 724:21
**slightest** [1] - 711:5
**slippery** [4] - 612:23, 613:14, 638:10, 642:20
**slope** [4] - 612:23, 613:14, 638:10, 642:20
**small** [7] - 599:5, 600:22, 600:23, 601:5, 699:8, 739:23, 740:8
**smiling** [3] - 651:8, 719:20
**soccer** [1] - 651:24
**social** [1] - 623:12
**society** [5] - 620:20, 747:15, 749:8, 749:20, 765:25
**sole** [4] - 660:12, 665:21, 711:10, 757:18
**solely** [2] - 672:21, 702:16
**solicit** [1] - 722:19
**solicitation** [3] - 658:13, 658:15, 666:8
**solicitations** [1] - 660:18

**solitary** [1] - 665:21
**someone** [23] - 609:3, 610:19, 633:18, 635:19, 645:15, 655:15, 656:14, 664:1, 667:15, 682:2, 682:14, 693:12, 712:23, 714:18, 714:23, 715:14, 732:3, 743:10, 760:21, 760:22, 766:1, 782:21, 784:12
**sometimes** [3] - 610:4, 710:24, 735:16
**somewhat** [5] - 619:18, 651:4, 667:11, 667:12, 774:25
**soon** [2] - 790:19, 791:6
**sorry** [11] - 635:17, 640:4, 641:15, 654:7, 665:6, 691:6, 692:17, 715:9, 734:8, 737:2, 774:11
**sort** [9] - 601:21, 655:16, 663:16, 666:15, 706:11, 719:22, 761:21, 764:12, 776:23
**sought** [5] - 638:6, 711:1, 737:11, 737:22, 748:16
**sounded** [1] - 767:18
**sounds** [4] - 672:16, 702:21, 710:22, 715:23
**source** [1] - 782:11
**span** [1] - 773:12
**speaking** [1] - 706:23
**special** [1] - 703:3
**specific** [11] - 612:12, 612:22, 614:2, 620:25, 643:19, 643:21, 643:22, 644:18, 659:11, 710:24, 781:4
**specifically** [6] - 621:19, 644:13, 752:16, 753:11, 784:5, 787:7
**spend** [1] - 640:18
**spent** [2] - 663:17, 702:3
**spiritual** [1] - 643:5
**sports** [2] - 649:11, 689:10
**spreadsheets** [1] - 772:13
**STAFFORD** [1] - 597:18
**stage** [1] - 612:10
**stake** [3] - 644:18, 659:24, 660:6
**stake-out** [3] - 644:18, 659:24, 660:6
**stakeout** [5] - 613:18, 614:2, 710:22, 711:2, 711:4
**stamp** [1] - 670:14
**stand** [4] - 635:23, 660:11, 660:19, 688:22
**standard** [1] - 689:19
**standing** [2] - 627:6, 725:4
**stands** [1] - 632:5
**staples** [1] - 649:6
**start** [8] - 619:14, 659:23, 684:16, 684:17, 720:11, 768:8, 773:21
**started** [1] - 722:17
**starts** [5] - 617:5, 619:13, 659:24, 684:8, 684:9
**state** [16] - 623:13, 626:12, 647:15, 665:4, 670:2, 670:19, 674:5, 674:13, 676:20, 709:3, 724:12, 727:18, 727:25, 728:10, 754:10, 756:1
**State** [2] - 647:16, 723:13
**statement** [6] - 621:25, 633:6, 662:7, 718:20, 782:9, 783:7
**statements** [2] - 633:1, 667:14

**Staten** [4] - 670:7, 670:8, 740:8
**STATES** [3] - 597:1, 597:3, 597:10
**states** [3] - 622:10, 623:22, 712:16
**States** [5] - 597:13, 598:6, 702:14, 727:15, 754:11
**stating** [3] - 643:11, 715:8, 732:1
**status** [1] - 598:11
**statute** [1] - 622:10
**statutory** [2] - 622:15, 712:6
**staunch** [1] - 644:2
**stay** [1] - 735:19
**stenography** [1] - 597:25
**step** [2] - 602:18, 705:20
**STEPHEN** [1] - 597:14
**stereos** [1] - 722:13
**sticking** [1] - 775:8
**still** [31] - 599:23, 600:10, 606:3, 606:12, 608:13, 616:5, 616:25, 622:22, 627:23, 627:24, 646:18, 648:23, 651:13, 651:15, 668:13, 670:4, 670:14, 675:7, 695:23, 698:11, 707:15, 714:15, 726:11, 739:7, 754:19, 763:11, 767:7, 775:19, 776:18, 791:12, 791:18
**stocky** [1] - 783:14
**stolen** [2] - 626:15, 775:3
**stomach** [6] - 706:21, 706:22, 708:10, 708:22, 708:24, 708:25, 709:15, 717:8
**stop** [2] - 607:17, 720:13
**stopped** [1] - 720:2
**story** [2] - 698:17, 698:23
**strengthen** [1] - 764:8
**stricken** [3] - 697:18, 792:14, 792:20
**strict** [1] - 696:25
**strictly** [2] - 731:22, 746:11
**stridency** [1] - 613:11
**strike** [13] - 618:22, 627:15, 648:10, 664:23, 673:24, 697:15, 753:6, 762:25, 771:1, 786:2, 786:20, 788:8, 792:16
**striking** [2] - 766:15, 788:21
**strong** [1] - 762:2
**stronger** [2] - 681:14, 684:6
**strongly** [5] - 616:2, 616:8, 731:17, 732:8
**struck** [9] - 599:15, 646:5, 648:14, 674:1, 763:4, 766:22, 771:5, 777:5, 786:6
**structure** [1] - 703:17
**struggle** [2] - 614:4, 642:14
**studies** [1] - 709:8
**stuff** [12] - 605:25, 655:6, 720:6, 771:19, 777:24, 778:5, 778:10, 778:18, 778:22, 781:13, 784:4, 784:21
**stunned** [1] - 620:2
**subject** [4] - 715:2, 717:16, 733:6, 761:18
**submit** [1] - 642:10
**submits** [3] - 621:23, 622:5, 644:10
**submitting** [1] - 604:6
**subsequent** [2] - 677:25, 721:2
**substance** [1] - 629:11
**substantial** [1] - 669:13

**substantially** [16] - 621:13, 622:14, 642:3, 642:10, 642:12, 643:1, 644:1, 644:6, 645:25, 659:5, 666:18, 666:19, 667:10, 668:2, 708:20, 719:4

**sudden** [1] - 762:6

**sufficient** [5] - 653:14, 665:1, 687:15, 695:4, 713:19

**sufficiently** [1] - 735:13

**suggest** [1] - 766:20

**suggested** [2] - 621:12, 776:22

**suggesting** [4] - 643:10, 725:1, 768:14, 787:19

**suggestion** [3] - 643:15, 768:12, 786:7

**suggests** [3] - 762:11, 786:13, 790:22

**suicide** [1] - 681:25

**Sulzer** [1] - 597:20

**summary** [1] - 794:3

**summer** [1] - 670:2

**superiors** [1] - 620:21

**support** [3] - 711:12, 716:14, 760:20

**supported** [3] - 717:3, 717:5, 761:1

**supports** [1] - 761:24

**suppose** [1] - 681:25

**supposed** [4] - 642:14, 642:15, 708:25, 718:12

**Supreme** [3] - 614:13, 740:11, 753:7

**surely** [1] - 686:18

**surmise** [1] - 672:11

**surmised** [1] - 782:5

**suspenders** [1] - 691:7

**sway** [1] - 734:12

**sympathy** [2] - 672:19, 702:13

**syndicate** [2] - 671:15, 672:13

**system** [7] - 615:3, 615:9, 702:1, 721:23, 721:24, 721:25, 769:1

---

# T

**table** [3] - 631:14, 708:23, 741:15

**taint** [1] - 780:17

**tainted** [2] - 786:21, 788:22

**talkative** [1] - 706:7

**talks** [1] - 660:25

**tall** [1] - 783:12

**target** [1] - 662:19

**tARYN** [1] - 597:13

**Taryn** [1] - 598:5

**tat** [1] - 697:3

**taxes** [3] - 601:4, 765:21, 765:22

**taxpayer** [1] - 747:14

**taxpayers** [1] - 749:18

**teachers** [1] - 773:22

**team** [1] - 762:5

**technical** [1] - 626:4

**telephone** [2] - 755:8, 755:14

**ten** [5] - 739:1, 764:21, 772:6, 772:21, 789:19

**tend** [1] - 633:2

**term** [4] - 609:18, 612:1, 652:16, 788:17

**terms** [8] - 605:5, 610:15, 613:13, 625:11, 665:16, 677:24, 695:13, 784:11

**terrible** [1] - 610:20

**test** [3] - 623:18, 644:6

**testify** [9] - 603:1, 631:4, 652:22, 678:25, 679:1, 741:6, 741:7, 757:17, 757:18

**testifying** [1] - 741:9

**testimony** [1] - 656:19

**THE** [648] - 597:9, 600:9, 600:14, 600:17, 600:19, 600:23, 600:25, 601:4, 601:7, 601:13, 601:17, 601:22, 602:8, 603:5, 604:11, 604:20, 604:25, 605:7, 605:12, 605:19, 605:21, 606:5, 606:7, 606:11, 606:14, 606:16, 606:22, 606:25, 607:5, 607:7, 607:11, 607:14, 607:17, 607:23, 608:3, 608:10, 608:15, 608:17, 609:5, 609:11, 609:23, 610:3, 610:10, 610:17, 610:22, 615:12, 615:18, 615:23, 616:1, 616:8, 616:16, 616:18, 616:20, 618:5, 618:9, 618:16, 623:6, 623:19, 623:22, 624:19, 624:23, 625:1, 625:4, 625:7, 625:9, 625:13, 625:16, 625:18, 625:22, 625:25, 626:7, 626:13, 626:16, 626:18, 626:22, 626:24, 627:20, 627:22, 627:25, 628:4, 628:7, 628:10, 628:13, 628:16, 628:18, 628:20, 628:22, 628:25, 629:2, 629:5, 629:7, 629:13, 629:16, 629:18, 630:1, 630:7, 630:10, 630:16, 630:23, 631:2, 631:7, 631:10, 631:20, 631:25, 632:9, 632:14, 633:3, 633:7, 633:14, 633:20, 633:24, 634:8, 634:18, 634:23, 635:1, 635:5, 637:7, 637:9, 637:12, 637:19, 637:22, 638:18, 638:20, 638:24, 639:13, 639:16, 639:20, 639:22, 640:2, 640:8, 640:11, 640:15, 641:1, 641:4, 641:7, 641:11, 641:22, 646:11, 646:14, 646:16, 646:19, 646:23, 647:3, 647:6, 647:8, 647:12, 647:15, 647:18, 647:20, 647:22, 647:24, 648:8, 648:19, 648:22, 649:2, 649:5, 649:9, 649:12, 649:15, 649:17, 649:21, 649:24, 650:3, 650:6, 650:10, 650:14, 650:17, 650:24, 651:3, 651:7, 651:9, 651:15, 651:17, 651:20, 651:23, 652:3, 652:9, 652:19, 654:9, 654:13, 654:17, 655:1, 655:6, 655:11, 655:18, 655:22, 656:2, 656:7, 656:24, 657:8, 657:11, 657:16, 657:20, 657:23, 662:4, 662:9, 662:14, 663:1, 663:7, 663:12, 663:20, 663:23, 664:6, 664:8, 664:14, 664:20, 668:8, 668:11, 668:17, 668:22, 668:25, 669:6, 669:11, 669:15, 669:18, 669:21, 669:24, 670:1, 670:7, 670:10, 670:12, 670:14, 670:17, 670:20, 670:23, 671:3, 671:5, 671:8, 671:10, 671:16, 671:18, 671:22, 672:4, 672:9, 672:16, 672:25, 673:2, 673:7, 673:9, 673:14, 673:20, 674:8, 674:22, 675:4, 675:6, 675:9, 675:13, 675:17, 675:20, 675:23, 676:1, 676:3, 676:6, 676:10, 676:15, 676:18, 676:22, 677:1, 677:19, 678:7, 678:15, 678:19, 679:4, 679:6, 679:21, 680:3, 680:7, 680:15, 680:23, 681:1, 681:5, 681:9, 681:13, 681:18, 681:21, 681:24, 682:3, 682:5, 682:8, 682:11, 682:16, 682:23, 683:2, 683:11, 683:21, 686:14, 686:16, 686:18, 686:21, 686:25, 687:5, 687:9, 687:17, 687:24, 688:2, 688:11, 688:15, 688:22, 691:3, 691:22, 692:3, 692:17, 693:2, 693:8, 693:16, 693:19, 693:21, 693:23, 694:5, 694:7, 694:12, 694:25, 695:6, 696:4, 696:12, 696:14, 696:17, 696:21, 696:23, 697:8, 697:12, 698:5, 698:8, 698:10, 698:15, 698:18, 698:21, 699:4, 699:6, 699:8, 699:11, 699:14, 699:20, 700:1, 700:16, 700:22, 701:4, 701:8, 701:12, 701:14, 701:17, 701:20, 701:23, 702:2, 702:5, 702:10, 702:20, 703:10, 703:15, 704:9, 704:12, 704:19, 705:3, 705:11, 706:1, 706:6, 706:13, 706:16, 706:19, 707:10, 707:17, 708:5, 712:22, 713:9, 713:17, 714:1, 714:3, 714:10, 714:20, 715:8, 715:20, 715:23, 716:2, 716:7, 716:13, 716:16, 716:23, 717:2, 717:5, 717:9, 717:13, 719:23, 719:25, 720:5, 720:9, 720:15, 720:17, 720:20, 720:22, 720:24, 721:4, 721:9, 721:14, 721:18, 721:22, 721:25, 722:6, 722:8, 722:12, 722:17, 722:20, 722:23, 723:2, 723:5, 726:8, 726:10, 726:13, 726:18, 726:22, 727:1, 727:4, 727:7, 727:10, 727:12, 727:14, 727:17, 727:19, 727:23, 728:1, 728:6, 728:9, 728:12, 728:15, 728:19, 728:21, 729:2, 729:9, 729:15, 729:21, 729:24, 730:5, 731:14, 731:21, 731:25, 732:6, 732:14, 732:20, 732:24, 733:3, 733:7, 733:9, 733:14, 733:19, 734:2, 734:4, 734:6, 734:11, 734:16, 734:20, 734:23, 735:1, 735:4, 735:6, 735:9, 735:19, 735:24, 736:4, 736:11, 736:14, 736:16, 736:18, 736:21, 737:1, 737:7, 737:12, 737:15, 737:18, 737:23, 738:5, 738:7, 738:13, 738:19, 739:4, 739:6, 739:9, 739:13, 739:18, 739:21, 739:25, 740:2, 740:5, 740:7, 740:12, 740:15, 740:19, 742:7, 743:3, 743:8, 743:13, 743:17, 743:23, 744:1, 744:5, 744:11, 744:17, 745:10, 745:12, 745:16, 745:18, 745:20, 746:3, 746:6, 746:12, 747:7, 749:25, 750:4, 750:9, 750:11, 750:15, 750:17, 750:19, 751:3, 751:6, 751:9, 751:12, 751:14, 751:16, 751:24, 752:2, 752:8, 752:14, 752:20, 753:4, 754:18, 754:23, 755:1, 755:4, 755:6, 755:8, 755:11, 755:14, 755:18, 755:21, 755:24, 756:2, 756:5, 756:9, 756:11, 756:14, 756:20, 756:23, 757:2, 757:21, 759:22, 760:4, 760:15, 761:4, 762:21, 762:23, 763:8, 763:10, 763:14, 763:20, 763:23, 764:2, 764:5, 764:7, 764:9, 764:14, 764:17, 764:19, 764:21,

764:23, 764:25, 765:2, 765:4, 765:7,
765:10, 765:18, 766:4, 766:12, 767:6,
767:11, 767:13, 767:17, 769:14,
769:18, 769:22, 770:2, 770:8, 770:15,
770:18, 770:20, 770:24, 771:10,
771:13, 771:17, 771:23, 772:1, 772:7,
772:10, 772:13, 772:17, 772:19,
772:22, 773:1, 773:3, 773:14, 774:1,
774:9, 774:12, 774:17, 774:22, 774:25,
775:8, 776:10, 777:11, 777:13, 777:18,
777:21, 778:2, 778:5, 778:9, 778:12,
778:14, 778:17, 778:21, 778:24, 779:3,
779:8, 779:10, 781:3, 781:6, 781:8,
781:10, 781:16, 781:20, 781:22,
781:25, 782:2, 782:7, 782:10, 782:13,
783:8, 783:10, 783:13, 783:15, 783:19,
783:22, 784:1, 784:7, 784:14, 784:17,
784:25, 785:3, 785:12, 792:25

**The court** [886] - 598:2, 598:9, 598:16,
599:3, 599:11, 599:14, 600:1, 600:4,
600:7, 600:10, 600:15, 600:18, 600:20,
600:24, 601:2, 601:6, 601:8, 601:15,
601:19, 601:24, 602:9, 603:7, 604:12,
604:21, 605:1, 605:9, 605:14, 605:20,
606:1, 606:6, 606:8, 606:12, 606:15,
606:20, 606:24, 607:1, 607:6, 607:10,
607:12, 607:16, 607:18, 608:1, 608:9,
608:11, 608:16, 608:18, 609:8, 609:17,
609:24, 610:7, 610:13, 610:19, 611:7,
611:10, 611:12, 612:4, 612:21, 613:9,
613:22, 614:5, 614:9, 614:10, 614:20,
614:23, 615:16, 615:19, 615:24, 616:2,
616:11, 616:17, 616:19, 616:21,
617:10, 617:14, 617:16, 617:19,
617:21, 618:7, 618:13, 618:19, 618:21,
620:14, 621:11, 621:25, 622:22,
622:24, 623:7, 623:21, 623:24, 624:1,
624:6, 624:12, 624:14, 624:17, 624:20,
624:24, 625:2, 625:5, 625:8, 625:10,
625:14, 625:17, 625:21, 625:23, 626:4,
626:9, 626:14, 626:17, 626:20, 626:23,
626:25, 627:4, 627:6, 627:10, 627:13,
627:15, 627:19, 627:21, 627:23, 628:1,
628:5, 628:8, 628:11, 628:14, 628:17,
628:19, 628:21, 628:23, 629:1, 629:3,
629:6, 629:8, 629:14, 629:17, 629:21,
630:5, 630:9, 630:11, 630:17, 630:24,
631:3, 631:8, 631:11, 631:21, 632:1,
632:10, 633:1, 633:4, 633:13, 633:16,
633:22, 634:6, 634:9, 634:21, 634:25,
635:3, 635:7, 635:8, 635:11, 636:7,
636:14, 637:2, 637:8, 637:10, 637:14,
637:21, 637:23, 638:2, 638:14, 638:16,
638:19, 638:21, 638:25, 639:15,
639:18, 639:21, 639:25, 640:6, 640:10,
640:12, 640:24, 641:3, 641:5, 641:9,
641:12, 641:14, 641:16, 641:19,
641:24, 644:21, 644:23, 645:9, 646:7,
646:10, 646:13, 646:15, 646:17,
646:20, 646:24, 647:4, 647:7, 647:10,
647:13, 647:17, 647:19, 647:21,
647:23, 648:4, 648:6, 648:10, 648:14,

648:18, 648:20, 640:23, 649:4, 649:8,
649:10, 649:13, 649:16, 649:18,
649:22, 650:1, 650:4, 650:7, 650:11,
650:15, 650:19, 650:25, 651:5, 651:8,
651:13, 651:16, 651:18, 651:22, 652:1,
652:4, 652:12, 652:20, 654:11, 654:14,
654:18, 655:3, 655:10, 655:12, 655:20,
655:23, 656:5, 656:9, 657:6, 657:10,
657:14, 657:17, 657:21, 657:24, 658:2,
658:20, 658:24, 659:1, 659:15, 659:25,
660:16, 660:24, 661:4, 661:9, 662:2,
662:5, 662:10, 662:20, 663:2, 663:9,
663:15, 663:22, 663:24, 664:7, 664:10,
664:15, 664:18, 664:22, 665:9, 665:12,
666:3, 666:23, 667:6, 668:7, 668:9,
668:12, 668:18, 668:23, 669:1, 669:7,
669:13, 669:17, 669:19, 669:22,
669:25, 670:6, 670:9, 670:11, 670:13,
670:16, 670:18, 670:21, 670:24, 671:4,
671:6, 671:9, 671:11, 671:17, 671:19,
671:24, 672:5, 672:10, 672:18, 673:1,
673:3, 673:8, 673:13, 673:17, 673:22,
674:1, 674:7, 674:9, 674:17, 674:21,
674:23, 675:2, 675:5, 675:7, 675:10,
675:14, 675:18, 675:21, 675:25, 676:2,
676:4, 676:8, 676:12, 676:16, 676:19,
676:23, 677:2, 678:4, 678:8, 678:16,
678:20, 679:5, 679:7, 679:22, 680:4,
680:8, 680:16, 680:24, 681:2, 681:8,
681:11, 681:15, 681:19, 681:23, 682:2,
682:4, 682:6, 682:9, 682:12, 682:18,
682:24, 683:3, 683:12, 683:22, 683:24,
684:18, 684:22, 685:16, 685:18,
685:20, 686:6, 686:10, 686:12, 686:15,
686:17, 686:19, 686:22, 687:1, 687:6,
687:10, 687:18, 687:25, 688:4, 688:13,
688:16, 688:23, 688:25, 689:4, 689:12,
689:15, 689:18, 689:20, 689:24, 690:2,
690:6, 690:15, 690:19, 690:22, 690:24,
691:4, 691:7, 691:9, 691:23, 692:4,
692:19, 693:6, 693:10, 693:18, 693:20,
693:22, 694:3, 694:6, 694:10, 694:13,
695:2, 695:7, 695:10, 696:3, 696:5,
696:13, 696:15, 696:19, 696:22, 697:6,
697:10, 697:13, 697:16, 697:18, 698:1,
698:3, 698:6, 698:9, 698:11, 698:17,
698:19, 698:22, 699:3, 699:5, 699:7,
699:9, 699:13, 699:16, 699:21, 700:2,
700:17, 701:2, 701:6, 701:10, 701:13,
701:16, 701:19, 701:21, 701:25, 702:3,
702:9, 702:12, 703:1, 703:2, 703:11,
703:16, 704:10, 704:13, 704:20, 705:4,
705:20, 706:2, 706:11, 706:14, 706:18,
707:6, 707:15, 707:23, 708:1, 708:6,
709:18, 710:6, 710:25, 711:12, 711:15,
711:19, 712:10, 712:12, 712:14,
712:23, 713:11, 713:18, 714:2, 714:7,
714:16, 715:1, 715:12, 715:22, 715:24,
716:6, 716:11, 716:14, 716:17, 716:20,
717:1, 717:3, 717:7, 717:10, 717:21,
718:1, 718:3, 718:20, 718:22, 719:7,
719:13, 719:19, 719:24, 720:3, 720:7,

720:14, 720:16, 720:19, 720:21,
720:23, 721:1, 721:5, 721:12, 721:17,
721:21, 721:24, 722:5, 722:7, 722:10,
722:16, 722:19, 722:21, 722:25, 723:4,
723:6, 723:8, 724:6, 724:9, 724:14,
724:17, 724:22, 724:25, 725:3, 726:3,
726:6, 726:9, 726:11, 726:14, 726:19,
726:23, 727:2, 727:5, 727:9, 727:11,
727:13, 727:16, 727:18, 727:20,
727:24, 728:2, 728:7, 728:10, 728:13,
728:16, 728:20, 728:25, 729:3, 729:10,
729:16, 729:22, 729:25, 730:6, 731:15,
731:22, 732:1, 732:7, 732:18, 732:21,
732:25, 733:4, 733:8, 733:11, 733:16,
733:21, 734:3, 734:5, 734:9, 734:13,
734:17, 734:22, 734:24, 735:3, 735:5,
735:8, 735:10, 735:22, 735:25, 736:5,
736:12, 736:15, 736:17, 736:19,
736:22, 737:3, 737:8, 737:13, 737:16,
737:19, 737:24, 738:6, 738:8, 738:14,
738:16, 738:21, 739:2, 739:5, 739:7,
739:10, 739:14, 739:19, 739:22, 740:1,
740:3, 740:6, 740:10, 740:13, 740:16,
740:20, 742:8, 743:5, 743:9, 743:14,
743:19, 743:24, 744:2, 744:6, 744:14,
744:18, 745:11, 745:13, 745:17,
745:19, 745:21, 746:5, 746:7, 747:1,
747:8, 747:10, 747:12, 747:16, 749:11,
749:14, 749:16, 750:1, 750:7, 750:10,
750:12, 750:16, 750:18, 750:20, 751:4,
751:8, 751:10, 751:13, 751:15, 751:17,
752:1, 752:4, 752:9, 752:16, 752:23,
753:1, 754:8, 754:15, 754:17, 754:19,
754:24, 755:2, 755:5, 755:7, 755:10,
755:12, 755:16, 755:19, 755:22,
755:25, 756:3, 756:7, 756:10, 756:13,
756:15, 756:22, 757:1, 757:5, 757:22,
759:25, 760:8, 760:18, 761:10, 761:13,
761:19, 762:3, 762:7, 762:9, 762:12,
762:14, 762:16, 762:22, 762:25, 763:3,
763:7, 763:9, 763:11, 763:15, 763:21,
763:25, 764:4, 764:6, 764:8, 764:11,
764:15, 764:18, 764:20, 764:22,
764:24, 765:1, 765:3, 765:5, 765:8,
765:12, 766:1, 766:7, 766:10, 766:14,
766:17, 766:22, 767:3, 767:5, 767:7,
767:12, 767:16, 767:19, 767:21, 768:7,
768:17, 768:25, 769:5, 769:10, 769:12,
769:17, 769:21, 769:24, 770:5, 770:14,
770:17, 770:19, 770:21, 771:1, 771:2,
771:5, 771:7, 771:9, 771:11, 771:14,
771:21, 771:24, 772:4, 772:8, 772:11,
772:16, 772:18, 772:20, 772:24, 773:2,
773:10, 773:25, 774:4, 774:11, 774:16,
774:19, 774:24, 775:7, 775:13, 775:21,
776:2, 776:4, 776:7, 776:11, 776:13,
777:3, 777:5, 777:9, 777:12, 777:14,
777:19, 777:25, 778:4, 778:7, 778:11,
778:13, 778:16, 778:19, 778:23, 779:1,
779:6, 779:9, 779:11, 779:21, 780:22,
780:24, 781:4, 781:7, 781:9, 781:15,
781:17, 781:21, 781:24, 782:1, 782:5,

782:8, 782:11, 782:14, 783:9, 783:12, 783:14, 783:17, 783:20, 783:23, 784:5, 784:11, 784:15, 784:23, 785:1, 785:5, 785:8, 785:10, 785:13, 786:1, 786:6, 786:8, 786:12, 786:14, 786:18, 786:19, 787:1, 787:5, 787:11, 787:14, 787:17, 787:22, 788:2, 788:20, 788:23, 789:6, 789:10, 789:14, 789:18, 789:21, 790:4, 790:6, 790:10, 790:16, 790:19, 791:1, 791:5, 791:12, 791:20, 791:22, 791:25, 792:3, 792:5, 792:8, 792:11, 792:16, 792:20, 793:1, 793:4, 793:13, 794:9, 794:10, 794:13, 794:15

**theme** [1] - 643:14

**theory** [2] - 677:20, 768:1

**therefore** [4] - 618:3, 632:12, 668:3, 678:23

**they've** [3] - 709:11, 778:10, 791:13

**thin** [1] - 783:14

**thinking** [11] - 636:4, 644:18, 667:20, 677:11, 677:21, 677:22, 677:24, 678:2, 686:3, 713:8, 761:14

**thinks** [2] - 710:1, 710:3

**third** [1] - 774:14

**thirty** [2] - 625:7, 625:8

**thorough** [1] - 718:13

**thoughtful** [4] - 613:2, 622:8, 709:12, 719:3

**thoughts** [4] - 672:11, 696:23, 701:2, 708:2

**threatened** [1] - 664:11

**threats** [1] - 666:11

**three** [17] - 598:11, 622:9, 629:12, 630:19, 638:8, 652:25, 668:20, 672:6, 676:1, 676:10, 698:25, 729:10, 740:24, 755:11, 757:11, 763:19, 773:20

**three-and-a-half** [1] - 676:10

**three-quarters** [1] - 763:19

**throughout** [3] - 620:11, 700:13, 727:14

**Thursday** [5] - 791:5, 792:9, 792:24, 792:25, 793:1

**ticket** [1] - 724:21

**ties** [1] - 698:21

**tip** [1] - 749:5

**tit** [1] - 697:2

**today** [15] - 622:10, 624:25, 627:1, 668:15, 675:11, 698:13, 726:15, 739:11, 771:18, 773:12, 779:24, 780:4, 781:1, 781:18, 786:10

**tomorrow** [1] - 792:8

**tonight** [1] - 599:19

**took** [4] - 620:20, 633:25, 635:23, 779:23

**tooth** [2] - 634:1

**top** [1] - 610:11

**topic** [1] - 602:5

**topics** [5] - 778:9, 784:11, 784:13, 784:15

**totality** [5] - 642:1, 644:10, 665:10, 708:18, 754:4

**totally** [3] - 634:12, 644:16, 709:21

**touch** [2] - 721:23, 721:25

**touched** [1] - 748:5

**tough** [2] - 614:6, 655:1

**towards** [3] - 621:4, 714:12, 747:25

**trafficking** [3] - 629:22, 702:8, 721:8

**trained** [1] - 600:24

**training** [1] - 626:2

**transcript** [1] - 597:25

**TRANSCRIPT** [1] - 597:9

**transportation** [2] - 699:2, 699:3

**Treasury** [1] - 773:2

**treated** [1] - 629:11

**treating** [4] - 763:24, 763:25, 764:7, 764:11

**trending** [1] - 613:18

**trial** [56] - 602:21, 603:13, 603:14, 604:10, 605:3, 630:14, 630:18, 631:13, 639:16, 639:19, 639:23, 640:1, 640:3, 647:2, 647:7, 650:12, 652:13, 652:15, 653:6, 653:7, 653:18, 672:15, 672:22, 676:20, 678:21, 679:9, 699:9, 699:17, 699:19, 700:4, 700:13, 702:16, 703:8, 703:17, 727:24, 728:2, 728:10, 728:17, 729:4, 729:17, 730:9, 730:16, 736:25, 737:5, 737:10, 737:21, 738:1, 738:10, 740:22, 741:2, 741:14, 757:25, 776:24, 782:24, 783:2

**trials** [1] - 620:13

**tried** [6] - 617:16, 630:18, 645:21, 678:5, 740:21, 773:23

**troubled** [2] - 616:25, 664:1

**troubling** [3] - 662:6, 662:10, 719:1

**true** [3] - 624:9, 719:16, 792:2

**truly** [1] - 635:25

**Trustee** [1] - 598:19

**trustee** [1] - 598:25

**trustees** [1] - 598:23

**try** [6] - 645:9, 666:14, 720:11, 782:15, 790:19, 792:25

**trying** [9] - 667:17, 667:19, 667:20, 689:21, 709:17, 734:8, 761:20, 775:5, 775:10

**Tucson** [1] - 662:3, 662:5

**turn** [1] - 645:22

**turning** [1] - 723:18

**TV** [1] - 774:13

**tweak** [1] - 614:18

**twelve** [1] - 759:1

**twenty** [3] - 647:24, 649:14, 660:25

**twenty-five** [1] - 647:24, 660:25

**twenty-two** [1] - 649:14

**twice** [4] - 607:10, 608:8, 611:2, 619:23

**Two** [1] - 766:19

**two** [37] - 602:4, 602:12, 602:17, 613:1, 614:23, 622:25, 630:13, 630:21, 631:14, 633:1, 637:2, 649:14, 653:3, 672:8, 678:14, 679:10, 700:9, 701:20, 703:18, 707:12, 725:5, 729:13, 730:11, 736:9, 740:22, 741:1, 741:14, 757:6,

757:13, 758:1, 765:11, 786:21, 788:14, 788:20, 789:14, 791:18, 793:6

**type** [8] - 645:17, 717:12, 734:18, 755:13, 760:2, 760:6, 772:11, 782:16

**types** [4] - 602:11, 636:5, 732:18, 732:21

**typographical** [1] - 710:10

# U

**U.S** [5] - 597:4, 597:15, 625:2, 702:18, 773:3

**ultimately** [2] - 659:4, 716:4

**unable** [7] - 733:10, 736:23, 737:4, 737:9, 737:20, 737:25, 738:9

**unanimous** [4] - 615:20, 631:8, 680:12, 731:16

**unanimously** [4] - 602:22, 652:17, 679:3, 741:23

**unaware** [1] - 786:24

**unbiased** [1] - 685:9

**uncharged** [1] - 665:23

**uncle** [2] - 755:17, 755:23

**uncomfortable** [1] - 708:14

**uncommon** [1] - 643:14

**under** [35] - 599:23, 600:10, 612:2, 618:25, 627:23, 627:24, 631:5, 634:25, 635:1, 636:3, 646:18, 648:24, 665:10, 666:4, 668:13, 675:7, 698:11, 715:13, 719:2, 726:11, 731:19, 732:14, 736:1, 739:8, 742:20, 753:19, 754:5, 754:11, 754:19, 763:11, 767:7, 775:6, 793:23, 794:11

**understood** [3] - 679:6, 680:15, 724:22

**unemployment** [1] - 669:23

**unequivocal** [1] - 621:22, 622:20

**unequivocally** [1] - 659:16

**unfavorable** [1] - 672:24

**unfortunate** [1] - 630:2

**unilateral** [1] - 793:18

**unintentional** [2] - 746:9, 747:21

**UNITED** [3] - 597:1, 597:3, 597:10

**United** [5] - 597:13, 598:6, 702:14, 727:14, 754:11

**unjustified** [2] - 695:14, 696:6

**unknown** [1] - 794:6

**unless** [5] - 616:13, 617:3, 631:16, 660:14, 730:1

**unlikely** [1] - 682:14

**unqualified** [1] - 709:21

**unrepairable** [1] - 714:5

**unresponsive** [1] - 667:12

**unusual** [2] - 669:3, 669:6

**unwilling** [1] - 708:16

**up** [62] - 611:15, 614:1, 614:7, 620:3, 624:3, 624:24, 627:17, 628:5, 630:4, 635:13, 636:4, 636:12, 644:3, 646:11, 646:24, 649:11, 659:13, 666:21, 669:16, 675:15, 686:6, 710:4, 713:10,

713:13, 713:15, 713:16, 714:22, 716:17, 718:1, 719:7, 720:23, 720:25, 721:16, 722:16, 731:24, 738:24, 739:14, 740:14, 747:13, 748:3, 749:1, 751:17, 754:9, 762:10, 763:5, 763:16, 767:14, 767:24, 771:7, 773:7, 773:23, 774:23, 775:2, 778:22, 779:15, 780:24, 790:16, 790:20, 791:1, 791:7, 792:24
**upbringing** [3] - 609:20, 610:23, 663:17

**Upstate** [3] - 719:25, 720:20, 720:21
**upstate** [1] - 721:12
**useful** [1] - 770:1
**uses** [1] - 764:12
**Uttecht** [1] - 753:8

## V

**vacuum** [2] - 608:11, 644:15
**valuable** [1] - 761:21
**value** [3] - 696:25, 760:23, 760:24
**values** [1] - 605:24
**variety** [1] - 784:8
**various** [4] - 622:9, 680:6, 740:7, 788:15
**vehicle** [1] - 626:15
**vehicles** [1] - 722:2
**venire** [1] - 789:22
**venue** [1] - 791:2
**verdict** [30] - 603:10, 604:15, 626:20, 626:21, 626:23, 631:8, 650:15, 650:16, 653:15, 653:16, 654:2, 676:23, 676:25, 679:7, 680:6, 680:12, 687:19, 705:5, 709:9, 728:2, 728:7, 728:13, 731:16, 742:9, 742:25, 747:23, 759:1, 759:17, 774:7
**versus** [1] - 618:25
**vicissitudes** [1] - 761:18
**victim** [3] - 656:23, 774:21, 775:4
**victims** [1] - 657:13
**video** [2] - 650:22, 651:1
**view** [37] - 601:23, 609:3, 611:22, 619:6, 622:1, 632:5, 633:9, 635:3, 635:16, 645:18, 656:11, 656:17, 660:9, 663:18, 667:4, 667:5, 669:13, 683:8, 685:3, 693:1, 701:25, 705:2, 708:21, 716:6, 731:17, 732:5, 732:10, 747:25, 749:22, 757:22, 760:19, 761:15, 761:20, 786:13, 786:23, 788:3, 793:22
**views** [36] - 601:24, 608:14, 614:10, 623:9, 630:12, 632:10, 643:2, 643:4, 644:7, 644:19, 652:4, 667:13, 677:3, 677:6, 677:10, 677:12, 677:14, 678:1, 678:2, 678:6, 688:18, 688:22, 692:6, 704:22, 715:25, 732:1, 736:22, 737:3, 737:8, 737:19, 737:24, 738:8, 740:14, 756:18, 759:9, 765:12
**VINCENT** [1] - 597:5
**Vincent** [1] - 672:20
**vintage** [1] - 629:14
**violating** [1] - 786:3

**violence** [8] - 615:25, 620:7, 620:10, 620:12, 620:17, 620:21, 661:1, 667:2
**violent** [2] - 609:20, 659:14
**virtue** [1] - 599:4
**visit** [1] - 793:6
**visiting** [1] - 793:3
**visitor** [1] - 793:23
**visits** [1] - 794:4
**visual** [1] - 700:25
**voice** [1] - 619:5
**voir** [1] - 645:1
**VOIR** [1] - 597:9
**vote** [32] - 615:17, 615:21, 616:7, 616:10, 618:14, 621:8, 621:10, 634:15, 634:21, 634:23, 637:5, 642:18, 662:12, 680:11, 688:16, 693:6, 693:25, 694:9, 694:25, 704:11, 710:18, 711:3, 714:17, 716:21, 749:3, 749:6, 749:13, 752:11, 753:18, 759:2, 759:13, 759:14
**voted** [1] - 752:10
**votes** [1] - 680:11
**voting** [4] - 637:12, 637:13, 637:14, 754:12
**vs** [2] - 753:8, 754:11

## W

**wait** [1] - 790:23
**waited** [1] - 770:11
**waiting** [2] - 781:18, 790:13
**walk** [1] - 790:9
**walks** [1] - 790:8
**wandering** [1] - 773:24
**wants** [2] - 642:22, 787:2
**Washington** [2] - 793:20, 794:5
**waste** [1] - 769:23
**watch** [1] - 686:22
**watched** [2] - 600:12, 624:21
**watching** [1] - 687:2
**wave** [1] - 641:14
**ways** [2] - 625:17, 693:23
**weapons** [5] - 602:16, 630:20, 653:2, 672:8, 700:8, 729:12, 741:1, 757:13
**weather** [1] - 790:13
**week** [4] - 699:18, 756:7
**weekend** [1] - 651:10
**weeks** [5] - 669:8, 669:16, 699:9, 756:5, 776:25
**weigh** [8] - 610:7, 610:8, 621:15, 623:16, 633:15, 673:4, 704:5, 731:5
**weighed** [1] - 623:17
**weighing** [1] - 715:11
**weight** [4] - 680:5, 714:13, 714:14
**welcome** [2] - 697:13, 708:6
**whatnot** [3] - 657:1, 657:3, 657:13
**whatsoever** [1] - 652:21
**whew** [1] - 639:20
**whole** [9] - 608:3, 614:1, 660:13, 686:6, 708:14, 723:2, 765:6, 768:25, 790:8

**wife** [1] - 650:1
**wife's** [1] - 650:4
**Wikipedia** [3] - 767:24, 768:13, 768:20
**wile** [1] - 774:17
**willing** [3] - 743:16, 754:13, 788:23
**willingness** [1] - 622:3
**window** [2] - 674:10, 674:11
**wire** [2] - 775:5, 775:10
**wired** [3] - 620:6, 620:10, 620:17
**wish** [1] - 707:11
**wishes** [3] - 631:18, 680:5, 742:21
**withdraw** [2] - 617:13, 760:1
**withdrew** [2] - 690:1, 690:2
**witness** [5] - 635:22, 665:6, 737:11, 737:22, 774:21
**WITNESS** [1] - 623:22
**witnesses** [5] - 657:1, 658:15, 658:18, 664:12, 666:11
**woman** [1] - 701:19
**wonder** [1] - 617:4
**wondering** [1] - 686:3
**word** [3] - 658:15, 714:5, 774:15
**words** [15] - 602:20, 607:21, 611:19, 631:22, 643:24, 659:8, 663:22, 681:7, 681:8, 687:12, 688:5, 701:10, 708:10, 744:24, 774:12
**worker** [1] - 727:10
**works** [7] - 602:10, 630:17, 650:1, 729:5, 759:15, 773:14, 791:10
**world** [1] - 677:25
**worry** [1] - 715:17
**worst** [5] - 709:24, 710:3, 747:15, 749:9, 749:21
**worth** [1] - 640:18
**wrist** [1] - 724:21
**write** [2] - 766:4, 794:8
**written** [1] - 790:23
**wrong** [1] - 656:20
**wrongly** [2] - 704:24, 704:25
**wrote** [3] - 666:20, 693:17, 707:19

## Y

**year** [2] - 600:25, 763:18
**years** [29] - 600:16, 601:5, 625:7, 625:8, 628:9, 649:14, 668:20, 674:8, 674:10, 676:1, 676:11, 677:25, 698:25, 722:3, 726:20, 739:20, 740:4, 740:5, 755:3, 755:11, 764:21, 772:6, 772:21, 772:23, 773:6, 773:8, 774:13, 775:10, 789:19
**yesterday** [1] - 599:24
**YING** [1] - 597:18
**YORK** [1] - 597:1
**York** [11] - 597:4, 597:16, 597:21, 602:1, 647:14, 647:15, 720:1, 723:13, 724:5, 727:13, 755:17
**young** [3] - 611:14, 677:22, 677:24
**youngest** [2] - 783:10, 783:11
**yourself** [1] - 600:21